UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

UNITED STATES OF AMERICA,                                    :

                                                             :          S16 17 CR. 630 (ER)

          -against-

                                                             :

KARL SEBASTIAN GREENWOOD,

                                                             :

                    *Defendant.*

-----------------------------------------------------------------------X

# KARL SEBASTIAN GREENWOOD'S REQUEST THAT THE COURT COMPUTE THE SENTENCING GUIDELINES BASED ON U.S. CRIMINAL CONDUCT

JUSTIN S. WEDDLE
JULIA I. CATANIA
BRIAN WITTHUHN
WEDDLE LAW PLLC
250 West 55th Street
30th Floor
New York, NY 10019
(212) 997-5518
jweddle@weddlelaw.com

HOWARD LEADER
534 West 112th Street
New York, NY 10025
(646) 533-7696
howard.leader@gmail.com

*Attorneys for Karl Sebastian Greenwood*

January 25, 2023

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................... 1

BACKGROUND ............................................................................................. 1

ARGUMENT ................................................................................................. 3

I.   The Guidelines Analysis Must Be Based on Only U.S. Criminal Conduct ........... 3

    A.   The Second Circuit's Rule Against Foreign Conduct in *Azeem* ...................... 3

    B.   The Sophisticated Means Enhancement in the Fraud Guidelines Confirms *Azeem*'s Rule .......................................................................................... 8

    C.   There Is Nothing Inextricable About Separating U.S. Criminal Conduct from Foreign Conduct ..................................................................... 10

II.  Fundamental Principles Support *Azeem*'s Conclusion That Foreign Conduct Is Not Encompassed in the Guidelines Offense Level Analysis .............................. 15

    A.   Federal Law Is Presumed Not to Have Extraterritorial Reach ................... 15

    B.   The Charges to Which Mr. Greenwood Pled Guilty Reach Domestic, Not Foreign, Conduct ................................................................................ 18

    C.   U.S. Courts Do Not Enforce the Penal Laws of Other Sovereigns ............... 21

CONCLUSION .............................................................................................. 25

TABLE OF AUTHORITIES

## Cases

*Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
  268 F.3d 103 (2d Cir. 2001) ......................................................................... 24

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 398 (1964) ...................................................................................... 25

Decision and Order, *United States v. Boustani*,
  No. 18 Cr. 681, ECF 231 (WFK) (E.D.N.Y. Oct. 3, 2019) ........................ 29

*Eur. Cmty. v. RJR Nabisco, Inc.*,
  764 F.3d 129 (2d Cir. 2014) ......................................................................... 21

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013) ...................................................................................... 18

*Moore v. Mitchell*,
  30 F.2d 600 (2d Cir. 1929) ........................................................................... 25

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010) ........................................................................... 17, 18, 20

*RJR Nabisco, Inc. v. Eur. Cmty.*,
  579 U.S. 325 (2016) ...................................................................................... 23

*United States v. All Assets Held at Bank Julius Baer*,
  251 F. Supp. 3d 82 (D.D.C. 2017) ............................................................... 23

*United States v. Allen*,
  864 F.3d 63 (2d Cir. 2017) ........................................................................... 28

*United States v. Azeem*,
  946 F.2d 13 (2d Cir. 1991) ................................................................. 1, 3, 4, 5

*United States v. Bowman*,
  260 U.S. 94 (1922) ........................................................................................ 19

*United States v. Chunza-Plazas*,
  45 F.3d 51 (2d Cir. 1995) ........................................................................... 6, 7

*United States v. Connolly*,
    24 F.4th 821 (2d Cir. 2022) ....................................................................... 28

*United States v. Dawn*,
    129 F.3d 878 (7th Cir. 1997) ................................................................ 12, 13

*United States v. Elbaz*,
    52 F.4th 593 (4th Cir. 2022) ...................................................................... 16

*United States v. Farouil*,
    124 F.3d 838 (7th Cir. 1997) ......................................................... 12, 14, 15

*United States v. Federative Republic of Brazil*,
    748 F.3d 86 (2d Cir. 2014) ........................................................................ 25

*United States v. Greer*,
    285 F.3d 158 (2d Cir. 2002) ..................................................................... 8, 9

*United States v. Hawit*,
    2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ............................................. 21

*United States v. Khododad*,
    122 F.3d 1058, 1995 WL 595073 (2d Cir. Sept. 12, 1995) ..................... 7, 8

*United States v. Levario-Quiroz*,
    161 F.3d 903 (5th Cir. 1998) ...................................................................... 5

*United States v. Napout*,
    963 F.3d 163 (2d Cir. 2018) ..................................................................... 21

*United States v. Parkins*,
    935 F.3d 63 (2d Cir. 2019) ....................................................................... 16

*United States v. Teyer*,
    322 F. Supp. 2d 359 (S.D.N.Y. 2004) ................................................ 12, 15

*United States v. Tokhtakhounov*,
    607 F. App'x 8 (2d Cir. 2015) ................................................................... 14

*United States v. Turner*,
    624 F. Supp. 2d 206 (E.D.N.Y. 2009) ..................................... 11, 12, 14, 16

*United States v. Vilar*,
  729 F.3d 62 (2d Cir. 2013) ................................................................... 18, 19

*United States v. Weingarten*,
  632 F.3d 60 (2d Cir. 2011) ................................................................... 19, 20

*Wisconsin v. Pelican Ins. Co.*,
  127 U.S. 265 (1888) ................................................................................... 24

**Statutes**

18 U.S.C § 1956(f) ................................................................................... 19, 20

Telemarketing Fraud Prevention Act of 1998,
  Pub. L. No. 184, 112 Stat. 520 (1998) ........................................................ 9

**Other Authorities**

Federal Sentencing Guidelines Manual Amendment 577 (effective Nov. 1, 1998)... 10

