UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                    :

UNITED STATES OF AMERICA     :
                                      :

        - v. -           :                 S16 17 CR. 630 (ER)
                                        :

KARL SEBASTIAN GREENWOOD,   :
                                      :

          Defendant.     :
                                      :

                                      :
------------------------------------------------------x

## **<u>Opposition to Defendant's Motion to Exclude Certain Conduct<br>from Sentencing Guidelines Calculation</u>**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Christopher J. DiMase
Nicholas Folly
Juliana N. Murray
Kevin Mead
Assistant United States Attorneys

- Of Counsel -

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................................. **3**

**BACKGROUND** ....................................................................................................................... **3**

**ARGUMENT** ............................................................................................................................ **7**

**I.**    **THE WIRE FRAUD, WIRE FRAUD CONSPIRACY, AND MONEY
LAUNDERING CONVICTIONS WERE NOT IMPERMISSIBLY
EXTRATERRITORIAL** ................................................................................. **7**

**II.**    **THE RULE OF *AZEEM* DOES NOT APPLY TO THE DEFENDANT'S WIRE
FRAUD CONVICTIONS** ............................................................................. **10**

**III.**    ***AZEEM* ALSO DOES NOT APPLY TO THE MONEY LAUNDERING
CONVICTION** ........................................................................................... **22**

**IV.**    **THE RULE OF *AZEEM* DOES NOT APPLY TO SECTION 2B1.1 OF THE
GUIDELINES** ........................................................................................... **25**

## PRELIMINARY STATEMENT

The defendant was the co-founder of OneCoin Ltd. ("OneCoin"), a fraudulent cryptocurrency that was used to perpetrate one of the largest global fraud schemes in history. As one of the two principal leaders of OneCoin, Greenwood defrauded millions of investors out of billions of dollars. He has pleaded guilty to these crimes, but now asks this Court at sentencing to establish a new rule of law that would let him escape responsibility for the enormous losses suffered by foreign investors because of the fraud scheme that he led. He also asks this Court to overlook his participation in a massive money laundering conspiracy that was operated in substantial part from the United States by co-conspirators Gilbert Armenta and Mark Scott, among others. Indeed, those co-conspirators, who operated from the United States throughout the conspiracy, laundered approximately $700 million. There is no precedent that supports Greenwood's novel theory of the law, and the Court should reject his arguments.

As set forth below, the billions in losses to foreign victims and the nearly $700 million laundered by co-conspirators within the United States are part of the very crimes the defendant has pled guilty to. They are therefore part of the offenses of conviction and must be accounted for in the Guidelines calculation. And while the Second Circuit has recognized that crimes that are entirely foreign *and* are not part of the offense of conviction do not count under the narcotics Guideline even when they are "part of the same course of conduct," that narrow holding has no application here. The Court should accordingly hold Greenwood fully accountable for both the domestic and foreign investors who Greenwood defrauded, as well as the full amount of fraud scheme proceeds that were laundered as part of the money laundering conspiracy.

## BACKGROUND

### A. Overview of the OneCoin Scheme

In 2014, the defendant, Sebastian Greenwood, and co-conspirator Ruja Ignatova co-

founded OneCoin, which was based in Sofia, Bulgaria.  OneCoin marketed and sold a fraudulent cryptocurrency by the same name.  The defendant and Ignatova conceived of and built the OneCoin business fully intending to use it to defraud investors.  For example, even before OneCoin went live, Ignatova discussed an "exit strategy" with Greenwood; the first option she listed was "Take the money and run and blame someone else for this…"

OneCoin marketed its fake cryptocurrency through a global multi-level marketing ("MLM") network of OneCoin members.  The defendant conceived of OneCoin's use of an MLM structure and was OneCoin's global master distributor and the leader of the MLM network through which the fraudulent cryptocurrency was marketed and sold.  As the top MLM distributor of OneCoin, Greenwood earned 5% of monthly OneCoin sales from anywhere in the world, which totaled more than €20 million each month.  Greenwood's mastery as a salesman and the use of the MLM structure helped contribute to OneCoin's incredible success as a fraud.  Indeed, between the fourth quarter of 2014 and the fourth quarter of 2016 alone, the scheme took in more than €4 billion from its victims.

The defendant, as well as Ignatova and others, made material misrepresentations to induce victims to purchase OneCoin cryptocurrency packages.  Among other things, they falsely represented that the value of OneCoin was determined by market supply and demand when, in fact, OneCoin's value was set by the company itself with no regard for market supply and demand; that OneCoin maintained a private blockchain, or a digital ledger identifying OneCoins and reporting historical transactions, when, in fact, OneCoin lacked a true blockchain, that is, a public and verifiable blockchain; and that the OneCoin cryptocurrency was "mined" using mining servers maintained and operated by the company when, in fact, OneCoins were never mined using computer resources.

OneCoin was a centrally-controlled fraud scheme.  It primarily operated out of an office in Sofia, Bulgaria, with secondary offices in Dubai and Hong Kong.  OneCoin was successfully marketed all over the world, including in North America, Europe, China, India, Southeast Asia, Latin America, and Africa.

OneCoin viewed the United States as a critical market for the company's success and entered the U.S. market in 2015.  On July 1, 2015, the defendant emailed Ignatova and another co-conspirator a draft "grand opening" announcement for OneCoin's launch in the United States three days later.  During a July 4, 2015 OneCoin webinar, Ignatova announced that official U.S. opening and said:

> [I]f we want to go and catch Bitcoin, we never can do this without being strong in the U.S. and without being part of the community.  So, um, this is actually why I am so excited about the U.S. as the market.  It's something that is about prestige. It's a huge market.  And, um, it is, I think, a place of innovation, of Wall Street, a place where we have to be if we want to be big.

OneCoin meetings and conferences were held in the United States, and OneCoin had U.S-based MLM promoters.

In that same webinar, Ignatova explained the interconnected way in which the OneCoin MLM cryptocurrency scheme worked: "the more people speak about OneCoin, the more people use it, the more value we create for each other.  And this is one of the few concepts, actually, in network marketing, where I feel that this works, where the more we are, the more valuable the product becomes."

As a result of the material misrepresentations by Greenwood, Ignatova, and other OneCoin representatives, victims all over the world invested in fraudulent OneCoin cryptocurrency packages.  Many of those victims resided in the United States, and their investments involved the use of interstate and foreign wires that passed through the Southern

District of New York.

The global loss to victims caused by the defendant's OneCoin scheme was several billion dollars, well above the $550 million band that is at the top of the Sentencing Guidelines.  The Government's current estimate of the amount of loss suffered by victims in the United States is substantially lower, but still significant, likely above $50 million.

### B.  Overview of the Money Laundering Conspiracy

As banks and financial institutions around the world began to catch on to the OneCoin fraud scheme, they became unwilling to handle OneCoin fraud money.  For example, OneCoin could not open bank accounts in the name of "OneCoin," and instead had to hide the origin of the funds in those accounts, and the purpose of the transfers to and from those accounts. OneCoin principals, such as the defendant, Ignatova, and co-conspirator Irina Dilkinska, resorted to a global network of money launderers who assisted them in concealing the nature, location, source, ownership, and control of OneCoin fraud proceeds.

