APPENDIX

Information from the ten District Court cases cited in the prosecution's opposition, *see* ECF 519 at 28-29, demonstrates that eight of the cases involve losses flowing from U.S. criminal conduct (i.e., they fit comfortably within the *Azeem* rule). The record of the other two cases is not clear regarding whether the sentencing courts included foreign criminal conduct in the offense level calculation, but in neither case did the prosecution or the defense cite or mention *Azeem* to the district court, and therefore the record reveals no analysis of *Azeem* issues.

**Cases That Fit Within Mr. Greenwood's Motion**
**<u>Because They Do Not Implicate Foreign Criminal Conduct</u>**

*United States v. Madoff*, 09 Cr. 213 (DC), was plainly a U.S.-based crime that targeted U.S. and foreign victims. Both Bernard Madoff and Bernard L. Madoff Investment Securities LLC ("BLMIS") were based in Manhattan, and the fraud was orchestrated from Manhattan and received the proceeds of victims of the fraud (wherever located) in Manhattan. Even where the charges involved international conduct, those charges involved wire transfers of the proceeds of various U.S.-based specified unlawful activities from BLMIS in Manhattan to Madoff accounts in London, followed by wire transfers *back* from London to the New York City accounts of BLMIS. *See* ECF 38 (Information), 92 (prosecution sentencing submission). Nothing about *Madoff* implicates the rule of *Azeem*.

*United States v. Shannon*, 18 Cr. 809 (RJS), was a U.S.-based fraud targeting a single Emirati company. As described in the Information, Shannon engaged in a wire fraud scheme from the United States "to keep deposits paid to [him] by a foreign company for the purchase of industrial tires without delivering the tires[.] Shannon caused interstate emails to be sent that fraudulently represented that he was being penalized by the [U.S.] Treasury Department's Office of Foreign Assets Control." ECF 12 (Information) at 1-2; *see also* ECF 24 (defendant's sentencing submission) at 3-4. This case does not implicate the rule of *Azeem* because all of the fraudulent conduct was perpetrated from the United States using U.S. wires.

*United States v. Hooper*, 19 Cr. 774 (JSR), was a fraud that involved the use of boiler rooms in Spain to direct elderly U.K.-based victims to send money to U.S. bank accounts of U.S. corporations to invest in U.S. penny stock of a U.S. corporation and fictional carbon credits. One defendant (Ralston) resided in the United States and set up the entities and bank accounts; other defendants lived abroad. As the prosecution's sentencing memorandum acknowledged: "Substantially all identified proceeds of the fraud were received in U.S. bank accounts in the names of shell entities created by

Ralston in the United States." ECF 219 at 3. Because the perpetrators directed the victims to send substantially all of the fraud proceeds to U.S. accounts of U.S. corporations, this case does not implicate *Azeem* or foreign criminal conduct.

*United States v. Apskalns*, 16-692 (JMF), was a fraud targeting U.S. victims conducted largely within the United States. As the prosecution's sentencing memorandum stated: "[T]he victims of the conspiracy have by and large been everyday Americans." ECF 428 at 5. "Apskalns was involved in the fraud scheme for nearly three years—first as a lower level member of the scheme who *opened bank accounts and withdrew cash in the United States*, but thereafter as a manager who . . . resided in Latvia and *directed activities on the ground in the United States from afar*." *Id.* at 3 (emphasis added). This case does not implicate *Azeem* or foreign criminal conduct.

*United States v. Adelekan*, 19-291 (LAP), was a case that involved email scams perpetrated by directing victims to send money to U.S. bank accounts. The defendant at all relevant times resided and operated in the United States. ECF 509 (defendant's sentencing submission) at 2. It appears that some or all of the 48 victims were U.S. victims. As described by the prosecution's sentencing memorandum: "Adelekan organized and led a crew of co-conspirators to *open and/or use bank accounts in the United States* under false pretenses so that those bank accounts could *receive fraud proceeds*, and so that Adelekan could funnel those fraud proceeds to other of his associates and to himself." ECF 514 at 2. This case does not implicate *Azeem* or foreign criminal conduct.

*United States v. Wedd*, 15 Cr. 616 (KBF/AT), was a case that involved an auto-subscribing scheme through a U.S. mobile messaging aggregator—Mobile Messenger—by a U.S.-based defendant that targeted U.S. victims. According to the prosecution's sentencing memorandum: "The nature and circumstances of the offense are extraordinarily serious because of the massive impact that resulted to ordinary Americans." ECF 676 at 6. "Wedd was synonymous with Mobile Messenger *in the United States*. He was Mobile Messenger's first employee in the United States, and built the company's operations here." *Id.* at 7 (emphasis added). "In total, *millions of Americans across all demographic groups fell victim to this fraud*—this was a true Main Street crime." *Id.* at 6 (emphasis added). This case does not implicate *Azeem* or foreign criminal conduct.

