# 94-1693

## United States Court of Appeals
## For the Second Circuit

———◆———

UNITED STATES OF AMERICA,

*Appellee,*

-against-

PARVIZ KHODADAD,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT
## PARVIZ KHODADAD

ROCHMAN PLATZER
FALLICK & STERNHEIM
*Attorneys for Defendant-Appellant*
*Parviz Khodadad*
666 Third Avenue, 17th Floor
New York, New York 10017
(212) 697-4090

*Of Counsel:*
BARRY M. FALLICK
BOBBI C. STERNHEIM

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . .iv

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . 2

POINT I . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        THE DISTRICT COURT'S EXPRESSED DISDAIN FOR DEFENSE
        COUNSEL DEPRIVED APPELLANT OF A FAIR TRIAL

POINT II . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        DURING THE SENTENCE PROCEEDING, THE DISTRICT COURT
        COERCED APPELLANT INTO WAIVING A VALUATION HEARING
        AND   IMPROPERLY   CALCULATED   APPELLANT'S   ADJUSTED
        OFFENSE LEVEL

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 28

i

**TABLE OF AUTHORITIES**

**Page**

**CASES:**

United States v. Ah Kee Eng, 241 F.2d
157 (2d. Cir.1957)...........................................15

United States v. Azeem, 946 F.2d 13
(2d Cir.1991)...........................................25,26

United States v. Bejasa, 904 F.2d 137
(2d Cir.), cert. denied, 498 U.S. 921,
111 S.Ct. 299, 112 L.Ed. 252 (1990).......................14,15

United States v. DiTommaso, 817 F.2d
201(2d Cir. 1987)...........................................16

United States v. Grunberger, 431 F.2d
1062 (2d Cir.1970).........................................15

United States v. Guglielmini, 384 F.2d
602 (2d Cir. 1967) .........................................9

United States v. Mickens, 926 F.2d 1323
(2d Cir. 1991), cert. denied, ___U.S.___,
112 S.Ct. 940, 117 L.Ed. 111 (1992).......................15

United States v. Nazzaro, 472 F.2d 302
(2d Cir.1973)...............................................7

United States v. Pisani, 773 F.2d 397
(2d Cir.1985)............................................7,15

United States v. Robinson, 635 F.2d 981
(2d Cir. 1980),cert. denied, 451 U.S.
992, 101 S.Ct. 2333, 68 L.Ed.2d
852 (1981).............................................7,14,15

United States . Rosa, 11 F.3d 315
(2d Cir.1993),cert.denied, ___U.S.___,
114 S.Ct. 1565, 128 L.Ed. 211 (1994)......................15

## Statutes:

18 U.S.C. §2314................................................24

18 U.S.C. §2315................................................24

U.S.S.G.§2B1.1................................................24

## STATEMENT OF JURISDICTION

Indictment Number 92 Cr. 488 was filed in the Southern District of New York on June 5, 1992. The trial commenced on May 23, 1994 and concluded on June 3, 1994. Appellant was sentenced on December 8, 1994, and a notice of appeal was filed on December 14, 1994.

Jurisdiction in this Court is found under 28 U.S.C. §1291, and Rule 4(b), Federal Rules of Appellate Procedure.

94-1693

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
-------------------

UNITED STATES OF AMERICA,

Appellee,

- against -

PARVIZ KHODADAD,

Defendant-Appellant.

**BRIEF FOR DEFENDANT-APPELLANT
PARVIZ KHODADAD**

**ISSUES PRESENTED FOR REVIEW**

1. Whether the district court's expressed disdain for defense counsel deprived appellant of a fair trial.

2. Whether, during the sentence proceeding, the district court coerced appellant into waiving a valuation hearing and improperly calculated appellant's adjusted offense level.

1

## PRELIMINARY STATEMENT

Parviz Khodadad appeals from a judgment of conviction, entered on December 8, 1994 in the United States District Court for the Southern District of New York before the Honorable John E. Sprizzo, convicting him, following trial by jury, of interstate transport of stolen property, in violation of 18 U.S.C. §§2314 and 2, and receipt of stolen property transported in interstate commerce, in violation of 18 U.S.C. §§2315 and 2.

