# 94-1693

*To Be Argued By*
KATHERINE M. CHOO

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 94-1693

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

PARVIZ KHODADAD,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

MARY JO WHITE,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*

KATHERINE M. CHOO,
GUY PETRILLO,
*Assistant United States Attorneys,
Of Counsel.*

## TABLE OF CONTENTS

PAGE

Preliminary Statement.............................. 1

Statement of Facts ................................. 2

    A.   The Government's Case .................. 2

        1.   Khodadad Fraudulently Obtains The Breughel......................... 3

        2.   Kalantari Searches For The Breughel And Other Valuables Taken By Khodadad............................ 5

        3.   Khodadad Attempts To Sell The Breughel In The United States ..... 6

    B.   The Defense Case......................... 9

ARGUMENT:

POINT I—The District Court Was Not Biased Against Khodadad ............................ 10

    A.   Applicable Legal Standards.............. 12

    B.   The District Court's Remarks To Counsel Were Provoked By Counsel And Were Not Prejudicial................................. 14

    C.   Any Prejudice Was Cured By The Court's Instructions To The Jury................. 27

    D.   The District Court Did Not Restrict An Attorney-Client Communication......... 33

POINT II—A Remand For Resentencing Is Appropriate ..................................... 35

CONCLUSION ...................................... 37

ii

TABLE OF AUTHORITIES

*Cases:*                                                        PAGE

*Richardson* v. *Marsh*, 481 U.S. 200 (1987)........    32

*United States* v. *Azeem*, 946 F.2d 13 (2d Cir.
    1991) .................................... 35, 36, 37

*United States* v. *Bejasa*, 904 F.2d 137 (2d Cir.
    1990)............................................    12

*United States* v. *Boatner*, 478 F.2d 737 (2d Cir.
    1973)................................... 24, 25 n.*

*United States* v. *Calfon*, 607 F.2d 29 (2d Cir.
    1979), *cert. denied*, 444 U.S. 1085 (1980)....    11

*United States* v. *Cruz*, 455 F.2d 184 (2d Cir.),
    *cert. denied*, 405 U.S. 918 (1972)............    30

*United States* v. *Curcio*, 279 F.2d 681 (2d Cir.),
    *cert. denied*, 364 U.S. 824 (1960) ...........12, 30

*United States* v. *D'Anna*, 450 F.2d 1201 (2d Cir.
    1971)............................................    30

*United States* v. *DiPaolo*, 804 F.2d 225 (2d Cir.
    1986)............................................    22

*United States* v. *DiTommaso*, 817 F.2d 201
    (2d Cir. 1987)...........................12, 23, 30

*United States* v. *Guglielmini*, 384 F.2d 602
    (2d Cir. 1967), *cert. denied*, 400 U.S. 820
    (1970) ..................................12, 23 n.*

*United States* v. *Keppler*, 2 F.3d 21 (2d Cir.
    1993)............................................    36

*United States* v. *Lopez*, 937 F.2d 716 (2d Cir.
    1991)............................................    11

iii

PAGE

*United States* v. *Manko*, 979 F.2d 900 (2d Cir.
1992), *cert. denied*, 113 S.Ct. 2993 (1993) ...   12

*United States* v. *Mickens*, 926 F.2d 1323 (2d Cir.
1991), *cert. denied*, 502 U.S. 1060 (1992) ....   29

*United States* v. *Pellegrino*, 470 F.2d 1205
(2d Cir. 1972), *cert. denied*, 411 U.S.
918 (1973) .........................21, 23 n.*, 24, 26

*United States* v. *Pisani*, 773 F.2d 397 (2d Cir.
1985) .........................12, 17, 14, 21, 22, 35

*United States* v. *Remini*, 967 F.2d 754 (2d Cir.
1992) ..........................................   17

*United States* v. *Robinson*, 635 F.2d 981
(2d Cir. 1980), *cert. denied*, 451 U.S.
992 (1981) .........................12, 19, 24, 25, 30

*United States* v. *Roldan-Zapata*, 916 F.2d 795
(2d Cir. 1990), *cert. denied*, 499 U.S. 940
(1991) ..........................................   17

*United States* v. *Rosa*, 11 F.3d 315 (2d Cir. 1993),
*cert. denied*, 114 S.Ct. 1565 (1994) ..........   23

*United States* v. *Ross*, 321 F.2d 61 (2d Cir.),
*cert. denied*, 375 U.S. 894 (1963) ............   25

*United States* v. *Vega*, 589 F.2d 1147 (2d Cir.
1978) ..........................................   11

*United States* v. *Viola*, 35 F.3d 35 (2d Cir.
1994) ..........................................   36

*United States* v. *Weiss*, 491 F.2d 460 (2d Cir.),
*cert. denied*, 419 U.S. 833 (1974) ............ 16, 25

iv

PAGE

*United States* v. *Wilkinson*, 754 F.2d 1427
(2d Cir.), *cert. denied*, 472 U.S. 1019
(1985)........................................... 11

*Other Authorities:*

U.S.S.G. § 2B1.1 (1992) ........................... 36

U.S.S.G. § 2B1.1(a) (1992) ........................ 36 n.*

U.S.S.G. § 2B1.1(b)(1)(N) (1992)................. 36 n.*

U.S.S.G. § 2B1.1(b)(1)(Q) (1992)................. 36 n.*

U.S.S.G. § 4A1.2(h)................................ 36

U.S.S.G. § 4A1.3(a) ............................... 36

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket No. 94-1693

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

PARVIZ KHODADAD,

*Defendant-Appellant.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

### Preliminary Statement

Parviz Khodadad appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York on December 8, 1994, following a two-week jury trial before the Honorable John E. Sprizzo, United States District Judge.

