27

## C. Any Prejudice Was Cured By The Court's Instructions To The Jury

Furthermore, any prejudice to the defendant from the District Court's remarks was addressed in the District Court's instructions to the jury.

In its initials instructions to the jury, the District Court explained as follows:

> If you think that you have formed an opinion during the course of the trial as to what I think about the case, put it out of your mind because my opinion of the case on the merits doesn't matter. It is your opinion of the case that matters.

(Tr. 6).

In its jury charge, the District Court emphasized that the jury should consider only the evidence in the case and not the Court's satisfaction with counsel for either party:

> I have expressed my displeasure in the performance of both sides during the course of this trial, and I have not been happy with the efficiency with which this case has been tried, simply because my main concern has been to get the case tried quickly, for I am aware of the burden it places upon your time and the calendar problems of the Court to have a case take longer than it should.

> However, . . . [s]uch factors have nothing whatsoever to do with the issues which you are going to be asked to resolve here. Your issue here is whether the government has proved

its case beyond a reasonable doubt, and that depends upon your assessment of the evidence and your assessment of the credibility of the witnesses. It has nothing to do with my dissatisfaction with counsel, or counsel's dissatisfaction with me, or whatever admonishment may have occurred during the course of this trial which may reflect either my personality or my standards or the lawyers' performance or noncompliance therewith. So get that out of your mind. It has nothing to do with this case. That is between them and me. It does not concern the function that you are supposed to perform.

You have sworn an oath to give Mr. Khodadad a fair trial consistent with the law and the evidence. That determination has nothing to do with whether you like the judge, whether you like the lawyers, whether you are satisfied with their performance or not satisfied with their performance. . . . [I]t has nothing to do with the issue which you have sworn by your conscientious oath to resolve. I want to get that up front on the table now so that you understand what that means. That is your oath. You are not to let any of that which is extraneous to your deliberations affect your judgment. That is strictly a matter between the Court and counsel. This is not a popularity contest between the lawyers, it is not a popularity contest between the lawyers and the judge, it is not a popularity contest between the judge and the jury.

You have to decide this case on the evidence, free of any concern with the personalities

29

involved. I can only express that view in the
strongest terms, because Mr. Khodadad is the
person whose guilt or nonguilt you are consid-
ering, and that has nothing to do with my per-
sonality and or the lawyers' personality or my
happiness or unhappiness with the speed with
which the trial has proceeded . . . . .

. . .

[I]f you think I have some opinion about the
case, put it out of your mind. . . . I frankly
don't care how this case comes out. That is
your function, not mine. My only function is to
see to it that the case is tried efficiently, fairly,
and in accordance with the law. That is my
only function. I have no opinions about this
case one way or the other. That is your job and
not mine.

(Tr. 939-42).

This forceful instruction cured any possible prej-
udice that Khodadad might have suffered from the
Court's remarks to counsel. Indeed, the District
Court's charge was quite similar to that approved by
this Court in *United States* v. *Mickens*, 926 F.2d 1323
(2d Cir. 1991), *cert. denied*, 502 U.S. 1060 (1992):

During the course of the trial, I have had to
admonish or reprimand attorneys on both sides
of the case because I did not believe that what
one or more of them was doing was proper.
You should draw no inference against an attor-
ney or his or her client. . . . It is irrelevant
whether you like a lawyer or whether you
believe I like a lawyer. The issue before you is
not which attorney is more likeable or the bet-

30

> ter lawyer. The issue is whether or not the gov-
> ernment has sustained its burden of proof.

*Id.* at 1328 n.1; *see also DiTommaso*, 817 F.2d at 220 (trial judge "mitigated the sting of his remarks by specifically instructing the jury 'not [to] hold any admonition I make to attorneys against his or her client"); *Pisani*, 773 F.2d at 404 (trial judge "at least partially mitigated the possibly prejudicial impact of his comments by explaining to the jury several times that his admonishments of counsel should have no bearing on their deliberations or determinations"); *Boatner*, 478 F.2d at 741-42 (trial court reminded the jury to deal only with the evidence before them and that exchanges between court and counsel were to be disregarded completely in their deliberations; "[t]hese strong admonitions tend to mitigate any prejudice that appellant might otherwise have suffered"); *United States* v. *Cruz*, 455 F.2d 184, 185 (2d Cir.) ("the court's charge carefully and properly pointed out that comments or questions by the court were not to be construed as in any way expressing any opinion or view on the part of the court whatsoever"), *cert. denied*, 405 U.S. 918 (1972); *Robinson*, 635 F.2d at 985 (approving instruction which conveyed that "whether . . . they or the judge liked a lawyer was irrelevant, and that it was [the jury's] duty to render a verdict according to the facts as found by them and the law as instructed by the court"); *United States* v. *D'Anna*, 450 F.2d 1201, 1206 (2d Cir. 1971) (similar instruction); *United States* v. *Curcio*, 279 F.2d 681, 682 (2d Cir.) (similar instruction), *cert. denied*, 364 U.S. 824 (1960).

