N4BBGREH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                          17 Cr. 630 (ED)

KARL SEBASTIAN GREENWOOD,

           Defendant.

                             Hearing
------------------------------x

                             New York, N.Y.
                             April 11, 2023
                             2:00 p.m.

Before:

                HON. EDGARDO RAMOS,

                             District Judge

                    APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  KEVIN MEAD
     NICHOLAS S. FOLLY
     JULIANA MURRAY
     Assistant United States Attorneys

WEDDLE LAW PLLC
     Attorneys for Defendant
BY:  JUSTIN S. WEDDLE
     BRIAN WITTHUHN
     JULIA CATANIA
       -AND-

PATTERSON BELKNAP WEBB & TYLER, LLP
     Attorneys for Defendant
BY:  MUHAMMAD FARIDI

N4BBGREH

1          (Case called)

2          MR. MEAD:  Good afternoon, your Honor.  AUSA Kevin

3    Mead, Nicholas Folly and Juliana Murray for the government.

4          THE COURT:  Good afternoon.

5          MR. WEDDLE:  Good afternoon, your Honor.  I'm Justin

6    Weddle.  I'd like to acknowledge some of my co-counsel who are

7    in the courtroom, but they're sitting at the table with me,

8    Muhammad Faridi of Patterson Belknap firm, and my colleague

9    Brian Witthuhn is in the front row, and my colleague Julia

10   Catania from Weddle Law will be joining us, but she's still in

11   the security line, and of course my client Mr. Greenwood is

12   here.

13         THE COURT:  And good afternoon to you all.  So this

14   matter is on for a status, and I guess the primary, if not

15   sole, reason we're getting together this afternoon is to make a

16   legal determination as to whether in the calculation of

17   Mr. Greenwood's applicable guidelines range we should include

18   that amount of allegedly fraudulent monies that were obtained

19   in connection with the entire OneCoin scheme, or whether we

20   should limit it to only those illicit funds that were obtained

21   from U.S.-based victims.

22         But let me begin by asking, has the government or the

23   defense calculated the applicable guidelines range from either

24   prospective?  Can you give me some sort of a ballpark as to

25   what the guidelines would like if I were to accept defendant's

N4BBGREH

1   position, or whether if I were to accept the government's

2   position.  By the way, you don't have to stand.  You can remain

3   seated.

4          MR. MEAD:  I'm not sure we have the exact numbers,

5   your Honor.  If we were to include all of the victims, meaning

6   including the international victims, the defendant's loss

7   amount would be well-beyond the top of the loss amount table of

8   $550 million.  My recollection is that he would max out on the

9   guidelines.  Even after acceptance of responsibility, even

10  after the three point reduction, he'd still be at 43, and would

11  therefore be at a guideline range of 60 years, which would be

12  the statutory maximum.  His guideline under the domestic loss

13  only would still be quite high.  I just don't have the exact

14  numbers handy unfortunately.

15         THE COURT:  Mr. Weddle, do you have an idea?

16         MR. WEDDLE:  Well, your Honor, fundamentally these are

17  factual issues, and the government bears the burden of proof.

18  So far I believe consistent with the government's legal

19  position, the government has been focusing on what guidelines

20  would look like if they're considering global conduct.  So I

21  don't think that the U.S. number has been a focus of their

22  investigation or their analysis so far.  And I think if your

23  Honor grants our motion and agrees with us on the scope of the

24  guidelines analysis, we would have a discussion with the

25  government about what is there in the discovery that nails this

N4BBGREH

1    down.  And we may or may not have disputed factual issues, and

2    hopefully we can narrow any disputed factual issues that there

3    are.  But in their opposition brief, they estimated a number of

4    $50 million.  But either way if your Honor decides -- well, if

5    your Honor decides the legal issue in our favor, we're still

6    talking about a very significant sentencing guidelines range

7    for Mr. Greenwood, and he understands that.  The prosecution's

8    sentencing guidelines range, quite frankly, is not of a human

9    scale, and so there's some aspects of this that are academic

10   because I think -- I hope that your Honor would not be inclined

11   to impose a 60-year sentence on Mr. Greenwood, even if that's

12   what the guidelines called for based on a global analysis of

13   the OneCoin business.  Mr. Greenwood is 46-years old.  I don't

14   think it's within human scale to impose sentencing like that.

15   He's already served nearing five years in prison -- or in jail,

16   pretrial detection, including some horrific circumstances.  But

17   if it was a $50 million number or a $10 million number, we're

18   still in the range, depending on enhancements which I think is

19   also effected by this legal determination, we're still in a

20   range of something like ten years.

21        THE COURT:  Okay.  So it's your motion, Mr. Weddle.

22   And so obviously you rely primarily on the Second Circuit case

23   *Azeem*.  That case seems to me to be an easy one to distinguish

24   from this case, because in that case there was conduct that was

25   clearly targeted at the United States, and conduct that was

N4BBGREH

1    clearly targeted towards another -- beginning it one country

2    and targeted towards another country, not the United States.

3    Isn't this a very different type of case, obviously

4    understanding and accepting the Second Circuit's determination

5    that purely external conduct should not be counted under the

6    guidelines here?

7              MR. WEDDLE:  I submit that it's the same case, your

8    Honor.

9              THE COURT:  The same case?

10             MR. WEDDLE:  It's the same case.  Because in *Azeem*, it

11   was the same co-conspirators, the same conduct; that is,

12   trafficking in Pakistani heroin, and different victimization.

13   So the United States was a victim of the trafficking into the

14   United States, and Egypt was a victim of the society basically

15   in Egypt was the victim of trafficking into Egypt.  But the

16   Second Circuit said it was the same course of conduct; and

17   therefore -- except for the guidelines decision to exclude

18   foreign criminal conduct from its analysis, it would otherwise

19   have qualified as relevant conduct under the guidelines based

20   on that analysis that it was part of the same course of

21   conduct.  The prosecutors here have said --

22             THE COURT:  But in that case did the government rely

23   on -- or did they define the crime of conviction as including

24   that extraterritorial conduct?

25             MR. WEDDLE:  The indictment was drawn more narrowly,

N4BBGREH

1    but the prosecution -- the district court in that case

2    specifically found that the Egypt conduct was part of the same

3    crime, was part of the crime of conviction.  And we submitted

4    that -- we cited this *Khodadad* case in the Second Circuit where

5    the U.S. Attorney's office conceded error based on *Azeem* in a

6    different case.  But in that case, the prosecution's brief to

7    the Second Circuit described *Azeem* in exactly that way.  They

8    said in *Azeem* it was part of the same crime.  The district

9    court found that it was part of the same crime, but it was

10   nevertheless plain error to include the non-U.S. criminal

11   conduct in the *Khodadad* case, and the case needed to be

12   remanded for resentencing.

