UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
UNITED STATES OF AMERICA,                :

                                          :

                                          :        S16 17 CR. 630 (ER)

          -against-                :

                                            :

KARL SEBASTIAN GREENWOOD,       :

                                            :

                          *Defendant.*      :
-----------------------------------------------------------------------X

**SENTENCING MEMORANDUM ON BEHALF OF KARL SEBASTIAN GREENWOOD**

MUHAMMAD U. FARIDI
LAUREN SCHORR POTTER
HANNAH M. BRUDNEY
PATTERSON BELKNAP WEBB & TYLER LLP
1133 AVENUE OF THE AMERICAS
NEW YORK, NY 10036
(212) 336-2000

JUSTIN S. WEDDLE
WEDDLE LAW PLLC
250 West 55th Street
30th Floor
New York, NY 10019
(212) 997-5518
jweddle@weddlelaw.com

HOWARD LEADER
534 West 112th Street
New York, NY 10025
(646) 533-7696
howard.leader@gmail.com

*Attorneys for Karl Sebastian Greenwood*

August 29, 2023

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ........................................................................... 1

PERSONAL AND PROCEDURAL HISTORY ................................................. 3

I.   Karl Sebastian Greenwood's Personal History and Character ............................3

     A.   Karl's Upbringing and Family ............................................................. 3

     B.   Karl's Education and Career ................................................................ 5

     C.   Karl's Reputation for Generosity and Kindness .................................. 6

     D.   Karl's Children.................................................................................... 7

II.  Karl's Arrest, Incarceration, and Extradition.................................................8

     A.   ██████████████████████████████████.................................. 8

     B.   ████████████████████████████████████████
          ███████████████████████████████████
          ████████████████████████████.................................................. 12

     C.   Karl's Three-Year Incarceration at MCC ██████████████.................. 13

     D.   Karl's Two-Year Incarceration at MDC Under Continued Harsh
          Conditions .................................................................................... 16

III. Karl's Incarceration Has Had a Severe Impact on His Family and His Relationships......18

     A.   Karl's Incarceration Has Devastated His Parents and Destroyed His
          Relationship With His Children................................................... 18

     B.   Karl Suffers From Extreme Isolation and Separation from His Community ....... 22

     C.   Karl Has Sought to Take Advantage of the Limited Opportunities
          Available During His Detention ................................................. 23

IV.  Offense Conduct and Procedural History ....................................................24

     A.   Karl's Guilty Plea ████████..................................................... 24

     B.   Legal Arguments Related to Karl's Plea and Sentencing..................... 24

ARGUMENT ................................................................................................. 26

I.     The Sentencing Guidelines Calculation Generates an "Absurd Guideline Result" and Should be Substantially Discounted ................................................................27

    A.     The Sentencing Guidelines Calculation ................................................ 27

    B.     A Substantial Sentence Reduction is Warranted Based on Loss Calculation ....... 28

II.     The Section 3553(a) Factors Support a Sentence of Time Served ....................................30

    A.     The Horrific Conditions of Karl's Pre-Sentence Incarceration Warrant a Substantial Variance from the Guidelines .......................................... 31

        i.     Karl's Detention in Thailand ...................................................... 31

        ii.     Karl's Detention in the MCC and MDC ...................................... 33

    B.     Karl Has Accepted Full Responsibility for His Crimes ........................ 36

    C.     A Sentence of Time Served Is Needed █████████████████ █████████████ ............................................................ 37

    D.     A Sentence Well Below the Guidelines Is Warranted to Avoid Sentence Disparities ...................................................................... 38

    E.     Karl's Status as a Foreign Citizen Counsels Against Further Incarceration ........ 38

    F.     Karl's History and Characteristics Counsel Against Additional Incarceration ...................................................................... 41

    G.     Additional Incarceration is Not Necessary for Specific or General Deterrence Nor is It Needed to Protect the Public and to Promote Respect for the Law ...................................................................... 41

    H.     The Court Should Consider Alternatives to Incarceration .................... 42

III.     No Restitution Should be Ordered ....................................................................43

IV.     No Fine is Warranted ..........................................................................................43

CONCLUSION .......................................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fernandez-Rodriguez v. Licon-Vitale*,
    470 F. Supp. 3d 323 (ER) (S.D.N.Y. 2020)............................................................14

*Koon v. United States*,
    518 U.S. 81 (1996)..................................................................................................30

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)..............................................27, 29, 30, 42

*United States v. Aracena de Jesus*,
    20-cr-19 (PAE), Dkt. 29......................................................................................33, 35

*United States v. Armenta*,
    17-cr-556, Dkt. 76.............................................................................14, 29, 43

*United States v. Azeem*,
    946 F.2d 13 (2d Cir. 1991)..............................................................25, 26, 28

*United States v. Carty*,
    264 F.3d 191 (2d Cir. 2001)..............................................................................31, 32

*United States v. Cohen*,
    19-cr-741, Dkt. 48...............................................................................................40

*United States v. Connolly*,
    16-cr-370, Dkt. 451.............................................................................................40

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013)................................................................................29

*United States v. Days*,
    19-cr-619 (CM), Dkt. 35.....................................................................................13

*United States v. Del Carmen*,
    18-cr-669 (JPO), Dkt. 286 ..................................................................................35

*United States v. Ellison*,
    18-cr-834 (PAE), Dkt. 582..................................................................................36

*United States v. Faibish*,
    12-cr-265 (ENV), Dkt. No. 271 ..........................................................................29

*United States v. Flores-Alberto*,
    20-cr-668 (JPO), Dkt. 27 ................................................................................35

*United States v. Gonzalez*,
    18-cr-669, Dkt. 250.................................................................................14, 34

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012)..........................................................29

*United States v. Hatcher*,
    No. 18 Cr. 454-10 (KPF), 2021 WL 1535310 (S.D.N.Y. Apr. 19, 2021) ........16, 38

*United States v. Kang*,
    No. 16-cr-837 (JPO), Dkt. 69 (S.D.N.Y. 2017) .......................................42

*United States v. Kloda*,
    133 F. Supp. 2d 345 (S.D.N.Y. 2001)..........................................................30

*United States v. Leitch*,
    No. 11 Cr. 609, 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013)................................43

*United States v. Malley*,
    21-cr-215 (ER), Dkt. 47 ........................................................................29, 35

*United States v. Marmolejos*,
    19-cr-626 (PAE), Dkt. 25.......................................................................35

*United States v. Mateo*,
    299 F. Supp. 2d 201 (S.D.N.Y. 2004) (VM) ...............................................33

*United States v. Morgan*,
    19-cr-209 (RMB), Dkt. 90 .......................................................................17

*United States v. Murphy*,
    108 F.R.D. 437 (E.D.N.Y. 1985).................................................................42

*United States v. Nunez*,
    19-cr-691 (CM), Dkt. 28........................................................................16, 35

*United States v. Rivas*,
    19-cr-529 (PAE), Dkt. 46.......................................................................35

*United States v. Rodriguez*,
    492 F. Supp. 3d 306 (S.D.N.Y. 2020) (JSR) .............................................33

*United States v. Salvador*,
    No. 98-cr-484 (LMM) 2006 WL 2034637 (S.D.N.Y. July 19, 2006) ...................32

*United States v. Shea*,
  20-cr-412, Dkt. 398 (S.D.N.Y. June 11, 2023)....................................26

*United States v. Thompson*,
  19-cr-698 (ER), Dkt. 49 ..............................................................29

*United States v. Torres*,
  No. 01-cr-1078 (LMM), 2005 WL 2087818 (S.D.N.Y. Aug. 30, 2005)........................31, 32

██████████
████████████████████████████

## Statutes

18 U.S.C. §§ 1343 and 2 .................................................................24

18 U.S.C. § 1349 ..................................................................24, 26

18 U.S.C. § 1956 ........................................................................24

18 U.S.C. §§ 1956(c)(7)(A) & 1961(1)(B) ...............................................26

18 U.S.C. §§ 3161(c)(1) ................................................................24

18 U.S.C. § 3553 ................................................................. *passim*

18 U.S.C. § 3572(a)(1) .................................................................43

18 U.S.C. § 3661 .......................................................................30

18 U.S.C. § 3663A .....................................................................43

18 U.S.C. § 3624(b) .................................................................3, 39

18 U.S.C. § 3162 ...............................................................24, 25, 37

U.S.S.G. § 2B1.1 .......................................................................28

U.S.S.G. §§ 2K2.1(b)(3)(A) ............................................................27

U.S.S.G. § 3B1.1(a) ...................................................................28

U.S.S.G. § 5A .........................................................................27

U.S.S.G. § 5E1.2(a) ...................................................................43

U.S.S.G. § 5H1.3 ......................................................................37

**Other Authorities**

Michael Balsamo, *AP Exclusive: Gun Found Inside Epstein Jail During Lockdown*, AP News (Mar. 5, 2020)........................................................................13

Stephen Rex Brown, *Strip Searches, Frozen Bologna Sandwiches and Wrecked Cells: MCC Inmates Detail Lockdown Due to Smuggled Gun*, N.Y. Daily News (Mar. 6, 2020) ............................................................................................14

Annie Correal, *No Heat for Days at a Jail in Brooklyn Where Hundreds of Inmates Are Sick and 'Frantic,'* N.Y. Times (Feb. 1, 2019) ..................................17

Jonathan Dienst, *MCC Returns to Normal Operations After Smuggled Gun Triggers Lockdown*, NBC New York (Mar. 11, 2020)...........................................14