George Osborne, U.K. Chancellor of the Exchequer, to Ben Bernanke, Chairman,
  U.S Fed. Reserve Sys. (Sept. 10, 2014), *reprinted in* Republican Staff of H. Comm.
  on Fin. Servs., 114th Cong., *Too Big to Jail: Inside the Obama Justice
  Department's Decision Not to Hold Wall Street Accountable* 42-43 (2016) ........... 22

Michael Stothard et al., *Paris Trade Talks Threat over US BNP Fine*, Fin. Times
  (June 3, 2014) ........................................................................................... 23

Mot. to Dismiss the Indictment (June 17, 2019), *United States v. Boustani*, No. 18
  Cr. 681 (WFK) (E.D.N.Y.) ........................................................................ 24

Paul Blake, *FIFA Scandal: Why The U.S. is Policing a Global Game*, BBC (May 28,
  2015) ...................................................................................................... 23

Sentencing Transcript (March 10, 2016), *United States v. Allen*, 14 Cr. 272, ECF
  242 (S.D.N.Y.) ........................................................................................ 24

Stewart Bishop, *Boustani Acquitted in $2B Mozambique Loan Fraud Case*, Law360
  (Dec. 2, 2019, 12:49 PM EST) ................................................................... 25

Transcript of Oral Argument at 2:14 – 3:23 (Jan. 26, 2017), *United States v. Allen*,
  Nos. 16 Cr. 898, 16 Cr. 939 (2d Cir.) ........................................................ 23

United States' Sentencing Memorandum at 8 (March 3, 2016), *United States v. Allen*, 14 Cr. 272, ECF 225 (S.D.N.Y.) ...................................................................24

**Regulations**

U.S.S.G. § 2B1.1(b)(10) ...............................................................................................9

PRELIMINARY STATEMENT

Clear binding authority of the Second Circuit establishes that, except with narrow, explicit exceptions inapplicable here, the Sentencing Guidelines analysis should be conducted using U.S. criminal conduct, not U.S. and foreign conduct. *See United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991). This authority dovetails with two established principles of American law—(i) that statutes are presumed to have only domestic, not extraterritorial, reach, and (ii) that courts do not enforce the penal laws of other sovereigns. The charges to which Mr. Greenwood has pled guilty have domestic, not extraterritorial reach. Thus, a proper application of the law pursuant to *Azeem* requires that the Guidelines analysis, likewise, have domestic, not extraterritorial reach, lest the Court, in effect, impose punishment for extraterritorial conduct that is not criminal under these domestic laws, or, equally invalid, impose punishment for foreign crimes in this Court. Accordingly, we request that the Court issue an order confirming that it will conduct its Guidelines analysis based only on U.S. criminal conduct—i.e., evidence of defrauded U.S.-based OneCoin investors, evidence of the laundering of U.S.-sourced criminal proceeds, or evidence of fraudulent conduct perpetrated within the United States in which Mr. Greenwood participated.

BACKGROUND

On December 16, 2022, Karl Sebastian Greenwood waived indictment and pled guilty to a superseding information filed the same day charging him with three counts: conspiracy to commit wire fraud, pursuant to 18 U.S.C. § 1349, wire fraud,

1

pursuant to 18 U.S.C. §§ 1343 and 2, and conspiracy to commit money laundering, pursuant to 18 U.S.C. § 1956. *See* ECF 510 and 511.

At the plea proceeding, Mr. Greenwood proposed that the Court organize the resolution of the remaining issues in the case in a three-step process. *First*, the Court should determine whether the Guidelines calculation should be applied to U.S.-targeted and U.S.-based conduct, or to worldwide conduct. *Second*, after determining this legal issue, the Court should establish a schedule and procedure for applying its legal determination to the evidence to be presented by the prosecution. *Third*, the Court should establish a schedule for the parties to make submissions regarding the sentencing factors set forth in 18 U.S.C. § 3553(a) and conduct a sentencing. The Court agreed with this proposal and scheduled briefing on the initial legal question of the applicability, or not, of foreign criminal conduct to the Guidelines analysis in this case.

The prosecution's public statements, and the Information, have alleged a general "OneCoin fraud," and claimed that this fraud resulted in "the receipt of over $1 billion of investor funds into OneCoin-related bank accounts." *See* Information at ¶¶ 2, 3.[1] The prosecution's allegations are based on worldwide OneCoin purchases, not OneCoin purchases that came from U.S. victims. As the Court is aware from post-trial briefing in the Mark Scott case, the trial evidence relating to U.S.-targeted conduct was more limited—the prosecution called two U.S. victims, who collectively

---

[1] These claims have not been proven. The only trial that has taken place in this case is the trial of Mark Scott in which the jury was not asked to decide the amount of funds at stake.

spent $54,000 on OneCoin-related purchases. Moreover, we anticipate that the evidence will show that OneCoin only operated in the U.S. market temporarily starting in July 2015. The evidence presented so far does not suggest anything near a ten-figure U.S. OneCoin market.

ARGUMENT

## I.  THE GUIDELINES ANALYSIS MUST BE BASED ON ONLY U.S. CRIMINAL CONDUCT

Clear Second Circuit authority, based on the plain meaning of the Sentencing Guidelines and sound policy, states that the Guidelines analysis must be based on U.S. criminal conduct, not U.S. and foreign criminal conduct.

### A.  The Second Circuit's Rule Against Foreign Conduct in *Azeem*

The Second Circuit's decision in *United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991), precludes using foreign criminal conduct to increase the Guidelines offense level—the offense level must be based on U.S. criminal conduct. In *Azeem*, the Second Circuit reversed and remanded for resentencing to correct a district court's erroneous calculation of the Guidelines based on heroin trafficking to the United States and Egypt. *Id.* at 18. Azeem and largely the same accomplices trafficked one kilogram of heroin from Pakistan into New York and another three kilograms into Cairo. *Id.* at 14-15. In applying Section 1B1.3, which establishes the relevant conduct used to determine the Guidelines range, the district court included all of the drugs trafficked into both New York and Egypt. *Id*. On appeal, the defendant argued that the sentencing court should not have included the Egypt transaction "because 1) it was not part of the same crime and 2) it was not a crime against the United States." *Id*.