Two of the key co-conspirators in the money laundering operation were U.S. citizens who operated from Florida: Gilbert Armenta, who was the boyfriend of Ignatova, and Mark Scott, who was a partner at a prominent law firm in the United States.  Scott laundered approximately $400 million of OneCoin fraud proceeds through a series of fake investment funds.  Armenta separately laundered over $300 million of OneCoin fraud proceeds through two Florida businesses named "Zala Group" and "Fates Group."  Other co-conspirators based in the United States assisted in the OneCoin money laundering operation.

The amount of money laundered by U.S.-based co-conspirators Armenta and Scott alone was approximately $700 million, a sum substantially above the $550 million band that is the top of the Sentencing Guidelines.

### C. Procedural Background

On December 16, 2022, the defendant pleaded guilty without the benefit of a plea agreement to a three-count superseding information (the "Information").  Count One charged the defendant with wire fraud conspiracy, from 2014 through 2018, for "soliciting individuals throughout the world" in connection with OneCoin.  Count Two charged the defendant with substantive wire fraud in connection with the OneCoin scheme.  Count Three charged the defendant with conspiring to launder the proceeds of the OneCoin fraud from 2014 through 2018, and alleged concealment, international, and promotion money laundering objectives of that conspiracy.

In the defendant's plea allocution, he admitted to participating in the global OneCoin fraud, stating among other things that: "I also knew that in the second half of 2015, with my participation, the company targeted the United States using these same misrepresentations, including by sending these misrepresentations by wire transmissions into the United States." Dec. 16, 2022 Plea Tr. at 30.


## ARGUMENT

### I. The Wire Fraud, Wire Fraud Conspiracy, and Money Laundering Convictions Were Not Impermissibly Extraterritorial

#### A. Applicable Law

While the wire fraud statute is not extraterritorial, *Eur. Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 140-41 (2d Cir. 2014), *rev'd on other grounds*, 579 U.S. 325 (2016), that does not mean it is cabined to conduct that is entirely domestic.  The Second Circuit has held that, "a claim predicated on mail or wire fraud involves sufficient domestic conduct when (1) the defendant used domestic mail or wires in furtherance of a scheme to defraud, and (2) the use of the mail or wires was a core component of the scheme to defraud."  *Bascunan v. Elsaca*, 927

F.3d 108, 122 (2d Cir. 2019).  It went on to explain that alternative standards, "would effectively immunize offshore fraudsters from mail or wire fraud," and that, "while a defendant's location is relevant to whether the regulated conduct was domestic, the mail and wire fraud statutes do not give way simply because the alleged fraudster was located outside the United States."  *Id.* at 123; *see also United States v. Napout*, 963 F.3d 163, 180 (2d Cir. 2020) (applying same standard in wire fraud conspiracy prosecution and upholding conviction where "the government presented ample evidence that the appellants had used American wire facilities and financial institutions to carry out their fraudulent schemes"); *United States v. Cornelson*, No. 15 CR. 516 (JGK), 2022 WL 2334054, at *7 (S.D.N.Y. June 27, 2022) (declining to dismiss fraud indictment even when "alleged conduct affected the United States only in a roundabout way") (internal punctuation omitted).

The money laundering statute, by contrast, *is* extraterritorial when the following requirements are met: "(1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000."  18 U.S.C. § 1956(f); *see also United States v. Approximately $25,829,681.80 in Funds, plus Int., in Ct. Registry Inv. Sys.*, No. 98 CIV. 2682 (LMM), 1999 WL 1080370, at *3 (S.D.N.Y. Nov. 30, 1999), *aff'd sub nom. United States v. Approximately $25,829,681.80 in Funds (Plus Int.) in the Ct. Registry Inv. Sys.*, 56 F. App'x 40 (2d Cir. 2003) (requirement that "the conduct occurs in part in the United States" met despite lack of physical presence in United States).[1]

---

[1] *See also United States v. Ojedokun*, 16 F.4th 1091, 1105 (4th Cir. 2021), cert. denied, 213 L. Ed. 2d 1017, 142 S. Ct. 2780 (2022) (actions by co-conspirators in 1956(h) prosecution sufficient for "the conduct occurs in part in the United States" requirement); *United States v. Sadighi*, 199

As relevant to both sets of statutes, individuals abroad are frequently held criminally responsible based on the acts of domestic co-conspirators. *See Bascunan v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019) ("while a defendant's location is relevant to whether the regulated conduct was domestic, the mail and wire fraud statutes do not give way simply because the alleged fraudster was located outside the United States"); *United States v. MacAllister*, 160 F.3d 1304, 1307 (11th Cir. 1998) ("The general rule is that a conspiracy to violate the criminal laws of the United States, in which one conspirator commits an overt act in furtherance of that conspiracy within the United States, is subject to prosecution in the district courts.")

### B.  Discussion

The defendant does not contest that his counts of conviction are sufficiently tethered to the United States to confer U.S. jurisdiction. Nor could he. Victims in the United States received communications about the scheme, and made investments in the scheme through bank wires. Both those communications and those investments were "wires" sufficient to satisfy the wire fraud and wire fraud conspiracy statutes. As to money laundering, the laundering of hundreds of millions of dollars by U.S.-based co-conspirators Armenta and Scott plainly met both the "conduct occurs in part in the United States" and the "value exceeding $10,000" requirements.

The defendant's plea allocution alone is sufficient to meet the jurisdictional requirements of these statutes:

> I also knew that in the second half of 2015, with my participation, the company targeted the United States using these same misrepresentations, including by sending these misrepresentations by wire transmissions into the United States. I also knew that banks were reluctant to accept the proceeds of sales of OneCoin. I therefore agreed with others to conceal the source of those proceeds when engaging

---

F.3d 1334 (9th Cir. 1999) (same); *United States v. Iossifov*, 45 F.4th 899, 913 (6th Cir. 2022) (same).

in financial transactions. I understood that the same agreement would apply to any of those proceeds coming from the United States market.

Dec. 16, 2022 Plea Tr. at 30.