*United States v. Saint Clair*, 19 Cr. 790 (PKC), was a case that involved a U.S.-based scheme to defraud investors "into providing loans to . . . the World Sports Alliance ("WSA")," through false representations. ECF 115 (prosecution's sentencing letter) at 1. The defendant perpetrated this scheme from the United States, and a prosecution

witness "identified approximately 40 IGObit Investors [i.e., victims] who invested approximately $502,000 that was deposited into WSA's account *at Bank of America.*" *Id.* at 4 n.1 (emphasis added). The prosecution based its loss calculation on these Bank of America funds, as well as records of cash payments and other documents seized during a search *of WSA's office in New York City*. *Id.* at 5 (emphasis added). This case does not implicate *Azeem* or foreign criminal conduct.

*United States v. Former*, 19 Cr. 781 (PKC), was a case that involved a business email compromise scheme perpetrated from the United States that fraudulently directed payments from a single victim (Braskem Netherlands B.V.) to a U.S. bank account. ECF 165 (victim impact statement) at 6-8; ECF 183 (sentencing transcript) at 8. As the prosecutor described at sentencing: "[W]ith regard to the people on the money side of the operation in the US, opening up the banking accounts, directing them what to do, when bank accounts are needed, what names to be used, when is the money coming, when they should take the money out, where should it go, that it's not coming out in cash and it's just going to other bank accounts. This is all being directed by the defendant." ECF 183 at 7-8. This case does not implicate *Azeem* or foreign criminal conduct.

**Cases Where the Record Is Not Clear, the Prosecution Did Not Cite *Azeem*, and the Court Did Not Consider *Azeem***

*United States v. Leyva*, 19 Cr. 667 (PAC), was a case that involved the prosecution of a U.S.-based leader of a fraud ring that operated out of the United States and India and targeted victims in the United States and Canada. According to the prosecution's sentencing memorandum, "[Leyva] was a leader or organizer of the offense" whose "primary responsibility was setting up *domestic* infrastructure—i.e., shell entities and bank accounts—that received victim payments. Leyva personally registered four entities in the Fraud Ring, and she assisted others in registering at least four more; thus, at least eight Fraudulent Entities link to her." ECF 66 at 5 (emphasis added). "The Fraud Ring collected payment through approximately 15 entities. *Fourteen of these entities were registered in the United States*, while the fifteenth was registered in India." *Id.* at 3 (emphasis added). It is not clear where this India-registered entity maintained bank accounts to which victims sent money. Nevertheless, Leyva's conduct was all domestic—she was based in Nevada, and established entities and bank accounts in the United States to which U.S. and Canadian victims were directed to send money. After initially being charged with two twenty-year felonies, Leyva was permitted to plead guilty to a superseding information that capped her exposure at 10 years' imprisonment, as part of a plea agreement with a stipulated guidelines range of 324-405 months. *Id.* at 1. Thus, it appears that the Guidelines calculation

was entirely based on U.S. criminal conduct—either fraud perpetrated from the United States and targeting U.S. and Canadian victims, fraud perpetrated from India targeting U.S. victims, or fraud perpetrated from the U.S. or India that directed the victims to send their payments to U.S. entities and bank accounts. All of these are consistent with *Azeem*.

It is theoretically possible that Leyva's crime involved an *Azeem* issue—that is, fraud perpetrated from India that targeted Canadian (not U.S.) victims and that only used non-U.S. wires or facilities to send payments to the single shell company in India (and not to any of the fourteen companies in the United States). Even so, we do not know the strategic considerations that went into the defendant not briefing the *Azeem* issue. Given that the plea agreement at issue capped Leyva's exposure at 10 years (rather than 40), Leyva may have made a strategic choice not to quibble about the loss amount or other Guidelines calculations. Indeed, the prosecution recommended a seven-year sentence. ECF 66 (prosecution's sentencing memorandum) at 1. Further, if the *Azeem* issue could have resulted in a decrease in the Guidelines, it is difficult to square the prosecution's failure to cite or mention *Azeem* to the district court with the prosecution's duty of candor to the court. *See* New York Rules of Prof. Conduct Rule 3.3(a)(2) ("a lawyer shall not fail to disclose to the tribunal controlling authority known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel").

*United States v. Philbrick*, 20 Cr. 351 (SHS), was a case that involved the defendant's fraudulent sale of fractional shares in works of art and his fraudulent pledges of works of art to obtain loans. It is apparent from the prosecution's sentencing memorandum that one of these victims was a finance corporation in Manhattan. ECF 60 at 4. In addition, the memorandum stated that the various frauds relating to a specific artwork totaled $15 million (out of a $86.43 million total fraud), and they all converged in either transfers of the artwork or money through Christie's auction house in New York City. ECF 60 at 9; *see* Christie's New York Live Auction 16977, "Post-War and Contemporary Art Evening Sale," Lot 33B. The record does not further reveal where the defendant perpetrated his frauds, nor specify where the victims were directed to send their $86.43 million. It is therefore unclear whether the rule of *Azeem* is implicated. The prosecution did not cite or mention *Azeem* to the district court, or parse the facts to determine whether the Guidelines were based on U.S. criminal conduct, or U.S. and foreign criminal conduct. Nor did the defense or the court consider the *Azeem* issue.