Khodadad was sentenced pursuant to the United States Sentencing Guidelines to a term of 41-months' imprisonment, a fine of $10,000, a three-year term of supervised release, and a special assessment of $100. He is currently serving his term of incarceration.

## BACKGROUND

The two-count indictment charged appellant with interstate transportation and receipt in interstate commerce of a painting valued at approximately $1,000,000. The painting by Pieter Brueghel The Younger, titled "The Flemish Proverbs" ("The Painting"), was alleged to have been stolen or fraudulently converted by appellant from Seyed Mostafa Kalantari.

In 1979, appellant agreed to transport valuable paintings and rugs from Iran to Germany for Kalantari, a wealthy Iranian. Kalantari planned to move to Europe after the fall of the Shah of

Iran and after the outbreak of the Iranian revolution. Kalantari wanted to take some of his valuables with him, including the Brueghel painting. Appellant agreed to transport them to Germany for Kalantari. Kalantari gave The Painting, other works of art, and Persian rugs to appellant and left for Europe in July 1979.

When Kalantari arrived in Germany, the Brueghel painting and other valuables were not found. He contacted appellant to inquire about his property. After repeatedly telling Kalantari that the property was on its way to Germany, appellant ultimately told Kalantari that his property had been stolen by someone else and could not be found.

Kalantari searched for his property throughout Europe, filing lawsuits in Germany, France and England. In the mid-1980's, Kalantari located several of his valuable rugs in a warehouse in Paris, listed under appellant's wife's name.

In the late 1980's, Kalantari located several of his missing paintings at Christie's Auction House in London. After filing suit, Kalantari recovered those paintings as well. In 1990, Kalantari registered the loss of the Brueghel painting and his other paint-ings with the Art Loss Registry in England, which information was conveyed to the International Foundation of Art Research in New York, an art loss registry in Manhattan. In early 1992, Kalantari

3

also contacted various art dealers in the United States about his remaining, lost paintings.

Also in 1990, appellant met Robert Ogle in California. Appellant told Ogle that he had a Brueghel painting to sell that he had acquired in Iran in the 1970's. Ogle agreed to help appellant in his efforts to sell The Painting by contacting Sotheby's and Christie's in New York. Appellant also contacted Hapsburg Gallery in New York as well, and experts from these auction houses came from New York to California to view The Painting with Ogle and another individual resembling appellant. Each expert confirmed that The Painting was authentic and offered to sell it at auction in New York. Appellant refused the offers and asked Ogle to sell The Painting on consignment in return for a $250,000 loan to appellant and his wife, which was secured by the Brueghel painting. Ogle thereafter contacted numerous potential buyers throughout the United States and abroad about The Painting and kept appellant apprised of his selling efforts.

In early May 1992, Ogle had contact with Jimmy Holmes, an art dealer who had a potential buyer for The Painting. For approximately two weeks, Ogle and Holmes negotiated the terms of the sale. The potential buyer, who was offering less than the $900,000 sought, wanted to view The Painting in New York. Arrangements were

4

made for a viewing at Cirker & Hayes, a bonded art warehouse in Manhattan.

On or about May 21, 1992, Ogle had The Painting shipped from California to New York. On May 26, 1992, Ogle flew to New York to consummate the sale. Before leaving California, Ogle advised appellant of the anticipated deal in New York and agreed to let appellant know if the deal was successful. On May 27, 1992, Ogle arrived at Cirker and Hayes and met Holmes and his client. As they viewed The Painting, several people identified themselves as agents of the Federal Bureau of Investigation. Ogle was interviewed by the FBI and, at the agents direction, Ogle telephoned appellant.

On May 29, 1994, appellant was arrested at his home in Danville, California.

## POINT I

### THE DISTRICT COURT'S EXPRESSED DISDAIN FOR DEFENSE COUNSEL DEPRIVED APPELLANT OF A FAIR TRIAL

On appeal, Parviz Khodadad challenges the district court's conduct during his trial and sentence proceeding. Appellant principally contends that the court's impatience and expressed disdain for defense counsel, evidenced through the abrupt tone of the judge's comments and curt and critical admonitions and underscored by the juror's written notes and verbal inquiry, denigrated defense counsel before the jury and deprived appellant of a fair trial and effective assistance of counsel.