Indictment 92 Cr. 488 (JES), in two counts, was filed on June 5, 1992. Count One charged Khodadad with transporting in interstate commerce an oil painting by Pieter Breughel The Younger, worth approximately $1,000,000, knowing that this work of art had been converted and taken by fraud, in violation of Title 18, United States Code, Sections 2314 and 2. Count Two charged Khodadad with receiving

and possessing the same work of art, after its conversion and after the same had crossed the boundary of a State and the United States, knowing the same to have been converted and taken by fraud, in violation of Title 18, United States Code, Sections 2315 and 2.

Trial began on May 23, 1994, and ended on June 3, 1994, when the jury returned a guilty verdict on both counts. On December 8, 1994, the District Court sentenced Khodadad to 41 months' imprisonment. The District Court also imposed a term of supervised release of three years and imposed a $10,000 fine and the mandatory assessments.

Khodadad is serving his sentence.

## Statement of Facts

### A. The Government's Case

The evidence at trial convincingly established that Parviz Khodadad stole from a friend in Iran an original Old Masters painting, caused the painting to be transported from Europe to California, and then attempted to sell the painting in New York. The evidence further established that, through an agent, Khodadad possessed the stolen painting—"The Flemish Proverbs" by Pieter Breughel The Younger (the "Breughel")—in New York after the painting was transferred from California to New York. The Government's evidence included the testimony of the Breughel's owner, Seyed Mostafa Kalantari, and members of his family; Robert Ogle, the individual to whom Khodadad consigned the Breughel for sale in 1991 and 1992; and art experts from the Sotheby's, Christie's and Habsburg-Feldman auction houses in

3

New York, who were shown the Breughel by Khodadad and Ogle. In addition, the Government offered certain sworn statements by Khodadad concerning his participation in the transportation of Kalantari's valuable property from Iran to Europe and physical evidence including the Breughel, correspondence from Sotheby's, Christie's, Habsburg-Feldman and other interested buyers of the Breughel, consignment agreements between Khodadad and Ogle, photographs, telephone records and other documents.

## 1.  Khodadad    Fraudulently    Obtains    The Breughel

In July 1977, Seyed Mostafa Kalantari, a wealthy Iranian national, purchased the Breughel at Christie's in London, England, and had it shipped to his home in Teheran, Iran. (Tr. 105-06, 109-10; GX 1A, GX 3).* Kalantari, a collector of valuable paintings, Persian rugs, crystal and silverware (Tr. 105), displayed the Breughel prominently in his home. (Tr. 114).

In early 1979, with the overthrow of the Shah of Iran, the political situation in Iran became unstable. Accordingly, Kalantari sent his family to live in France (Tr. 121-23), and stored his valuables in a basement and storage room in his home. (Tr. 123-27). Khodadad, a close family friend of Kalantari, then

---

*  "Tr." refers to the trial transcript; "GX" refers to a Government exhibit at trial; "DX" refers to an exhibit of the defendant at trial; "Sent. Tr." refers to the transcript of the sentencing proceeding of December 8, 1994; "[Date] Tr." refers to the transcript of proceedings before the District Court on the date indicated; "Br." refers to Khodadad's brief on appeal; "A." refers to the appendix to that brief.

4

suggested to Kalantari that he move his valuables out of his home altogether, and Kalantari agreed. In April 1979, Khodadad helped Kalantari move many of his precious rugs to the homes of Kalantari's sisters in Teheran. (Tr. 127-30).

Khodadad thereafter suggested to Kalantari that he transport his valuables to the Federal Republic of Germany through a shipping company known to Khodadad. (Tr. 131). Again, Kalantari agreed. In May 1979, Khodadad and Kalantari packed approximately ninety-five of Kalantari's Persian rugs. Khodadad brought them to a shipper, and, approximately one month later, Khodadad provided shipping documents to Kalantari to confirm that the rugs had been shipped to Germany. (Tr. 133-35; GX 14A, GX 14B, GX 14C, GX 14D). Khodadad urged Kalantari to move the rest of his valuable property to Germany, including his remaining rugs, paintings, antiques, crystal and silverware. (Tr. 138). Kalantari agreed, and, shortly thereafter, Khodadad packed the Breughel and twenty-three other valuable paintings, hundreds of precious rugs, crystal and silverware and took them from Kalantari's home. (Tr. 139, 151, 159-164; GX 5C, GX 5D, GX 5E, GX 5F, GX 5G, GX 5H, GX 6A, GX 11, GX 12, GX 13).

In July 1979, Kalantari left Iran for France. Because Khodadad had told him that his property had been sent to a particular storage facility in Frankfurt, Germany (Tr. 170), in December 1979, Kalantari traveled there. When he arrived, he learned that a "Mr. Lamm" had taken possession of his property. Kalantari telephoned Khodadad in Iran. Khodadad reassured him, telling him that Lamm was a friend of Khodadad's and had done him a favor by taking custody of the property. (Tr. 172-74). When Kalantari

5

obtained Lamm's address from the storage company and visited him, however, Lamm would not make arrangements to return Kalantari's property. Khodadad, still in Iran, nevertheless continued to reassure Kalantari, telling him that his property would be delivered to him and not to worry. (Tr. 177).