Khodadad contends that the charge reinforced the District Court's disdain for counsel by repeating that the Court had been displeased with defense counsel's

31

performance. (Br. 11). But the Court indicated that it was displeased with counsel for both parties and made clear that it had very high standards. These comments strongly suggested that the Court was not especially dissatisfied with defense counsel.

Khodadad also contends that this case is unique because the jury "reacted to the strained atmosphere of this trial, both verbally and in writing [sic]." (Br. 15). Khodadad's argument is unpersuasive because, as set forth below, the jury notes, which were largely concerned with scheduling, show that the jury was not prejudiced against the defendant. Further, all of the notes were written before the Court issued the curative instruction set forth above.

Immediately prior to this instruction, and in the instruction itself (in comments that Khodadad underlines in his brief (Br. 11, 13)), the Court referred to notes that the jury had submitted to the Court and the parties concerning the efficiency with which the trial was proceeding* and to a question posed by one juror to the Court Reporter concerning the Court's general anger toward lawyers. (Tr. 939). With respect to the notes, the District court summarized their content as they were received. In one note, a juror expressed concern about the length of the trial. (Tr. 343).** In another note, the same juror and a second

———————

* The jury notes do not appear to have been maintained in the record or in the District Judge's chambers.

** While not a part of the record, Government trial counsel recalls that this note also asked in substance whether anything could be done to move the trial along more quickly and referred to the time being wasted by defense counsel in cross examination.

32

juror advised the Court and parties as to the last day on which they could sit. (Tr. 624-26). A third and fourth note concerned the jury's preferences as to the scheduling of the jury charge. (Tr. 846-47). A fifth note also concerned scheduling. (913-15).*

These notes demonstrate no prejudice toward the defendant. Moreover, counsel had access to all of the jurors' notes and requested neither additional curative instructions nor a mistrial. Further, the Court issued the curative instruction quoted above after all of the jury's notes had been issued. Accordingly, Khodadad has not shown prejudice. *See Richardson* v. *Marsh*, 481 U.S. 200, 211 (1987) (jury is presumed to follow jury instructions).

With respect to the juror's remark to the Court Reporter, the juror asked whether the District Judge tended to get "angry about the performance of counsel" in most cases. (Tr. 939). As a preliminary comment to its charge, the District Court answered that question in the affirmative, indicated to the jury that the Court's standards were very high in order to promote efficiency, and then proceeded to give the lengthy charge quoted above. There is no reason to conclude that this explanation, addressed solely to the performance of counsel for both parties and the general inability of lawyers to meet the Court's high standards, and followed by a lengthy, clear instruction on the jury's duty to ignore colloquy

---

\* During the trial, the jury also asked in notes to see the Breughel and that one court interpreter speak more softly. (Tr. 791).

Case 1:17-cr-00630-ER   Document 593-4   Filed 02/10/23   Page 7 of 11

between the Court and counsel, caused prejudice to Khodadad.*

## D.  The District Court Did Not Restrict An Attorney-Client Communication

Misrepresenting the record, Khodadad asserts that on one occasion the District Court interfered with his communication with counsel. (Br. 6-8). The record makes clear that the communication at issue was not a potential attorney-client communication but a communication between an interpreter and trial counsel. Even if the potential communication had involved Khodadad, under the circumstances, a Court ruling that it would not stop a direct examination to allow lawyer and client to confer, would have been appropriate.

During the Government's direct examination of Kalantari, the following colloquy occurred:

> COUNSEL:    Could I have a moment, your Honor?

———————

* Without citing to any authority, Khodadad calls for a hearing to determine the location of the jury's notes. (Br. 5 n.2, 14). As noted above, the jury's notes were available to Khodadad's trial counsel, counsel sought no instructions after particular notes were received and sought no mistrial. Further, even if the notes indicated unusual jury concern with the pace of the trial, which the Government submits they did not, the District Court clearly advised the jury that any concerns about counsel's competence and the Court's opinion of counsel were irrelevant to their deliberations. Accordingly, no hearing is necessary.

34

THE COURT:    For what?

COUNSEL:    To consult with my client.

(Pause)

THE COURT:    You have two lawyers here. You can have co-counsel consult with your client. There's no reason we have to stop the proceedings.

COUNSEL:    May I approach the bench?

THE COURT:    No. The next time you need to consult with your client, have [co-counsel] do it. You can have him sit next to your client. And, he can pass the note to you.