13            So the district court conceptualized the conduct as

14   the same crime, and the U.S. Attorney's office a few years

15   later in *Khodadad* conceptualized the *Azeem* case of being about

16   the same crime, but improperly including in the guidelines

17   analysis what is foreign criminal conduct.  I think it's the

18   same thing here, your Honor.  Because if, for example, there is

19   a person selling OneCoin -- a person in Bulgaria selling

20   OneCoin using fraudulent representations to somebody in China,

21   that is outside the scope of the U.S. wire fraud statute.  The

22   U.S. wire fraud statute is a statute of domestic application.

23   Second Circuit has said that.  And that was based on the *RJR*

24   *Nabisco* case coming out of the Supreme Court as well, but it's

25   a statute of domestic application.  The *Bascunan* case, I'm

N4BBGREH

1    probably mispronouncing the case in the Second Circuit

2    specifically said that for purposes of the wire fraud statute,

3    and for purposes of analyzing extraterritoriality, the court

4    should look at the focus of the statute.  And in that case the

5    Second Circuit said the focus of the wire fraud statute,

6    Section 1343, was not a scheme, but it's the use of U.S. wires

7    in furtherance of the scheme.

8        THE COURT:  Was there a money laundering count in that

9    case?

10        MR. WEDDLE:  In the *Bascunan* case, I don't recall off

11    the top of my head, your Honor.  In my example of selling

12    OneCoin to a victim in China from Bulgaria, there's no use of

13    the U.S. wires.  If people in Bulgaria are selling OneCoin

14    using misrepresentations and U.S. wires to victims in the

15    United States; then, yes, that is a U.S. wire fraud crime, and

16    that's why Mr. Greenwood pled guilty.  So there should be no

17    mistake here that Mr. Greenwood has pled guilty because he

18    believes he's guilty of the crimes.  It's just that to analyze

19    the proper punishment for that crime, this Court should not be

20    seeking to sweep into a domestic criminal statute, u.S. wire

21    fraud, conduct that is not a violation of U.S. law, but is

22    instead a violation perhaps of Chinese law or Bulgarian law or

23    something like that.

24        THE COURT:  But taking your example, Mr. Weddle,

25    someone from Bulgaria defrauds someone in China by selling them

N4BBGREH

1    bogus cryptocurrency, but the proceeds that were obtained from

2    the victim in China then laundered through the United States,

3    isn't that what makes this case different?

4              MR. WEDDLE:  There are two pieces to that if I may,

5    your Honor.

6              THE COURT:  Sure.

7              MR. WEDDLE:  And I think the short answer is no.  If

8    the money -- let's take this example, the same hypothetical.

9    If the perpetrator of the fraud in Bulgaria defrauds a victim

10   in China and says, please wire your payment to this shell

11   company incorporated under New York law with a New York bank

12   account, then that is part of a domestic wire fraud; because

13   that fraud integrally itself uses U.S. wires.

14             And that example, your Honor, that hypothetical is a

15   description of several of the district court cases that we've

16   cataloged in our appendix, but were cited by the government,

17   several of those cases are neatly explained by that fact.  That

18   is, that the perpetrators, even if they were outside the United

19   States, told their victims to send the money to the United

20   States and send the money into U.S. entities, U.S. bank

21   accounts.  So if you're making use of U.S. wires as a core part

22   of accomplishing that fraud; then, yes, it is part of the

23   fraud, and we would agree that it should be -- that such a

24   transaction would be included in the guidelines analysis

25   because it's within the scope of the domestic wire fraud crime.

N4BBGREH

1          So the description -- and I know your Honor was not

2    trying to describe anyone's position in your opening remarks,

3    but our position on what the *Azeem* case means and what our

4    position is on the proper analysis of the guidelines is not

5    limited to U.S.-based victims.  It's a bit more complicated

6    than that.  It's not much more complicated than that.  But it

7    would include a situation like I've just described where an

8    integral part of the fraud is, please send your money to this

9    U.S. bank account.  That is the case in several of those

10   district court cases.

11          It would also include -- and this was the case, for

12   example, in the *Pasquantino* case from the Second Circuit where

13   people in the United States, physically in the United States

14   conducted a fraud that victimized the government of Canada.  If

15   the perpetrators are physically in the United States conducting

16   a wire fraud, then all of their victims, foreign and domestic,

17   are part of that domestic wire fraud, because it's being

18   conducted integrally from the United States with U.S. wires.

19          THE COURT:  So the implication or the invocation of

20   the money laundering statutes play no role in the analysis?

21          MR. WEDDLE:  Let me turn to the money laundering

22   statute.  The money laundering analysis does not change the

23   result, but the analysis is different.  Fundamentally if we're

24   talking about money laundering, money laundering is not a

25   colloquialism.  It is a term of art defined by statute.  It is

N4BBGREH

defined in Section 1956.  Its description is, I'm going to

simplify it, but its description is essentially conducting a

financial transaction with the proceeds of a specified unlawful

activity.  It's not any money.  It can't be any money, and it

can't be the proceeds of crime.  It has to be the proceeds of a

specified unlawful activity.  I can give an example to try to

illustrate this, your Honor.

            THE COURT:  Sure.

            MR. WEDDLE:  Are you familiar with the story of *Oliver

Twist*.  The musical *Oliver*.

            THE COURT:  Can I have more gruel.

            MR. WEDDLE:  That's basically it.  Imagine this

hypothetical.  There's a taxi driver in London who makes the

money, and he sends it the United States.  And he says, please

launder this for me, sends it to *Gilbert Armenta* or whoever.

And he says, please launder this for me.  And that person

engages in financial transactions in the United States using

U.S. entities, moves it around.  That is not money laundering.

Notwithstanding someone saying it's money laundering, asking it

to be laundered, engaging in shell corporation transactions.

Why?  Because it's the proceeds of driving a taxi.  It's not

illegal.  Okay.