Emma Kaufman, *Segregation by Citizenship*, 132 Harv. L. Rev. 1379, 1403 (2019) ..................................................................39

Hon. Jed. S. Rakoff, "Why The Federal Sentencing Guidelines Should Be Scrapped," 26 Fed. Sent. Rptr. 226 (Oct. 2013) ......................................................28

Evan Simko-Bednarski, *Sam Bankman-Fried Risks Trading One Notorious Jail For Another Back in the U.S.*, N.Y. Post (Dec. 20, 2022) ......................................16

UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Committee against Torture, Concluding observations on the initial report of Thailand, (June 20, 2014)...............................9

UN Economic and Social Counsel, Committee on Economic, Social, and Cultural Rights, concluding observations on the combined initial and second periodic report of Thailand (July 7, 2015) .............................................................9

UN International Covenant on Civil and Political Rights, Concluding observations of the Human Rights Committee on Thailand (July 8, 2005)...................................9

U.S. Attorney's Office, S.D.N.Y., *Former Correctional Officer Sentenced to 36 Months In Prison For Obstructing Investigation Into Smuggling Of Firearm Into Metropolitan Correctional Center* (Feb. 8, 2023)...........................................13

Benjamin Weiser, *Justice Dept. to Close Troubled Jail Where Jeffrey Epstein Died,* N.Y. Times (Aug. 26, 2021) ...................................................................13

Sally Quillian Yates, Deputy Attorney General, U.S. Dep't of Justice, Speech at Columbia Law School on Criminal Justice Reform (Oct. 29, 2015).....................42

Defendant Karl Sebastian Greenwood respectfully submits this sentencing memorandum in advance of his sentencing, which is scheduled for September 12, 2023, and requests that the Court consider the information below and in the attached exhibits in determining an appropriate sentence. For the reasons discussed below, including the extraordinarily harsh conditions of Karl's confinement to date (a period of more than five years), a sentence of time served is sufficient to achieve the objectives of sentencing set forth in Title 18, United States Code, Section 3553(a).

## PRELIMINARY STATEMENT

Karl is a forty-six-year-old hard-working, generous, and devoted son, and the father of four. Karl has spent the past five years languishing in jail, ███████████████████ █████████████████████████████████████, months of lockdown, and utter isolation. For his entire five years of detention, Karl has been imprisoned outside of his home country with no presence of family. Karl has pleaded guilty to three offenses, takes full responsibility for his misconduct, and is deeply regretful for his actions. Section 3553(a) directs the Court to impose a sentence that is sufficient, but not greater than necessary, to meet the goals of sentencing. Here, the Court should impose a sentence of time served or, alternatively, a period of home detention to be served in Sweden.

Karl's five-year incarceration has been extraordinarily harsh. Karl was arrested in Thailand in 2018 and housed in the notorious Klong Prem prison for three months. ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ After being extradited to the United States in 2018, Karl was held in the Metropolitan Correction Center ("MCC") for three years, more than half of which Karl estimates was in lockdown. This Court is well-aware of the

inhumane conditions in the MCC and how those conditions only worsened during the pandemic. When the MCC closed in 2021, Karl was moved to the Metropolitan Detention Center ("MDC"), where he has remained for the past two years, experiencing constant lockdowns, harsh conditions, reduced programming, and limited ability to contact family.  Karl's five years of confinement have been, in short, traumatic.

Karl's incarceration has had a similarly devastating impact on his family and his familial relationships.  Karl's family lives over four thousand miles away in Sweden and has had enormous difficulty communicating with him in prison.  Due to his parents' ████████, as well as the restricted visitation resulting from the pandemic, Karl has had only one visit from his family in five years.  Moreover, Karl's four children have grown up over the past five years without any contact with their father.

More than thirty letters have been submitted on Karl's behalf, depicting a man who is generous, driven, kind, and devoted to his family and friends.   Karl's involvement in the OneCoin conspiracy was a grave error and Karl has accepted full responsibility for his crimes.  ████████
████████████████████████████████████████████████████████████████████████
████████████

Section 3553(a) requires that the Court consider, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, the need to promote respect for the law and afford adequate deterrence, and the need to avoid unwarranted sentence disparities.  Karl appreciates the seriousness of his offenses and is deeply remorseful.  ████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

████████████████████████ And should Karl serve additional prison time, as a non-citizen, he will be ineligible to receive good time credit towards early release under the First Step Act and will not have access to critical programs that U.S. citizens do, ████████████████████████ Moreover, a sentence of continued incarceration will ultimately require Karl to be detained by ICE for an unknown period of time before being deported to Sweden. Finally, Karl has a strong support network of close family and friends waiting for him in Sweden, including his parents and his children. The defense respectfully submits that a sentence of time served, or alternatively a period of home incarceration in Sweden, would serve the goals of sentencing here.

## PERSONAL AND PROCEDURAL HISTORY

### I. Karl Sebastian Greenwood's Personal History and Character

#### A. Karl's Upbringing and Family[1]

Karl was born on ████████ 1976, in Stockholm, Sweden to ████████ ████████████████████ Karl has a brother, ██████ who is four years younger. Karl grew up in a close-knit, stable, and loving family. Karl's parents founded their own advertising business in Sweden and worked to instill in him the importance of education, hard work, and independence from an early age. Although Karl's parents were not wealthy, they sought to provide an upbringing filled with joy, adventure, and kindness. Mr. Greenwood shared:

> [Karl] was raised in a stable home environment founded on basic Christian values of honesty, kindness, and respect, and we also instilled in him the importance of education, hard work, and independence. Ex. 3.

Mrs. Greenwood fondly described Karl's demeanor, writing:

> As a child, Karl was loving and happy most of the time, curious about everything and life itself. He played and built things. A couple of ropes and tying knots could

---

[1] Karl was called by his middle name "Sebastian" by his family and friends for most of his life and some have done so in their letters of support.

3

keep him happy for hours.  He was great fun to be with, a real entertainer and we all have so many happy memories …. He spent hours in his Swedish grandfather's workshop to 'fix things' and loved to take him by his hand and walk to the woods or the river to explore the nature of go fishing.  Ex. 2.

In addition to his supportive parents, Karl's uncle, █████████, played a seminal role in Karl's life from the time he was born.  █████████ recalled fond memories and family vacations from Karl's childhood, and explained that he and Karl "share a special bond that perhaps goes beyond that of most uncle-nephew relationships."  Ex. 5.  As Karl grew up, █████████ recognized that he and Karl "share the same philosophical outlook on life based on hard work and achievement, coupled with a humble recognition for other people's struggles."  *Id*.

Karl has also had a close relationship with his younger brother, ██████ ████ described Karl as both "consistently protective" and "very inclusive," always ensuring that ████ did not feel left out as a child.  Ex. 4.  ██████ wrote:

It was comforting for me to know he was always nearby.  If I injured myself at school or had any problems with other kids, he was always there for me.  Our parents worked long hours, running a small business, which meant Karl had to take responsibility for me from an early age.  *Id.*

Karl's uncle, █████████, echoed ██████ description, noting that Karl always assumed responsibility for his younger brother's safety during family trips and consistently looked out for his younger cousins as well.  ██████ wrote:

This attitude to his sibling came naturally to him and later also extended to my younger son and daughter.  Karl voluntarily adopted the role of an older brother to his cousins, particularly to my son, and during many Christmas get-togethers I knew Karl could be relied on to calm the young ones down whenever they became over-excited.  In these days of turmoil, men like Karl who have a natural calming effect on others, is a rare gift.  Ex. 5.

█████████ children, Karl's cousins, similarly recounted Karl's profound presence in their lives.  ██████ ███████████████████████████████████████, recalled his cousin's patience and care for him, writing:



Ex. 6.

Karl's cousin, ███████████, added that:

> Karl has always felt like the big brother I never had. Caring, fun loving and laid back, someone to look up to and admire. He always looked out for us younger ones and I would always look forward to seeing him and his brother on regular family visits. Kind to the core, he would always help family when it was needed without question or agenda, which I always remember and hold dear. Ex. 15.

**B.** **Karl's Education and Career**

Karl attended university at the European Business School in London and graduated with a degree in International Business and Management Studies in 2001. Ex. 44.

Following graduation, Karl worked for the global auditing and consulting firm KPMG in Germany until 2005. PSR ¶ 128. In 2006, Karl returned to Sweden to work in his parents' advertising business for several years. *Id.* ¶ 126. Karl worked closely with his father to grow the business and develop new projects. Mr. Greenwood wrote:

> I spent two years working closely with Karl at our small publishing and marketing agency. We travelled together as colleagues, meeting clients, signing up suppliers and developing new projects. He was an inspiration from the start; positive, creative and most importantly, respectful to everyone he engaged with. He also demonstrated strong leadership skills in helping to steer the transition of our advertising sales to the digital age. Ex. 3.

From 2009 to 2012, Karl lived and worked in Singapore. PSR ¶ 127. From 2012 to 2014, Karl returned to Sweden to continue work for his parents' advertising agency. *Id.* ¶ 126. In 2014, Karl moved to Asia and began working for OneCoin. *Id.* ¶ 124.

## C. Karl's Reputation for Generosity and Kindness

As reflected in the over thirty letters submitted by Karl's family, friends, and fellow inmates on his behalf, Karl is a generous and compassionate individual.[2]

Karl's uncle, ████████ described him as "an extraordinarily caring and helpful person who derives immense joy and satisfaction from helping others to develop their abilities and potential to succeed in life." Ex. 5. Karl's aunt, ████████, similarly emphasized Karl's "empathy towards others," noting that he has "always been loyal, kind, faithful and generous not only to his fine upstanding family but to all who had the pleasure to cross his path." Ex. 7.