3

at 15. The Second Circuit rejected the first argument, finding that both drug transactions—i.e., drugs trafficked into Cairo *and* New York—comprised the same course of conduct. *Id*. at 16.

As to the defendant's second argument, however, the Court "agree[d] that the Cairo transaction should not have been included in the base offense level calculation because it was not a crime against the United States." *Id*. at 16. Accordingly, the Second Circuit held that the district court should have calculated the Guidelines range based only on the one kilogram imported into New York, without factoring in the three kilograms imported into Egypt, even though they were part of the same scheme. *Id*. at 16-17.

In reaching this conclusion, the Second Circuit used as its "starting point" the "language of the Sentencing Guidelines themselves." *Id*. at 17. The Court explained that Section 1B1.3(a)(2) of the Guidelines "is broadly worded to include 'all such acts and omissions that were part of the same course of conduct or common scheme or plan,' but does not explicitly address the issue of foreign crimes and activities." *Id*. (quoting U.S.S.G. § 1B1.3(a)(2)). "However, the Guidelines elsewhere note that foreign *sentences* may not be used in computing a defendant's criminal history category," but may be used for upward departures. *Id*. (emphasis in original) (referring to U.S.S.G. §§ 4A1.2(h), 4A1.3(a)). The Court reasoned that the Guidelines' intentional choice explicitly to reference foreign crimes in some places but not in others demonstrates that the silence in Section 1B1.3(a)(2) as to foreign crimes indicates that foreign criminal conduct should *not* be included in base offense levels.

*Id.* ("From these provisions, it follows that Congress, while it has not remained entirely silent, has chosen to assign to foreign crimes a rather limited role.").

In addition to its dispositive textual interpretation, the Second Circuit explained sound policy reasons for its conclusion. It explained that courts should "avoid creating a new use for foreign crimes in sentencing." *Azeem*, 946 F.3d at 17. If U.S. courts did otherwise, they would have "to perform a careful comparative analysis of foreign and domestic law" to determine whether foreign conduct was criminal under domestic law, foreign law, both, or neither. *Id.* Furthermore, "[w]ere a global approach required, we would soon find it necessary to determine the appropriate evidence that must be produced by the prosecution to show that the activity occurred and that it violated foreign law," and courts would quickly wade into a morass when confronted with foreign arrests that may have been unconstitutionally obtained under United States law. *Id.* Thus, "[w]ithout a clear mandate from Congress, [the Court] decline[d] to create the complexities that the inclusion of foreign crimes in the base offense level calculation would generate." *Id.* at 18.

*Azeem*'s rule applies to offense levels generally, even though *Azeem* involved narcotics offenses, because it rests on an interpretation of Section 1B1.3, which pertains to every offense's Guidelines calculation. *See id.* at 17.[2] Specifically, *Azeem*'s textual analysis compared Section 1B1.3 of the General Application Principles of the

---

[2] *See also United States v. Levario-Quiroz*, 161 F.3d 903, 906 (5th Cir. 1998) (holding that "relevant conduct" for a defendant convicted of illegal entry and illegal importation of a firearm did not include criminal conduct in Mexico immediately preceding the illegal entry and importation; the defendant killed a man and then engaged in a firefight with Mexican law enforcement as he fled across the Rio Grande river).

5

Guidelines, which provides no language incorporating foreign criminal conduct into offense level computations, with Sections 4A1.2 and 4A1.3 (general provisions on computing criminal history and a policy statement regarding departures based on the inadequacy of the criminal history category), which expressly *do* incorporate foreign criminal *sentences* in certain circumstances that are inapplicable here. The Court's determination that the Guidelines' incorporation of foreign sentences in some contexts precluded incorporating foreign conduct elsewhere was thus a determination that applied to the Guidelines generally.

Indeed, in *United States v. Chunza-Plazas*, 45 F.3d 51 (2d Cir. 1995), the Second Circuit applied the rule of *Azeem* in a case involving fraudulent documents. The defendant was a former Colombian police officer who retired to New York City, where he was arrested and convicted of possessing fraudulent alien-registration cards—conduct carrying a Guidelines range of 0-6 months' incarceration. *Id.* at 52. At the prosecutors' request, the district court imposed a 16-level upward departure from the offense level based on evidence that the defendant, while a police officer in Colombia, had acted as a member of the Medellin cartel and committed violent and deadly acts, including assassination and terrorist acts, on behalf of Pablo Escobar and the cartel. *Id.* at 52-55. The district court imposed a sentence of five years—the statutory maximum. *Id.* at 55.

The Second Circuit reversed. "Like Azeem's Egyptian conspiracy," the Court held, "Chunza's illegal activities in Colombia were not crimes against the United States, and therefore should not be included in the guideline calculation." *Chunza-*

*Plazas*, 45 F.3d at 57. The Second Circuit followed the *Azeem* rule, therefore, regardless of whether the offense at issue was a drug crime, *and* in a circumstance in which a careful comparative law analysis was not required—the Court was "confident" that the defendant's activities in Colombia (murder and terrorist acts) were "prohibited by both domestic and Colombian law." *Id.* at 57. The Court "vacate[d] the sentencing court's upward departure from 6 months to 60 months, which was based on unrelated foreign conduct." *Id.* at 58.