Further, the defendant and his co-conspirators deliberately targeted the United States market, and planned to make huge profits from that market. The defendant emailed a draft "grand opening" announcement for launching in the U.S. market, and OneCoin officially launched in the United States on July 4, 2015. During that presentation, Ignatova explained their plan to "catch Bitcoin," which would rely in part on the "huge market" of the United States, and she showed a slide which described the total value of Bitcoin as $11.7 billion.[2]

## II.    The Rule of *Azeem* Does Not Apply to the Defendant's Wire Fraud Convictions

Greenwood's primary argument is that he should not be held liable for the billions of dollars in losses that he caused OneCoin victims to suffer, and the hundreds of millions of dollars in funds that he and his co-conspirators laundered, based on the Second Circuit's holding in *Azeem*. The Court's holding in *Azeem* is inapposite. There, the Second Circuit held that uncharged entirely foreign drug transactions that were nonetheless "part of the same course of conduct . . . as the offense of conviction" should typically not be considered under the Guidelines. However, in this case, the losses to foreign victims and the funds laundered from the United States (and around the world) were the core of the very offenses that Greenwood has pleaded guilty to. These losses and the full amount of the funds laundered should therefore be part of the sentencing calculation for three independent reasons: (1) they are part of the "offense of conviction" itself; (2) they are part

---

[2] Even if the Court were to consider only purely domestic loss—and it should not, for all the reasons described in this brief—"[l]oss for purposes of the fraud guideline . . is defined as 'the greater of actual loss or intended loss.'. . [I]ntended loss is 'the pecuniary harm that was intended to result from the offense.'" *United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 103 (2d Cir. 2014) (quoting U.S.S.G. § 2B1.1 n. 3(A). As demonstrated by the webinar, the domestic *intended* loss from the OneCoin scheme was substantially greater than the $50 million plus of actual loss by U.S. victims.

of a "common scheme or plan," and (3) they are "closely intertwined" with the domestic conduct.

### A. Applicable Law

Under the Sentencing Guidelines, Courts must take into account the "offense of conviction," as well as "all acts and omissions [] that were part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G § 1B1.3(a)(2).[3]  The Supreme Court has explained that the "offense of conviction" is *different* from those two additional categories: "'relevant conduct,' in a case like this, includes *both* conduct that constitutes the 'offense of conviction,' *and* conduct that is 'part of the same course of conduct or common scheme or plan as the offense of conviction.'"  *Edwards v. United States*, 523 U.S. 511, 514 (1998) (emphasis in original) (internal citations omitted).  The Guidelines also make clear the difference between "the offense of conviction" on the one hand and conduct that is "part of the same course of conduct or common scheme or plan."  *See* U.S.S.G. § 1B1.1 n.1(I) (distinguishing "offense of conviction" from "relevant conduct"); U.S.S.G. § 3D1.2(b) (allowing for grouping of multiple separate offenses of conviction when "constituting part of a common scheme or plan"); U.S.S.G. § 3E1.1 n1(a) (noting that for acceptance of responsibility, "a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction").  Those distinctions make sense.  When making a relevant conduct determination as to "common scheme or plan" or "same course of conduct," there must be a point of comparison, something that the proposed other conduct can be "common" *to* or the "same" *as*.  That comparison point is of course the "offense of conviction."

---

[3] U.S.S.G § 1B1.3(a)(2) specifically governs "offenses of a character for which § 3D1.2(d) would require grouping of multiple counts."  The wire fraud and money laundering counts at issue here are such offenses.  *See* U.S.S.G § 3D1.2 (specifically stating that Section 2B1.1 (which governs the wire fraud offense) and Section 2S1.1 (which governs the money laundering offense) are covered by Section 3D1.2(d)).

There are further differences between "common scheme or plan" on the one hand and "same course of conduct" on the other.  The Guidelines explain that "common scheme or plan" means that the acts are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*."  *Id.* at n.5(B)(1).  As to the "same course of conduct," the Guidelines say that, "[o]ffenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."  *Id.* at n.5(B)(2).

There are thus three types of conduct that are relevant to the Guidelines determination: (1) "the offense of conviction," (2) acts that are part of a "common scheme or plan as the offense of conviction," and (3) acts that are part of the "same course of conduct . . . as the offense of conviction."  U.S.S.G. § 1B1.3(a)(2).[4]

In the vast majority of cases governed by U.S.S.G § 1B1.3(a)(2), these categories are a

---

[4] For other cases clarifying these distinctions, *see United States v. Feldman*, 647 F.3d 450, 462 (2d Cir. 2011) (distinguishing between "offense of conviction" and other types of relevant conduct in calculating loss amount); *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000) (same); *United States v. Robie*, 166 F.3d 444, 456 (2d Cir. 1999) (uncharged frauds may constitute "relevant conduct"); *United States v. Stanley*, 12 F.3d 17, 20 (2d Cir. 1993) (acquitted frauds may constitute relevant conduct); *United States v. Burnett*, 968 F.2d 278, 280 (2d Cir. 1992) ("We have repeatedly held that quantities and types of narcotics uncharged in the offense of conviction can be included in a defendant's base offense calculation if they were part of the 'same course of conduct' or part of a 'common scheme or plan' as that offense") (internal punctuation omitted); *United States v. Eisenhart*, 710 F. App'x 50, 52 (2d Cir. 2018) (explaining that the Guidelines take into account both "the offense of conviction *and all relevant conduct under § 1B1.3*") (emphasis in original); *United States v. Ayala*, 75 F. Supp. 2d 126, 129 (S.D.N.Y. 1999) (distinguishing drug trafficking that was part of the "offense of conviction" from drug dealing that was "relevant conduct"); *United States v. Peterson*, 101 F.3d 375, 384 (5th Cir. 1996) (explaining the Sentencing Commission's choice between the "real offense" versus "charge offense" theories of sentencing, and how the "relevant conduct" section of the Guidelines reflects a concession to the "real offense" system); *cf.* Fed. R. Crim. P. 8(a) ("The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are connected with or constitute parts of a common scheme or plan.").

distinction without a difference—courts take the conduct into account as long as it fits into any one of the three categories, and courts therefore need not determine *which* of the three categories apply.[5]  However, the Second Circuit has created a very limited exception for the third category— acts that are part of the "same course of conduct" and not part of the offense of conviction itself— when that same course of conduct occurred entirely abroad and was not a crime against the United States.

In *United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991), the defendant was convicted of conspiracy to import heroin into the United States in connection with the transportation of one kilogram of heroin from Pakistan to New York.  At sentencing, the district court enhanced the offense level based on the transportation of additional heroin from Pakistan to Egypt by the same co-conspirators, even though that Egyptian heroin was not intended for the United States.  This separate Egyptian drug deal was conduct that the defendant was not charged with or convicted of.  While the Second Circuit agreed that the Pakistan-to-Egypt transportation was part of the same "course of conduct" as the defendant's importation of heroin into the United States, it reversed, finding that the Guidelines "assign to foreign crimes a rather limited role," and that transporting narcotics from Pakistan to Egypt was "not a crime against the United States."  *Id.* at 16-17.  The Second Circuit was explicit that its analysis was based on the third category, "course of conduct."  *Id.* at 16.  The first category—"the offense of conviction"— plainly was not implicated.  The charged crime was a conspiracy to import heroin into the United States, and it was therefore impossible for the transportation of heroin from Pakistan to Egypt to be part of that

---

[5] One of the instances in which it matters—and which clarifies the distinction—is in the restitution context.  Restitution is limited to victims of the offense of conviction, and does not include victims of other relevant conduct otherwise properly considered under the Guidelines. *See Hughey v. United States*, 495 U.S. 411, 413 (1990); *United States v. Lussier*, 104 F.3d 32, 33 (2d Cir.1997).