Appellant first objects to the manner in which the trial judge restricted consultation between appellant and his counsel. Appellant also contends that the trial judge frequently made comments which disparaged and demeaned defense counsel in the presence of the jury. Finally, appellant claims prejudice because the district court's statements to the jury during its final instructions, in direct response to notes and inquiries by the jury (T.939,941)[1], aggravated this negative proceeding by further

---

[1]Numbers in parenthesis preceded by "T." refer to the pages of the trial transcript.

6

expressing disapproval of trial counsel.[2]

In reviewing a challenge to a trial judge's conduct, this Court "must determine whether the judge's behavior was so prejudiced that it denied [appellant] a fair, as opposed to a perfect trial." United States v. Pisani, 773 F.2d 397, 402 (2d Cir. 1985); United States v. Robinson, 635 F.2d 981, 984 (2d Cir. 1980), cert. denied, 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed. 2d 852 (1981). Fundamental to the right of a fair trial, however, is the court's responsibility to maintain an appearance of impartiality and detachment. See United States v. Nazzaro, 472 F.2d 302 (2d Cir.1973).

Throughout all proceedings, appellant required the assistance of a certified Farsi interpreter to translate the testimony and assist in communications with counsel. At various times, a Farsi word or phrase was at issue. Counsel's infrequent request for the opportunity to consult with appellant was met with a summary denial:

> MR. SCHECHTER: Could I have a moment, your Honor?
>
> THE COURT: For what?
>
> MR. SCHECHTER: To consult with my client.

---

[2]The notes which are referenced in the district court's final instructions have not been located; nor have any other jury notes (T.847, 984). Consequently, this Court should remand this case for a determination as to their location or for a reconstruction hearing.

7

(Pause)

THE COURT: You have two lawyers here. You can
have co-counsel consult with your client.
There's no reason we have to stop the proceed-
ings.

MR. SCHECHTER: May I approach the bench?

THE COURT: No. The next time you need to con-
sult with your client, have Mr. Sussman do it.
You can have him sit next to your client. And
he can pass the note to you (T.107).

In its continuous attempt to move the trial along, the trial court

restricted appellant's consultation with his counsel.

On several occasions, the trial judge made comments in the

jury's presence that suggested a negative perception of defense

counsel's competence:

THE COURT: So the problem with your question,
and I guess I'm going to have to go back and
explain to you very slowly, the problem with
your question is ... (T.362).

* * *

THE COURT: Do you listen at all to the ans-
wers?

MR. SCHECHTER: I listen to every answer.

THE COURT: You obviously didn't because not
five minutes ago she said there wasn't an ad-
dress on the microfiche.

MR. SCHECHTER: I know that.

THE COURT: So why are you asking such a silly
question--... (T.525).

8

Likewise, the judge's discussion, in the presence of the jury, of the Jenck's Act (18 U.S.C.§3500) provided another occasion for the court to demean the defense:

> THE COURT: Do you have this catalogue with you?
>
> THE WITNESS: I had a copy of it at one point.
>
> THE COURT: Is there a copy of the catalogue there? Why should we guess?
>
> Would you like to look at it?
>
> THE WITNESS: Yes, please.
>
> THE COURT: She would like to look at it too.
>
> MR. SCHECHTER: I didn't get this 3500 material.
>
> THE COURT: This is not 3500 material. This is not a statement of this witness. We assume a certain minimal knowledge of the law when you come in here, Mr. Schechter. Your argument that this is 3500 is absurd. Think before you speak (T.518).

These disparaging remarks served to discredit the defense in the eyes of the jury. See, e.g., United States v. Guglielmini, 384 F.2d 602, 605 (2d Cir. 1967) (where this Court criticized the district court's conduct toward defense counsel in a similar instance involving a discussion of the Jenck's Act.)

At other times, the trial court sternly admonished defense counsel in the presence of the jury:

9

THE COURT: Are we back to an area where I indicated I will not accept proof?

MR. SCHECHTER: We're not, your Honor.

MS. CHOO: We're very close, your Honor.

THE COURT: If you cross the line, I'm going to terminate your cross-examination. That's the first sanction. The next one might be to reconsider your *pro hac vice* status.