Kalantari waited, telephoning Khodadad periodically to inquire about the status of his property. (Tr. 177). Khodadad continued to tell Kalantari that his valuables "were on the way." (Tr. 391). In late 1980 or 1981, Kalantari learned that Khodadad was in Dusseldorf, Germany, and spoke to him by telephone. During that conversation Khodadad told Kalantari that someone had stolen Kalantari's property. (Tr. 182).

## 2. Kalantari's Search For The Breughel And Other Valuables Taken By Khodadad

Kalantari proceeded to search for his property. First, he traveled to London, England, where he met with two art gallery owners—Alfred Cohen and Richard Green—and told them about his lost paintings. In addition to asking these dealers to try to obtain information about the missing paintings, Kalantari asked Cohen to review Christie's and Sotheby's catalogues for his paintings. Kalantari also informed Christie's in London about his loss. (Tr. 370-71, 390).

In April 1983, Kalantari located eight of his Persian rugs at a customs house in Paris, and commenced a lawsuit in France to recover the rugs and the Breughel. (Tr. 372-73). After recovering the rugs through this proceeding, he provided photographs of his lost paintings to French authorities. (Tr. 371-72).

6

Kalantari also visited Christie's office in Paris to ask for assistance in recovering the Breughel and informed a Paris gallery owner that the Breughel was missing. (Tr. 373).*

During 1984, Kalantari heard that Khodadad's Paris residence had been burglarized and that fifteen of Kalantari's paintings had been stolen from the residence. (Tr. 858). Kalantari eventually located five of the paintings in London in June 1986, when they were put up for sale at Christie's. (Tr. 190). Kalantari successfully sued for the return of these five paintings. In connection with that proceeding, Kalantari obtained a sworn statement from Khodadad, who was living in California at the time, that Khodadad had kept fifteen of Kalantari's paintings in his Paris home, that his home had been burglarized and the fifteen paintings stolen, and that the paintings in Christie's possession were five of the stolen paintings. (Tr. 868; GX 7, GX 7T). In February 1987, in connection with a legal proceeding in Germany initiated by Kalantari against Lamm and others, Khodadad also provided sworn testimony in San Francisco, California, that he had been present in Iran when Kalantari's rugs were packed and taken from Kalantari's home for shipment to Germany. (Tr. 868-69; GX 50).

### 3. Khodadad Attempts To Sell The Breughel In The United States

In 1990, Khodadad approached Robert Ogle, an auctioneer, at Ogle's gallery in Redwood City, California, and told him that he owned the Breughel and

---

* Kalantari and his nephew made additional efforts to find the Breughel "[a]nywheres in the world that it could be." (Tr. 374).

7

wanted to sell it with Ogle's assistance. (Tr. 533-35). After viewing the Breughel at Khodadad's home in Danville, California, Ogle contacted Christie's and Sotheby's in New York to confirm the authenticity of the Breughel, assess its market value and solicit interest in a sale. (Tr. 535-37). Ian Kennedy, the Old Masters painting expert at Christie's, confirmed that the Breughel was authentic and expressed an interest in coming to California to examine it. Ogle kept Khodadad apprised of his contacts with Kennedy and of Kennedy's plans to visit. In April 1990, Kennedy flew from New York to California to view the Breughel at Ogle's home. The viewing was attended by Khodadad and Khodadad's son. After the viewing, Khodadad and his son took the Breughel away. (Tr. 425-29, 540, 542; GX 15A, GX 15B, GX 16A, GX 16B, GX 16C).

Ogle also contacted Sotheby's Old Masters painting expert, George Wachter. Wachter also asked to see the Breughel (Tr. 547-48), and traveled from New York to California to inspect it. Again, Khodadad and his son attended the viewing. Ogle photographed Khodadad's son displaying the Breughel to Wachter. (Tr. 742; GX 18).

After these art experts had inspected the Breughel, Ogle received numerous written communications from Christie's and Sotheby's in New York in which each expressed an interest in selling the Breughel at their respective Old Masters sales in New York. Ogle provided copies of these communications to Khodadad. (Tr. 548-554; GX 21A, GX 21B, GX 21C, GX 21D, GX 23A, GX 23B). Khodadad ultimately declined the offers of the auction houses. (Tr. 554). Ogle thereafter contacted art dealers, brokers and museums in New York, California, New Orleans, Austria, Canada, Germany, and the Netherlands concerning a possible sale

8

of the Breughel, and received various communications in response. (Tr. 557-59; GX 29A, GX 29B, GX 29C, GX 29D, GX 29E, GX 29F, GX 29G, GX 29H, GX 29I, GX 29J, GX 29K, GX 29L, GX 28M, GX 29N). Ogle kept Khodadad apprised of his selling efforts and the level of interest expressed by potential purchasers. (Tr. 557-58).

In early 1991, Khodadad contacted Habsburg-Feldman, another auction house in New York, to discuss a possible consignment of the Breughel for sale. (Tr. 398, 756-57). Geza von Habsburg, the auction house chairman, Mahiar Makzani, an Iranian gemologist, and others flew from New York to California to examine the Breughel and various pieces of jewelry also being offered by Khodadad. After Khodadad showed them the Breughel at his home, he discussed consigning the painting to Habsburg for sale at its upcoming auction in New York. (Tr. 398- 400). During the following month, Khodadad and his son negotiated the sales price of the Breughel (Tr. 759), but Khodadad ultimately determined not to consign the painting to Habsburg-Feldman. (Tr. 401-02). At one point during the negotiations, Khodadad advised Makzani that he had more paintings and jewelry in bank vaults in France, and asked for Makzani's assistance in retrieving those valuables. Makzani declined. (Tr. 762-63).