COUNSEL:    *Actually it was the interpreter who called something to my attention and told me the interpretation was inaccurate.*

THE COURT:    That's fine. That's something you can prove later.

(Tr. 107-08) (emphasis added). Thus, by trial counsel's admission, the communication with which the District Court allegedly interfered did not even involve Khodadad. Instead, the communication involved counsel and the defense interpreter. Khodadad's "interference with attorney-client communication" claim is simply an invention.

Moreover, even if trial counsel's request to interrupt the trial testimony had been for the purpose of

35

consulting with Khodadad, it would have been well
within the Court's authority to deny this request. As
this Court noted in *Pisani*, "a trial judge has wide dis-
cretion to adopt methods designed to expedite a trial."
773 F.2d at 402. Here, a request to interrupt the tes-
timony of a witness to permit consultation would have
been particularly lacking in merit because Khodadad
had two attorneys, one law student and two Farsi
interpreters sitting with him at the defense table dur-
ing the trial. (Tr. 107). With this defense team in
place, effective communication with counsel during
the trial was assured.

## POINT II

### A Remand For Resentencing Is Appropriate

Khodadad contends that he was coerced into waiv-
ing a sentencing hearing (Br. 18-21, 26), and that in
its calculation of the loss attributable to Khodadad's
offense under the relevant conduct principles of the
Sentencing Guidelines, the District Court erred in
considering property that was converted by the defen-
dant abroad and not subsequently transported to the
United States. (Br. 18-26). Because the Government
is in agreement with Khodadad with respect to his
latter contention, and respectfully submits that a
remand for resentencing is appropriate, there is no
need to address Khodadad's coercion claim.

In *United States* v. *Azeem*, 946 F.2d 13 (2d Cir.
1991), the defendant claimed that his heroin activi-
ties in Egypt should not have been counted in fixing
his base offense level because (1) they were not part
of the same conspiracy of which he was convicted and
(2) the heroin transaction in Egypt was not a crime

36

against the United States. With respect to Azeem's
first claim, this Court held that the district court did
not err in finding the Egyptian conspiracy was part of
the same crime as Azeem's offense of conviction in the
United States. With respect to Azeem's second claim,
however, this Court agreed, holding that the Egyptian
transaction "should not have been included in
the base offense level calculation because it was not
a crime against the United States." *Id.* at 16-17.
Reasoning that Congress had assigned a limited role
to foreign crimes in the Sentencing Guidelines,
*see* U.S.S.G. §§ 4A1.2(h), 4A1.3(a) (foreign sentences
may not be used in computing criminal history cate-
gory but may be used as a basis for an upward depar-
ture), the *Azeem* Court held that "[w]ithout a clear
mandate from Congress, we decline to create the com-
plexities that the inclusion of foreign crimes in the
base offense level calculation would generate." *Id.* at
17-18.

While Khodadad did not raise the issue below
and "plain error" analysis therefore applies, *United
States* v. *Keppler*, 2 F.3d 21, 23-24 (2d Cir. 1993),
remand is nevertheless appropriate because *Azeem*
was controlling as of the time of sentencing, *United
States* v. *Viola*, 35 F.3d 37, 41 (2d Cir. 1994), and,
under U.S.S.G. § 2B1.1 (1992), the adjusted offense
level corresponding to Khodadad's offense was greater
than it would have been if the foreign aspects of Kho-
dadad's conduct had not been considered.* *Id.*

---

* Under U.S.S.G. § 2B1.1(a) (1992), the base
offense level was four. Under U.S.S.G. § 2B1.1(b)-
(1)(Q), an additional sixteen levels was added at
sentencing to reflect a total loss of greater than
$5 million and up to $10 million. This loss amount
incorporated the value of the Breughel and the value

37

Accordingly, a remand for resentencing is appropriate.

## CONCLUSION

### The judgment of conviction should be affirmed and the case should be remanded for resentencing.

Dated:    New York, New York
          May 15, 1995

                         Respectfully submitted,

                         MARY JO WHITE,
                         *United States Attorney for the*
                         *Southern District of New York,*
                         *Attorney for the United States*
                                  *of America.*

KATHERINE M. CHOO,
GUY PETRILLO,
    *Assistant United States Attorneys,*
              *Of Counsel.*

------

of the other property taken from Kalantari by Khodadad. (*See* Presentence Report at 6; A. 25; Sent. Tr. 21-23, 28-29; A. 62-64, 69-70). If the value of the Breughel alone had been considered as a basis for determining loss, only 13 levels would have been added. *See* U.S.S.G. § 2B1.1(1)(N) (1992). Thus, Khodadad's adjusted offense level was higher than it would have been had *Azeem* been applied.