            To take the *Oliver Twist* comparison.  *Oliver Twist*

involves an orphan, but the orphan got mixed up with a crowd,

pickpocketing ring of orphans supervised by an older man named

N4BBGREH

*Fagin*.  So I think it was -- what was his name.  I'm just

blanking on it.  The *Artful Dodger* was the most successful

pickpocket.  If the *Artful Dodger* running around the streets of

London picking pockets on behalf of *Fagin* and his crew, takes

that money and sends it to *Gilbert Armenta* and says please

launder this for me.  And they put it through a bunch of shell

corporations in Florida and send it back to the *Artful Dodger*,

once again, your Honor, that is not money laundering.  And it

doesn't matter that it's the proceeds of a crime in London.

He's running around pickpocketing people.  It is not money

laundering because it is not the proceeds of a specified

unlawful activity.

         I'll take it one step further, your Honor.  Part of

that story involved *Oliver Twist* running away from that

pickpocketing ring.  And *Fagin* and his co-conspirators went off

to kidnap *Oliver Twist* and bring him back.  Now if *Fagin* took

money that he made from that scheme and sent it to *Gilbert*

*Armenta* and said please do a bunch of transactions with this

and launder this money for me, that would be a money laundering

crime.

         THE COURT:  Wait.  Wait.  Did *Oliver Twist* ever leave

London?

         MR. WEDDLE:  No.

         THE COURT:  So he was kidnapped in London, and the

crime was committed in London?

N4BBGREH

1          MR. WEDDLE:  Yes.

2          THE COURT:  And the money was sent to the U.S.

3          MR. WEDDLE:  But I'll tell you why that's a money

4    laundering crime and why it's very different from our case.

5    Because under the money laundering statute, part of the

6    definition of specified unlawful activity, includes a violation

7    of a foreign criminal law falling into one of a number of

8    enumerated categories.  One of those categories is kidnapping.

9    So violating a U.K. anti-kidnapping crime is a specified

10   unlawful activity, so is domestic U.S. wire fraud, so is the

11   situation in the *Lazarenko* case which involved, I think it was

12   a former president of Ukraine, who made proceeds, not from

13   fraud -- well, he was charged with fraud, that part was

14   reversed -- but his proceeds from extortion were a proper

15   predicate for money laundering because a violation of foreign

16   crime involving extortion is defined as specified unlawful

17   activity.  And that is, your Honor -- and I have my book here.

18   I could hand it to your Honor.  It's 1956 (c)(7)(B) is the

19   portion of specified unlawful activities that involve an

20   offense against a foreign nation.  But it doesn't just say an

21   offense against a foreign nation.  It says an offense against a

22   foreign nation involving, and then there are a bunch of

23   romanette paragraphs.  They include extortion.  They include

24   kidnapping.  They include bribery.  They include murder.  They

25   include drug crimes.  You know what they do not include, fraud,

N4BBGREH

1   and that is the difference.  It's not a specified unlawful

2   activity as a violation of foreign law because simple fraud is

3   not in this list, even though *Fagin*'s kidnapping is,

4   pickpocketing is not, fraud is not.

5        THE COURT:  Even though pickpocketing is illegal in

6   London.

7        MR. WEDDLE:  Exactly, your Honor.  Because the money

8   laundering statute does not cover engaging in financial

9   transactions in the proceeds of any crime under anyone's law.

10  It covers engaging in financial transactions with the proceeds

11  of specified unlawful activities.  The specified unlawful

12  activity in this case is wire fraud, a U.S. crime of domestic

13  application.  So any proceeds that come from U.S. victims using

14  U.S. wires, any money that involves my example of, if a

15  perpetrator said, send your money from China to New York in

16  order to pay for your OneCoin, that would be the proceeds of a

17  U.S. wire fraud.  Or, if there was a perpetrator in New York

18  calling people in China saying buy OneCoin, here are a bunch of

19  false statements about it.

20       THE COURT:  Weren't there perpetrators in the United

21  States once upon a time selling OneCoin and sending their

22  message out into the ether, which arguably crossed the border

23  to Canada, South America, Europe, etc.

24       MR. WEDDLE:  Well, it's the government's burden of

25  proof.  I anticipate that they will be able to establish that

N4BBGREH

1    there were such people.  And those losses are part of what we

2    think is covered the guideline.

3         THE COURT:  How do we limit that?  How do we say,

4    okay, it went this far, but no further?

5         MR. WEDDLE:  I think it's actually quite simple.  I

6    mean, these are wire transactions.

7         THE COURT:  They're wire transactions, but the scheme

8    that's alleged is essentially lying about the bona fides of a

9    particular cryptocurrency, and the wires were used in

10   connection with that scheme.  And if the message about the

11   falsity of the cryptocurrency traveled over interstate borders,

12   why shouldn't the entirety of that wrongful activity be

13   included?

14        MR. WEDDLE:  The guidelines are -- unfortunately, the

15   guidelines in a fraud case are typically based on dollar

16   losses.  So we're not talking about sort of messages floating

17   around in the ether.  We're talking about OneCoin losses.  So

18   the OneCoin losses should be determinable based on records and

19   financial transactions.  You can't really sell OneCoin to a

20   victim in the United States without the victim in the United

21   States creating a digital record of the sale, and presumably a

22   digital record of those proceeds of that sale going somewhere.

23        Now, they have to get to their destination before they

24   can be laundered, your Honor, because otherwise there's a

25   merger problem in the analysis.  But if they have gotten to the

N4BBGREH

their destination, let's say somebody is sitting in Bulgaria

and sells OneCoin to a victim in Nebraska, the victim in

Nebraska sends a wire transfer in order to pay for that

OneCoin.  That would be part of a proper analysis of the

guidelines in my view if the government has evidence to support

it.  If that money made its way to Bulgaria and then someone in

Bulgaria said let's take these proceeds of the U.S. victims, of

the U.S. fraud and send it back to the U.S. to be laundered;

then, yes, that is the proceeds of a U.S. wire fraud, and so

that would be properly included.

        There's a disconnect as far as I've seen it in the

government's proof that I've seen, and I think this was fully

argued by Mark Scott so I don't want to belabor the point.  But

just to say -- for someone to say, for example, *Gilbert Armenta*

to say, I had an understanding or whatever, I'm not that

familiar with the *Gilbert Armenta* case.  But if hypothetically

said, I had an understanding that the money that was coming to

me came from OneCoin sales, that really does not tell you

whether those are the proceeds of a specified unlawful activity

or not.  There are some proceeds of OneCoin sales that are the

proceeds of U.S. wire fraud, and those are the ones that I've

described.  And it's a little bit more complicated than just

U.S. victims because I think it falls into a couple of buckets;

u.S. victims as well as -- let me back up -- a couple of

buckets as we described them in our briefing.