Karl had a particularly special relationship with his personal driver in Thailand, ████████ ████████████████████████████████████████ ████████████████████████████████████████ █████████████████████

██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ █████████████████████████████████
Ex. 10.

Karl is similarly quick to extend generosity and assistance to complete strangers. While living in Thailand, Karl sponsored schooling for nearly one hundred Thai children who had no access to education. ████████ writes:

> I have seen Mr. Greenwood in action with his work and he has sincerely helped many people in Thailand including children who didn't have access to basic school needs and where Mr. Greenwood sponsored 98 children to go to school and get the basic needs fulfilled for their future life. Ex. 10.

While the above two examples might be discounted by the source of Karl's largesse at the time (OneCoin income), his impulse to help others runs deep and pre-dates his crime. For example,

---

[2] This section highlights only some of the letters submitted on Karl's behalf. They can all be found at Exhibits 2-33.

while in University, Karl consistently came to the aid of a homeless man living near campus. Karl's parents' friend, █████████, recounts:

> On the very first day [of university], I witnessed one of many examples to come of Karl's thoughtfulness and compassion when he emerged from the building where he lived to greet me but stopped to give some change and a few encouraging words to a young homeless man on the pavement near the steps. As I later found out he would often help this young man and take him to a nearby hamburger bar and make sure he had a dinner. He didn't have much money himself as a student, but enough he thought to share with others. Ex. 8.

Karl's friend, █████████, described Karl as "truly a happy, positive guy with a big heart," and someone who "was never afraid to show that people and relationships meant everything to him, not just within his own circle, but people in general that he had perhaps met just once or twice." Ex. 25.

Karl has continued to contribute to his community and impact those around him while incarcerated. With educational resources scarce during the pandemic, Karl created and taught a class in financial basics, technical analysis, and day trading for his fellow inmates. █████████, a fellow inmate, wrote:

> [Karl] took the initiative to prepare for and start the class without any directives nor support from the Education Department, he acquired the books, prepared the syllabus and the class structure. He ran the class daily for 4 weeks, and the attendance grew bigger as the good word of mouth has spread around the unit….Mr. Greenwood made himself available outside the class time to answer questions and help those who need a little push to keep up. Ex. 13.

█████████, another inmate, added that:

> Mr. Greenwood has really taken the time and the effort and went to a great length to help other inmates to seek a law-abiding opportunities, to change their perspective on life and to better themselves. So they can get back on track after serving their time. Ex. 12.

### D. Karl's Children

Karl is the proud father of four children, all of whom he misses deeply. Two of Karl's children, EG and OG, ages thirteen and fifteen, currently live in Sweden with Karl's ex-wife, who Karl married when he was working for his family in Sweden. Prior to his arrest, Karl was a steady

presence in his children's' life and consistently maintained a close relationship with them. Upon the couple's separation, even when he was living in Asia while his children were in Sweden, Karl supported both children emotionally and financially, with frequent calls and visits. Indeed, Karl had a plane ticket booked to return to Sweden for his daughter's birthday only two days after he was arrested in Thailand.

While living in Thailand, Karl was in a relationship with ██████████ Karl and Ms. ███████ had a daughter, AG, who is now seven years old and lives in Thailand with her mother. Karl's relationship with Ms. ████████ ended amicably, and Karl supported his daughter financially and cared for her regularly until his arrest.

During the two years before his arrest, Karl spent several months working in Panama and formed a relationship with ████████████, with whom he had a son, LG, now six years old. After their relationship ended, Karl's son and his mother moved to Mexico. Karl maintained contact with his son and Ms. ██████ before he was arrested, but has been unable to communicate with them while incarcerated.

## II. Karl's Arrest, Incarceration, and Extradition

### A. ████████████████████████████████████████

On July 25, 2018, Karl was arrested in Thailand at the direction of the U.S. government and imprisoned at the notorious Klong Prem prison in Bangkok for three months prior to his extradition to the United States. Ex. 1 at 3.[3]

Thai prisons, and particularly Klong Prem prison, have long been criticized for rampant human rights violations and cruel conditions. Dating back to 2005, the Human Rights Committee on Thailand at the UN International Covenant on Civil and Political Rights raised concerns about

---

[3] Exhibit 1 is a copy of ████████████████████████████████████.

"overcrowding and general conditions of places of detention, particularly with regard to sanitation and access to healthcare and adequate food."[4]  Several years later, in 2014, the United Nations Committee against Torture issued a report on Thai prisons, concluding:

- "[T]he Committee remains seriously concerned about the continued allegations of **widespread torture and ill-treatment of detainees**";

- "[T]he Committee remains seriously concerned at the extremely high levels of **overcrowding and harsh conditions** prevailing in detention facilities"; and

- "Reports before the Committee indicate incidents of continuing **violence in detention,** ███████████████████████████████████████ ███████████████████████████████"[5]

In 2017, the International Federation for Human Rights issued a report on Thailand's Prisons, based on a case study of two facilities inside Klong Prem, including the Bangkok Remand Prison ("BRP"), where Karl was detained, and a women's prison.  The Federation's findings include:

- "The International Committee of the Red Cross puts the minimum space for accommodation at $3.4m^2$ per person in shared or dormitory accommodation.  The minimum space currently mandated by the Department of Corrections ($1.1m^2$ for women and $1.2m^2$ for men) is only 32% and 35% of that amount, respectively."

- "The sleeping dormitories…are empty rooms with linoleum floors [i.e. without beds or other furniture]…many former prisoners reported…40-50 people in a dormitory of about $24m^2$ at the BRP…[I]nmates at the BRP reported having a space of approximately 0.60m (width) each when sleeping, significantly lower than the standard specified by the ICRC.  As a result, inmates…are forced to sleep [on the floor] on their sides due to the insufficient space, and in order to avoid conflicts with other inmates."

- "At the BRP, according to one former inmate, the smaller dormitories have two to three fluorescent lights, while the larger ones have five to six lights. The lights are

[4] UN International Covenant on Civil and Political Rights, Concluding observations of the Human Rights Committee on Thailand (July 8, 2005), available at https://digitallibrary.un.org/record/558365.
[5] UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Committee against Torture, Concluding observations on the initial report of Thailand, (June 20, 2014), available at https://digitallibrary.un.org/record/782764 (emphasis added); *see also* UN Economic and Social Counsel, Committee on Economic, Social, and Cultural Rights, concluding observations on the combined initial and second periodic report of Thailand (July 7, 2015), available at https://digitallibrary.un.org/record/798125 (raising "concern at the substandard living conditions and excessive overcrowding in detention centres").

kept on throughout the night, to prevent the prisoners from escaping or breaking the rules."

Karl's detention at Klong Prem surpassed the horrors detailed in these reports. Upon arriving there, Karl was forced to strip naked and was hosed down, his body was shaved, and he was forced to sit naked, chained to other inmates for 24 hours before receiving clothes. Ex. 1 at 3; PSR ¶ 112. Karl was housed in a room with approximately 75-120 other prisoners, with a small space on the floor to sleep, without a mattress, and a hole in the floor for a toilet. Ex. 1 at 3; PSR ¶ 113. The floor was made of broken cement and full of cockroaches, rodents, and scorpions. Ex. 1 at 3.

The room was controlled by gangs, and the single correctional officer assigned to supervise the room let the gangs act with impunity. As the only non-Thai speaker in the room, Karl was specifically targeted by the gangs. Ex. 1 at 3; PSR ¶ 113. The gangs forced Karl to sleep closest to the toilet hole and repeatedly approached him to try and get him addicted to crystal meth or to peddle drugs to other new inmates. PSR ¶ 113. Food at Klong Prem consisted of soiled rice and fish filled with maggots and was otherwise controlled by the gangs. *Id.* Karl survived on fruit and water. PSR ¶ 113. Karl was kept in this room daily from 3:00 p.m. to 5:30 a.m. Ex. 1 at 3. At 5:30 a.m. every morning, Karl was forced to sit in the sun in the lotus position for three hours of "prayer." If he failed to sit properly, he was physically punished.

Karl was petrified his entire time at Klong Prem. He was unable to use the toilet or sleep for weeks out of fear for his safety. Ex. 1 at 3-4. During his time at Klong Prem, Karl witnessed numerous gang sexual assaults and saw four people die from suicide. Upon learning that Karl was being detained at Klong Prem, Karl's parents were horrified. Mr. Greenwood wrote:

It took many days for us to find out what had happened to him, which was a terrifying experience in the extreme, and when we finally discovered his whereabouts, our terror turned to horror. Karl had been incarcerated at Klong Prem,

a notorious maximum-security prison in Thailand, known for its draconian conditions and a place where the Thai inmates fight foreigners for money.

Once inside its yellowing walls topped with rusty barbed wire, Karl's head was shaved and he was locked up in a single room with more than a hundred inmates ranging from thieves and drug smugglers to cutthroats and murderers. His bed was the concrete floor, his lavatory a bug-infested hole in one corner where the inmates defecated in full view.

To this day, Karl has never shared exactly what happened to him in that hellish place [] nor have we asked. Perhaps he was protecting us, but we could imagine the worst. Ex. 3.

**B.** ████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████

From September 2021 through April 2022, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

In early 2022, while detained at MDC, ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████.

## C. Karl's Three-Year Incarceration at MCC ███████████

███████████████████████████, Karl was extradited to the U.S., where he was detained at the MCC for a period of nearly three years until August 2021. The inhumane conditions at MCC are notorious among defendants, lawyers, and judges in this District, and ultimately led to the facility's closure in 2021.[6] Karl suffered through some of the worst periods of MCC's tainted history.