The United States Attorney's Office for the Southern District of New York has itself acknowledged that including foreign losses in the calculation of the offense level is reversible error pursuant to *Azeem*. In *United States v. Khododad*, 122 F.3d 1058, 1995 WL 595073 (2d Cir. Sept. 12, 1995) (unpublished), the defendant participated in stealing an "Old Masters painting" and "numerous other valuables from his friend, Seyed Kalantari" in 1979, and was arrested when he attempted to sell the painting in New York in 1992. *Id.* at *1. He was convicted of interstate transportation of stolen property, in violation of 18 U.S.C. §§ 2314 and 2315. *Id.* The defendant argued on appeal that "the district court erred in calculating the loss attributable to his offense by considering property that was converted by him abroad and never transported into the United States," and the United States Attorney's Office "concede[d] that, in light of *United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991), a remand for resentencing is appropriate on this point." *Id.* at *3. The Second Circuit remanded for resentencing "in accordance with our decision in *Azeem*." *Id.*

7

The Second Circuit has reaffirmed the *Azeem* rule even when distinguishing its applicability. In *United States v. Greer*, 285 F.3d 158 (2d Cir. 2002), the defendants were convicted of violating the Maritime Drug Law Enforcement Act ("MDLEA"). The Second Circuit found that the sentencing court erred by excluding "98% of the hashish" found on ships in Canadian waters when determining "the defendants' relevant conduct under U.S.S.G. § 1B1.3 for purposes of calculating a base offense level." *Id*. at 179. The Court stated that, unlike in *Azeem*, "the crimes in this case are not foreign crimes; the MDLEA is a United States criminal statute that specifically covers conduct outside the United States." *Id*. at 179-80. Thus, the Court stated that its holding—that the Guidelines calculation should have included the larger quantity of drugs—was entirely "consistent with" *Azeem*. *Id*. at 179. In other words, Greer's conduct in the territorial waters of Canada were specifically covered by an expressly *extraterritorial* U.S. criminal statute, so this Canadian conduct *was* U.S. criminal conduct under that statute. Here, like *Azeem*—but unlike *Greer*—the crimes to which Mr. Greenwood pled guilty do not "specifically cover[] conduct outside the United States." *See id*. at 179-80; *infra* Point II (discussing non-extraterritoriality of wire fraud and money laundering offenses to which Mr. Greenwood pled guilty).

## B. The Sophisticated Means Enhancement in the Fraud Guidelines Confirms *Azeem*'s Rule

The enhancement within Section 2B1.1(b)(10) for "sophisticated means," which specifically references conduct "outside the United States," confirms the *Azeem* rule, since it is quite clearly designed to provide additional punishment for persons

committing crimes *targeting U.S. victims* from outside the United States. The enhancement states:

> If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) *a substantial part of a fraudulent scheme was committed from outside the United States*; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels.

U.S.S.G. § 2B1.1(b)(10) (emphasis added). The "background" to the Guidelines states that this enhancement "implements, in a broader form, the instruction to the Commission in Section 6(c)(2) of Public Law 105-184." That provision, in turn, directs the Commission to "provide an additional appropriate sentencing enhancement, if the offense involved sophisticated means, including but not limited to sophisticated concealment efforts, such as *perpetrating the offense from outside the United States*." Telemarketing Fraud Prevention Act of 1998, Pub. L. No. 184, 112 Stat. 520 (1998) (emphasis added). This provision demonstrates that Congress understood that the Guidelines offense level does not include foreign criminal conduct that does not target U.S. victims. If Congress instead contemplated that the Guidelines offense level included foreign criminal conduct, it would have omitted the word "from" and simply stated "perpetrating the offense ~~from~~ outside the United States." The use of the word

"from" establishes that the conduct targeted by the Guidelines is directional—i.e., conduct occurring *from* outside the United States, *targeting* the United States.[3]

## C. There Is Nothing Inextricable About Separating U.S. Criminal Conduct from Foreign Conduct

In certain out-of-circuit cases, and in at least one district court case in this Circuit, prosecutors have attempted to avoid the clear rule of *Azeem* by arguing that U.S. and foreign criminal conduct is "inextricably intertwined." Even if *Azeem* admitted of such an exception—it does not—there is nothing inextricable about separating the OneCoin fraud into U.S. criminal conduct and non-U.S. conduct. Indeed, Judge Hurley in the Eastern District of New York rejected just such an argument in sentencing a defendant for a financial fraud. In *United States v. Turner*, 624 F. Supp. 2d 206 (E.D.N.Y. 2009), the court applied the *Azeem* rule in a wire fraud case in which the defendant, while operating in Australia and the Bahamas, targeted U.S. and non-U.S. victims. *Id*. at 209-10. The government alleged that Turner defrauded sixty victims (almost all of whom were in foreign countries) of about $55 million globally. *Id*. At sentencing, the government argued that because the

---

[3] Moreover, the Sentencing Commission provided the following "Reason for the Amendment" for the original version of the enhancement, which likewise reveals it was designed to increase punishment for foreign conduct *targeting U.S. victims*:

> [T]he Commission has been informed that fraudulent telemarketers increasingly are conducting their operations from Canada and other locations outside the United States. Additionally, testimony offered at a Commission hearing on telemarketing fraud indicated that telemarketers often relocate their schemes to other jurisdictions once they know or suspect that enforcement authorities have discovered the scheme. Both types of conduct are specifically covered by the new enhancement.

Federal Sentencing Guidelines Manual Amendment 577 (effective Nov. 1, 1998).

defendant's domestic and foreign conduct constituted a single, "inextricably intertwined" scheme, the foreign conduct counted under Section 1B1.3. *Id.* at 215-16. The court rejected that position and found that Turner should be punished only for his crimes against the United States, which entailed only three victims and about $3.98 million in losses from the fraud. *Id.* It explained, "In sum, *Chunza-Plazas*, like *Azeem*, instructs that foreign conduct not constituting crimes against the United States should not be considered for purposes of calculating the guideline range for the counts of conviction." *Id.* at 218. As the *Turner* decision makes clear, there was nothing "inextricably intertwined" about a financial fraud case targeting foreign and U.S. victims such that the U.S. losses could not be isolated and used to calculate the Guidelines range. *Id.* at 221. They were readily extricable, as they are here.