"offense of conviction."

The few Second Circuit decisions interpreting *Azeem* are consistent with that narrow holding.  In *United States v. Chunza-Plazas*, 45 F.3d 51(2d Cir. 1995), the defendant was convicted of possessing two fraudulent alien-registration cards in his home in Staten Island in 1993.  At sentencing, the district court departed upward based on the defendant's role in the Medellin cartel in Colombia years earlier.  The Second Circuit reversed, explaining that:

> [W]hile Azeem's Egyptian heroin conspiracy was viewed as part of the same course of conduct underlying his United States activity, Chunza's possession of the fraudulent registrations and the counterfeit social-security cards was not part of the same crimes as committing homicide and terrorist acts for the Medellin cartel in Colombia. Thus, the reasons for excluding consideration of Chunza's foreign conduct are even stronger than the circumstances in *Azeem*.

*Id.* at 57-58.  In other words, the court in *Chunza-Plazas* held that the district court erred because the Medellin conduct fit in *none* of the three categories that a court should consider when calculating the Guidelines.

In *United States v. Greer*, 285 F.3d 158 (2d Cir. 2002), the Second Circuit held that the district court erred when it did *not* include foreign drugs as "relevant conduct' in a conviction under the Maritime Drug Law Enforcement Act ("MDLEA").  At the outset, the Circuit emphasized that "Section 1B1.3 provides that *all* acts committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant and that occurred during the commission of the offense *shall* be factored into the determination of the base offense level."  *Greer*, 285 F.3d at 179 (emphasis in original).  The Circuit went on to hold that "[c]ontrary to the District Court's suggestion, nothing in the U.S.S.G. limits [the Guidelines] application to activity undertaken against the United States."  *Id.* (internal punctuation omitted)*.* The Circuit explained that this holding was fully consistent with *Azeem*.  It noted that unlike the statute at issue in *Azeem*, the MDLEA was a statute that covered conduct outside the United States, and the crimes

at issue in *Greer* were therefore not foreign crimes.  *Id.* at 179-180.  In *United States v.
Tokhtakhounov*, 607 F. App'x 8, 14 (2d Cir. 2015), the Second Circuit distinguished *Azeem* and
affirmed the application of leadership points to a member of a transnational gambling enterprise,
even though the bookies he supervised lived in Ukraine and primarily collected bets from
individuals in Eastern Europe, given their "ties to the criminal activity that took place in the
United States."

Other courts have recognized an additional basis to include foreign conduct as part of the
Guidelines calculation: when that foreign conduct is closely intertwined with the offense of
conviction.  *See, e.g., United States v. Teyer*, 322 F. Supp. 2d 359, 367 and n.3 (S.D.N.Y. 2004)
(Lynch, J.) (allowing foreign conduct within the same course of conduct to be considered when
"closely intertwined" with offense of conviction); *United States v. Dawn*, 129 F.3d 878, 885 (7th
Cir. 1997) (allowing foreign conduct when "inextricable" from offense of conviction); *see also
United States v. Tokhtakhounov*, 607 F. App'x 8, 14 (2d Cir. 2015) (citing favorably the
"inextricable" language in *Dawn*).  While this Court need not adopt that standard for all the
reasons set forth in this brief, the foreign losses would be included under that standard as well.
*See infra* at 19-20.

### B.  Discussion

#### 1.  The Foreign Losses on the Wire Fraud Counts Were Part of the Offenses of Conviction

The losses to foreign investors were part of the "offense[s] of conviction" that the
Government charged and that the defendant pleaded guilty to.  Where, as here, the foreign conduct
is part of the crime of conviction, it is *by definition* part of a crime against the United States and
*Azeem* does not apply.  The defendant should therefore be held fully responsible for all investor
losses that resulted from the crimes he pleaded guilty to.

The defendant participated in a single massive wire fraud scheme and wire fraud conspiracy, both crimes against the United States, encompassing millions of victims all over the world.  The Information to which the defendant pleaded guilty charged the wire fraud and wire fraud conspiracy as a single overarching scheme:

> From in or about 2014 through in or about January 2018 . . . GREENWOOD, and others working on his behalf, made and caused to be made false statements and misrepresentations soliciting individuals throughout the world, including in the Southern District of New York, to invest in 'OneCoin,' a purported cryptocurrency, and instructed individuals to transmit investment funds to OneCoin depositor accounts in order to purchase OneCoin packages, thereby causing individuals to send interstate and international wires representing their OneCoin investments, and resulting in the receipt of over $1 billion of investor funds into OneCoin-related bank accounts.

Information at ¶¶ 1-2 (wire fraud conspiracy), ¶ 3 (substantive wire fraud).

In addition, in his plea allocution, the defendant pleaded guilty to a single overarching fraud scheme that targeted both international and domestic victims:

> I knew and intended that people would buy into OneCoin and related products based on the misconception that it would be a profitable investment and based on the misconception that OneCoin, like Bitcoin, was a cryptocurrency based on a distributed blockchain and valued by supply and demand. In fact, I knew the company would set and manipulate the stated value of OneCoin. . . . I also knew that in the second half of 2015, with my participation, the company targeted the United States using these same misrepresentations, including by sending these misrepresentations by wire transmissions into the United States. . . At the time I participated in this conspiracy in the United States, I knew what I was doing was wrong.

Dec. 16, 2022 Plea Tr. at 29-30.

Nor is the fact that this is a single crime merely an artifact of the charging instrument. OneCoin operated as a highly coordinated international scheme, with Ruja Ignatova and Sebastian Greenwood at its helm.  Like a host of legitimate cryptocurrency businesses, Ignatova and Greenwood promoted *one* core product to all their customers: the OneCoin cryptocurrency.  And although OneCoin was sold to investors around the globe, there was one headquarters, in Sofia,

Bulgaria, where Ignatova worked, and where OneCoin's operations were centralized, with key decisions running through Ignatova and Greenwood.

Furthermore, MLM frauds are by their very nature interconnected.  They are not like certain other types of fraud schemes—romance scams, for example—where the fraud on each victim is separate and discrete.  In an MLM fraud, each victim is counted on to recruit additional victims. MLM schemes rely on a perception that the MLM network is growing quickly, and that it will be easy for a new participant to recruit additional members.  Without growth and increasing size, an MLM fraud scheme will quickly peter out.  The defendant and his co-conspirators understood this, and they knew they needed to constantly expand into new markets if the scheme was to survive. As Ignatova explained when announcing the launch in the United States and attempting to recruit American victims, "It's something that is about prestige.  It's a huge market . . .  a place where we have to be if we want to be big."