MR. SCHECHTER: Your Honor, I'm not going to cross the line.

THE COURT: Then don't. What are you asking about? (T.334).

* * *

Q.   Did Mr. Kalantari seem to accumulate his wealth very suddenly --

MS. CHOO: Objection, your Honor.

THE COURT: Sustained.

Q.   Did you know--

THE COURT: One more question along that line and your examination will be terminated. In view of what I said this morning, it's bordering on being in flagrant disregard of the court's order about the issues in the trial. One more question along that line will terminate your examination and also will cause me to consider sanctions (T.509).

* * *

Q.   In any event, you felt no compunction whatsoever in telling these various and sundry lies?

A.   I --

10

> THE COURT: You don't have to dignify that im-
> proper question with a response. Improper and
> your examination is over (T.727).

Such rebukes of trial counsel further tarnished the defense in the eyes of the jury.

The negative atmosphere of this trial reached a new height following summations. The trial court's coercive and demeaning treatment of defense counsel had an obvious impact on the jury. It prompted the jury to express its dissatisfaction in writing and sparked at least one juror to ask "Does the judge get that angry at the performance of counsel in most of his cases?" (T.939). Rather than attempting to mitigate the problem, the trial court reiterated its disapproval of counsel in a direct statement to the jury at the beginning of its final instructions:

> THE COURT: Members of the jury, I know that
> from time to time it seemed to you that this
> case would never end, and from time to time it
> seemed to me that it would never end. However,
> I told you that we would try this case within
> two weeks, and we have. We have done the best
> we can to do that. I certainly have done the
> best I can do to see to it that it gets tried
> quickly.
>
> Before we start, let me say that from
> time to time the jury might have detected my
> dissatisfaction with the way the case was pro-
> ceeding and the efficiency with which it was
> being tried. Let's get it out on the table.
> Some of you have expressed that dissatisfac-
> tion in your own notes to the Court and to the
> parties. I think one of you may even have ex-
> pressed it to the court reporter yesterday. I

11

<u>think the inquiry put to the court reporter
was: Does the judge get that angry about the
performance of counsel in most of his cases?</u>
And the answer is, yes, I do. I have my own
standards as to how a case should be tried and
the efficiency with which it should proceed.
Those standards are not necessarily consistent
with what other judges do. I have expressed my
displeasure in the performance of both sides
during the course of this trial, and I have
not been happy with the efficiency with which
this case has been tried, simply because my
main concern has been to get the case tried
quickly, for I am aware of the burden it
places upon your time and the calendar prob-
lems of the Court to have a case take longer
than it should.

However, bear in mind, as I told you at
the very beginning, that trials are live pro-
ceedings, they are not on tape, and they re-
flect to some extent the personality of the
parties, the personality of the lawyers and
the personality of the judge. Such factors
have nothing whatsoever to do with the issues
which you are going to be asked to resolve
here. Your issue here is whether the govern-
ment has proved its case beyond a reasonable
doubt, and that depends upon your assessment
of the evidence and your assessment of the
credibility of the witnesses. It has nothing
to do with my dissatisfaction with counsel, or
counsel's dissatisfaction with me, or whatever
admonishment may have occurred during the
course of this trial which may reflect either
my personality or my standards or the lawyers'
performance or noncompliance therewith. So get
that out of your mind. It has nothing to do
with this case. That is between them and me.
It does not concern the function that you are
supposed to perform.

You have sworn an oath to give Mr.
Khodadad a fair trial consistent with the law
and the evidence. That determination has noth-
ing to do with whether you like the judge,

12

whether you like the lawyers, whether you are satisfied with their performance or not satisfied with their performance. It has to do with their personalities, but it has nothing to do with the issue which you have sworn by your conscientious oath to resolve. I want to get that up front on the table now so that you understand what that means. That is your oath. You are not to let any of that which is extraneous to your deliberations affect your judgment. That is strictly a matter between the Court and counsel. This is not a popularity contest between lawyers and the judge, it is not a popularity contest between the judge and the jury.