In June 1991, Khodadad consigned the Breughel to Ogle for sale on the conditions that the painting be sold for no less than $900,000, that Khodadad's interest in the painting not be disclosed, and that a loan of $250,000 be provided to Khodadad in return for a security interest in the painting. (Tr. 565; GX 19, GX 24, GX 30, GX 31, GX 32). In May 1992, a dealer in New York contacted Ogle and told him that a client

9

was interested in purchasing the Breughel. (Tr. 567-68). Ogle then negotiated terms and conditions of the sale with the New York dealer, advised Khodadad of the price that was being offered, and told Khodadad that "this was a serious offer." (Tr. 569). After Ogle reached agreement with the New York dealer on the terms of the sale, Ogle advised Khodadad that he intended to go to New York to show the Breughel. (Tr. 570). When Khodadad indicated that he wanted to go to New York with Ogle, Ogle declined because Khodadad's insistence at prior showings that his identity remain concealed had raised suspicions. (Tr. 570-71). Accordingly, Ogle shipped the Breughel from San Francisco to New York (Tr. 572-73, GX 41A, GX 41B), and on May 26, 1992, traveled alone to New York. (Tr. 572).

On May 27, 1992, Ogle went to a bonded warehouse where the Breughel was to be shown to the interested buyer. (Tr. 576-77). When Ogle arrived at the warehouse, Special Agents of the Federal Bureau of Investigation ("FBI") seized the Breughel and questioned Ogle. (Tr. 577-78).

During June 1992, after Khodadad's arrest in this case, Khodadad contacted a friend, Massoud Khosrowpanah, and asked him to contact Kalantari to tell him that he, Khodadad, was "ready to help [Kalantari] . . . to resolve this problem." (Tr. 492). Previously, Khodadad had informed Khosrowpanah that he had moved all of Kalantari's paintings and rugs out of Iran. (Tr. 473).

## B. The Defense Case

The defendant did not testify. He called Ogle, FBI Special Agent Phil Rence, Kalantari, and Kalantari's

nephew Farokh Kabir as witnesses. Ogle testified that he traveled to Austria on two occasions and opened a bank account. (Tr. 771, 775). Agent Rence testified that on May 29, 1992, he arrested Khodadad at the defendant's home and that Khodadad spoke limited English. (Tr. 794-98). Kabir testified that he corresponded with Khodadad in 1986. (Tr. 802-05). Kalantari testified that Kabir had been able to recover one rug from Khodadad in 1984 by purchasing it back for 14,000 francs. (Tr. 858). Kalantari also testified that Khodadad gave testimony in 1987 at the German Consulate in San Francisco relating to the loss of Kalantari's rugs (Tr. 862-63), and provided a letter sworn to and signed by Khodadad in connection with the London proceeding bought by Kalantari to regain custody of five of his paintings. (Tr. 866-68).

## ARGUMENT

### POINT I

### The District Court Was Not Biased Against Khodadad

Assembling a short list of sharp remarks by the District Court to his trial counsel, all of which were occasioned by questions or comments of counsel that violated clear rulings of the District Court or constituted unfair or confusing remarks by counsel before the jury, Khodadad contends that he was deprived of a fair trial because the District Court was impatient and disdainful of his lawyer in the presence of the jury. (Br. 8-14). Khodadad also asserts that the District Court's instruction to the jury which was designed to cure any possible prejudice arising from

11

the Court's remarks to counsel effectively aggravated the prejudicial impact of the Court's remarks. (Br. 6-7, 11-17). In addition, Khodadad asserts that on one occasion the District Court improperly restricted his communication with counsel.

Khodadad's claims must fail, first, because none of these claims was raised below. Thus, absent "plain error," Khodadad has waived any claim to appellate review. *United States* v. *Lopez*, 937 F.2d 716, 725 (2d Cir. 1991); *see United States* v. *Calfon*, 607 F.2d 29, 31 (2d Cir. 1979), *cert. denied*, 444 U.S. 1085 (1980) ("plain error means error going to the "very essence of the case"); *United States* v. *Wilkinson*, 754 F.2d 1427, 1432 (2d Cir.), *cert. denied*, 472 U.S. 1019 (1985) (doctrine of "plain error" is to be used sparingly). Counsel is not relieved of an obligation to make timely objections merely because it is the trial judge's actions that are viewed as objectionable. *Cf. United States* v. *Vega*, 589 F.2d 1147, 1152 (2d Cir. 1978).

Waiver aside, Khodadad's fair trial claim must also fail because it is not supported by a fair reading of the record. While some of the District Court's more pointed remarks ideally should not have issued, the remarks were provoked by counsel and went only to counsel's conduct in violation of Court rulings, not the underlying merits of the case against Khodadad or his defense. In addition, the District Court also chastised Government counsel before the jury, thereby showing no partisanship. Most importantly, the Court's instructions to the jury forcefully directed the jury to focus on the evidence alone and to ignore colloquy of the Court and counsel or any perception that the Court was dissatisfied with the performance of counsel. Finally, with respect to Khodadad's claim that the Court interfered with his communication

12

with counsel, the record establishes that the potential communication at issue was not an attorney-client communication at all but a communication between an interpreter and counsel.

Accordingly, Khodadad's fair trial claim should be rejected.