N4BBGREH

          The first bucket is U.S. victims regardless of where
they're targeted from.  So a U.S. victim targeted from Bulgaria
is equally a part of a domestic wire fraud as a U.S. victim
targeted from Kansas.  The second bucket involves targeting of
victims regardless of where they're located from the U.S. or
integrally using U.S. wires to do it.  Like in my example when
they said, send all the payments to New York.  That is
targeting people around the world from the U.S.

          If there are OneCoin salesmen, for example, who are
co-conspirators in the charged crime, and they are selling to
people in Florida and in London, if the government has evidence
of that, I would agree that that should be included in the
sentencing guidelines analysis.

          THE COURT:  What quantum of evidence is going to
satisfy you that a particular victim was victimized in a
particular way, in a particular place?

          MR. WEDDLE:  I think we're jumping ahead to stage two
of my organizational structure.  Off the top of my head -- and
I don't want to be bound by this because I would want to look
up the cases, but I think the standard is a preponderance of
the evidence.  And I think that for a loss amount -- I don't
know what the terminology is, but a reasonable approximation is
appropriate.  And we all know that often times it doesn't
matter.  I mean I don't think we're going to calculating losses
down to the dollars and cents because we've got cutoffs in the

N4BBGREH

1    loss table at -- I think it's 10 million.  I have it here.

2    There's a cutoff at 9 million, 500.  There's a cutoff at 25

3    million.  There's a cutoff at 65 million.  So the government's

4    estimate in its brief is about 50 million.  I'm not conceding

5    that they can prove that, but it only matters that they can't

6    prove it if the proof is going to fall below 25 million.

7              THE COURT:  It sounds like to me, and tell me if I'm

8    wrong, that you will not be satisfied unless the government is

9    able -- or that the way that you would want to quantify, not

10   only the amount of loss, but where that loss originated is only

11   where the wires were initiated, correct?  So wherever victims

12   initiated the wires from -- and assuming that those wires were

13   initiated in foreign countries, to the extent that that

14   happened, those will not count from your perspective?

15             MR. WEDDLE:  A wire initiated in a foreign country?

16             THE COURT:  Correct.

17             MR. WEDDLE:  Not going to the United States in anyway

18   and not using U.S. dollars?

19             THE COURT:  I don't know how far you want to follow

20   the money, but let's say yes.

21             MR. WEDDLE:  This is a very unusual case as we've said

22   in our brief.  I think even granting the government its

23   estimate, we are to borrow phrase from, I think this is from

24   Morrison, we are in a situation of the domestic tail trying to

25   wag a foreign dog.  And the numbers that the government is

N4BBGREH

1    positing, without getting to stage two, we're going to look at

2    the proof.  The numbers that the government is positing

3    involves at most I think one percent U.S. related conduct, and

4    99 percent not.  The closest I have been able to find in all

5    these cases that we've been citing in our briefs is *Azeem*

6    itself, which was 25 percent U.S. criminal conduct; 75 percent

7    Egyptian criminal conduct.  And the Second Circuit clearly you

8    shouldn't be using that other 75 percent.  It's a one kilogram

9    case. It is not a four kilogram case.

10           So we are in a unusual situation where there's this

11   tiny bit of U.S. conduct, which I still think is going to

12   result in a sentencing guidelines range that I'm going to ask

13   your Honor not to impose because it's going to be too high, but

14   it's going to be a significant range.  But I think that the

15   level of proof here I still think is going to be -- I'm

16   predicting it's going to be relatively straightforward, because

17   these are not cash transactions, so they've got to move through

18   bank records.  There are all kinds of cases where people

19   extrapolate from sampling and they interview a subset of

20   people.

21           I've done cases like this as a prosecutor, your Honor,

22   where we had thousands of victims of advance fee scheme.  There

23   were markers essentially of the methodology, the phone numbers

24   that were being used, and we sampled a certain number of

25   victims and we came up with a number.  So all of those tools I

N4BBGREH

1  think are available in the sentencing context.  But what I

2  don't think is available is the government to say, well, we

3  call it global.  So because we call it global, we call it a

4  global OneCoin fraud, that trumps the domestic reach of the

5  wire fraud statute.

6        THE COURT:  I think they do a little bit more than

7  this.  They say, we call it global and that's how we charged it

8  and that's what he pled to.  Let me ask you this, Mr. Weddle.

9  The government ask me to look at it from the guidelines

10 perspective, in one of three ways.  One, the total conduct that

11 they want to assert is relevant here is part of the count of

12 conviction.  The second part of their argument is that even if

13 it's not, it's relevant conduct.  So why isn't it relevant

14 conduct?  I can take into account even if it's not prosecutable

15 in the United States if it's a crime, I can take it into

16 account, can't I?

17       MR. WEDDLE:  No, that's exactly what *Azeem* says you

18 should not do.  *Azeem* looked at the definitions of relevant

19 conduct.  And there's two description of relevant conduct in

20 the guidelines that everyone agrees are almost always, I would

21 say, in this case too, a distinction without a difference, same

22 course of conduct or common scheme and plan.  Those are

23 relevant conduct.  And *Azeem* says, those don't mean non-U.S.

24 criminal conduct.  It has to be criminal conduct.  We know that

25 relevant conduct is not just any conduct that's part of a

N4BBGREH

common scheme or plan or part of a course of conduct.  It has

to be criminal conduct.  And *Azeem* says, it has to be U.S.

criminal conduct.

The prosecutors -- I think that there's a serious

circularity issue with the prosecutors' argument, which we said

in our briefs.  I'm sure your Honor understands that's our

argument.  The prosecutors cannot, I submit -- and there are

lots of reasons for this and principles that it would violate

if they could, which I'll go through in a minute.  But they

cannot just say, it's a global fraud that we've charged as a

1343 violation; and therefore in this case 1343 has global

reach.  The statute we know is a statute without

extraterritorial reach.  We know that the focus of the statute,

which is the required the analysis for extraterritoriality is

on the wire transmissions.  And the wire transmissions have to

be U.S. touching.  They can either be interstate or

international, but they have to be U.S. touching.