As this Court is aware, MCC was filthy, consistently lacked hot water, plagued with infestations of roaches and rodents, and consumed by violence and rampant drug use. Chronic shortages of staff, including medical staff, also meant that people suffered for long periods of time before ever receiving treatment.[7] In *United States v. Days*, 19-cr-619 (CM), Dkt. 35, Tr. at 19:18-20, 20:8-9 (S.D.N.Y. April 29, 2021), former Chief Judge McMahon described the conditions at the MCC, as well as the MDC where Karl would be later housed, as "disgusting, [and as] inhuman as anything I've heard about [at] any Colombian prison, but more so because we're supposed to be better than that…. There is no excuse for the conditions in [the MCC and MDC]." Judge McMahon also lamented her "complete and utter inability to do anything meaningful about the conditions at the MCC" during the five years that she was Chief Judge. *Id.* at 19:7-8.

Even before the pandemic, MCC was regularly on lockdown, resulting in inmates being confined to their cells for 23 hours a day. For instance, Jeffrey Epstein's death in August 2019 resulted in several lockdowns. And, in February 2020, MCC experienced a particularly severe lockdown after a gun was smuggled into the facility by a corrections officer.[8] During this

---

[6] Benjamin Weiser, *Justice Dept. to Close Troubled Jail Where Jeffrey Epstein Died,* N.Y. Times (Aug. 26, 2021), available at https://www.nytimes.com/2021/08/26/nyregion/MCC-epstein-jail-closed.html (noting that the jail "has long been criticized by inmates, lawyers, and even judges for the conditions in which prisoners have been held.").
[7] *Id.*
[8] Michael Balsamo, *AP Exclusive: Gun Found Inside Epstein Jail During Lockdown*, AP News (Mar. 5, 2020), available at https://apnews.com/article/us-news-ap-top-news-weekend-reads-manhattan-prisons-b01bcff4beda06346f90e1b8edd25b03; U.S. Attorney's Office, S.D.N.Y., *Former Correctional Officer Sentenced to*

lockdown, inmates reported to attorneys that mice and water bugs ran through the units as correctional officers unblocked holes in walls that inmates had stuffed with clothing to prevent pests. Toilets overflowed, spreading urine and raw sewage. No clean drinking water was provided, and inmates were forced to drink from their bathroom sinks, which often only ran brown water.[9]

Conditions only went from bad to worse at the MCC when the pandemic arrived in March 2020. In *Fernandez-Rodriguez v. Licon-Vitale*, 470 F. Supp. 3d 323, 328 (ER) (S.D.N.Y. 2020), this Court noted that the management of the MCC "was well aware of the threat posed by the virus and of the guidance that was issued to address it, [and] failed to implement common-sense measures to stop the spread of the virus." Instead, throughout the pandemic, the MCC was placed in constant lockdown, resulting in suspended visitation, limited programming, and inmates' inability to speak to family members and lawyers. As Judge Oetken observed in *United States v. Gonzalez*, 18-cr-669, Dkt. 250, Tr. at 17:20-22 (S.D.N.Y. April 2, 2021), MCC's lockdown conditions essentially amounted to "solitary confinement" for 23 hours a day, "with no access to visitors for most of that time, [and] virtually limited programming." In sentencing Gilbert Armenta, another defendant in the OneCoin case, this Court expressly acknowledged the "very, very unfortunate" conditions at the MCC, including the "inability to speak with family members and lawyers and to be locked down for days and weeks at a time." *United States v. Armenta*, 17-cr-556, Dkt. 76, Tr. at 64:19-22 (S.D.N.Y. Feb. 16, 2023).

---

*36 Months In Prison For Obstructing Investigation Into Smuggling Of Firearm Into Metropolitan Correctional Center* (Feb. 8, 2023), available at https://www.justice.gov/usao-sdny/pr/former-correctional-officer-sentenced-36-months-prison-obstructing-investigation.

[9] *See* Stephen Rex Brown, *Strip Searches, Frozen Bologna Sandwiches and Wrecked Cells: MCC Inmates Detail Lockdown Due to Smuggled Gun*, N.Y. Daily News (Mar. 6, 2020), available at https://bit.ly/2xqbgjw; Jonathan Dienst, *MCC Returns to Normal Operations After Smuggled Gun Triggers Lockdown*, NBC New York (Mar. 11, 2020), available at https://www.nbcnewyork.com/investigations/mcc-returns-to-normal-operations-after-smuggled-gun-triggers-8-day-lockdown/2321864/.

Karl spent nearly three years imprisoned at the MCC and experienced these consistently horrific conditions before and during the pandemic. In addition to suffering through the unsanitary conditions, lack of hot water, rodents, cockroaches, violence, and widespread drug use during those three years, Karl reports being on lockdown for **eighteen consecutive months**, beginning in March 2020. This amount of confinement under lockdown conditions is staggering. Karl's experience at MCC ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████

    ██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████.

    The conditions of confinement that Karl experienced for three years at the MCC are disgraceful by any standards. As discussed further *infra,* these deplorable conditions cannot be

ignored or overstated, and the Court should give them great weight in determining a reasonable and just sentence.

### D.    Karl's Two-Year Incarceration at MDC Under Continued Harsh Conditions

After the MCC was closed in 2021, Karl was transferred to the MDC, where he has spent the past two years.  Conditions at the MDC are similarly appalling, and the facility is consistently on lockdown.  MDC has also struggled to accommodate the influx of MCC inmates amid a reduced number of correctional officers and the continuing effects of the pandemic.  In September 2022, the corrections officers' union sent a letter to the Bureau of Prisons complaining of staffing shortages leading to "hazardous conditions" at the MDC that "are abusive and inhumane as inmates often receive meals untimely, have no access to hygiene products or the ability to shower, and lack access to adequate medical care."[10]

Judges in this District have not hesitated to criticize the conditions at the MDC.  In *United States v. Nunez*, 19-cr-691 (CM), Dkt. 28, Tr. at 16 (S.D.N.Y. May 5, 2021), Judge McMahon characterized the MDC as subjecting inmates to "terrible conditions, inhumane conditions, conditions that should not exist at any incarcerative facility in the United States of America."  In *United States v. Hatcher*, No. 18 Cr. 454-10 (KPF), 2021 WL 1535310, at *4 (S.D.N.Y. Apr. 19, 2021), Judge Failla criticized "the extreme lockdown conditions at the… MDC," which led to the lack of "mental health care, drug abuse treatment, and other important services."  Judge Berman has similarly emphasized the generally terrible, violent, and drug-infested conditions of the MDC and described the lack of heat, light, and hot water at the MDC during the winter of 2019 as a

---

[10] Evan Simko-Bednarski, *Sam Bankman-Fried Risks Trading One Notorious Jail For Another Back in the U.S.*, N.Y. Post (Dec. 20, 2022), available at https://nypost.com/2022/12/20/sam-bankman-fried-risks-trading-one-notorious-jail-for-another-back-in-the-us/.

"disaster" and "beyond unacceptable." *United States v. Morgan*, 19-cr-209 (RMB), Dkt. 90, Tr. at 13:8-9, 13-14 (S.D.N.Y. May 5, 2020).[11]

Over the past two years at the MDC, Karl reports that he has been on lockdown for weeks, and even months, at a time, confined to a five-by-six-foot cell with one other inmate. ███ ███████████████████████████████████████████████████████ And yet, in a truly unconscionable revelation of the harshness of his confinement, despite its lockdowns, unsanitary conditions, overcrowding, and violence, MDC is, by comparison, the most stable environment in which Karl has been detained since his arrest over five years ago. █████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████

The conditions of Karl's five-year confinement in the MCC and MDC have been nothing short of shocking and inhumane. Karl estimates that, in total, he has spent **well over 50%** of his five-year detention, or approximately **2.5 years**, in lockdown, an unfathomable and deeply injurious length of time.



[11]*See also* Annie Correal, *No Heat for Days at a Jail in Brooklyn Where Hundreds of Inmates Are Sick and 'Frantic,'* N.Y. Times (Feb. 1, 2019), available at https://www.nytimes.com/2019/02/01/nyregion/mdc-brooklyn-jail-heat.html.

███████████████████████████████████████████████████

## III. Karl's Incarceration Has Had a Severe Impact on His Family and His Relationships

Karl's five-year incarceration in Thailand and the U.S. has had a devastating impact on his relationship with his family and friends, as well as on his own well-being.

### A. Karl's Incarceration Has Devastated His Parents and Destroyed His Relationship With His Children

The impact of Karl's incarceration on his parents and his connection to them cannot be overstated. Mr. and Mrs. Greenwood are in their mid-seventies █████████████████ ██████████████ ███████████████████████████████████████████ ███████████████████████████████████████████████ Mr. and Mrs. Greenwood have tried desperately to stay in touch with Karl, but the constant lockdowns at the MCC and MDC, coupled with the time difference, have made communication extremely difficult. Ex. 2. Their only means of communication has been email. Moreover, ███████████████ ███████, the over 4,000-mile journey from Sweden to the United States, and the restricted visitation during the pandemic, they have only been able to visit Karl in prison **once over the past five years**. During their visit to the MCC in 2019, Mr. and Mrs. Greenwood were utterly distraught by the state of their son. Mrs. Greenwood wrote:

> When my husband and I eventually were able to visit Karl after his life had taken such a disastrous turn was in July 2019 at MCC—a whole year after his incarceration. We barely recognized Karl. ██████████████████████████ ████████████████████████████████ Ex. 2.