Moreover, the Seventh Circuit cases upon which the prosecution relied in *Turner* to argue that foreign victims should be included in the Guidelines calculation are either consistent with *Azeem*, or to the extent they are not, are not binding and distinguishable. They no more support the inclusion of foreign conduct or victims here than they did in *Turner*, as Judge Hurley explained. *Id.* at 218-22 (discussing *United States v. Dawn*, 129 F.3d 878 (7th Cir. 1997); *United States v. Farouil*, 124 F.3d 838 (7th Cir. 1997); and *United States v. Teyer*, 322 F. Supp. 2d 359 (S.D.N.Y. 2004), *reversed on other grounds by United States v. Magana*, 147 F. App'x 200 (2d Cir. June 14, 2005) (*Crosby* remand)).

In *Dawn*, the Seventh Circuit questioned the correctness of *Azeem*'s clear rule, 129 F.3d at 885 n.11, but nevertheless stated that *Azeem* and *Chunza-Plazas* were

distinguishable and consistent with the child-pornography sentence imposed there under the unique facts of that case. In *Dawn*, the defendant was a U.S. citizen who filmed sexual conduct involving himself and "street children in Honduras, who had lived with Dawn in his home there while he was employed as a primary school teacher." *Id.* at 880; *see id.* at 883 (indicating that Dawn is an American citizen). Although he filmed the activity in Honduras, the film was developed in the United States after Dawn transported it here. *Id.* at 881. Dawn was convicted of receiving and possessing this child pornography. *Id.* at 879-80. The district court applied the offense level enhancements of Section 2G2.1, which governs sexually exploiting minors and is cross-referenced in Sections 2G2.2, the section applicable to possessing and receiving child pornography. The Seventh Circuit affirmed, finding:

> In this case, however, Dawn's exploitation of minors in Honduras created the very pornography that he received and possessed here in the United States. In a literal sense, then, Dawn's domestic offenses were the direct result of his relevant conduct abroad; pragmatically speaking, they are inextricable from one another.

*Id.* at 885. The Seventh Circuit expressly found *Dawn* to be distinguishable from *Azeem* and *Chunza-Plazas* in this way and stated that its holding did not conflict with that "line of authority" of the Second Circuit. *Id.*

Despite *Dawn*'s statements to the contrary, it appears to conflict with binding Second Circuit authority and should be disregarded for that reason. In any event, there is nothing about the facts here that is "inextricable" in the way that the Seventh Circuit found Dawn's conduct—personally exploiting minors to create child pornography, which he filmed in Honduras but developed in the United States—to

12

be. As *Turner* demonstrates, "*Dawn* provides scant, if any, aid to the prosecution" not only because it appears to conflict with *Azeem*, but also because nothing about the U.S. criminal conduct at issue in *Turner* (or here) was the "direct result" of fraud conducted abroad and targeting foreign victims. *Turner*, 624 F. Supp. 2d at 221.

In *Farouil*, the defendant was convicted of importing heroin into the United States in violation of 21 U.S.C. § 952(a). *Farouil*, 124 F.3d at 840. Farouil argued that the district court erred in attributing to him, for sentencing purposes, the drugs that were seized from a co-conspirator arrested in Belgium and intercepted *before* arriving in the United States. *Id.* at 844. The Seventh Circuit disagreed and reasoned that because the intercepted drugs were part of the scheme to import drugs *into the United States*, the criminal conduct was directed at the United States and thus includable in the Guidelines calculation as U.S. criminal conduct. *Id.*; *see also United States v. Tokhtakhounov*, 607 F. App'x 8, 14-15 (2d Cir. 2015) (summary order) (finding that a leadership role enhancement was properly applied to the New York defendant who supervised bookies operating in Ukraine and Russia, because the money collected by these bookies was passed to the defendant, who used it to place bets in New York as part of his gambling and RICO operation). The Seventh Circuit expressly found *Farouil* to be distinguishable from *Azeem* and *Chunza-Plazas* because the foreign conduct at issue targeted the United States. *Farouil*, 124 F.3d at 844-45.

In *Teyer*, the defendant pled guilty to conspiracy to import cocaine into the United States and using a firearm during and in relation to a drug trafficking crime. *Teyer*, 322 F. Supp. 2d at 376. The sentencing court applied a two-level enhancement

under Section 3C1.1 because the defendant, while incarcerated in Belize and facing extradition to the United States, attempted to bribe officials in Belize. *Id*. at 366-67. The Southern District of New York interpreted Torres-Teyer's attempted bribery scheme to be an attempt "to obstruct Belizean and United States justice in connection with" his United States prosecution, and thus permitted the enhancement. *Id*. at 366. As Judge Hurley aptly explained in *Turner*, *Teyer* means:

> (1) [T]hat if a defendant engages in foreign conduct which is closely intertwined with the count or counts of conviction, and was intended to impede a United States investigation and/or prosecution, he or she is appropriately saddled with a 2 level § 3C1.1 enhancement, and (2) nothing in *Azeem* or *Chunza-Plazas* dictates a contrary result.

*Turner*, 624 F. Supp. 2d at 218-19 (discussing *Teyer*, 322 F. Supp. 2d at 367).[4]

Thus, *Farouil* and *Teyer* stand for the unremarkable proposition—consistent with *Azeem* and *Chunza-Plaza*s—that U.S.-targeted conduct can be relevant to a defendant's base offense level. Here, such U.S.-targeted conduct includes only U.S.

---

[4] The Fourth Circuit in *United States v. Elbaz*, 52 F.4th 593, 608-09 (4th Cir. 2022), recently declined to reach the question of whether the district court impermissibly considered foreign conduct for sentencing purposes, deciding instead that any error was harmless because the district court would have given the same sentence regardless of the applicable Guidelines range. In a portion of its decision that the Fourth Circuit openly acknowledged constituted conjecture, the Court wrote:

> As we have already noted, Elbaz's purely foreign conduct was not a violation of U.S. criminal law. It is also unclear on the record before us whether Elbaz's foreign conduct was "criminal conduct" in a foreign jurisdiction. So if § 1B1.3's broad language has an implicit limitation, as we have sometimes stated, the district court might have erred when it considered losses from purely foreign conduct when setting its initial sentencing range.