Within this global structure, Greenwood oversaw OneCoin's marketing and sales. Ignatova called him the "magic sales machine" and he had the formal title of "Global Master Distributor," earning 5% of global sales, regardless of whether they occurred in the United States or abroad.[6]   In this case, where losses to foreign investors were a core part of the offense of conviction, *i.e.*, the OneCoin scheme to which Greenwood pleaded guilty, those losses must be included in the Guidelines calculation.

One of the primary cases relied on by Greenwood, *United States v. Turner*, 624 F. Supp.

---

[6] To the extent the defendant relies on the fact that he was *personally* abroad when the fraud occurred, his argument fails for all the reasons in this brief, along with the fact that his interpretation would lead to an absurd result under the Guidelines.  Under that interpretation, two co-conspirators who committed the exact same wire fraud scheme together would be subject to wildly different Guidelines calculations depending on where each co-conspirator happened to live.

2d 206 (E.D.N.Y. 2009), does not suggest otherwise.  In that case, the Government charged only three substantive counts of wire fraud, and identified only three John Does on Long Island who were, respectively, the victims of each of the three counts of wire fraud.  *United States v. Turner*, 05-CR-601 (E.D.N.Y.) (dkt. 19) (information).  The court in *Turner* held that the defendant's additional Australian victims may have been part of the defendant's "same course of conduct," but that *Azeem* meant that same course of conduct evidence should be excluded.  Because the defendant was charged with three separate counts of substantive wire fraud with three identified Long Island victims, however, the Australian victims were definitionally not part of the "offense of conviction."[7]

Given that all of the loss to foreign victims is part of the offenses of conviction that Greenwood pled guilty to (*i.e.*, the OneCoin fraud scheme and conspiracy), *Azeem* and *Turner* are both inapplicable.  All of the losses in this case are a direct result of that "offense of conviction," which is a crime against the United States, and the defendant's sentence should reflect the full losses from that single fraud scheme.

## 2. In the Alternative, The Foreign Losses on the Wire Fraud Counts Were Part of a Common Scheme or Plan

*Azeem*'s holding was explicitly about "same course of conduct," the third and most attenuated category of conduct that courts consider at sentencing.  946 F.2d at 16.  The case made clear that it had nothing do to with the second category, a "common scheme or plan."  *Id.*

---

[7] The defense also relies on *United States v. Khodadad*, 122 F.3d 1058 (2d Cir. 1995) (table), where the Government agreed to remand a case based on *Azeem*.  While the facts in the opinion are sparse, it appears that the defendant was convicted of receiving stolen goods and then sentenced based on a loss amount that included stolen goods not charged in the indictment.  The case would then be exactly in keeping with the "offense of conviction" versus "same course of conduct" distinction.  The opinion also lacks a holding because it was based on the Government's agreement to remand.

("The 'same course of conduct' is defined apart from 'common scheme or plan' and looks to 'whether the defendant repeats the same type of criminal activity over time' without requiring that acts be connected by common participants or an overall scheme.")

In this case, the losses to the foreign victims and the losses to the domestic victims were all part of a common scheme—the OneCoin scheme.  OneCoin was plainly a single common scheme due to, among other things, its centralization, its single product, the interconnected nature of an MLM, and the defendant's key role at the top of the scheme.  Indeed, the defendant pleaded guilty to wire fraud, a statute that explicitly criminalizes "any *scheme* or artifice to defraud," 18 U.S.C. § 1343 (emphasis added); Information at ¶¶ 2, 3 (charging a "scheme and artifice to defraud").[8]  Therefore, even if the Court were to find that the losses to foreign victims were separate from the "offense of conviction"—which it should not—the losses to foreign victims should be included in the Guidelines calculation because they are part of a "common scheme or plan."

### 3.  In the Alternative, The Foreign Losses on the Wire Fraud Counts Were Closely Intertwined with the Domestic Losses

As described above, *see supra* at 15, some courts have used an alternative "closely intertwined" standard to determine whether foreign conduct should be included under the Guidelines.  The foreign and domestic sides of the OneCoin fraud were closely intertwined: they were controlled by the same people from the same location, they sold the same product, and they

---

[8] Moreover, a conspiracy such as the OneCoin conspiracy is by its very nature a "common scheme or plan."  *See* U.S.S.G. § 1B1.3 n.5(B)(i) (fact that "the conduct constituted an ongoing conspiracy" would necessarily establish a "common scheme or plan"); *United States v. Catapano*, No. CR-05-229 (SJ), 2008 WL 2222013, at *13 (E.D.N.Y. May 22, 2008), *report and recommendation adopted*, No. 05 CR 229 (SJ) (SMG), 2008 WL 3992303 (E.D.N.Y. Aug. 28, 2008) ("To prove a single conspiracy, the prosecution must establish that a common scheme or plan was agreed to by all of the co-conspirators.").

used the same fraudulent marketing.  If the Court were to adopt that alternative "closely intertwined" standard, then for those reasons and all the reasons that the foreign conduct was part of the "offense of conviction," it was also "closely intertwined" with the domestic conduct, and therefore should be included in the Guidelines calculation.[9]

### 4.   Courts Routinely Include Foreign Victims in Loss Amount Calculations

Case law from other courts and the routine practice of courts in this District make clear that the defendant should be held responsible for the full amount of global loss under one or more of the theories set forth above.

In *Pasquantino v. United States*, 544 U.S. 349 (2005), the Government charged several defendants with wire fraud for smuggling liquor from the United States into Canada.  The Government's theory was that the defendants were defrauding the nation of Canada out of the high taxes that Canada would typically charge on imported alcohol.  The Supreme Court affirmed the conviction, writing that, "Their offense was complete the moment they executed the scheme inside the United States . . . This domestic element of petitioners' conduct is what the Government is punishing in this prosecution, no less than when it prosecutes a scheme to defraud a foreign individual or corporation, or a foreign government acting as a market participant."  *Id.* at 371.

*Pasquantino* is primarily a case about the defendant's conviction, rather than his

---

[9] Referring to the standard in *United States v. Dawn*, 129 F.3d 878, 885 (7th Cir. 1997), the defendant argues that the domestic and U.S. victims are not "inextricable."  Dkt. 516 at 10-11. The *Dawn* court clearly meant "inextricable" to mean something like closely linked, rather than that it was genuinely difficult or impossible to determine whether the conduct occurred abroad or domestically.  In *Dawn*, the defendant created child pornography abroad, transported it into the United States, was convicted for possessing the child pornography, and was subject to an enhanced sentence as a result of his production of child pornography abroad.  Had the *Dawn* court wished to separate the conduct abroad from the domestic conduct, it could easily have done so.

sentence, but the quoted language makes clear that the wire fraud statute covers losses to foreign victims.  Moreover, the dissent zeroed in on the loss amount sentencing calculation that had been used by the trial court, explaining that, "the Pasquantinos avoided over $2.5 million in Canadian duties, and Hilts, over $1.1 million. The resulting offense-level increases yielded significantly longer sentences for the defendants." *Id.* at 375.  *Pasquantino*'s sentencing calculation that included foreign loss on a wire fraud conviction—a calculation that the dissent objected to and the Supreme Court implicitly affirmed—is exactly how the Court should calculate loss here. Any alternative reading of *Pasquantino* would lead to the absurd result that the defendant was properly convicted of defrauding the Canadian government, but that his sentence should not have reflected the loss to the sole victim.