You have to decide this case on the evidence, free of any concern with the personalities involved. I can only express that view in the strongest terms, because Mr. Khodadad is the person whose guilt or nonguilt you are considering, and that has nothing to do with my personality and or the lawyers' personality or my happiness or unhappiness with the speed with which the trial has proceeded.

I want that to be very clear to you, because some of you have expressed that in written notes to the Court and with the court reporter yesterday, which was brought to my attention. Therefore, it is very important that I express that.

Ordinarily, I would give you a fairly canned charge on that, which I gave you at the start of the case, which is that if you think I have some opinion about the case, put it out of your mind. That is all true too, by the way. I frankly don't care how this case comes out. That is your function, not mine. My only function is to see to it that the case is tried efficiently, fairly, and in accordance with the law. That is my only function. I have no opinion about this case one way or the other. That is your job and not mine.

13

My job is to instruct you on the law.
What I have told you is part of the law. The
jury is to decide this case free from bias,
prejudice, or sympathy of any kind, and free
from any personal concerns you may have with
what the lawyers have done or what the Court
thinks about what the lawyers have done. Your
oath is to assess the evidence fairly. Mr.
Khodadad is entitled, both under the Constitu-
tion and laws of the United States, to a fair
trial of the issues of his guilt or nonguilt.
My function is to instruct you on the law.
You, as the jury, have the obligation to ac-
cept the law as I give it to you. You don't
have the power, nor do you have the freedom,
to decide for yourselves what you think is
fair or do what you think is right in accor-
dance with your own notions of rough justice.
That is not what a jury is permitted to do.
Under our system, the Court is the sole judge
of the law.

The jury is the sole judge of the facts.
You, the jury, decide what the facts are, but
you must apply the law that the Court gives to
you. It is not your function to correct me or
to guess whether I am right or wrong. There is
another court that sits on the 17th floor that
considers that question in the event that it
gets there. You should understand that (T.939-
43) (emphasis added).

This instruction did little to cure the prejudicial effect of

the trial court's avowed disdain for defense counsel. Contrast

United States v. Bejasa, 904 F.2d 137, 141-42 (2d Cir.), cert. de-

nied, 498 U.S. 921, 111 S.Ct. 299, 112 L.Ed. 252 (1990), (where the

district court's cautionary instruction was deemed to have cured

any possible prejudice); United States v. Robinson, 635 F.2d at 985

(where any prejudice to appellants was deemed at least partially

14

mitigated by a lengthy closing instruction in which the judge expressed gratitude to defense counsel for their conscientious efforts and for "work well done.")

We acknowledge that a review of appellant's claim is difficult because the Court is "unable to observe directly the interaction of personalities during trial." Pisani, 773 F.2d at 402. Nonetheless, while this Court's review is limited to "'the cold black and white of a printed record' ", (United States v. Grunberger, 431 F.2d 1062, 1067 (2d Cir.1970) (quoting United States v. Ah Kee Eng, 241 F.2d 157, 161 (2d. Cir.1957), the fact that the jury reacted to the strained atmosphere of this trial, both verbally and in writing, distinguishes this case from others wherein this Court has addressed claims of judicial intemperance. The instances cited herein may not seem so indistinguishable from other cases where this Court has held that while "remarks which, judged in isolation from the totality of the record throughout the dispassionate looking glass of hindsight, 'would better have been left unsaid'" (Bejasa, 904 F.2d at 141, quoting Robinson, 635 F.2d at 985), their cumulative effect was not a deprivation of the right to a fair trial. See, e.g., United States . Rosa, 11 F.3d 315 (2d Cir.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1565, 128 L.Ed. 211 (1994), United States v. Mickens, 926 F.2d 1323 (2d Cir. 1991), cert. denied, _ U.S. ___, 112 S.Ct. 940, 117 L.Ed. 111 (1992); Bejasa, 904 F.2d

15

137; United States v. DiTommaso, 817 F.2d 201 (2d Cir. 1987). How-
ever, when coupled with the written notes and verbal inquiry by the
jurors, these remarks can only have served to discredit the defense
in the minds of the jury to appellant's detriment.