## A.  Applicable Legal Standards

In determining whether a trial judge's conduct has deprived a defendant of a fair trial, a reviewing court must not focus on isolated incidents taken out of context, but instead must

> examine the entire record and attempt to determine whether the conduct of the trial has been such that the jurors have been impressed with the trial judge's partiality to one side to the point that this became a factor in the determination of the jury.

*United States* v. *Guglielmini*, 384 F.2d 602, 605 (2d Cir. 1967), *cert. denied*, 400 U.S. 820 (1970); *see also United States* v. *Manko*, 979 F.2d 900, 905 (2d Cir. 1992), *cert. denied*, 113 S. Ct. 2993 (1993). In the final analysis, the issue is not whether the trial judge's conduct may have left something to be desired, but whether his behavior was "so prejudicial that it denied [the defendant] a fair, as distinguished from a perfect, trial." *United States* v. *Robinson*, 635 F.2d 981, 984 (2d Cir. 1980), *cert. denied*, 451 U.S. 992 (1981); *see also United States* v. *DiTommaso*, 817 F.2d 201, 220 (2d Cir. 1987); *United States* v. *Pisani*, 773 F.2d 397, 402 (2d Cir. 1985). Reversal is appropriate only if the trial judge's conduct "so impressed the jury with the trial judge's partiality to the prosecution

13

with the trial judge's partiality to the prosecution that this became a factor in determining the defendant's guilt." *United States* v. *Pisani*, 773 F.2d 397, 402 (2d Cir. 1985); *see United States* v. *Bejasa*, 904 F.2d 137, 141 (2d Cir. 1990) ("This Court will reverse when it 'appears clear to the jury that the court believes the accused is guilty'") (quoting *United States* v. *Nazarro*, 472 F.2d 302, 303 (2d Cir. 1973)); *United States* v. *Robinson*, 635 F.2d at 984 (trial judge's conduct "must never reach the point at which it appears clear to the jury that the court believes the accused is guilty").

It is similarly well settled that a trial judge "will often have a duty to participate actively" in a case to ensure that issues are clearly presented and to prevent confusion in the questioning of witnesses or statements of counsel. *United States* v. *Curcio*, 279 F.2d 681, 682 (2d Cir.), *cert. denied*, 364 U.S. 824 (1960); *see also Pisani*, 773 F.2d at 403. Indeed, a trial judge "is more than a moderator or umpire and has an active responsibility to see that a criminal trial is fairly conducted." *Robinson*, 635 F.2d at 984; *see also United States* v. *Bejasa*, 904 F.2d at 141 (a judge "need not sit like a 'bump on a log' throughout the trial") (citation omitted).

Finally, this Court has recognized that trial "judges, being human, are not immune to feelings of frustration, at the occasional antics or unartfulness of attorneys . . . ." *Bejasa*, 904 F.2d at 141. Such feelings may give vent to remarks that "judged in isolation from the totality of the record through the dispassionate looking glass of hindsight 'would better have been left unsaid.'" *Id*. (quoting *Robinson*, 635 F.2d at 985). In short, just as a defendant is not entitled to a perfect trial, he cannot expect an infallible

14

judge. Here, when the record is viewed in its entirety, including the overwhelming evidence of guilt, it is clear that Khodadad received a fair trial before a judge who was not prejudiced against him.

## B. The District Court's Remarks To Counsel Were Provoked By Counsel And Were Not Prejudicial

### 1. Counsel Provoked The District Court's Comments

As set forth below, the six specific remarks of the District Court of which Khodadad complains fall into three categories. In the first category, the Court's comments came in response to patent efforts by counsel to elicit irrelevant and unfairly prejudicial testimony in direct violation of prior Court rulings. In the second category, the Court responded to improper and repetitive questioning by counsel in violation of the Rules of Evidence and rulings of the Court. Finally, in a third category, counsel attempted to grandstand before the jury by claiming erroneously that the Government had not provided him with prior statements of a witness.

#### a. Counsel's Attempts To Flout Court Rulings

Before trial, Khodadad moved *in limine* to introduce evidence that Kalantari, *in absentia*, was convicted in Iran of fraud. The District Court excluded the evidence, explaining as follows:

> If there was ever any government that failed to exercise the rudiments of due process it was [Iran] and I'll exclude it. You can cross-examine him as to the underlying fact, but to the extent that the revolutionary government has in fact

15

> I'm not satisfied that the government of the
> Ayatollah Khomeini is the kind of government
> that practices due process.

(5/23/94 Tr. 16-17).

Despite this ruling, counsel questioned Kalantari on three occasions about the conviction. First, counsel asked Kalantari about his "fugitive" status in Iran and his knowledge that he had been prosecuted in Iran. (Tr. 235-36). Counsel then asked Kalantari whether he knew that he had been "sentenced to death in absentia in Iran." (Tr. 236). Sustaining the Government's objection, the District Court reminded counsel of the Court's pretrial ruling:

> We had a pretrial conference on that, and I told
> you in our pretrial conference, before this jury
> was selected, that I was going to allow no ref-
> erence to Iranian convictions because they are
> not obtained consistent with our standards
> of due process. I gave you a clear direction.
> That question violates it. The next violation
> will be met with a stronger sanction. Do you
> understand?

(Tr. 236-37). Notwithstanding this clear reminder, counsel proceeded to question Kalantari about a Government investigation in Iran into Kalantari's former construction company and referred to a document in the Farsi language which mentioned a court decree. When counsel attempted to elicit testimony from Kalantari about "conclusions" drawn from that investigation, the District Court sustained the Government's objection again:

16

> Sustained. Sustained on both grounds, the grounds discussed yesterday and on relevance grounds today. It is not relevant to this proceeding.