Their say-so that this is global, therefore, they've

now converted a domestic statute into one with global reach, it

cannot be the case.  It violates *Azeem* because the same thing

could have the been done in *Azeem*.  The prosecutors could have

said, there's a global scheme to distribute Pakistani heroin,

including to the United States, and that charge would be no

different from our charge.  To permit that kind of charge

manipulation is contrary to the guidelines considered choice to

N4BBGREH

base sentencing based on real offense conduct, not on charging

decisions by the prosecutors, by and large there are

exceptions.  For the prosecutors to say this is a global

scheme, or for the prosecutors to say, these defendants

conspired to violate the laws of Egypt and Pakistan and the

United States as part of the same scheme; therefore, please

include all four kilograms of heroin.  That violates the

fundamental principle which has been articulated by the Supreme

Court that we don't punish foreign crimes in U.S. courts.

THE COURT:  And perhaps, Mr. Weddle, that sounds to me

like an argument that should have been made prior to pleading

guilty to the crime that was charged.

MR. WEDDLE:  I disagree, your Honor.  Obviously we

thought -- we knew all about this argument, and we discussed it

transparently with the prosecutors before pleading guilty.

THE COURT:  But there was no agreement?

MR. WEDDLE:  There was no agreement.  Pleading guilty

is not an admission or a concession of anything in the

indictment, except what the defendant allocute to.  It's the

allocution which is the admission.  The allocution covers the

elements of a domestic U.S. wire fraud.  Mr. Greenwood cannot

convert the reach of Section 1343 into anything broader than

what Congress said it reaches, anymore than the prosecutors

can.  And the sort of this -- this is the wrong phrase to use

because I'm not trying to attribute any kind of ill-intent to

N4BBGREH

1   anyone.  The kind of slight of hand of calling it a worldwide

2   fraud or calling it a worldwide --

3          THE COURT:  It was in fact a worldwide fraud, right.

4   Even if I were to accept your argument, this was a fraud that

5   was international in scope, that had co-conspirators and people

6   actively working on behalf of it, not only in the United States

7   and Bulgaria, but in dozens of other countries.  It raises a

8   policy question, how are we supposed to attack as a society and

9   prosecute these international schemes or schemes that are

10  international in scope if we're not able to take into account

11  the entirety of the criminal conduct?

12         MR. WEDDLE:  I don't disagree with anything that your

13  Honor said, except that, that's a policy question for the

14  United States Congress.  And the United States Congress has

15  answered the question by making Section 1343 domestic not

16  extraterritorial.  They've answered the question by adopting

17  the guidelines without a reference to foreign criminal conduct.

18  They've answered the question, according to the Second Circuit

19  in *Azeem*, by choosing elsewhere in the guidelines to take

20  account of foreign activity.  And the other Second Circuit

21  authorities that we cite in our brief like; for example, the

22  *Greer* case, there are the situations where Congress has made a

23  different policy choice.

24         Like, for example, in the *Greer* case, the crime at

25  issue was -- I'm going to get the name wrong.  It was like the

N4BBGREH

maritime distribution of narcotics act or something like that,

MD something or other.  And that said if you're distributing

narcotics in the territorial waters of another country, that's

a violation of U.S. law if the other country consents to

prosecution here in the United States.  So that's a different

calibration of that policy question, your Honor.  It's not a

policy question that should be answered by prosecutors, and

it's not a policy question that respectfully should be answered

by judges.  That violates -- to do so violate another

fundamental principle which is the principle of legality.

Criminal statutes have to be defined -- sorry, crimes

are supposed to be defined in statute, not in indictments, and

not in case law, but they're supposed to be defined and give

fair notice in a statute.  The statutes at issue in this case

are domestic statutes.  And I agree with you that OneCoin was

sold worldwide.  It may well be a crime to sell OneCoin in the

way it was sold in China.  It may be a Chinese crime.  I don't

know.  It may not be.  It may be a Bulgarian crime.  I don't

know.  It may not be.  But if we assume that it is, the *Azeem*

case and the fundamental principle -- three things.  The *Azeem*

case, the presumption against extraterritoriality of *Morrison*,

and the principle that U.S. courts do not enforce violations of

other sovereigns laws.

All of those things say we cannot take it upon

ourselves as prosecutors or courts to police even a worldwide

N4BBGREH

fraud when Congress has made a different policy determination.

And that same policy determination is most clearly made, maybe

not most clearly made, is also clearly made in the wire fraud

statute because there is -- remember when I talked about the

romanette?

THE COURT:  Sure.

MR. WEDDLE:  There is one of those definitions that

includes the word "fraud." But it's not just fraud simple, full

stop.  It says, it is a specified unlawful activity with

respect to a financial transaction occurring in whole or in

part in the United States within the definition of specified

unlawful activity is an offense against a foreign nation, not a

U.S. crime, a foreign crime, involving fraud or any scheme or

attempt to defraud by or against a foreign bank as defined in

blah, blah, blah.  So Congress made a specific choice there.

And they said, you know what is a specified unlawful activity,

a fraud by or against a foreign bank that violates, let's say,

the law of Bulgaria, the criminal law of Bulgaria, but not all

fraud, not the *Artful Dodger*'s pickpocketing.

THE COURT:  Let me ask you this one last question,

Mr. Weddle, then I'll let you sit down.  Do I have to in order

to rule in your favor determine that whatever aspect of the

wire fraud was committed in the U.S. was limited to the U.S.?

I'm not talking about the money laundering now, but whatever

other aspects of the actual wire fraud.  So to the extent that

N4BBGREH

1    any activity took place in the United States concerning the

2    wire fraud that I have to limit the reach of that activity to

3    the U.S. boundaries.

4         MR. WEDDLE:  No.  If it's using a wire that's a U.S.

5    wire, it can reach all around the world.  A wire from New York

6    to Bulgaria is included.

7         THE COURT:  Then I come back to the question I asked

8    earlier.  How do we determine what the reach of that was;

9    whether what initiated the wire was some falsity that was

10   stated here in the U.S., but I get your point.

11        MR. WEDDLE:  This is, as I said before, this is a

12   special case because most likely it didn't, and so we figure it

13   out with evidence just like we normally do.  But in a case

14   where you got at least 99 percent non-U.S. conduct, there's a

15   very small chance that some wire that doesn't touch the United

16   States -- I would submit no chance that a wire between China

17   and Bulgaria had anything to do with what anyone was saying

18   while they were sitting in the U.S. or using a U.S. wire.  It's

19   a speculation in this case, whereas in cases where the tables

20   were turned and you have 99 percent of the transactions

21   involving the U.S., you've might come out on that differently.