Mr. Greenwood similarly wrote:

> [Karl] expresse[d] relief at the prospect of being transferred to the U.S. or in his words, 'civilization'. A full year later when we were able to visit him at MCC, ██ ████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████ Ex. 3.



Mrs. Greenwood described the experience of visiting Karl in 2019 as "deeply horrifying,"

████████████████████████████████████████████████████████████████
████████████████████████████████████████ Ex. 2. Mr. Greenwood added that:

> We have not seen Karl since that awful day in 2019— ████████████████
> ████████████████████████████████—but not a minute
> has passed without me seeing his ghostly face, languishing behind bars. It is an
> image that has haunted me ever since and I see it now as I write this. Ex. 3.

In addition to the day-to-day sense of loss that they feel without Karl, Mr. and Mrs.

Greenwood are also crippled with the fear that they may not live to see Karl return home. As a

close friend, ████████████████, wrote:

> As all those who care for Seb are aware, he has now been isolated from those who
> love and depend on him for over four years: His children miss him desperately,
> and his parents – my closest friends since our late teens – are now in their seventies;
> have been under excruciating stress during this time; ████████████████████
> ██████████████████████████████████████████████████████████████
> ██████████████████████████████████████████ Ex. 9.

Karl's uncle, ████████, has witnessed Mr. and Mrs. Greenwood's suffering, and is himself

also eager to see Karl return home. ████████ has a job available to Karl when he is released that

will help him get his life back on track. ████████ wrote:

> With great difficulty I have tried to keep in touch with Karl throughout his
> incarceration these past four years and I understand how much he has suffered from
> the isolation from his children and family, being so very far away from us all.
> Therefore, I most respectfully ask Your Honour to show leniency for Karl so that
> he may have the chance to reset his life by being reunited with his children and
> family who so greatly need him to come home. I also ask this not least for his
> parents whose traumatic and unrelenting suffering I continue to witness every
> single day. Ex. 5.

Karl's incarceration has also taken an immense toll on his children.  Karl has not had any contact with his two children who live in Sweden for over five years and has missed countless milestones and memories. ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████



The loss of contact has been heartbreaking for Karl.  He tells me how he misses them every day, suffers over not seeing their faces, hearing their voices, fearing he will lose them all together.  He dreams about them and wakes with anguish in his heart. ███████████████████████████████████████

████████████████████████████████████

Karl's parents and brother maintain a strong relationship with Karl's children in Sweden, and have tried to provide Karl with updates on his children's lives.  But Karl's children miss him enormously and have many questions about his whereabouts.   The children have grown into teenagers without the support or guidance from their father.  Mrs. Greenwood explained:

> There have been a lot of questions, crying and many nightmares and their mother has done a good job of bringing them up under these difficult circumstances and we are grateful that she is protective of them, but in my opinion, there is a huge void in their souls that only Karl can fill.  He is the only one who can answer all their questions and help them to understand and move forward to a happy, well-adjusted life.  Their mother has pledged that she, Karl, and the children will take the time needed to work things out in the children's best interest as soon as Karl is allowed to come home and reconnect with the family.  Ex. 2.

Karl's brother ███ echoed Mrs. Greenwood's sentiment, noting that Karl's arrest and incarceration has had "a deep impact on us all," and that the "impact on his children is incalculable." Ex. 4.

Karl's incarceration has similarly impacted his daughter in Thailand, and her mother, Ms. █████. Upon Karl's arrest, Thai police confiscated all of Ms. ████████ property and possessions, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ██████████████████████████████████

    We miss Karl Sebastian so much that it hurts us inside. He is a good man, loving and devoted father. He always provided for us, kept us safe and made sure we always was [sic] good. █████████████████████████████████████ Ex. 11.

Mr. ██████ Karl's former driver in Thailand, ████████████████████████████

█████████████████████████████████████████████████████████████████

      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
Ex. 10.

**B.** **Karl Suffers From Extreme Isolation and Separation from His Community**

Separated from his family and friends by thousands of miles, with no support system in the

United States, and very few opportunities to speak to his family in Europe, ████████████████

████████████████████████████████████  While detention during the pandemic was

indisputably difficult for all inmates, Karl's experience was made all the worse by his complete

isolation from his support network.  As Mrs. Greenwood wrote:

> The isolation was and still is dreadful.  Karl knew no one in America and had no
> one to lean on for support.  We have no family in the U.S. and had no knowledge
> of American law or how the system works and the distance of more than 4000 miles
> made it very difficult to help him.  That was, and still is, extremely hard for us all.
> Ex. 2.

█████████████████████████████████

████████████████████████████████████

█████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████

████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████

█████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████

**C.    Karl Has Sought to Take Advantage of the Limited Opportunities Available During His Detention**

Despite the enormous obstacles Karl has faced during his period of incarceration, Karl has nonetheless sought to take advantage of the limited opportunities available at the MDC for continued training and programming.    Karl has successfully completed numerous courses, including:

- Tutor Training
- Columbia University- Oedipus
- Columbia University -Advanced Philosophy
- Money Smart Older Adults
- 7 Habits Leadership Class
- Introduction to Chess
- Basic Bookkeeping
- Budget & Finance
- Entrepreneurship
- Business Ethics
- Quarantine Small Business
- Business Acumen
- Personal Wellness
- Customer Service
- Sales Fundamentals
- Time Management
- Conflict Resolution
- Foreign Language Skills, Spanish
- Lead by Example
- Poetry Leisure Time
- Marketing Basics
- Leadership and Influence
- Developing Creativity
- 10 Soft Skills You Need

Exs. 34-43, 45.  Karl also developed and taught a class in financial basics, technical analysis, and day trading for his fellow inmates and has tutored many inmates even beyond those classes.

## IV.    Offense Conduct and Procedural History

### A.    Karl's Guilty Plea ████████████

Karl was arrested in Thailand on July 25, 2018, █████████████████████
███████████████████████ He was extradited to the United States in October 2018.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████.

On December 16, 2022, Karl pled guilty to three counts: wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956.  Dkt. 508.  Karl allocuted to his involvement in the OneCoin scheme and related money laundering and admitted that he knew what he was doing was wrong.  These are significant financial crimes and Karl recognizes the seriousness of these offenses.  The nature and circumstances of these crimes are set forth in Karl's plea allocution and otherwise summarized by the Probation Department in the Pre-Sentence Report ("PSR") and counsel's Objections thereto.  PSR ¶¶ 16-48.

### B.    Legal Arguments Related to Karl's Plea and Sentencing

Over the course of this matter, at least three legal issues have arisen that could have had an impact on the status of Karl's case and the applicable Guidelines range.

*First*, by pleading guilty, Karl waived the government's violations of the Speedy Trial Act, 18 U.S.C. § 3162, which, by the time of the plea, amounted to at least 243 days of non-excluded Speedy Trial time since his arraignment.  Had Karl challenged the violations, the Court would have, at a minimum, been *required* to dismiss the information without prejudice and the government would have been forced to refile charges.  *See* 18 U.S.C. §§ 3161(c)(1) (requiring trial to commence within 70 days); 3162(a)(2) (stating that the "indictment *shall be dismissed* on

motion of the defendant" (emphasis added)); *see also* Dkt. 496 (detailing at least 243 days of Speedy Trial Act violations). The Court also would have had the discretion to order the mandatory dismissal to be *with prejudice*.

*Second*, on January 25, 2023, Karl filed a motion arguing that the Court conduct its Sentencing Guidelines analysis based only on Karl's U.S. criminal conduct, rather than worldwide conduct, pursuant to the Second Circuit's decision in *United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991) (the "*Azeem* issue"). *See* Dkts. 516, 522, and 523. Following oral argument, on April 12, 2023, the Court denied Karl's motion. Dkt. 538. Had the Court ruled in Karl's favor and limited the sentencing analysis solely to U.S. conduct, the Guidelines calculation for Karl's sentence would be materially different. Specifically, as counsel articulated in a letter to the Court on May 1, 2023, the government's evidence shows approximately $10 million in losses relating to U.S. conduct. Dkt. 541 (citing GX-723-B and GX-723-E to the trial of Mark Scott); *see also* Dkt. 539, Tr. at 4, 39; PSR Obj. at 1-2. While this is a significant sum and would have resulted in a Guidelines calculation equaling or exceeding the time Karl has served, it is a fraction of the billions in losses alleged by the government that result from its inclusion of all OneCoin sales worldwide, and regardless of any connection of the United States to those sales. Moreover, the government would have been unable to provide evidence sufficient to support leadership or victim enhancements based on U.S.-based criminal conduct.[12] PSR Obj. at 2. Similarly, if the defense's *Azeem* argument had prevailed, the Guidelines calculation for the conspiracy to commit money laundering conviction would be materially different, since it would be calculated based on

---

[12] The prosecution has not identified any U.S. victims who suffered substantial financial hardship. *See e.g.,* Dkt. Nos. 187 at 64-108; 195 at 787-817. And the government offered no evidence that Karl had a leadership role, or virtually any role, in connection with OneCoin's business in the United States. *See* PSR ¶¶ 64-65.

financial transactions involving only the proceeds of U.S. substantive wire fraud violations—again, approximately $10 million—and the defense believes no sophisticated laundering enhancement would apply to the financial transactions involving those funds. Although the Court has rejected the defense's *Azeem* argument, Karl preserves for appeal the *Azeem* issue and the resulting effects on the Guidelines calculation.