*Id*. at 609. *Elbaz*'s dicta demonstrates the wisdom of the *Azeem* rule. *See Azeem*, 946 F.2d at 17-18 ("[W]e decline to create the complexities that the inclusion of foreign crimes in the base offense level calculation would generate.").

victims and the laundering of the proceeds of fraud targeting U.S. victims, not foreign criminal conduct.[5]

## II. FUNDAMENTAL PRINCIPLES SUPPORT *AZEEM*'S CONCLUSION THAT FOREIGN CONDUCT IS NOT ENCOMPASSED IN THE GUIDELINES OFFENSE LEVEL ANALYSIS

*Azeem*'s unambiguous holding that foreign conduct is not considered in the Guidelines offense level analysis is reinforced by the presumption against extraterritoriality in American federal law, the fact that the crimes at issue here are not extraterritorial, and the established principle that the United States must not enforce the penal laws of a foreign sovereign. Where the law and policy considerations perfectly align—as they do here—the only conclusion is that Mr. Greenwood's Guidelines offense level should be based on U.S. criminal conduct, not on foreign conduct directed at foreign purchasers of OneCoin.

### A. Federal Law Is Presumed Not to Have Extraterritorial Reach

In *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), the Supreme Court, in deciding whether Section 10(b) of the Securities Exchange Act of 1934 provides foreign plaintiffs a cause of action to sue foreign and American defendants, reaffirmed that "[i]t is a 'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Id.* at 255 (quoting *EEOC v. Arabian*

---

[5] If there were some ambiguity in the Guidelines about whether offense levels should be determined based on foreign criminal conduct—there is not, as demonstrated by the plain meaning and the rule of *Azeem* and *Chunza-Plazas*—the rule of lenity would dictate that any such ambiguity should be resolved in Mr. Greenwood's favor. *United States v. Parkins*, 935 F.3d 63, 66 (2d Cir. 2019) ("That principle—the rule of lenity—applies to the Sentencing Guidelines.").

*American Oil Co.*, 499 U.S. 244, 248 (1991)). This presumption against extraterritoriality "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign, matters." *Id*. The result is that without an "affirmative intention of the Congress clearly expressed," a statute does not have extraterritorial effect. *Id*.

Thus, there can be no uncertainty in American law about whether fraudulent schemes involving conduct and effects abroad should be policed and punished in U.S. courts—they should not. An attempt to do so lures courts into "produc[ing] a collection of tests for divining what Congress would have wanted, complex in formulation and unpredictable in application." *Id*. at 255-56. *Morrison*'s remedy for this error is simple: "Rather than guess anew in each case, *we apply the presumption in all cases*, preserving a stable background against which Congress can legislate with predictable effects." *Id*. at 261 (emphasis added); *see also Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013) (holding that the Alien Tort Statute is not extraterritorial and that the "canon of statutory interpretation" that U.S. laws do not have extraterritorial reach "reflects the 'presumption that United States law governs domestically but does not rule the world.'" (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007))).

Since *Morrison*, the Second Circuit has enforced the presumption against extraterritoriality in all cases. For example, in *United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013), which reviewed securities fraud convictions for violations of Section 10(b) and Rule 10b-5, the Second Circuit rejected the prosecutors' argument seeking to

limit the presumption against extraterritoriality to civil laws, and held that the presumption applies equally to criminal laws. *Id*. at 72. It explained that the prosecutors' reliance on *United States v. Bowman*, 260 U.S. 94 (1922),[6] was wrong, stating that "no plausible interpretation of *Bowman* supports [the prosecutors'] broad proposition; fairly read, *Bowman* stands for quite the opposite." *Id*. at 73-74. In so holding, the Second Circuit confirmed the expanse and significance of the presumption against extraterritoriality, explaining that "the presumption 'serves to protect against unintended clashes between our laws and those of other nations which could result in international discord.'" *Id*. at 74 (quoting *Kiobel*, 569 U.S. at 115). Thus, the Court "discern[ed] no reason that these concerns are less pertinent in the criminal context." *Id*. at 72 (emphasis added).

In addition, in *United States v. Weingarten*, 632 F.3d 60 (2d Cir. 2011), the Second Circuit—in reviewing a conviction for transportation of a minor with intent to engage in criminal sexual activity and travel with intent to engage in illicit sexual conduct—applied the presumption against extraterritoriality and reversed in part. *Id*. at 61. The Court held that the statute prohibiting travel with the intent to engage in illicit sexual conduct does not reach travel "occurring wholly between two foreign countries and without any territorial nexus to the United States." *Id*. at 71. Thus,

---

[6] In *Bowman*, the Supreme Court reviewed whether criminal charges for conspiracy to defraud a company owned by the United States could be brought against sailors who committed their crimes while at sea. *Bowman*, 260 U.S. at 95-96. The Court held that the presumption against extraterritoriality does not apply to criminal statutes that "*are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents.*" *Id*. (emphasis in original); *see Vilar*, 729 F.3d at 73 (explaining *Bowman*'s limited scope). The charges here do not involve "the right of the government to defend itself."

even in the face of heinous violent crimes, the Court applied the clear presumption against extraterritoriality. *Id*. at 64. The Court affirmed the defendant's conviction on the counts that it concluded had a "nexus" to the United States, as permitted and envisioned by the statute of conviction, 18 U.S.C. § 2423. *Id*. at 64.

**B.   The Charges to Which Mr. Greenwood Pled Guilty Reach Domestic, Not Foreign, Conduct**

All of the charges to which Mr. Greenwood pled guilty are domestic, not extraterritorial in reach. *Morrison* instructed that the test of whether a statute applies extraterritorially is not whether the activity "lacks all contact with the territory of the United States." *Morrison*, 561 U.S. at 266. The Court explained, "it is a rare case of prohibited extraterritorial application that lacks all contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case." *Id*. Instead, the Court held that a statute must affirmatively indicate extraterritorial reach in order to cover foreign conduct. *Id*. at 255.