Consistent with *Pasquantino*, courts of appeals have affirmed the inclusion of foreign fraud victims in loss amount calculations.  *See United States v. Chmielewski*, 218 F.3d 840, 843 (8th Cir. 2000) ("It is no intrusion to gauge the severity of Mr. Chmielewski's domestic crime by measuring the damage done to his extraterritorial victims.  In doing so, we consider a foreign loss not to uphold a foreign law, but to uphold our own law, U.S.S.G. § 2F1.1,[10] which directs us to consider the loss caused by fraud as a measure of a just punishment."); *United States v. Okike*, 60 F. App'x 100, 102 (9th Cir. 2003) (rejecting argument in fraud case "that some of the victims whose losses were included in the $1,403,130 figure were not United States residents and that the district court should not have considered their losses"); *United States v. Enwerem*, 482 F. App'x 869, 871 at n.* (4th Cir. 2012) (rejecting argument in fraud case based on "the inclusion of losses sustained by foreign victims to calculate attributable loss").

In addition, as described below, Southern District courts have routinely applied

---

[10] The fraud Guidelines were previously codified at Section 2F1.1, rather than Section 2B1.1.

enhancements in fraud cases based on losses sustained by victims outside of the United States. *See infra* at 28-29.[11]

### III.   *Azeem* Also Does Not Apply to the Money Laundering Conviction

Greenwood not only pleaded to wire fraud offenses, but he also pleaded to a conspiracy to launder the proceeds from the OneCoin fraud scheme.  As noted above, approximately $700 million in OneCoin fraud proceeds were laundered by U.S.-based money launderers as part of the charged money laundering conspiracy.  Much like the wire fraud counts of conviction, *Azeem* is inapplicable to calculating Greenwood's money laundering offense level under Section 2S1.1.

As described above, the money laundering statute explicitly has extraterritorial reach, and the defendant's conduct is covered by that extraterritoriality provision.  *See supra* at 7-10.  As the defendant concedes, because he is not a United States citizen, the statute reaches his activity when "the conduct occurs in part in the United States," as it did here.  Dkt. 516 at 19 (quoting 18 U.S.C. § 1956(f)(1).  Considering the clear extraterritorial reach of the money laundering statute, the defendant ignores the plain words of the statute and argues that the "conduct" referenced in

---

[11] In a footnote, the defendant argues for application of the rule of lenity.  For all the reasons stated herein, there is no "grievous ambiguity" warranting application of the rule of lenity.  *See Muscarello v. United States*, 524 U.S. 125, 138-39 (1998).  Furthermore, although the Second Circuit has applied the rule of lenity to the Guidelines, *United States v. Simpson*, 319 F.3d 81, 85 (2d Cir. 2002), the Supreme Court's decision that vagueness challenges cannot be made to the advisory Guidelines casts serious doubt on that conclusion, *Beckles v. United States*, 137 S. Ct. 886, 895 (2017).  Like the due process vagueness doctrine, the rule of lenity derives from concerns of fair warning and avoiding arbitrary enforcement, *id.* at 892, that do not apply to the advisory Guidelines, *id.* at 894.  Although the Second Circuit has applied the rule of lenity to the Guidelines since *Beckles*, it did so in reliance on *Simpson*—a case dating to when the Guidelines were mandatory—without further analysis.  *United States v. Parkins*, 935 F.3d 63, 66 (2d Cir. 2019).  As *Beckles* recognizes, "concerns about statutory vagueness, which underlie the rule of lenity, do not give rise to similar concerns regarding the Guidelines."  *United States v. Gordon*, 852 F.3d 126, 130 n.4 (1st Cir. 2017); *see also United States v. Wright*, 607 F.3d 708, 716-20 (11th Cir. 2010) (Pryor, J., concurring).

the statute is the specified unlawful activity, and that in this case, that must be limited to "the domestic wire fraud."  Greenwood is wrong on all accounts.

**First**, the reference in the statute to "conduct" is plainly the laundering activity, not the specified unlawful activity ("SUA").  The statute provides that, "There is extraterritorial jurisdiction over the conduct prohibited by this section if [] the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States."  18 U.S.C. § 1956(f)(1).  Section 1956 prohibits money laundering.  It does not criminalize the SUAs themselves, and so "the conduct" that must occur in part in the United States is clearly the money laundering itself.  This alone defeats Greenwood's entire argument as to the money laundering count.

**Second**, the money laundering statute is not limited solely to laundering the proceeds of U.S. crimes.  *See* 18 U.S.C. § 1956(c)(7)(B) (defining various offenses "against a foreign nation" as specified unlawful activities under the statute); *see also United States v. Lazarenko*, 564 F.3d 1026, 1033-34 (9th Cir. 2009) ("the violation of Ukrainian law is the specified unlawful activity").  Therefore, there is no basis in the law to limit the Guidelines calculation for money laundering offenses to only the proceeds that were derived from U.S. victims.

**Third**, for all the reasons described in this brief, the foreign victims of the OneCoin fraud are properly included in the defendant's wire fraud and wire fraud conspiracy convictions, and should therefore be included as part of the calculation of the money laundering offense conduct.

In this case, approximately $700 million in OneCoin proceeds was laundered by U.S. citizens Armenta and Scott, who resided in and largely operated from the United States while they conducted that laundering.  Those actions by the defendant's co-conspirators are plainly sufficient to place the defendant's conduct within the jurisdictional reach of the money

laundering statute.  *See United States v. Ojedokun*, 16 F.4th 1091, 1105 (4th Cir. 2021) (actions by co-conspirators in 1956(h) prosecution sufficient for "the conduct occurs in part in the United States" requirement); *United States v. Sadighi*, 199 F.3d 1334 (9th Cir. 1999) (same); *United States v. Iossifov*, 45 F.4th 899, 913 (6th Cir. 2022) (same).  Since this conduct—conduct that Greenwood pled guilty to participating in—is clearly an offense against the United States, there is no basis in the law to exclude these laundered funds from Greenwood's offense level calculation.