In the present case, the jury cannot be regarded as having
freely come to its own conclusion when the court so obviously dis-
paraged appellant's counsel. Through its attitude toward trial
counsel, the district court imparted a message of disapproval to
the jury and seemingly invited the jury to take a negative view of
appellant. In a case such as this, where the jury was so keenly
attuned to the court's disdain for defense counsel, as evidenced by
its notes to the court and verbal inquiry, and where the court di-
rectly confirmed this notion while charging the jury, the court's
contempt for counsel surely affected the jury's deliberations.

The trial court left the jury with the indelible impression
that it held trial counsel in low regard. The charge further con-
veyed to the jury the court's low opinion of the defense. Such con-
duct, especially during a fairly short trial as this, dealt a de-
structive blow to appellant's defense and effectively served to
severely prejudice appellant in the eyes and minds of the jury.

A review of the trial court's comments upon an examination of
the record leads to the firm impression that appellant did not re-
ceive a fair trial and the effective assistance of counsel to which

our laws entitle him. Accordingly, the judgment of conviction should be reversed and the case remanded for a new trial. In the alternative, this case should be remanded for a hearing as to the whereabouts or the contents of the jury notes.

## POINT II

DURING THE SENTENCE PROCEEDING, THE
DISTRICT COURT COERCED APPELLANT
INTO WAIVING A VALUATION HEARING AND
IMPROPERLY CALCULATED APPELLANT'S
ADJUSTED OFFENSE LEVEL

On appeal, appellant claims he was pressured into waiving his right to contest his guideline calculations. During his sentencing proceeding, appellant contested the valuation used to calculate his adjusted offense level. The district court granted an evidentiary hearing but cautioned appellant that he could face sentencing enhancements if he put in evidence or testified at the hearing. The court also stated that appellant would be remanded pending the hearing. Consequently, appellant declined his opportunity to challenge his guideline calculations. This waiver was made under duress.

In addition, appellant argues that the district court improperly calculated his adjusted offense level by erroneously including the value of Kalantari's rugs and other artwork. Appellant contends that only the value of the Brueghel painting should have been used to calculate his offense level under United States Sentencing Guidelines ("U.S.S.G.") §2B1.1.

The Probation Department fixed the aggregate value of all items given to appellant by Kalantari at $10,000,000 based on

18

Kalantari's estimation (PSR¶16,24)[3] but qualified that "[w]e are awaiting a more detailed accounting of the stolen property and the value from the victim." (PSR¶16). The district court, crediting Kalantari's trial testimony, accepted the guideline range as set forth in the Presentence Report (S.28). For guideline purposes, appellant was "held responsible for all items stolen from Kalantari in 1978/79. Pursuant to Section 1B1.3, the theft of the Brueghel painting, other works of art and Persian rugs by  the defendant is included in the following guideline calculations as relevant con-duct." (PSR ¶22). The district court found that "the theft of the painting and the theft of the rug was part of the same criminal conduct and therefore clearly constitutes relevant conduct... by a preponderance of the evidence and... beyond a reasonable doubt..." (S.22).

Appellant objected to the court's relevant conduct determina-tion (S.22) and contested the value of property used to calculate the offense level:

> MR: SCHECHTER: The defendant has never been given an adequate opportunity to contest the value of the articles.

> THE COURT: He had the opportunity at trial.

---

[3]Numbers in parenthesis preceded by "PSR¶" refer to paragraphs of the Presentence Report; those preceded by "S." refer to pages of the transcript of the sentence proceeding held on December 8, 1994.The Presentence Report and the Sentencing Transcript are reproduced in the Joint Appendix.

19

MR. SCHECHTER: That was not an issue at trial.

THE COURT: I heard testimony at the trial. You cross-examined at the trial --

MR. SCHECHTER: There are a number of collateral issues.

THE COURT: All right. Do you want a hearing? I will let your client testify, but bear in mind, there is at present no enhancement for obstruction of justice. If your client wants to testify, that game is open.

MR. SCHECHTER: Is that the only avenue?

THE COURT: You want to put in evidence of valuation --

MR. SCHECHTER: Does it have to come from his mouth?

THE COURT: You could have made a request for hearing long before now. Why didn't you? You see I am getting impatient with you. You have had 7 months. There's been no request for a hearing, but I will give you one on the issue of valuation if you want one. But bear in mind there is a down side to that.