(Tr. 243-44).

Undeterred, counsel questioned Kalantari later about Kalantari's written communications to the Iranian government, and in particular, those concerning the "prosecutor's office" and "that court decree." This time, the District Court told counsel that if he tried to violate the Court's ruling again, his cross examination would be terminated. (Tr. 334-35).*

Khodadad now complains that the District Court was unfair. (Br. 8). His complaint rings hollow. As this Court explained in *United States* v. *Weiss*, 491

---

\* The relevant colloquy follows:

> THE COURT: Are we back to an area where I indicated I will not accept proof?

> THE GOV'T.: We're very close, Your Honor.

> THE COURT: If you cross the line, I'm going to terminate your cross-examination. That's the first sanction. The next one might be to reconsider your pro hac vice status.

> DEF. COUNSEL: Your Honor, I'm not going to cross the line.

> THE COURT: Then don't. What are you asking about?

> DEF. COUNSEL: They have to do with—

> THE COURT: I heard questions about Iran and a prosecutor. You make your choices and take the consequences. (Tr. 334-35).

17

F.2d 460, 469 (2d Cir.), *cert. denied*, 419 U.S. 833 (1974):

> When defense counsel repeatedly and persistently attempts to introduce irrelevant evidence. . . , he must expect that once the trial judge has made his basic ruling successive objections by the government will undoubtedly be sustained. Nor is it surprising that such wasteful tactics will lead a trial judge, during the heat of a nine-day trial, sometimes to become impatient. Judges, while expected to possess more than the average amount of self-restraint, are still only human. They do not possess limitless ability, once passion is aroused, to resist provocation.

*See also United States* v. *Remini*, 967 F.2d 754, 759 (2d Cir. 1992) ("the district judge conducted himself properly, ruling appropriately on objections and attempting to stop defense counsel from ignoring its rulings"); *United States* v. *Roldan-Zapata*, 916 F.2d 795, 807 (2d Cir. 1990), *cert. denied*, 499 U.S. 940 (1991) ("A fair reading of the record reveals that the judge's comments in front of the jury, even if at times stern or sarcastic, were appropriate responses to counsel's improper questioning of witnesses"); *Pisani*, 773 F.2d at 402 ("if defense counsel pursues an objectionable line of questioning, he can hardly cry 'foul' "); *Robinson*, 635 F.2d at 985 ("at least some of the trial judge's objectionable remarks were provoked by improper conduct on the part of [defendant's] counsel").

Similarly, Khodadad's complaint that the District Court reacted unfairly to his attempt to elicit testimony as to Kalantari's wealth (Br. 10) misleadingly

fails to give context to the Court's comments. Again, the District Court's reaction was provoked by counsel's attempt, after several warnings, to violate a clear Court ruling.

Defense counsel cross-examined Kalantari extensively on his wealth and how he obtained it. (Tr. 195-219, 280-82, 292-96, 300-06, 315-17, 326-321, 343-44, 358-60, 367, 385-88). When counsel sought to elicit cumulative testimony about Kalantari's wealth through his niece, Shaparie Adhami, the District Court ruled as follows:

> It is not a major issue in the case. We have heard alot of testimony about it, and I am not going to hear any more. There is no dispute about the fact that her uncle, by his own testimony, was worth, what, 50 million, is that what he said. We don't need any more examination along that line.

(Tr. 459). In a conference outside of the presence of the jury, the Court again advised counsel that such testimony would not be permitted:

> We're trying to keep this case limited to the government's charges against your client. I am not going to allow you to divert them as you tried to do with the last witness . . . . We spent two days hearing about bribery and how rich this witness was. We've had enough of it, all right.

(Tr. 490).

Counsel then attempted to violate these rulings in his questioning of the very next witness. Asking a friend of both Kalantari and Khodadad whether

19

Kalantari had accumulated his wealth "very sud-
denly," counsel not surprisingly drew a rebuke from
the Court. (Tr. 509).* Again, because the Court's
remarks were caused by counsel's improper behavior,
Khodadad's claim of unfairness is completely unper-
suasive. *See Robinson*, 635 F.2d at 985; *see also
Pisani*, 773 F.2d at 404 (noting that some of the trial
judge's comments were provoked by "counsel's con-
tinuing to do things that the court had specifically
cautioned him to avoid, a factor that properly may be
taken into account to determine whether defendant
was prejudiced").

### b.  Counsel's Improper Questioning Of Witnesses

Khodadad complains of three instances in which
the District Court admonished counsel for asking
improper questions. In each case, the Court's critical
reaction, viewed in context, was hardly unfair.

First, when counsel asked a compound question,
the District Court sustained the Government's objec-
tion. Counsel then asked essentially the same ques-
tion, again in compound form. The District Court
explained to counsel why his question was compound
and directed counsel to separate the question into two

---

* After counsel asked this question, the Court
stated:

> One more question along that line and your
> examination will be terminated. In view of what
> I said this morning, it's borderline on being in
> flagrant disregard of the Court's order about the
> issues in the trial. One more question along that
> line will terminate your examination and also
> will cause me to consider sanctions. (Tr. 509).

20

parts. Although he agreed to do so, counsel then proceeded to ask the the same compound question again. (Tr. 361-62). Khodadad labels unfair the Court's adverse reaction to counsel's third attempt to ask the improper compound question. (Br. 8).