22   And so, you know what, it's a reasonable approximation, or the

23   probable cause standard is met.

24        And that's like one of the cases in the district court

25   where there was 14 U.S. entities and bank accounts, and one

N4BBGREH

1   Indian bank account.  And you might say, well, it's conceivable

2   that there were victims sending money from outside of the U.S.

3   in Canada to an Indian entity in order to transmit their

4   payment that was fraudulently obtained.  But, the reality was

5   it didn't matter in that case because the guidelines were -- I

6   don't know the percentages are.  I can't do in my head that

7   fast.  But If you got 14 out of 16 fully domestic operating

8   entities the way it almost always happens is that way, it's not

9   going to move the needle in the guidelines to worry about that

10  15th entity in India and how much money went there from purely

11  non-U.S. Canadian victims.

12          THE COURT:  Thank you.  Mr. Mead.

13          MR. MEAD:  Thank you, your Honor.  We agree that *Azeem*

14  is a very different case than this one, and I want to focus on

15  one of the reasons why that is so, and that's the offense of

16  conviction argument that we made in our brief.  The sentencing

17  guidelines typically call for courts to consider three

18  categories of conduct as relevant to sentencing.  One of them

19  is the offense of conviction itself, the core of the criminal

20  conduct that the defendant was convicted of.  The other two are

21  the common scheme or plan and the same course of conduct.

22          In this case, the losses to foreign victims aren't

23  just part of a course of conduct, they are all part of the

24  offense of conviction itself.  How do we know that?  We can

25  look at the information.  We can look at the allocution, and we

N4BBGREH

1    could look at the actual evidence in this case.  As to the

2    information, the charging language in the case.  Greenwood and

3    others made statements "soliciting individuals throughout the

4    world to invest in OneCoin, resulting in the receipt of over

5    $1 billion of investor funds into OneCoin related bank

6    accounts." This case was charged as one scheme, as one

7    conspiracy.  It wasn't charged as four million separate frauds

8    one directed against each potential victim, and it was

9    explicitly charged as an international scheme in this case.

10            The allocution.  The defendant admitted in his

11   allocution to participating in a single fraud scheme.  He also

12   admitted that it was an international scheme.  He refers in his

13   allocution -- and this language is on page 16 of our brief,

14   your Honor -- he refers to the fact that for part of the time

15   the scheme targeted the United States; meaning, by definition,

16   that it must have targeted other places at other times.

17            Now, as to the evidence.  I'm not going to belabor

18   this point because the Court is of course quite familiar with

19   OneCoin at this point.  OneCoin was, as a matter of fact, a

20   single massive fraud scheme.  It operated as a highly

21   coordinated international scheme with the defendant *Ruja*

22   *Ignatova* at the center.  It promoted a single product to its

23   customers all around the world, the OneCoin cryptocurrency, and

24   it's actually in the name itself. It's called OneCoin.  They're

25   selling one product.  There was one global headquarters in

N4BBGREH

Bulgaria, and multi-level marketing schemes like OneCoin are by their very nature interconnected.  They rely on constantly recruiting new individual victims and expanding into new markets, such that victims in all sorts of countries might be convinced in part by the fact that OneCoin is operating in the United States and recruiting victims in the United States.

And equally importantly, the money in this case was being laundered in large part by United States-based money launders, who supervised the laundering of approximately $700 million from the United States, and that is itself a number that maxes out the fraud guidelines.

Now, let's talk about *Azeem* and why it's different here.  All *Azeem* says is that when you're talking about the same course of conduct bucket in a narcotics case, that conduct, conduct that is totally foreign does not count.  *Azeem* does not deal with crimes that are part of the offense of conviction itself.  And the foreign conduct at issue in *Azeem* actually couldn't have been part of the conviction itself, because the crime that *Azeem* was convicted of was conspiring to import heroin into the United States.  The foreign conduct was the transportation of heroin from Pakistan to Egypt.  And by definition, the transportation of heroin from Pakistan to Egypt is not part of the crime of importing heroin into the United States.

It's a simple two-step argument. Step one is that

N4BBGREH

*Azeem* does not limit the consideration of foreign conduct when that foreign conduct is part of the offense of conviction.  And step two is, the information, the evidence, and the defendant's own allocution make clear that the offense of conviction in this case was the single massive international OneCoin fraud and conspiracy.

THE COURT:  But I think that the defense would say, look, I grant you that you perhaps have proven a global scheme.  However, here in the United States, you can only go as far as the particular criminal statutes will allow you to go.  And so even though you've proven this massive fraud, we can only go as far as the borders of the United States.  And even with respect to the money laundering count, which is an extraterritorial count, that also only goes as far as the underlying statutes will go, and the wire fraud statutes are not extraterritorial, so why shouldn't -- why don't doesn't that argument win the day?

MR. MEAD:  We of course can't charge purely foreign crimes, unless there's an exterritorial statute, but that's not what's happening here.  This crime involves United States wires.  There's no dispute whatsoever that they're promotors in the United States and they're people recruiting victims in the United States, and victims in the United States are sending wires.  This big scheme has plenty of domestic wires in it, which is why it's a case that we could charge, and which is why

N4BBGREH

1      the defendant could plead guilty to it.

2              THE COURT:  But the domestic wires to Mr. Weddles's

3      point are a small percentage of the overall illicit proceeds,

4      correct?

5              MR. MEAD:  That's correct, your Honor, yes.  The

6      domestic victims are a relatively small percentage of the total

7      victims in this case.

8              THE COURT:  And, therefore, is there something to the

9      argument that -- well, this is the United States victims as the

10     tail wagging, the global victims is the dog; and therefore it

11     would be improper for me to include those additional victims?

12             MR. MEAD:  I think all that's required here is that

13     there be some domestic wires, and that's clearly the case here.

14             THE COURT:  As long as there's a tail here, we're

15     good?

16             MR. MEAD:  I think any other rule is both outside the

17     language of the statute and totally un-administrable.

18     Otherwise the Court would have to say, well, you have to prove

19     50 percent or 75 percent or something, and there's no line that

20     makes any sense, I think, once you prove that there's some

21     domestic wires in the case, and there clearly are here.