*Third*, it has recently come to defense counsels' attention that Count Three of the operable information—the conspiracy to commit money laundering charge—references as the predicate "specified unlawful activities" both Counts One and Two of the information, wire fraud and conspiracy to commit wire fraud. Dkt. 510 at 3-5. But conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, is not a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7)(A) & 1961(1)(B), and thus cannot serve as a money laundering predicate generating "proceeds"; only the proceeds of the substantive wire fraud offense charged in Count Two can constitute a money laundering predicate. *See United States v. Shea*, 20-cr-412, Dkt. 398 (S.D.N.Y. June 11, 2023) (prosecutors confessing error in a jury instruction listing conspiracy to commit wire fraud as a specified unlawful activity for a money laundering charge). Accordingly, to the extent the Court relied on the underlying conspiracy to commit wire fraud as a predicate for the money laundering charge in its ruling on the *Azeem* issue, the defense respectfully requests that the Court reconsider, or, at a minimum, take account of the issue in fashioning a just remedy under Section 3553(a).

**ARGUMENT**

Karl has spent the last five years detained in notoriously inhumane prisons, separated from his loved ones by thousands of miles, and suffering through deplorable conditions and ███████ ███████████████. Karl pled guilty to his crimes, he appreciates the seriousness of his conduct,

██████████████████████████████████████ Karl is deeply remorseful for his actions and for the harm they have caused.

The Sentencing Guidelines calculation in this case is grossly disproportionate to the conduct and should, in effect, be discounted almost entirely. Instead, the Section 3553(a) factors should govern this sentencing, and upon consideration of those factors, the defense respectfully submits that a sentence of time served is sufficient but not greater than necessary to meet the goals of sentencing. Alternatively, if the Court believes that a further term is necessary, the defense respectfully requests that the Court sentence Karl to an additional period of home incarceration to be served in his home country of Sweden, where he can begin to be reintegrated into his parents' and children's lives.

I.      **The Sentencing Guidelines Calculation Generates an "Absurd Guideline Result" and Should be Substantially Discounted**

A.      **The Sentencing Guidelines Calculation**

The Guidelines calculation prepared by Probation and the government produces an "absurd" result and should be heavily discounted in the Court's sentencing considerations. *See United States v. Adelson*, 441 F. Supp. 2d 506, 509, 512 (S.D.N.Y. 2006) *aff'd*, 301 F. App'x 93 (2d Cir. 2008). Indeed, Probation's recommendation of a Guidelines sentence simply reflects this absurd result and otherwise wholly fails to account for the 3553(a) factors relevant here, including Karl's pre-sentence detention. Probation calculates a final offense level for Karl of 50, which is, quite literally, off the Guidelines Sentencing Table. U.S.S.G. § 5A. This offense level is principally driven by the calculated loss amount of over $500,000,000, a calculation that results in a *thirty-level increase*. By comparison, even violent and dangerous acts involving explosives and terrorism result in enhancements only half as large. *See e.g.,* U.S.S.G. §§ 2K2.1(b)(3)(A) (fifteen-level enhancement for firearms offense involving a portable rocket or missile), 2K1.5(b)(1)

(fifteen-level enhancement for boarding aircraft with an explosive "without regard for the safety of human life"), 2J1.2(b)(1)(c) (twelve-level enhancement if obstruction of justice related to a terrorism offense). This result is controlled by the Court's ruling on the *Azeem* issue. That said, as noted above, *supra* 25-26, had the Court agreed with the defense on the *Azeem* issue, the offense level would have been reduced by *10 levels* based on loss amount alone. *See* USSG § 2B1.1(b)(1)(K).

Probation's offense level also includes three enhancements, a six-level victim enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(C), a leadership enhancement pursuant to U.S.S.G. § 3B1.1(a), and a sophisticated means enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(B) and (C). As to the victim and leadership enhancements, as noted above, *supra* 25, had the Court agreed with the defense on the *Azeem* issue, the defense submits that neither enhancement would have applied. The guidelines calculation for the money laundering conviction would likewise have been materially different—it would be based on the approximately $10 million of U.S.-based or -targeted criminal conduct, and no sophisticated laundering enhancement would apply.

Accordingly, had the defense prevailed on the *Azeem* issue, Karl's offense level could have been reduced by as many as *20 levels*, to 30.[13] The defense preserves its *Azeem* argument, and the resulting guidelines effects of adopting that argument, for appeal.

### B.     A Substantial Sentence Reduction is Warranted Based on Loss Calculation

As calculated by Probation, Karl's Guidelines range is life imprisonment, capped at the statutory maximum of 60 years. For a non-violent offender with no criminal history points to face a sentence of life imprisonment truly reflects, as Judge Rakoff has described it, the "irrationality of the Guidelines, which leads to unjust results in case after case after case." Hon. Jed. S. Rakoff,

---

[13] With no criminal history points, Karl's guideline range would have been 97 to 121 months, *before* consideration of the very significant mitigation factors present here.

"Why The Federal Sentencing Guidelines Should Be Scrapped," 26 Fed. Sent. Rptr. 226, 229 (Oct. 2013). As this Court has recognized, the Sentencing Guidelines for fraud cases "put[] too much of an emphasis on an amount of money and [do] not really get at harm." *United States v. Malley,* 21-cr-215 (ER), Dkt. 47, Tr. at 48:1-13 (S.D.N.Y. Dec. 2, 2021); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 509, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (loss amount "guidelines have so run amok that they are patently absurd on their face," as they place an "inordinate emphasis" on "putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without however, explaining why it is appropriate to accord such huge weight to such factors"); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (over-focus on loss amount table "effectively guarantee[s]" that many sentences will be "irrational on their face").

Indeed, in sentencing Mr. Armenta, this Court expressly recognized that the Guidelines range was essentially a nonstarter, noting that "100 years in jail for this type of activity is probably **preposterous on its face**." *Armenta,* 17-cr-556 (ER), Dkt. No. 76, Tr. at 62:20-21 (emphasis added); *see also United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (finding 20-year sentences for $300 billion dollar fraud was "not merely harsh" but "dramatically more severe than c[ould] be justified"); *United States v. Faibish*, 12-cr-265 (ENV), Dkt. No. 271, Tr. at 23:2-7 (E.D.N.Y. March 10, 2016) ("I subscribe to the views of a whole host of judges who have said so publicly … that the guidelines, even with its slight revisions, are just mindlessly accelerated once you have numbers of any size added in the loss or gain table."); *United States v. Thompson,* 19-cr-698 (ER), Dkt. 49, Tr. at 28:22-29:2 (S.D.N.Y. February 4, 2021) (loss amount guidelines "put entirely too much emphasis on the amount of the fraud"). The same points hold true here.

## II. The Section 3553(a) Factors Support a Sentence of Time Served

While the Court is required to consider the Guidelines in determining an appropriate sentence, the sheer inhumanity of the Guidelines calculation in this case renders it largely irrelevant to a proper analysis of the other Section 3553(a) factors and a determination of a just punishment. *See Adelson*, 441 F. Supp. 2d at 512 (where the court is "confronted with an absurd guideline result," the court may instead "focus its primary attention on the non-guidelines factors set forth in § 3553(a), including both those of general applicability and those that ha[ve] special relevance to [the defendant's] particular circumstances)." As applied here, the Section 3553(a) factors justify a sentence of time served.

Section 3553(a) allows the Court to consider "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Section 3553(a) directs the Court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the goals of sentencing set forth in Section 3553(a)(2). The sentence imposed must be "the least severe sentence sufficient to accomplish the[se] goals of sentencing." *United States v. Kloda*, 133 F. Supp. 2d 345, 347–48 (S.D.N.Y. 2001) (citation and internal quotation marks omitted). Among other things, the Court considers the following factors in determining an appropriate sentence: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the need for the sentence to "promote respect for the law," "provide just punishment," "afford adequate deterrence," and "to protect the public from further crimes of the defendant"; (3) "the kinds of sentences available"; and (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(1). In formulating the appropriate sentence, the Court may consider any fact it deems relevant to sentencing. *See* 18 U.S.C. § 3661 ("No limitation

shall be placed on the information . . . which a court . . . may receive and consider for the purpose of imposing sentence.").

### A. The Horrific Conditions of Karl's Pre-Sentence Incarceration Warrant a Substantial Variance from the Guidelines

The Second Circuit has long recognized that periods of pre-sentence custody spent in particularly arduous conditions merit recognition in calculating a just sentence, as they are "not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines." *United States v. Carty*, 264 F.3d 191, 196–97 (2d Cir. 2001) (citation and internal quotation marks omitted). For five years of detention to date, Karl has suffered through deplorable prison conditions, ███████████████████████████████████ severe isolation, a pandemic, ██████. Karl's pre-sentence custody alone justifies a substantial variance from the Guidelines.

#### i. Karl's Detention in Thailand

Karl's three-month detention at Klong Prem prison in Thailand warrants a substantially reduced sentence. Judges in this District routinely recognize the impact of a defendant's pre-sentence detention in a foreign facility in determining a reasonable sentence, often concluding that time spent in such facilities warrants a below-guidelines sentence. *See Carty*, 264 F.3d at 193 (remanding for consideration of deplorable confinement conditions defendant experienced while being detained in the Dominican Republic, including being held in a "four-foot by eight-foot cell with three or four other inmates with no light," no running water in his cell, and a "hole in the ground" as a toilet). In *United States v. Torres*, No. 01-cr-1078 (LMM), 2005 WL 2087818 (S.D.N.Y. Aug. 30, 2005), Judge McKenna varied downward due to the harsh conditions of defendant's pretrial detention in Colombia. The court noted that conditions in the Combita prison were "harsh by any American standard," given that inmates lived without heat or hot water despite

windy and cold temperatures, were housed in cells "whose windows were only barred, without glass," and could "receive visits only every 15 days." *Id.* at *2. Similarly, in *United States v. Salvador*, No. 98-cr-484 (LMM) 2006 WL 2034637, at *4 (S.D.N.Y. July 19, 2006), Judge McKenna found that a "complete lack of even minimal sanitary conditions and lack of food at times" during the defendant's pre-sentence detention in the Dominican Republic while awaiting extradition warranted a reduced sentence.