Because the wire fraud statute does not provide an affirmative indication that the statute applies extraterritorially, the Second Circuit has held that it is a purely domestic law. In *Eur. Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014), *rev'd on other grounds*, 579 U.S. 325 (2016), the Second Circuit analyzed 18 U.S.C. § 1343 and concluded that it did not "overcome *Morrison*'s presumption against extraterritoriality," and instead reached only U.S. domestic conduct. *Id*. at 140-41; *see also United States v. Hawit*, 2017 WL 663542, at *4 (E.D.N.Y. Feb. 17, 2017) ("As

18

the parties recognize, the federal wire fraud statute, 18 U.S.C. § 1343, does not apply extraterritorially."). Moreover, "the extraterritorial reach of an ancillary offense [such as] . . . conspiracy is coterminous with that of the underlying criminal statute." *United States v. Napout*, 963 F.3d 163, 179 (2d Cir. 2018) (quoting *United States v. Hoskins*, 902 F.3d 69, 96 (2d Cir. 2018)). Thus, the conspiracy to commit wire fraud statute also has purely domestic reach.

The text of the money laundering statute with which Mr. Greenwood was charged, 18 U.S.C. § 1956, provides an express provision governing (and limiting) extraterritorial reach. Section 1956 provides for extraterritorial jurisdiction where "(1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000." 18 U.S.C § 1956(f). Thus, the relevant inquiry is whether "the conduct occur[ed] in part in the United States," because Mr. Greenwood is not a U.S. citizen,[7] and the funds at issue have a value exceeding $10,000. Here, the "conduct," identified and charged as the specified-unlawful-activity predicate is the domestic wire fraud. *See* Information at ¶ 5 (". . . would and did conduct . . . such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the proceeds of the wire-fraud scheme alleged in Counts One and Two of this

---

[7] Indeed, we anticipate that the evidence will show that Mr. Greenwood is a dual U.K.-Swedish citizen who was arrested and incarcerated in Thailand before being extradited to the United States, where he has remained in custody since the date of his arrival in 2018. We anticipate that the evidence will show few, if any, times that Mr. Greenwood set foot in the United States prior to his extradition.

Information . . . ."); ¶ 7 (". . . with the intent to promote the carrying on of specified unlawful activity, to wit, the wire-fraud scheme alleged in Counts One and Two of this Information . . .").

In other words, the terms of Section 1956(f), combined with the limits of the applicable charges, demonstrate that the only money laundering conspiracy charged is a conspiracy intended to launder "proceeds" of the charged specified unlawful activity—i.e., the domestic wire fraud. The money laundering charge therefore only reaches financial transactions involving these domestic proceeds and occurring "in part in the United States." *See* 18 U.S.C. § 1956(f); *see, e.g.*, *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 339 (2016) (finding that the RICO statute can apply extraterritorially only to the extent the predicate offenses alleged in the specific case themselves apply extraterritorially); *United States v. All Assets Held at Bank Julius Baer*, 251 F. Supp. 3d 82, 91 (D.D.C. 2017) (finding that civil forfeiture under Section 981(a)(1)(A), which lists as its predicate acts "specified activity" as defined in the money laundering statutes of Sections 1956 and 1957, applied extraterritorially "to the extent that the underlying criminal statute or the specified unlawful activity applies to conduct abroad.").

Thus, only domestic conduct is relevant to Mr. Greenwood's U.S.-based prosecution for U.S. crimes.

## C.  U.S. Courts Do Not Enforce the Penal Laws of Other Sovereigns

The second established principle that supports the *Azeem* rule is that U.S. courts do not enforce the penal laws of other sovereigns. As stated in 1888 by the Supreme Court:

> By the law of England and of the United States the penal laws of a country do not reach beyond its own territory except when extended by express treaty or statute to offenses committed abroad by its own citizens; and they must be administered in its own courts only, and cannot be enforced by the courts of another country. Wheat. Int. Law, (8th Ed.) §§ 113, 121. Chief Justice MARSHALL stated the rule in the most condensed form, as an incontrovertible maxim, 'the courts of no country execute the penal laws of another.' *The Antelope*, 10 Wheat. 66, 123.

*Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 289-90 (1888), *overruled on other grounds by Milwaukee Cnty. v. M.E. White Co.*, 296 U.S. 268 (1935). This principle (and a related one—the revenue rule)[8] have "been defended on several grounds, including respect for sovereignty, concern for judicial role and competence, and separation of powers." *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 109 (2d Cir. 2001). Judge Learned Hand explained as follows:

> To pass upon the provisions for the public order of another state is, or at any rate should be, beyond the powers of a court; it involves the relations between the states themselves, with which courts are incompetent to deal, and which are intrusted to other authorities. It may commit the domestic state to a position which would seriously embarrass its neighbor.

---

[8] The revenue rule originated from "a longstanding common law doctrine providing that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns." *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 109 (2d Cir. 2001).

*Moore v. Mitchell,* 30 F.2d 600, 604 (2d Cir. 1929) (L. Hand, J., concurring).

Case law in the Supreme Court and this Circuit recognizes the endurance and significance of this rule in the international context. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 413-14 (1964) (acknowledging the principle "that a court need not give effect to the penal or revenue laws of foreign countries"); *United States v. Federative Republic of Brazil*, 748 F.3d 86, 92 (2d Cir. 2014) ("Recognizing the pronouncement of criminal rules to be a significant expression of national sovereignty, 'the common law' had thus long understood 'that acts were punished as crimes only by the state or nation whose laws were violated.'" (quoting Robert A. Leflar, Note, *Extrastate Enforcement of Penal and Governmental Claims*, 46 Harv. L. Rev. 193, 195 (1932))).