Notably, the $700 million is more than sufficient to clear the $550 million band at the top of the Guidelines and Greenwood should be held accountable for all of these funds that were laundered as part of the conspiracy.[12]

---

[12] The ruling the defendant requests with respect to the application of Section 2B1.1 would create a bizarre result.  In this case, the defendant participated in an international conspiracy to commit wire fraud and to launder the proceeds of the wire fraud.  A substantially larger quantity of money was laundered by United States co-conspirators than was obtained from United States victims.  Consider a far more extreme example, in which the defendant defrauded foreign victims of $600 million and United States victims of $10,000, and the defendant then laundered all $600 million through the United States.  The money laundering Guideline, Section 2S1.1, calculates a defendant's offense level based on the underlying specified unlawful activity ("SUA") if they were "direct" money launderers who were themselves involved in the underlying SUA, or based on the total amount of money laundered if they were not involved in the underlying SUA.  U.S.S.G. § 2S1.1(a); *United States v. Menendez*, 600 F.3d 263, 267 (2d Cir. 2010) (explaining the difference between "direct" and "third party" money launderers").  If foreign victims did not count, then the defendant's Guidelines would be based solely on a $10,000 loss amount for the United States victims based on the direct money laundering Guideline, and his Guidelines range would be close to zero months' imprisonment.  On the other hand, a defendant who laundered money in the exact same way but did *not* participate in the underlying fraud would be subject to the third-party money laundering Guideline based on the $600 million figure, and his Guidelines range would likely be life imprisonment.  Under the defendant's interpretation, in other words, a money launderer who committed the underlying SUA—and is therefore presumably more culpable—could receive a far lower sentence than a money launderer who was otherwise identically situated but did not participate in the underlying SUA.  It would indeed turn the law on its head if Greenwood, who was a co-founder and leader of the OneCoin fraud scheme was found to have a lower Guidelines because he not only participated in the money laundering conspiracy, but also in the underlying fraud scheme.

**IV.    The Rule of *Azeem* Does not Apply to Section 2B1.1 of the Guidelines**

The foreign losses should be included in the Guidelines calculation for an entirely independent reason: *Azeem* does not apply to Section 2B1.1 of the Guidelines.

**First**, *Azeem* was a case that interpreted the narcotics Guideline at Section 2D1.1.  Its holding is limited to that context, and the Second Circuit has never applied *Azeem* to limit consideration of foreign conduct governed by Section 2B1.1.[13]  Different Guidelines should be interpreted differently, and nothing in Section 2D1.1 indicated an intent that the Guideline apply to foreign conduct.  Moreover, *Azeem*'s holding was based in part on a concern unique to the drug context—that certain drugs might be illegal in the United States but not elsewhere.  *See* 946 F.2d at 17 (describing "the use and sale of certain drugs that would have violated our law, but not the foreign law where sold and used").  Accordingly, *Azeem*'s requirement is limited, and does not apply in the context of Section 2B1.1.

**Second**, even if language in *Azeem* suggests that it is more broadly applicable to other Guidelines, there can be no doubt that it does not apply to *all* other Guidelines, and Section 2B1.1 is one of the Guidelines to which *Azeem* is inapplicable.

To the extent *Azeem* can be interpreted to create a general presumption that the Guidelines do not apply to foreign conduct, that presumption can of course be rebutted.  In *United States v. Greer*, 285 F.3d 158, 179 (2d Cir. 2002), for example, the Second Circuit held that *Azeem* did not apply and that foreign drugs were properly included in the Guidelines calculation because the

---

[13] In *United States v. Chunza-Plazas*, 45 F.3d 51 (2d Cir. 1995), the defendant was presumably convicted under 18 U.S.C. § 1546, for which the relevant Guideline is Section 2L2.2, and the Second Circuit only considered *Azeem*'s holding in connection with its review of an upward departure under Section 5K2.9.  Moreover, as described above, the *Chunza-Plazas* Court limited consideration of foreign conduct because—even if it had occurred in the United States—it was sufficiently attenuated from the charged offense that it did not constitute relevant conduct at all under Section 1B1.3.

conviction was for a violation of the MDLEA.  Many terrorism statutes explicitly apply to foreign conduct, and harm to those foreign victims can of course be properly included in the Guidelines calculations for violations of those offenses.  *See, e.g.*, 18 U.S.C. § 32 (destruction of aircraft or aircraft facilities), § 37 (violence at international airports), § 1091 (genocide), and § 2280 (violence against maritime navigation).  And many provisions in the Guidelines themselves evidence an intent that the provision apply extraterritorially.  *See, e.g.*, 2B1.5(b)(2) and n.3(A) (providing for an enhancement under the theft or damage of cultural resources Guideline when those resources were in a museum, even if that was a foreign museum); § 2B5.1(b)(5) (providing for an enhancement under the counterfeiting Guideline when any part of the offense was committed outside the United States); § 2C1.1, background note (explaining that the bribery Guideline applied to convictions under 15 U.S.C. §§ 78dd-1, 78dd-2, and 78dd-3, which "generally involve a payment to a foreign public official, candidate for public office, or agent or intermediary, with the intent to influence an official act or decision of a foreign government or political party"); § 2M5.3 (Guideline for providing material support to designated foreign terrorist organizations); 2T1.1(b)(1) and n.4 (providing for an enhancement under the tax evasion Guideline when the defendant fails to report "income exceeding $10,000 in any year from criminal activity," and defining "criminal activity" to include "any conduct constituting a criminal offense under . . . foreign law").

Just like as to those provisions, the Sentencing Commission intended Section 2B1.1 to include foreign activity, and multiple provisions of the Guideline section reflect that intention.

- Section 2B1.1(b)(17) provides for enhancements if a defendant "derived more than $1,000,000 in gross receipts from one or more financial institutions" or the offense "substantially jeopardized the safety and soundness of a financial institution."  The Second Circuit has explained that the purpose of the enhancement is to account for a criminal, "putting that institution's financial safety and soundness at risk."  *See United States v. Huggins*, 844 F.3d 118, 123 (2d Cir. 2016).  The application notes explain that a "financial

institution" includes a "foreign bank." U.S.S.G. § 2B1.1 n.1. Thus, Section 2B1.1 reflects an intent by the Sentencing Commission that an enhancement apply to protect a specific type of foreign victim, a foreign bank.

- Section 2B1.1(b)(10) provides for enhancements if, "the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials [or] a substantial part of a fraudulent scheme was committed from outside the United States." That enhancement also makes clear that foreign activity should be counted under Section 2B1.1. *See Carrasco v. United States*, 820 F. Supp. 2d 562, 568 (S.D.N.Y. 2011) ("This specific reference to extraterritorial application conclusively demonstrates that conduct justifying enhancements under the Guidelines is in no way limited to conduct that occurred within the territorial United States.")

- Several of the crimes cross-referenced to Section 2B1.1 are explicitly extraterritorial in scope. *See, e.g.*, 18 U.S.C. § 38(f) (extraterritoriality provision for fraud involving aircraft or space vehicle parts); 18 U.S.C. § 470 (counterfeit acts committed outside the United States); 18 U.S.C. § 1029(h) (extraterritoriality provision for access device fraud); 18 U.S.C. § 2332b(b) (extraterritoriality provision for acts of terrorism transcending national boundaries); 49 U.S.C. §§ 14915(b), 14915(c), and 13531(a)(3) (extraterritoriality provision for criminal failure to give up possession of household goods by freight forwarder); and 49 U.S.C. §§ 46317(a) and 40102(a)(5) (extraterritoriality provision for pilots criminally operating in air transportation without an airman's certificate). Those cross-references indicate that Section 2B1.1 is intended to apply to foreign conduct. The alternative is that the Sentencing Commission essentially intended two separate versions of Section 2B1.1: one for a limited set of crimes in which each of the enhancements was intended to reach foreign conduct, and one for a broader set of crimes in which it was not.