MR. SCHECHTER: You mean if the defendant testifies.

THE COURT: If he testifies or puts on evidence which I find to be fabricated.

MR. SCHECHTER: I would also like --

THE COURT: You can have your hearing on that issue Monday.

MR. SCHECHTER: Thank you.

THE COURT: Stay here for the weekend, we will have the hearing on Monday. Bring in your wit-

20

nesses. What other objections do you have on the sentencing?

MR. SCHECHTER: I did want to also say to the court that I don't think it fair or right to hold against the defendant in any context at all the fact that his lawyers decided to present a motion directed to his confession. The defendant didn't testify and--

THE COURT: I am not holding it against him. What I am saying to you is he allowed his son to testify. What I said was, and I said it at the time of the hearing, he put his son on to testify and --

MR. SCHECHTER: I put the son on to testify, he didn't.

THE COURT: He could have said no, all right?

MR. SCHECHTER: That is speculative, Judge.

THE COURT: In any event, that is not part of the sentencing. If you want a hearing on valuation, bring in all the proof you have Monday at 11:00.

MR. SCHECHTER: May I consult for a moment with the defendant?

THE COURT: If you don't want a hearing you can let me know. But if you want one, we are not going to delay his sentence for a protracted period of time, and I am going to remand him pending the hearing so he doesn't have to go back to California.

MR. SCHECHTER: I withdraw any request for hearing.

THE COURT: Discuss it with your client first because he is going to accuse you of violation if you don't discuss it with him.

21

MR. SCHECHTER: May I have a moment to discuss it with him?

THE COURT: Yes. I will take my sentence next in the robing room.

(Recess)

MR. SCHECHTER: Your Honor, the defendant declines to present evidence at a hearing. First of all, he has no personal knowledge as to or recollection as to the value of those particular items. The defendant contents himself with the observation that he doesn't feel it's his burden of proof in this matter and that --

THE COURT: It's not?

MR. SCHECHTER: I don't believe it is. And that we don't feel that the record at trial sufficiently makes out by clear and convincing or preponderance or any standard of evidence whatsoever --

THE COURT: Then I will let the government refresh my recollection as to what the evidence was.

MR. SCHECHTER: May I just finish what I am saying?

THE COURT: Yes.

MR. SCHECHTER: Any value which would have been testified at trial would have been the value of goods as they were in 1979 and 1980. Second of all, there was no adjustment for currency valuation. I don't think it's speculative to point out that the value of the Iranian rial is subject to dramatic fluctuations depending on the current state of relations between the government of Iran and the United States.

All in all, I would just say that it's the defendant's contention that this matter

22

was never proved at trial and that it's the government's burden at this time, not ours.

THE COURT: Then I will have the government tell me what the trial proof was.

MS. CHOO: Mr. Kalantari was asked about the value of the property by Mr. Schechter on cross. He said that at the time it was stolen from him it was worth 5 to 10 million dollars. Mr. Schechter also questioned him about testimony he had given in the English proceeding in the late '80s about the value of the carpets alone, leaving all the other valuables such as the painting aside, in which he testified that it was worth 10 million dollars.

THE COURT: I think he testified that some of these rugs were worth $35,000, $40,000 each, didn't he?

MS. CHOO: I don't remember testimony about individual rugs, your Honor.

THE COURT: I remember testimony about $35,000, $40,000 for an individual rug. How many rugs were taken?

MS. CHOO: About 290 rugs, your Honor.

THE COURT: I find it more than sufficient to persuade, and I adhere to my previous ruling, that value was established at the trial. You could take it to the Court of Appeals.

MR. SCHECHTER: I suppose I can take anything to the Court of Appeals --

THE COURT: No, you have to have a finding from me. If you have evidence that you want to put in, but I take it you do not.

MR. SCHECHTER: At this moment I don't. I have no further arguments on this objection.