Second, in counsel's cross examination of a custodian of records employed by Christie's auction house, the witness testified to a specific recollection about the contents of a microfiche record of the sale of the Breughel to Kalantari in 1977. (Tr. 521-22; GX 3). Counsel nevertheless attempted to refresh the witness's recollection as to this record by showing her a letter on Christie's letterhead concerning the auction house's record of the sale. (Tr. 525). The District Court, which had already admitted the letter in evidence, thereby permitting Khodadad to make any relevant argument about its contents, disallowed this effort because no showing had been made that the witness's memory had failed. (Tr. 525-26). Khodadad contends that the Court inappropriately rebuked counsel for failing to listen to the witness's answers and attempting this improper line of inquiry. (Br. 8).

Last in this category, Khodadad points to the Court's instructions to a witness not to dignify an improper argumentative question posed by counsel at the end of a cross examination which consumed over 150 pages of transcript. (Br. 10-11).*

While the District Court's comments in these three instances certainly might have been delivered less harshly, in each case, the Court's reaction was occa-

_____

* The cross examination of this witness, Robert Ogle, the individual whom Khodadad engaged to sell the Breughel, is found at pages 583 to 727 of the trial transcript.

21

sioned by attempts of counsel to ask improper ques-
tions and thus potentially confuse the jury. The trial
judge has a duty to ensure that issues are presented
clearly to the jury. *Pisani*, 773 F.2d 397 at 403; *United
States* v. *Pellegrino*, 470 F.2d 1205, 1206 (2d Cir.
1972), *cert. denied*, 411 U.S. 918 (1973).

Further, the Court's comments did not issue with-
out prior warning. Early in the case, after numerous
instances of repetitive and argumentative questioning
by defense counsel, the District Court, outside the
presence of the jury, issued to the attorneys for both
parties a long explanation of the Court's ground rules:

> If it's not clear now it ought to be clear that
> under my ground rules, which I have explained
> to you, I do not permit argumentative ques-
> tions, I [d]o not permit repetitive questions,
> I do not permit questions which are designed to
> express, in the vernacular, some surprise for
> whatever theatrical effect you think it has in
> the presence of a jury . . . . You don't charac-
> terize testimony. The time to characterize it
> and to argue it and to make jury arguments as
> to the credibility or lack of credibility of
> what they say based upon the facts is on sum-
> mation. . . .I try to have a fair trial within the
> rules of evidence and procedures. I run a strict
> courtroom on evidence and on questioning sim-
> ply because it is the fairest way to try a case.
> Your client is entitled to a fair trial and I want
> to see to it that he gets it and I also want to see
> to it that we get this case tried within some
> time fair to these people who have been selected
> to try this case. And the more repetitive ques-
> tions and the more unfocused your examination
> is, with these protracted pauses in the trial,

> you delay the time of these people who are here
> almost as volunteers. I do it for your benefit,
> for their benefit and for the system's benefit.
> That's my way. Right or wrong that's what I do.

(Tr. 266-69). The District Court cannot now be faulted for reacting with vehemence to defense counsel's attempt to violate the Court's ground rules. *United States* v. *DiPaolo*, 804 F.2d 225, 232 (2d Cir. 1986) ("the judge [made] clear that counsel should play within the rules . . . and [gave] fair warning that if counsel attempt[ed] to play outside the rules, the Court [would] not hesitate to point it out to the jury"); *see also Pisani*, 773 F.2d at 402 ("if defense counsel pursues an objectionable line of questioning, he can hardly cry 'foul' when the judge . . . excludes the testimony *sua sponte*").

### c. Counsel's Erroneous Claim Before The Jury That The Defense Had Not Been Provided 3500 Material

During the cross examination of the same custodian of records for Christie's as referred to above, defense counsel claimed before the jury that he had not been provided with alleged 3500 material—the Christie's catalogue for the auction at which Kalantari purchased the Breughel. The District Court corrected counsel, explaining that the document in question was not 3500 material for the witness. The Court continued: "We assume a certain minimal knowledge of the law when you come in here, Mr. Schechter. Your argument that this is 3500 material is absurd. Think before you speak." (Tr. 518). While the Court's comments were severe, it was counsel, through his grandstanding, who initiated the colloquy before the jury. Given the false impression that

23

counsel's remarks might have left with the jury—that the Government had not disclosed required materials and prejudiced the defense—the Court's reaction was not surprising.*

## 2. The District Court's Remarks Did Not Prejudice The Defendant

Khodadad was not prejudiced by the District Court's remarks to trial counsel. First, the Court's remarks were uniformly directed at counsel's conduct and did not concern the strength or weakness of either the Government's case or the defense case. *See United States v. DiTommaso*, 817 F.2d 201, 220 (2d Cir. 1987) ("reversal is not mandated where, as here, rebukes of defense counsel reflected not upon the merits of the case but rather on the way it was being handled"); *United States v. Rosa*, 11 F.3d 315, 343 (2d Cir. 1993) (rejecting claim where some criticisms were warranted "and none of the comments suggested endorsement of any witness's testimony or revealed any bias against any defendant"), *cert. denied*, 114

---

* Khodadad cites *United States v. Guglielmini*, 384 F.2d 602, 605 (2d Cir. 1967), *cert. denied*, 400 U.S. 820 (1970). In that case, this Court criticized the trial court's discussion of the Jencks Act because the discussion implicitly suggested to the jury that the defense had done something wrong in making appropriate requests of the Government. The District Court's comments here were in no way misleading. Quite the contrary, because the document referred to by defense counsel here was not required to be disclosed under the Jencks Act, the District Court properly corrected counsel's statement to the contrary. *See United States v. Pellegrino*, 470 F.2d at 1206 (trial judge's duty to ensure that trial is conducted fairly).