22             THE COURT:  Okay.

23             MR. MEAD:  I want to talk a little bit about the

24     policy bases here and what the alternative that the defendant

25     wants the law to be is.  If the defendant is right, loss amount

N4BBGREH

liability under the guidelines can very hugely based on minor

factual quirks if a co-conspirator happens to send a critical

email while he's on a layover in the United States, maybe his

guideline amount is vastly higher than it would be otherwise,

despite those facts of course having nothing to do with the

defendant's real world culpability.

    If the defendant is right, then as the Court gestured

at, this procedure becomes very difficult to administer.  You

need to figure out whether a victim in China may have heard a

webinar in the United States, and that was part of the reason

that he was convinced to invest in OneCoin.  And most

importantly, if the defendant is right about the law, then in

order to hold the defendant and people like him fully

responsible for a huge international fraud like that, what

needs to happen is that he's supposed to be separately

prosecuted and convicted in dozens of different countries in

order to hold him fully responsible.  And that's of course not

the law.  When someone like the defendant is convicted of

participating in a single huge fraud scheme like this one, and

when at least some of the wires are domestic, he should be held

responsible for the full loss of the scheme, which is what

accurately captures his culpability.

    I just want to address one or two additional points

the defendant raised.  One is the case *Khodadad*.  The

government made a concession in a brief in 1995.  I don't think

N4BBGREH

there's any argument here that that concession is binding on

the government in this separate case.  There's no argument that

the Second Circuit decision is binding either.  It's an

unpublished decision in which -- in I believe a footnote.  It

relies entirely on the government's concession.  And most

importantly *Khodadad* is entirely consistent with the

government's offense of conviction argument because there the

indictment explicitly referred to a single painting. And at

sentencing, the loss amount was enhanced based on additional

paintings not described in the indictment.

Onto the money laundering point.  First off, the money

laundering point doesn't matter at all if the Court rules in

the government's favor on the wire fraud point, because that

will drive the guidelines.  But there are a couple of different

reasons why the defense is getting the money laundering point

wrong.  First, as we've explained, the fraud here is the wire

fraud.  The full wire fraud was the full loss amount.

Second, as to the specified unlawful activities.  In

the definitional section of 18, U.S.C., 1961 listing various

specified unlawful activities, one of them is fraud in the sale

of securities not tethered to any sort of underlying criminal

statute, which would be covered in this case.  And also

important --

THE COURT:  Is crypto a security?

MR. MEAD:  Yes, it is, your Honor.  That's our view.

N4BBGREH

1        THE COURT:  That's your view.  Has that been

2   established?

3        MR. MEAD:  Just a second, your Honor.

4        (Counsel conferred)

5        MR. MEAD:  We charge a securities fraud count in this

6   case.  Our view is, it's plainly a security.  The defense may

7   disagree with that point, but our view is that it is plainly a

8   security, and it was charged as such in this case.

9        THE COURT:  And I'm not putting you on the spot,

10  Mr. Mead, but what is the state of play in the Circuit or

11  across the Circuit concerning whether or not crypto is a

12  security?

13       MR. MEAD:  I don't think it's been decided by the

14  Circuit one way or the other, your Honor.

15       THE COURT:  Or any other Circuit?

16       MR. MEAD:  Not to my knowledge.  It's a hot issue

17  that's being contested, but I'm not sure that there's any

18  Circuit law on it.

19       THE COURT:  Okay.

20       MR. MEAD:  And, finally, I direct the Court to -- in

21  the same list that the defendant was pointing to, Section

22  1956(c)(7)(B)(vi), and that's a list of foreign crimes that can

23  constitute specified unlawful activity.  And number six is an

24  offense with respect to which the United States would be

25  obligated by multi-lateral treaty, either to extradite the

N4BBGREH

1   alleged offender or to submit the case for prosecution if the

2   offender were found within the territories of United States.

3   That's basically saying if the crime would be subject to

4   extradition, it's a crime where you can prosecute the

5   laundering of those proceeds.  And I'm not going to say that

6   we've done a country by country analysis of every single

7   country where there were victims in this case, but of course

8   fraud is typically a crime that is subject to extradition.

9          THE COURT:  And, in fact, you've extradited someone?

10          MR. MEAD:  I think it means the opposite, your Honor,

11   such that the United States would be obligated to extradite

12   someone to the --

13          THE COURT:  -- to the other country.

14          MR. MEAD:  Yes, your Honor.  And I don't want to

15   belabor the money laundering point too much.  Again, the wire

16   fraud itself is part of the offense of conviction in this case,

17   and for that reason the defendant should be held fully liable

18   for the full losses he caused.

19          THE COURT:  Okay.  Anything else, Mr. Weddle?

20          MR. WEDDLE:  Very briefly, your Honor.  I think that

21   this idea that we're hearing now for the first time today about

22   securities transaction being a specified unlawful activity.

23   It's not charged in the information as the specified unlawful

24   activity that is the predicate for the money laundering charge

25   here.  It wasn't admitted by my client.  It is highly

N4BBGREH

1  questionable whether cryptocurrency is a security.  It's not

2  clear to me under which countries' laws that would be decided.

3  And, your Honor -- and I think the government knows full-well

4  that they have *Brady* material in their discovery about

5  discussions that government actors had with other law

6  enforcement actors around the world about whether or not

7  cryptocurrency could be a security.  And even if cryptocurrency

8  is a security, the charge here is that this was fake.  I have

9  no idea how, even if a cryptocurrency can be a security, a not

10 cryptocurrency can also be a security.  That's totally without

11 any support or precedent.

12         But I think, your Honor, this kind of bobbing and

13 weaving demonstrates the wisdom and the binding nature of the

14 *Azeem* rule; which is, Why should we be involved in trying to

15 figure out whether Bulgarian law would count OneCoin as a

16 security.  It's a morass.  And sovereigns should enforce their

17 own law.  The buckets that we've described are the buckets that

18 are United States wire fraud.  They're within the scope of what

19 Congress has decided.  And those losses and that conduct is the

20 conduct that is within the scope of the sentencing guidelines

21 according to *Azeem*'s analysis and holding of the sentencing

22 guidelines.

23         And nothing about the wording of count of conviction,

24 nothing about common scheme or plan versus common course of

25 conduct, none of those things avoid the interpretative

N4BBGREH

methodology of *Azeem; which is,* Azeem says, listen, for the

sentencing guidelines, if there's a specific reference to

taking into account some kind of foreign characteristics, then

do it.  The fact that there are such references tells you that

the general rule is absent an explicit reference, don't do it.