Karl was detained for three months in Klong Prem, recognized by the United Nations as a notoriously inhumane facility and surely "harsh by any American standard." As explained in detail above, *supra* 10-11, Karl was deprived of his humanity and humiliated immediately upon his arrival there. He was stripped naked and hosed down, shaved head to toe, and he was forced to sit naked, while being chained to other inmates, for 24 hours before receiving clothes. Karl was housed with over 75 other men in a single room infested with rodents. He had a small space on a cracked concrete floor to sleep, next to the hole that inmates used as a toilet. The food was barely edible, left out in the heat and filled with maggots. The room was controlled by gangs, who ruled without limit. Karl was kept in the room daily from 3:00 p.m. to 5:30 a.m., at which time he was forced to sit in the sun in the lotus position for three hours, and if he failed to do so properly, he was beaten. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

[REDACTED]

### ii. Karl's Detention in the MCC and MDC

The exceptionally harsh confinement conditions that Karl has endured at the MCC and MDC similarly warrant a substantial reduction of his sentence. Detention at the MCC and MDC, particularly during the pandemic, has been nothing short of inhumane, as courts have consistently recognized. *See supra* 13-18.

In addition to the filth, rodent infestations, violence, and drug abuse that has come to be expected at MCC and MDC, Karl suffered what amounts to *years* of consecutive lockdowns resulting from the pandemic. *See e.g. United States v. Rodriguez*, 492 F. Supp. 3d 306, 311

(S.D.N.Y. 2020) (JSR) (reducing defendant's sentence and noting that the pandemic has made defendant's "incarceration harsher and more punitive than would otherwise have been the case," because "the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal") (citation omitted). These lockdowns forced Karl into near-solitary confinement and denied him virtually all ability to speak with his family or access programming or support services.

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████.

In recognition of these brutally harsh conditions, many Judges in this District have imposed sentences well below the guidelines ranges to account for the disproportionately severe experience of incarceration at the MCC and MDC during the pandemic. In *United States v. Gonzalez*, 18-cr-669, Dkt. 250, Tr. at 17:17-25 (S.D.N.Y. April 2, 2021), Judge Oetken emphasized how "punitive" and "harsh" detention at the MCC during the pandemic was, noting that "[m]ost of the time has been in lockdown conditions, 23 hours a day, basically like solitary confinement with no access to visitors for most of that time [and] virtually limited programming." As a result of these conditions, Judge Oetken concluded that detention at the MCC during the pandemic constituted the "**equivalent of either time and a half or two times what would ordinarily be served.**" *Id.* (emphasis added). Other courts in this District have acted similarly:

- *United States v. Aracena de Jesus*, 20-Cr-19 (PAE), Dkt. 29, Tr. at 36:16-37:11 (S.D.N.Y. July 1, 2020) (granting substantial downward variance from 30-37 months to 6 months in part because of the "horrific conditions" at MCC during the pandemic, and emphasizing that the "**time in the MCC was way harder than anyone intended when [defendant was] detained**," and that "any mature system of justice, any thoughtful judge in imposing the reasonable sentence [] would **have to recognize the unexpected and regrettable ardors that [defendant] experienced**" in MCC, and noting that "[p]rison is supposed to be punishment, but **it is not supposed to be trauma** of that nature or close") (emphasis added).

- *United States v. Ramirez,* 20-cr-29 (JPO), Dkt. 47, Tr. at 19:2-17 (S.D.N.Y. Oct. 20, 2020) (finding that time served during the pandemic at MDC is "**twice as punitive as it would otherwise be**," and accordingly sentencing defendant to 18 months rather than 3 years, noting among other things, that the defendant was "thousands of miles away from his family," and recognizing "how harsh and punitive it's been, particularly in a situation where it is a nonviolent offense") (emphasis added).

- *United States v. Marmolejos*, 19-cr-626 (PAE), Dkt. 25, Tr. at 32:16-33:5 (S.D.N.Y. Nov. 24, 2020) (noting that "**a day spent in terribly substandard prison conditions, although not intended as a form of punishment**, **exacts more punishment for an incarcerated defendant than a day in ordinary conditions**," and concluding that the fact that the defendant's last "eight months or so in custody [at MCC during the pandemic] has been in trying conditions is an argument for a below-guidelines sentence, and **the sentence I impose today will be farther below the guidelines sentence than it otherwise would have been on account of the conditions in which [defendant had] been held**") (emphasis added).

- *United States v. Flores-Alberto,* 20-cr-668 (JPO), Dkt. 27, Tr. at 12:5-18 (S.D.N.Y. June 23, 2021) (giving "**20 months credit for the 10 months [defendant] actually served**" on the grounds that "detention during this pandemic has been extremely difficult") (emphasis added.)

- *United States v. Nunez*, 19-cr-691 (CM), Dkt. 28, Tr. at 16:8-15 (S.D.N.Y. May 5, 2021) (finding that defendant had "**done far more time**" than the actual number of months he was incarcerated as a result of the inhumane conditions at the MCC and MDC, "conditions that should not exist at any incarcerative facility in the United States of America") (emphasis added).

- *United States v. Del Carmen,* 18-cr-669 (JPO), Dkt. 286, Tr. at 16:2-12 (S.D.N.Y. May 21, 2021) (concluding that time spent during the pandemic has been under "harsher conditions" and constitutes "more punishment," and explaining that "**having spent that many months is the equivalent of even more**") (emphasis added).

- *United States v. Rivas*, 19-cr-529 (PAE), Dkt. 46, Tr. at 24:3-19 (S.D.N.Y. December 15, 2020) (explaining that the fact that the "past eight months of

[defendant's] custody has been in trying and harrowing conditions" with "**extreme lockdowns, … restrictions on family visits and contact, and on restrictions on visits and contact from attorneys**…**is a reason to impose, all things being equal, a lower sentence than otherwise**") (emphasis added).

- *United States v. Ellison*, 18-cr-834 (PAE), Dkt. 582, Tr. at 80:9-81:2 (S.D.N.Y. Nov. 4, 2020) (noting that prison conditions during the pandemic have "made the experience of being incarcerated in jail **much harder and more scary than could ever have been anticipated or intended**" and explaining that defendant's sentence "**will be below the sentence I otherwise would have imposed…in recognition of the rigors** [defendant] faced in prison since [the start of the pandemic]") (emphasis added).

This Court similarly recognized the impact of detention at the MCC during the pandemic in its calculation of Mr. Armenta's sentence. In explaining the basis for Mr. Armenta's sentence, this Court explained:

> [Y]ou were incarcerated at the MCC at perhaps the worst point in that sad institution's history. We here in this building had to deal with a lot of that. So we were very well aware, not only of the fact of the conditions, but of the inability to speak with family members and lawyers and to be locked down for days and weeks at a time. It was a very, very unfortunate time, and I take that into consideration as well. 17-cr-556, Dkt. 76, Tr. at 64:15-22.

Mr. Armenta spent approximately eight months at the MCC, including only **twelve days** during the pandemic, before he was released to home confinement. By contrast, Karl was detained at the MCC for **three years,** including **eighteen consecutive months of lockdown** beginning at the start of the pandemic. Karl has also served an additional two years in the MDC, where he continues to experience regular lockdowns, overcrowding, harsh conditions with reduced staffing, and severely limited contact with the outside world. The Court should give great weight and consideration to Karl's detention at the MCC and MDC in calculating a just sentence.

### B. Karl Has Accepted Full Responsibility for His Crimes

Karl accepts full responsibility for his involvement in the OneCoin conspiracy, as evidenced by his guilty plea allocution. Karl understands the seriousness of his conduct and is deeply remorseful for his actions and the harm they caused.

By pleading guilty, Karl agreed to waive the government's staggering Speedy Trial Act violation. At the time of his guilty plea, at least 243 days had elapsed since his arraignment, *over three times* the 70 days permitted by statute. *See* Dkt. 496. Karl agreed to waive this argument despite the fact that he had been detained for the entire 243-day delay.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

**C.     A Sentence of Time Served Is Needed** ██████████████████████
███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[REDACTED]

**D. A Sentence Well Below the Guidelines Is Warranted to Avoid Sentence Disparities**

A sentence of time served will also avoid any sentencing disparities between Karl and other similarly situated defendants, including other members of the OneCoin conspiracy. OneCoin defendant Mr. Armenta was sentenced to five years imprisonment (after spending only 12 days at MCC during the pandemic). Karl's co-defendant Mark Scott is currently awaiting sentencing after being convicted at trial in 2019 of conspiracy to commit money laundering and conspiracy to commit bank fraud and has spent a total of *seven days* in prison, having the opportunity to be released on home detention when COVID hit. In contrast, Karl has already spent five tortured years in prison, which, given the conditions of confinement, is at least the equivalent of ten years. A sentence of continued incarceration would simply enhance these existing sentencing disparities.