Even where criminal prosecutions are domestic, but appear to penalize foreign conduct, they risk harming international relations, as reflected in public perception and common sense. For example, the U.S. prosecutions of British banks for AML violations and violations of U.S. sanctions against Iran resulted in high level complaints by the British government that it was being "unfairly targeted" and subjected to excessive and biased sanctions that were inconsistent with prior U.S. practice. George Osborne, U.K. Chancellor of the Exchequer, to Ben Bernanke, Chairman, U.S Fed. Reserve Sys. (Sept. 10, 2014), *reprinted in* Republican Staff of H. Comm. on Fin. Servs., 114th Cong., *Too Big to Jail: Inside the Obama Justice Department's Decision Not to Hold Wall Street Accountable* 42-43 (2016). In France, the sentiment was similar in response to U.S. enforcement action against French

banks relating to sanctions violations. The Financial Times reported that the highest levels of French government found the U.S. prosecutions and fines of French banks to be "completely unreasonable," "unilateral," and "disproportionate." Michael Stothard et al., *Paris Trade Talks Threat over US BNP Fine*, Fin. Times (June 3, 2014).[9] The FIFA prosecutions caused similar international discord. *See* Paul Blake, *FIFA Scandal: Why The U.S. is Policing a Global Game*, BBC (May 28, 2015) ("America does not even like football, or so many people think. Why is it leading the charge against alleged Fifa corruption?").[10]

This international friction is echoed by domestic concern. When the first LIBOR-related conviction reached the Second Circuit, Judge Cabranes opened the oral argument by stating:

> The general public, as well as the court, are entitled to understand how and why this prosecution was undertaken, or any prosecution was undertaken. And this is an unusual and complicated case where the two defendants are U.K. nationals, they are young and relatively low-level employees, and they worked in London for a Dutch bank which may be a household name in Den Haag but not in my parochial American world. . . . Now, all of this is a puzzlement to me, and interesting, at least, so maybe you can give us a description of what was going on here . . . I know you're geared up with large questions of statutory construction and constitutional issues, all of which we'll hear, but we want to get a little context here.

Transcript of Oral Argument at 2:14 – 3:23 (Jan. 26, 2017), *United States v. Allen*, Nos. 16 Cr. 898, 16 Cr. 939 (2d Cir.). These convictions were reversed on other

---

[9] Available at https://perma.cc/2G7W-QC7V.

[10] Available at https://www.bbc.com/news/world-us-canada-32889845.

grounds, as were other LIBOR convictions. *See United States v. Allen,* 864 F.3d 63 (2d Cir. 2017); *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022).[11]

The same intuition is also shared by jurors. In *United States v. Boustani*, No. 18 Cr. 681 (WFK) (E.D.N.Y.), in which the defendant was charged with securities fraud conspiracy, wire fraud conspiracy, and money laundering conspiracy, the defense sought dismissal for lack of any relation to the United States. *See* Mot. to Dismiss the Indictment at 1 (June 17, 2019), *United States v. Boustani*, No. 18 Cr. 681 (WFK) (E.D.N.Y.) (arguing that "[t]he Indictment against Mr. Boustani must be dismissed for failure to state an offense because the extraterritorial conduct described in its pages falls outside the reach of the U.S. laws that are alleged to have been violated."). Although the Eastern District of New York denied the motion, *see* Decision and Order, *United States v. Boustani*, No. 18 Cr. 681, ECF 231 (WFK) (E.D.N.Y. Oct. 3, 2019), these simple facts apparently resonated with the jury, which acquitted based on the case's lack of connection to the Eastern District of New York. As reported:

> Jurors who spoke to reporters after the hearing said their verdict came down to a matter of venue. A major issue in the case was whether or not U.S. charges were properly brought against Boustani, a Lebanese citizen working for Abu Dhabi-based Privinvest on Mozambican projects

---

[11] The questioning of the LIBOR prosecutions happened in a context in which the prosecution—unlike here—argued that worldwide effects of LIBOR manipulation was *not* the appropriate benchmark for sentencing Allen and Conti. Although the prosecution did not cite or abide by the *Azeem* rule for reasons that are not clear, the prosecution nevertheless argued that only conduct related to "the days for which a trader requested a LIBOR manipulation" was relevant for sentencing. *See* United States' Sentencing Memorandum at 8 (March 3, 2016), *United States v. Allen*, 14 Cr. 272, ECF 225 (S.D.N.Y.). The prosecution therefore estimated the loss at about $1.1 million rather than the $600 million it estimated represented total market loss. *Id*. at 7-8; *id*. at 3. The sentencing court adopted this calculation of about $1.1 million in losses. Sentencing Transcript at 15:21-25 (March 10, 2016), *United States v. Allen*, 14 Cr. 272, ECF 242 (S.D.N.Y.).

who had never set foot in the U.S. before he was arrested. . . . "I think as a team, we couldn't see how this was related to the Eastern District of New York," said the jury foreman.

*See* Stewart Bishop, *Boustani Acquitted in $2B Mozambique Loan Fraud Case*, LAW360 (Dec. 2, 2019, 12:49 PM EST).[12]

The natural common-sense aversion to U.S. prosecutors' efforts to police the world aligns with the presumption against extraterritoriality and the prohibition on enforcing other sovereigns' penal laws. These principles and sentiments confirm the propriety of *Azeem*'s rule, which prohibits calculating Mr. Greenwood's Guidelines offense level based on conduct that took place in Europe, Asia, and other parts of the world, and that had no non-incidental connection to the United States, its wire facilities, or U.S. victims.

## CONCLUSION

The Court should confirm that it will calculate the applicable Sentencing Guidelines offense level based on only U.S. criminal conduct, as discussed herein.

---

[12] Available at https://www.law360.com/articles/1221333/boustani-acquitted-in-2b-mozambique-loan-fraud-case.

Dated:        January 25, 2023
              New York, New York

Respectfully submitted,

JUSTIN S. WEDDLE
JULIA I. CATANIA
BRIAN WITTHUHN
WEDDLE LAW PLLC
250 West 55th St., Fl. 30
New York, NY 10019
(212) 997-5518
jweddle@weddlelaw.com

HOWARD LEADER
534 West 112th Street
New York, NY 10025
(646) 533-7696
howard.leader@gmail.com

*Attorneys for Karl Sebastian Greenwood*