- Section 2B1.1 also cross references to Section 2B1.5—the theft or damage of cultural resources Guideline—when that Guideline is higher. U.S.S.G. 2B1.1(c)(4). Enhancement (b)(2) and note 3(A) of that Guideline in turn provides for an enhancement when those resources were in a museum, even if that was a foreign museum.

- Several Guidelines that plainly cover foreign conduct cross-reference to the loss table in Section 2B1.1(b)(1). *See, e.g.*, U.S.S.G. §§ 2B5.1(b)(1) (offenses involving counterfeit bearer obligations of the United States); 2C1.1(b)(2) (offering, giving, soliciting, or receiving a bribe); 2Q2.1(b)(3)(A) (offenses involving fish, wildlife, and plants); and 2S1.1(a)(2) (money laundering).

- Nothing in Section 2B.1. indicates that it should be limited to domestic losses or domestic conduct. Indeed, Section 2B1.1 is among the most detailed provisions in the Sentencing Guidelines—it has 20 separate enhancements and 21 notes, and has been amended approximately 51 times. Despite that level of detail, nothing in the Guideline evidences any intent to limit its provisions to domestic conduct.

Therefore, even if *Azeem* announced a rule that most Guidelines do not cover foreign

27

conduct, that rule does not apply to the fraud Guideline applicable in this case.[14]

**Third**, the inapplicability of *Azeem* in such cases has been so obvious that Southern District courts *routinely* apply enhancements in fraud cases based on losses sustained by victims outside of the United States.  For example:

- In *United States v. Hooper et al.*, 19-CR-774 (JSR), a U.K.-based defendant pleaded guilty to a years-long wire fraud conspiracy count based on his participation in a boiler room scheme that primarily targeted elderly victims in the U.K..  There was no dispute that the loss amount properly included the losses by the U.K. victims.  Dkts. 207, 218, and 219 (charging instrument and sentencing submissions).

- In *United States v. Philbrick et al.*, 20-CR-351 (SHS), the defendant pleaded guilty to a years-long wire fraud count based on a wide-ranging art fraud involving international victims.  There was no dispute that the loss amount properly included the losses sustained by international victims.  Dkts. 10, 57, 60 (charging instrument and sentencing submissions).

- In *United States v. Apskalns et al.*, 16-CR-692 (JMF), the defendant pleaded guilty to a years-long bank and wire fraud conspiracy count based on an internet fraud scheme involving domestic and international victims.  There was no dispute that the loss amount properly included the losses sustained by international victims.  Dkts. 191, 426, 428 (charging instrument and sentencing submissions).

- In *United States v. Adelekan et al.*, 19-CR-291 (LAP), the defendant was convicted at trial of a years-long wire fraud conspiracy count based on business email compromise and romance schemes involving both domestic and international victims.  There was no dispute that the loss amount properly included losses sustained by international victims.  Dkts. 296, 509, 514 (charging instrument and sentencing submissions).

---

[14] *Azeem* was decided on September 30, 1991, when the Guidelines were so new that the court needed to decide how to deal with the "straddle offense" that the defendant committed. Amendment 439 to the Guidelines was made effective on November 1, 1992, after *Azeem* was decided.  Prior to the issuance of Amendment 439, "same course of conduct" and "common scheme or plan" were not even defined terms under the Guidelines.  Amendment 439 defined those terms for the first time, and specifically explained that a "common scheme or plan" would include, for example, "the conduct of five defendants who together defrauded a group of investors by computer manipulations that unlawfully transferred funds over an eighteen-month period . . . on the basis of any of the above listed factors; i.e., the commonality of victims (the same investors were defrauded on an ongoing basis), commonality of offenders (the conduct constituted an ongoing conspiracy), commonality of purpose (to defraud the group of investors), or similarity of modus operandi (the same or similar computer manipulations were used to execute the scheme)."  Thus, Amendment 439—or any of the amendments since that implicate foreign conduct—may well have implicitly abrogated the holding of *Azeem*.

- In *United States v Wedd et al.,* 15-CR-616 (KBF/AT), the defendant was convicted at trial of a series of years-long wire fraud and wire fraud conspiracy counts involving mobile phone "cramming" with both domestic and international victims.  There was no dispute that the loss amount properly included losses sustained by international victims.  Dkts. 375, 672, 677 (charging instrument and sentencing submissions).

- In *United States v. Saint Clair*, 19-CR-790 (PKC), the defendant was convicted a trial of a years-long wire fraud count based on a scheme to obtain a loan involving both U.S. and Canadian victims.  There was no dispute that the loss amount properly included losses sustained by the Canadian victims.  Dkts. 62, 113, 115 (charging instrument and sentencing submissions).

- In *United States v. Former*, 19-CR-781 (PKC), the defendant pleaded guilty to a year-long wire fraud conspiracy count based on a series of business email compromise schemes involving both domestic and international victims.  There was no dispute that the loss amount properly included losses sustained by international victims.  Dkts. 6, 163, 165 (charging instrument and sentencing submissions).

- In *United States v. Leyva*, 19-CR-667 (PAC), the defendant pleaded guilty to a years-long wire fraud conspiracy count based on a scheme to defraud thousands of victims in the United States and Canada by tricking the victims into paying for phony computer repair services.  There was no dispute that the loss amount properly included losses sustained by Canadian victims.  Dkts. 48, 65, 66 (charging instrument and sentencing submissions).

- In *United States v. Madoff*, 09-CR-213 (DC), the defendant pleaded guilty to several counts of decades-long securities fraud, investment advisor fraud, mail fraud, and wire fraud for a multi-billion-dollar Ponzi scheme with both domestic and international victims.  There was no dispute that the loss amount properly included losses sustained by international victims.  Dkts. 38, 84, 92 (charging instrument and sentencing submissions).

- In *United States v. Shannon*, 18-CR-809 (RJS), the defendant pleaded guilty to a substantive wire fraud in connection with his defrauding of a company in the United Arab Emirates.  There was no dispute that the loss amount properly included the loss sustained by the sole victim, a foreign company.  Dkts. 12, 24, 26 (charging instrument and sentencing submissions).

## **CONCLUSION**

For the foregoing reasons, the Court should include the loss to foreign victims when calculating the loss amount under the Sentencing Guidelines.

Dated: New York, New York
        February 15, 2023

                            Respectfully submitted,

                            DAMIAN WILLIAMS
                            United States Attorney

            By:    */s/*_____
                            Christopher J. DiMase/ Nicholas Folly/
                            Juliana N. Murray/ Kevin Mead
                            Assistant United States Attorneys
                            (212) 637-2433/1060/2314/2211