23

> THE COURT: I will accept the valuation that
> the guideline ranges as set forth in the pre-
> sentence report.
>
> MR. SCHECHTER: The presentence report does not
> disclose the basis, it says according to in-
> formation available to the government but has
> not shared the source of that information with
> the court.
>
> THE COURT: I am relying on the trial record.
> The trial record is sufficient to establish
> value, and I do recall the testimony of Mr.
> Kalantari; I found it credible and persuasive
> and supported by the nature of the property
> taken -- I do believe there was testimony in
> the record about any one of these rugs being
> worth anywhere from $40,000 and there were a
> large number of them taken; and the evidence
> seems to be well supported by the record. If
> not, the Court of Appeals will vacate that
> finding (S.23-29) (emphasis added).

At the conclusion of the December 8, 1994 sentencing proceed-
ing, the court imposed a sentence of 41-months' imprisonment. Con-
trary to its threat of remand pending the valuation hearing, the
court permitted appellant to voluntarily surrender to commence his
sentence on January 2, 1995.

The value of property in issue plays an important role in de-
termining sentences for violations of 18 U.S.C.§§2114, 2115. See
U.S.S.G. §2B1.1. Pursuant to U.S.S.G. §2B1.1(b)(Q), 16 levels were
added to appellant's base offense level based on property valued up
to $10,000,000, resulting in an adjusted offense level of 20, Crim-
inal History Category II, and a guideline range of 37 to 46 months.

24

The Brueghel painting alone, which in 1990 was valued at $1,000,000, would have required an increase of only 13 levels [U.S.S.G. §2B1.1(b)(N)], resulting in an adjusted offense level of 17 and a guideline range of 27 to 33 months.

Kalantari's property was unlawfully converted in Europe after it was transported from Iran in 1979. Any "theft" of Kalantari's property was beyond the jurisdiction of the district court. Jurisdiction in the district court was limited to the crimes charged in the indictment which concerned interstate transport of the Brueghel painting from California to New York. Any wrongful taking or conversion of Kalantari's property by appellant was not an element of these offenses, only proof of appellant's knowledge that the property had been stolen or unlawfully converted. See 18 U.S.C. §§2114, 2115.

The district court's determination that the unlawful conversion in Europe of Kalantari's rugs and other artwork constituted relevant conduct did not justify inclusion of their value into a calculation of appellant's adjusted offense level. This Circuit has rejected consideration of foreign activities as "relevant conduct" for §1B1.3 purposes. See United States v. Azeem, 946 F.2d 13 (2d Cir.1991).

In Azeem, 946 F.2d at 16-18, this Court held that consideration of foreign narcotics activities in the calculation of that

25

defendant's base offense level was inappropriate despite a finding that the foreign conduct was part of the same course of conduct as the offense of conviction, i.e., heroin importation. Likewise, the unlawful conversion abroad of Kalantari's rugs and other artwork was not a crime against the United States and should not have been included in a calculation of appellant's offense level. See Azeem, 946 F.2d at 16.

The Brueghel painting was purchased on July 8, 1977 for 99,000 British pounds sterling (T.377-78; Government Exhibit 3, the purchase invoice from Christie's in London). In 1990, Ian Kennedy, Senior Vice President of Christie's and head of its Old Masters Painting Department, inspected the Brueghel Painting and placed an insurance value of $1,000,000 on it (T.423-24, 430). The $5,000,000 to $10,000,000 aggregate property valuation used to calculate the offense level was based on Kalantari's estimation (T.292) and was unsupported by verifying documentation or other corroborating information.

The valuation of the property bore directly on the sentence imposed upon appellant. Reacting to the coercive threats of the district court, appellant forfeited his legitimate right to challenge his guideline calculations. Moreover, the district court erroneously calculated appellant's adjusted offense level. Accordingly, the sentence should be vacated and the case remanded for

26

resentencing following an evidentiary hearing on the value of the property used to calculate appellant's adjusted offense level.

**CONCLUSION**

For the reasons stated in Point I, the judgment of conviction should be reversed and the case remanded for a new trial. In the alternative, this case should be remanded for a hearing as to the whereabouts or the contents of the jury notes. For the reasons stated in Point II, the sentence should be vacated and the case remanded for resentencing following a valuation hearing.

Respectfully submitted,

Rochman Platzer Fallick & Sternheim
Attorneys for Defendant-Appellant
Parviz Khodadad
666 Third Avenue, 17th Floor
New York, New York 10017
(212) 697-4090

Barry M. Fallick
Bobbi C. Sternheim
Of Counsel

28