S. Ct. 1565 (1994); *United States* v. *Boatner*, 478 F.2d 737, 740 (2d Cir. 1973) ("The trial court's comments were directed exclusively at the conduct of appellant's counsel, not . . . at appellant's credibility or the strength of his case"); *United States* v. *Pellegrino*, 470 F.2d at 1207 ("None of the interventions explicitly undercut the appellants' presumptions of innocence . . . by implying any belief on the part of the court of appellants' guilt").

Second, the District Court also criticized Government counsel, thereby showing no partisanship. The District Court rebuked Government counsel in the presence of the jury for undue delay during the examination of a witness (Tr. 162-63), failing to finalize a translation of a Farsi document with which the defense sought to cross examine Kalantari (Tr. 232), establishing an order of proof which inconvenienced a foreign witness (Tr. 474), and failing to provide headphones promptly to the Court during testimony in which tape recordings were played. (Tr. 532). The District Judge also asked at one point whether Government counsel was awake. (Tr. 216). In addition, the District Court criticized the Government's failure to make timely objections. (Tr. 680).

Thus, the District Court demonstrated no favoritism in criticizing counsel. *Robinson*, 635 F.2d at 985 ("In assessing the nature and extent of any prejudice to the defendants from the trial judge's conduct toward their counsel, we may also consider whether the judge exhibited partisanship by favoring Government trial counsel or holding them to lesser standards than those exacted of counsel for the defendants").*

---

\* The Court's lack of partisanship was reflected in other ways, such as its generally evenhanded treat-

25

Third, the remarks cited by Khodadad comprise a small portion of the record. The vast majority of the record reflects generally temperate behavior on the part of the trial judge. *United States* v. *Weiss*, 491 F.2d 460, 469 (2d Cir. 1974), *cert. denied*, 419 U.S. 833 (1974); *see also Pisani*, 773 F.2d at 404 ("as serious as some of the incidents are, they occupy but a very small part of this extensive trial record"); *Robinson*, 635 F.2d at 984 ("the instances of criticism of counsel, serious as some of them are, occupy but a small part of an extensive trial record").

Fourth, the case against Khodadad was very strong. *See United States* v. *Ross*, 321 F.2d 61, 66 n.3 (2d Cir.), *cert. denied*, 375 U.S. 894 (1963); *see also*

---

ment of objections by the parties. The Court sustained defense counsel's objections on numerous occasions and some of these rulings were *sua sponte* (*e.g.*, Tr. 45, 170, 171, 378, 578, 729-30). The Court also overruled Government objections. (*E.g.*, Tr. 523, 774, 852.) *See Robinson*, 635 F.2d at 985 (noting that the trial judge sustained defense objections to the Government's questions, criticized the prosecutor for improper offers of proof, and overruled objections to questions put by defense counsel); *United States* v. *Weiss*, 491 F.2d 460, 468-69 (2d Cir. 1974) ("Whatever display of impatience or irritation was exhibited by the trial judge toward defense counsel, the record further reveals that while the judge from time to time took defense counsel to task, he did not hesitate likewise to express disapproval of some of the prosecutor's tactics and to sustain numerous defense objections"), *cert. denied*, 419 U.S. 833 (1974); *see also United States* v. *Boatner*, 478 F.2d 737, 740 (2d Cir.) ("trial court's rulings on objections during the trial were quite evenhanded and displayed no bias toward one side or the other"), *cert. denied*, 414 U.S. 848 (1973).

*Boatner*, 478 F.2d at 742. Khodadad admitted to a friend that he had taken Kalantari's paintings and precious rugs out of Iran. (Tr. 473). He showed the Breughel to experts from Sotheby's and Christie's in 1990. (Tr. 425-26, 540, 542, 547-48, 742). Photographs taken at the Ogle residence during viewings of the Breughel by experts, including one of Khodadad's son holding the Breughel, were in evidence. (GX 15, GX 15B, GX 16A, GX 16B, GX 16C, GX 18). Khodadad also contacted the Habsburg-Feldman auction house in New York to negotiate a possible consignment of the Breughel. (Tr. 398-402, 756-63). Thereafter, in 1991 and 1992, Khodadad executed consignment agreements with Ogle (Tr. 565; GX 19, GX 24, GX 30, GX 31, GX 32), and, on behalf of Khodadad, Ogle contacted potential buyers of the Breughel in New York, California, New Orleans and outside of the United States. (Tr. 557-59; GX 29A, GX 29B, GX 29C, GX 29D, GX 29E, GX 29F, GX 29G, GX 29H, GX 29I, GX 29J, GX 29K, GX 29L, GX 29M, GX 29N). When Ogle was contacted by a New York dealer about a possible purchase of the Breughel, Ogle informed Khodadad of the contact and thereafter kept him informed of the progress of negotiations and of Ogle's intention to take the painting to New York for a showing. (Tr. 567-71). Telephone records in evidence reflected numerous telephone calls from Ogle's residence to Khodadad's residence during the weeks preceding Ogle's trip to New York in May 1992. (Tr. 695-98, 711-12; GX 3516-3E). Accordingly, this was not remotely a "close case in which the verdict was tipped by the court's reaction to counsel." *Boatner*, 478 F.2d at 742. As "the evidence of [defendant's] guilt, the sufficiency of which is not contested here, was overwhelming," *Pellegrino*, 470 F.2d at 1208, prejudice cannot be shown.