To do otherwise wades into a morass of international

questions of law, and it violates the general principle that we

shouldn't be enforcing other sovereigns laws.  And I submit

that because the wire fraud statute is domestic, this is

exactly the same as *Azeem.*  In the words of Mr. Mead, you can't

charge importation of heroin into Egypt as a violation of U.S.

law because that's not within the scope of U.S. criminal

statute.  For the same reason, you can't charge fraud that is

committed without the use of U. S. wires as a violation of

Section 1343.  It's outside the scope of the statute.  And the

prosecutors say so cannot expand the scope of that statute or

undue Congress's decision about the scope of that statute.

Thank you, your Honor.

THE COURT:  Thank you.  I'm going to take five

minutes, be right back out.

(Recess)

THE COURT:  I actually don't know what the procedural

process of this is, but to the extent it's a motion by the

defense to exclude the international aspect of the scheme, the

motion is denied.

N4BBGREH

First of all, I'm not going to resolve the issue of whether or not crypto is a currency, nor do I think I have to. I think the government is correct, although it is the first time I've had an opportunity to review and analyze *Azeem*, and I do think it's a close case, but I don't think that this case is like *Azeem*.  As the government argues, and as I believe convincingly, the crime that was charged in this case was a unitary international scheme that was run in substantial part, at least the money laundering part, out of the United States. And not only that, but other aspects of the crime are also run out of the United States at times.  And where there is a large scheme, a large international scheme, I do not believe that the United States loss, even those that are not extraterritorial do not require that those schemes be chopped up into individual countries.

And because of that, because the scheme that was charged was international in scope, and because the various aspects, each of the various aspects of the scheme was carried out, at least in part in the United States, and certain aspects of which were carried out in substantial part out of the United States as I understand it, the primary money launderers for OneCoin were Mr. Armenta and Mr. Scott.  They were based in the United States I think at all times during their involvement in the scheme.  Mr. Scott actually had been found guilty by a jury, and Mr. Armenta having pled guilty.  And because it was

N4BBGREH

1    both (A) not only charged as an international unitary scheme,

2    but was carried out as an international unitary scheme, I

3    believe that it would be perfectly appropriate to include the

4    totality of the illicit activity in the calculation of the

5    applicable guidelines range.

6           As Mr. Weddle, however, has also suggested, this may

7    be in large part an academic exercise, but I have said on the

8    record on previous occasions that in my view the guidelines

9    tables concerning financial frauds are inflated.  And although

10   I am of course and will calculate the guidelines as accurately,

11   correctly, and I will consider them, if the maximum term that

12   Mr. Greenwood is facing is 60 years, I can't foresee that he

13   will be sentenced to anything close to approaching 60 years.

14   But that of course is a matter for another day.

15          Now in keeping with the approach that was suggested, I

16   think without objection by the government, what do we do next?

17          MR. WEDDLE:  Can I take credit, your Honor?  I think I

18   suggested the approach.

19          THE COURT:  Mr. Weddle.

20          MR. WEDDLE:  Well, I think, your Honor if we could

21   just put it down for a control date sometime in the future, and

22   then why don't we spend sometime talking to the prosecutors now

23   that we've gotten your ruling on this legal issue about whether

24   there are guidelines issues that we want to contest in a

25   factual way or a legal way.  But let's just see sort of how

N4BBGREH

1   things shake out in the next few weeks, and then propose maybe

2   by letter either that we move, that we set out a schedule for

3   stage three based on no disputed facts, or that we set out a

4   schedule for resolving disputed facts.

5           THE COURT:  I'm happy to do that, assuming there's

6   agreement with the government and it's a reasonable period of

7   time.  I have to tell you, Mr. Weddle, I was getting scared

8   about the potential *Fatico* issues that you were suggesting we

9   take on if I were to have ruled in your favor; not that that

10  swayed me one way or another.

11          MR. WEDDLE:  I hope they didn't, your Honor.  I don't

12  want to do the government's job for them, but I think they have

13  bank records that they could add up to a number.  But, anyway,

14  that's water under the bridge at this point.  I do want to do

15  some research and make sure that I'm not waiving factual issues

16  relating to this legal decision that your Honor has made; or

17  that I'm improperly preserving for appeal this legal issue,

18  notwithstanding not fighting about facts given this legal

19  issue.  So I just want to do a little bit of research on that,

20  but I think -- I don't think that we're going to need a Fatico

21  hearing on whether the loss amount is in the $500 million

22  range.  I don't want to promise that for sure.  I think we

23  should kick the tires and think about your Honor's decision and

24  see if there are portions of the prosecutor's *Pimentel* letter

25  that are subject to reasonable dispute that we should really

N4BBGREH

1   present to your Honor; or if we should move onto 3553(a)

2   factors.  I would propose something like a three-week period of

3   time to report back with a proposal by letter.  I haven't had a

4   chance to talk to the prosecutors about it, about what the next

5   steps are.

6           THE COURT:  That's fine with me.  If you do determine

7   that a subsequent hearing prior to sentencing is necessary, it

8   would be helpful if you could sketch out the contours of what

9   that type of hearing would be before me in conjunction with the

10  government.  Okay.  Mr. Mead.

11          MR. MEAD:  That's fine with the government three weeks

12  from now as a date to submit a letter about whether there are

13  factual disputes that require a hearing is fine with the

14  government.

15          I do want to ask the Court to exclude time under the

16  Speedy Trial Act.  As the Court may remember from the plea, a

17  handful of counts remain outstanding, and we'd just like to

18  exclude time to some sort of control date, either the three

19  week date or perhaps a date 60 days out.

20          THE COURT:  Mr. Weddle.

21          MR. WEDDLE:  No objection, your Honor.

22          THE COURT:  I will exclude the time between now and

23  the three weeks, and we'll get that exact date from Ms. Rivera.

24  Under the Speedy Trial Act, I find that Mr. Greenwood's

25  interest in excluding that time outweigh the interest of the

N4BBGREH

1    public in a speedy trial in order that we might as best as we

2    can make the appropriate determination of what the appropriate

3    guidelines range should be.

4              Ms. Rivera.

5              THE DEPUTY CLERK:  Yes.  May 2, 2023.

6              THE COURT:  So by that date you should at least submit

7    a letter to the Court.  Anything else that we should do?

8              MR. MEAD:  Nothing from the government, your Honor.

9              THE COURT:  Mr. Weddle?

10             MR. WEDDLE:  No, your Honor.

11             THE COURT:  We're adjourned.  Thank you, everyone.

12             (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25