**E. Karl's Status as a Foreign Citizen Counsels Against Further Incarceration**

Significantly, Karl's status as a foreign citizen subjects him to further disparities with similarly situated U.S. citizen defendants. Karl has no criminal history points and he is a non-violent offender. But for his citizenship status, Karl would be eligible for several prison related

"benefits." First, he would be eligible for placement in a minimum-security prison. Karl's foreign status, however, makes it likely that he will be detained in a privately-run for-profit prison.[14] For-profit private prisons housing all-foreign inmate populations typically have "unusually poor healthcare, overcrowding, [and] higher rates of solitary confinement, lockdowns, and deaths in custody than comparable BOP institutions; and a dearth of rehabilitative programs such as drug treatment and education courses, which are offered in other federal prisons."[15] As has been recently noted, "all-foreign prisons represent . . . an emergent penology in which noncitizens are punished differently than citizens of the United States."[16] These conditions will simply extend and worsen the suffering Karl experienced at the MCC and MDC ███████████████████████ ███████████████████████

As a non-citizen, Karl will also be <u>in</u>eligible to receive good time credit towards early release under the First Step Act, 18 U.S.C. § 3624(b), and ██████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████

Finally, any sentence of further incarceration will ultimately require Karl to be detained by ICE before being deported to Sweden. In a recent sentencing of a non-citizen defendant found guilty of conspiracy to commit wire fraud and bank fraud as well as two counts of wire fraud, Judge McMahon imposed a sentence of time served and six months of home confinement to be

---

[14] *See* Emma Kaufman, *Segregation by Citizenship*, 132 Harv. L. Rev. 1379, 1403 (2019) (citing that more than half of the noncitizen prisoner population is incarcerated in criminal alien requirement low security prisons run by for-profit corporations).
[15] *Id.* at 1409.
[16] *Id.* at 1408.

served in the defendant's home country.  *United States v. Connolly*, 16-cr-370, Dkt. 451, Tr. at 91:8-24 (S.D.N.Y. Oct. 24, 2019) (emphasis added).  Judge McMahon explained:

> If I could sentence Mr. Black to a term of incarceration -- a brief term of incarceration -- knowing that he would go to a facility appropriate to his criminal conduct, I would do it. But I know that I can't. I know that simply because he is a noncitizen -- and I use that term advisedly, [h]e is not an illegal alien – [b]ut **because he is a non-citizen, he will not be eligible to serve his sentence in the same way that any American citizen who stood convicted of this crime would serve.  And that's not right.**
>
> And for reasons that are incomprehensible to me, were I to sentence him to a short term of imprisonment – which would be served in a private facility and not at some place like FCI Allenwood . . . for reasons I cannot comprehend, at the end of that term he could not walk out the door and be picked up … and taken to the airport. **He would be treated like an illegal alien, and he would be released into the custody of ICE, and at some point long after my intended sentence had expired he would be deported. And that's not right**.

Judge Pauley expressed similar sentiments in sentencing a non-U.S. citizen who pleaded guilty to conspiracy to commit securities fraud, to time served with home detention to be served in his home country.  *United States v. Cohen*, 19-cr-741, Dkt. 48, Tr. at 42:4-12 (S.D.N.Y. June 9, 2020).  Judge Pauley noted:

> In dealing with defendants who are foreign nationals like [defendant] other judges have given consideration to the consequences attached to that status by the Bureau of Prisons.  Foreign nationals, unlike similarly situated U.S. citizens, are unable to serve terms of imprisonment in a camp or minimum security facility.  And when foreign nationals complete a term of imprisonment they are transferred to ICE detention where they can wait for an indefinite period to be returned to their home country.

The impact of Karl's foreign status on any further sentence of incarceration is significant: not only is he thousands of miles away from any support network, while incarcerated he is deprived of programs that enable defendants to reduce their time in a prison facility, and he will be forced into ICE custody upon his release where he can remain for an unknown period of time, effectively extending his period of incarceration.  A U.S. citizen in the same position as Karl would face far less—and less harsh—time than him.

**F.**     **Karl's History and Characteristics Counsel Against Additional Incarceration**

As discussed above, and as evidenced by the over thirty support letters submitted on his behalf, Karl is a generous, kind, and empathetic person. He cares deeply about his friends and family. He has devoted time in prison to tutoring and teaching his fellow inmates. Moreover, Karl's parents greatly need his support and presence in their lives, and his children yearn for the care and love of their father. Karl's community is eager to welcome him home and will work to support him as he gets back on track, including by setting him up with a stable, law-abiding job.

Karl accepts full responsibility for his serious crimes, and, more than anything, wants to restart his life. As Mr. Greenwood writes:

> [Karl] has paid an immeasurable price for his misdeeds, and the impact on him will be profound and life-long…. I appeal to you, Your Honor, to allow him to return home, in the first instance to make amends to his children who have suffered more than we may ever know, and then to begin the process of rebuilding his life so that he will once again be able to become a productive and useful member of society. Ex. 3.

**G.**     **Additional Incarceration is Not Necessary for Specific or General Deterrence Nor is It Needed to Protect the Public and to Promote Respect for the Law**

The goals of specific and general deterrence have already been served by the five-year pre-sentence incarceration Karl has served. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Karl is highly unlikely to commit future offenses. Karl and his family have suffered, and will continue to suffer, extreme public shame and turmoil as a result of his conduct. Karl's case received widespread media coverage in Sweden and across the world, destroying his and his family's reputation and ███████████████████████████████ Karl's conduct has also had a permanent impact on his relationship with his parents and children.

Furthermore, empirical evidence indicates that even seemingly short sentences—although the defense submits that nothing about Karl's five-year detention has been "short"—can send a strong message to potential white-collar offenders. *See Adelson*, 441 F. Supp. 2d at 514 (describing the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders").

### H.     The Court Should Consider Alternatives to Incarceration

To the extent the Court believes that an additional period of punishment is necessary, the defense respectfully requests that the Court impose a non-custodial sentence of home detention in Sweden. Such a sentence would best serve the requirements of Section 3553(a) and the ends of justice in this case. *See* 18 U.S.C. § 3553(a)(3).

There is growing recognition by the U.S. Sentencing Commission, the Department of Justice, and the courts that alternatives to incarceration warrant greater consideration generally, and in the white-collar context particularly. For example, in October 2014, then-Deputy Attorney General Sally Yates noted that "[w]hile it's true that there are dangerous defendants from whom society needs to be protected, there are others . . . for whom alternatives to incarceration make a lot more sense."[17] Courts have similarly recognized that non-incarceratory sentences may be appropriate in white collar cases. *See, e.g.*, *United States v. Kang*, No. 16-cr-837 (JPO), Dkt. 69 (S.D.N.Y. 2017) (imposing a non-incarceratory sentence for a first time offender who pled guilty to conspiracy to commit securities fraud and honest services wire fraud and faced a guidelines range of 97-121 months); *United States v. Murphy*, 108 F.R.D. 437, 439 (E.D.N.Y. 1985) ("For most crimes of white collar corruption it may not be necessary to provide substantial prison

---

[17] Sally Quillian Yates, Deputy Attorney General, U.S. Dep't of Justice, Speech at Columbia Law School on Criminal Justice Reform (Oct. 29, 2015), *available at* https://www.justice.gov/opa/speech/deputyattorney-general-sally-quillian-yates-delivers-remarks-criminal-justice-reform.

terms."); *United States v. Leitch*, No. 11 Cr. 609, 2013 WL 753445 at *12 (E.D.N.Y. Feb. 28, 2013) (noting that there are "an array of alternative sanctions—home confinement, community service, and fines…that allow judges to impose enhanced (and sometimes even constructive) punishment without sending the defendant to prison.).

Moreover, as noted *supra* 39-40, in circumstances like Karl's, courts have concluded that non-incarceratory sentences may be particularly appropriate for foreign citizens as a way to prevent prolonged detention in ICE custody. These concerns are even more pronounced here,

██████████████████████████████

### III.    No Restitution Should be Ordered

Pursuant to Section 3663A(c)(3) of the Mandatory Victim Restitution Act, the Court may decide not to impose restitution if it finds that "the number of identifiable victims is so large as to make restitution impracticable," or that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide resolution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A. In sentencing Mr. Armenta, this Court declined to impose restitution for precisely these reasons. *Armenta*, 17-cr-556, Dkt. 76, Tr. at 60:23-61:4. The defense respectfully submits that the same conclusion is warranted in this case and requests that no restitution be ordered.

### IV.    No Fine is Warranted

The Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). Similarly, Section 3572 requires the Court to consider, among other things, "the defendant's income, earning capacity, and financial resources[.]" 18 U.S.C. § 3572(a)(1). As

evidenced by the list of assets provided to Probation, Karl has demonstrated that he lacks the ability to pay a fine.[18]

**CONCLUSION**

For the past five years, Karl has more than paid the price for his crimes. Karl accepts full responsibility for his crimes and appreciates the gravity of his conduct. For the forgoing reasons, Karl respectfully requests that the Court impose a sentence of time served, resulting in his immediate deportation to Sweden, or alternatively home detention in Sweden.

---

[18] ████████████████████████████████████

Dated: New York, New York
August 29, 2023

Respectfully submitted,

By:  _____
Muhammad U. Faridi
Lauren Schorr Potter
Hannah Brudney
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
mfaridi@pbwt.com
lspotter@pbwt.com
hbrudney@pbwt.com
(T) 212 336-2000

Justin S. Weddle
WEDDLE LAW PLLC
250 West 55th Street
New York, NY 10019
jweddle@weddlelaw.com
(T) 212 997-5518

Howard Leader
534 West 112th Street
New York, NY 10025
howard.leader@gmail.com
(646) 533-7696

*Counsel for Karl Sebastian Greenwood*