UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

KARL SEBASTIAN GREENWOOD,

Defendant.

17 Cr. 630 (ER)

**GOVERNMENT'S SENTENCING MEMORANDUM**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Nicholas Folly
Juliana N. Murray
Kevin Mead
Assistant United States Attorneys

- Of Counsel -

## TABLE OF CONTENTS

Background ....................................................................................................................... 2

   I.   Offense Conduct ................................................................................................ 2

      A.  OneCoin Fraud Scheme ........................................................................... 2

      B.  Money Laundering Operation ................................................................... 8

   II.  The Charges, Guilty Plea, and the Guidelines Calculation ............................ 9

   III.   Greenwood's Legal Arguments Related to His Plea and Sentencing ................... 10

Discussion ...................................................................................................................... 12

   I.   Applicable Law ............................................................................................... 12

   II.  A Sentence of at Least 30 Years Is Warranted In This Case ....................... 13

      A.  The Need For The Sentence To Reflect The Nature and Seriousness Of the Offense ............................................................................................. 13

      B.  Just Punishment ..................................................................................... 18

      C.  General Deterrence ................................................................................. 19

      D.  Specific Deterrence ................................................................................ 21

      E.  The Guidelines Provide a Useful Framework in this Case ................... 23

      F.  Greenwood's Personal Background and Character Do Not Justify A Sentence of Time Served ........................................................................ 24

      G.  The Time-Served Sentence Greenwood Requests Would Result in an Unwarranted Disparity with Similarly Situated Defendants ................. 25

   III.   Restitution and Forfeiture ............................................................................... 29

      A.  The Court Should Not Order Restitution, Pursuant to Section 3663A(c)(3) ........ 29

      B.  The Court Should Enter a Forfeiture Order Against the Defendant ................... 30

Conclusion ..................................................................................................................... 32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KARL SEBASTIAN GREENWOOD,<br><br>Defendant. | 17 Cr. 630 (ER) |

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum and accompanying exhibits in connection with the sentencing of defendant Karl Sebastian Greenwood ("Greenwood" or the "defendant"), the co-founder of "OneCoin," which sentencing is scheduled for September 12, 2023, at 11:00 AM.  For the reasons that follow, a sentence of at least 30 years' imprisonment, which is well below the Guidelines of 720 months, is appropriate.

Greenwood's crimes were extraordinary and involved nearly unprecedented dimensions. Between 2014 and 2018, when he was arrested, Greenwood defrauded millions of investors in the company he created, OneCoin, of more than $4.5 billion. Greenwood, alongside OneCoin's co-founder Ruja Ignatova, enticed everyday investors with false promises of a "financial revolution," but instead betrayed their trust and left them facing financial ruin, as he lined his pockets with more than $300 million.  To date, Greenwood's victims have submitted several impact statements, which give voice to the serious economic damage, not to mention disillusionment and despair, caused by Greenwood's conduct.  As the Court can see from these letters, Greenwood's victims were far from wealthy.  Each worked hard for the money they invested with Greenwood.  And Greenwood worked hard at convincing his victims to turn over this money, preying on the lack of financial sophistication of his investors and timing his scam perfectly on the heels of Bitcoin's

1

success.   Greenwood was OneCoin's primary promoter; he toured the globe, whipping up excitement about what he claimed was the next Bitcoin.   In reality, OneCoin was conceived of by him and Ignatova from day one as a massive fraud.   The coins that Greenwood duped his investors into buying were worthless.   By the time Greenwood was arrested, he had inflicted irreversible harm on his investors—the money was gone, spent on the lavish lifestyles that he and other co-conspirators lived for years.

Despite orchestrating one of the largest fraud schemes ever perpetrated, Greenwood now asks this Court to impose a sentence of time served, which would amount to approximately 5 years—substantially below the Guidelines of 60 years.   Although the Government does not take the mitigating factors cited by the defense lightly, a *far* greater sentence is necessary here to meet all the goals of sentencing.   Given the extraordinary breadth of the defendant's criminal conduct in this case and the need for just punishment, promotion of respect for the law, and adequate deterrence, a sentence of at least 30 years' imprisonment is necessary.

## **Background**

## I.    **Offense Conduct**

### A. **OneCoin Fraud Scheme**

Greenwood and co-founder Ignatova conceived and orchestrated a multibillion-dollar fraud scheme by which they defrauded millions of individual OneCoin investors.   Greenwood and Ignatova co-founded OneCoin Ltd. ("OneCoin") in 2014.   OneCoin was based in Sofia, Bulgaria.   (PSR ¶ 18).   OneCoin marketed and sold a fraudulent cryptocurrency by the same name.   (PSR ¶ 20).   OneCoin began operating in the United States in or around 2015.   (PSR ¶ 43).   Between the fourth quarter of 2014 and the fourth quarter of 2016 alone, the scheme took in more than $4 billion from at least 3.5 million victims.   (PSR ¶¶ 19-20).

OneCoin marketed its fake cryptocurrency through a global multi-level marketing ("MLM") network of OneCoin members.  Greenwood conceived of OneCoin's use of an MLM structure and was OneCoin's global master distributor and the leader of the MLM network through which the fraudulent cryptocurrency was marketed and sold.  Through the MLM structure, OneCoin members received commissions for recruiting others to purchase cryptocurrency packages.  As the top MLM distributor of OneCoin, Greenwood earned 5% of monthly OneCoin sales from anywhere in the world, which totaled more than $200 million from the fourth quarter of 2014 through the fourth quarter of 2016 alone, and exceeded approximately $300 million in total (when including the additional period from 2016 through 2018).  (*See* PSR ¶ 20, *see also* Scott Trial Tr. at 174[1] and Exhibit A, KG_USAO_00026071).  Greenwood's mastery as a salesman and the use of the MLM structure helped contribute to OneCoin's rapid growth and incredible success.  (PSR ¶ 20).

From OneCoin's inception, Greenwood and Ignatova used the notoriety of Bitcoin to convince investors that OneCoin was the next "can't miss" investment opportunity.  Greenwood and Ignatova wanted investors to believe that OneCoin was a legitimate cryptocurrency like Bitcoin and deliberately drew the comparison between the two cryptocurrencies through their representations to investors and their marketing materials.  (PSR ¶ 42).  For example, in a OneCoin PowerPoint presentation prepared by Greenwood, OneCoin described itself as "a unique and innovative cryptocurrency, that is born on the success of the pioneering and famous cryptocoin, Bitcoin."  (*See* Exhibit B, KG_USAO_00052786, at 14).  In another slide, OneCoin highlighted the explosive growth of Bitcoin, stating that "Bitcoins increased their value 75 times in 2013," and

---

[1] "Scott Trial Tr." refers to the trial transcript from the trial of co-conspirator Mark Scott, *see United States v. Mark Scott*, 17 Cr. 630 (ER).

including the following quote from The Guardian newspaper, "Man buys $27 of bitcoin, forgets that he had bought and finds that they're now worth $886,000." (*Id.* at 15). In the same presentation, OneCoin urged investors to "Get in Early" so that they would not miss out on this once in a lifetime opportunity. (*Id.* at 34).

Greenwood and Ignatova made similar representations to investors at massive promotional events around the world. For example, in or around 2016, OneCoin held the "Coin Rush" promotional event at Wembley Arena in London, England. At the event, Greenwood introduced Ignatova to a crowd of thousands of OneCoin members. Ignatova walked onto the Wembley Arena stage wearing a red ball gown to the tune of Alicia Keys's "Girl on Fire." Ignatova then proceeded to repeatedly and favorably compare OneCoin, which Greenwood and Ignatova knew was a fraudulent cryptocurrency, to Bitcoin, stating, "OneCoin…is supposed to be the Bitcoin killer" and "In two years, nobody will speak about Bitcoin anymore." (*Id.*). Images from that event are shown below:



As shown above, during Ignatova's remarks, OneCoin displayed a page from a slide deck to the audience that falsely depicted that OneCoin had *already* surpassed the market capitalization of every leading cryptocurrency except for Bitcoin.

In reality, unlike legitimate cryptocurrencies like Bitcoin, OneCoin had *no actual value* and was conceived of by Greenwood and Ignatova as a fraud from day one. (PSR ¶ 27). The misrepresentations made by Greenwood and others to OneCoin investors were legion, and the cryptocurrency was worthless. Among other things, OneCoin lied to its members about how its cryptocurrency was valued, claiming that the price of OneCoin was based on market supply and demand, when in fact OneCoin itself arbitrarily set the value of the coin, without regard to market forces. (PSR ¶ 29). The purported value of a OneCoin grew steadily from €0.50 to approximately €29.95 per coin, as of in or about January 2019. (PSR ¶ 31). Unsurprisingly, it never decreased in value.

Greenwood also lied to investors about the utility of the tokens included in trader packages, claiming that they could be used to secure positions in OneCoin's "mining pools," depicted in promotional materials as computer hardware used to "mine" OneCoins. (PSR ¶ 32-33). But there were no mining pools, and no computers to mine OneCoin either. (*Id.*). Greenwood knew that this lie was essential to convincing investors that OneCoin was a legitimate cryptocurrency. As he wrote in an email to Ignatova, "[t]he concept of converting tokens into OneCoin is an important phase for validity and truth behind the OneCoin. The so called 'mining' of coins is a concept that is very familiar in the industry and a story we can sell to the members." (PSR ¶ 33). However, as Greenwood and Ignatova both knew, OneCoin was "not mining actually—but telling people shit." (*Id.*). Greenwood's only concern about the fake mining was whether Greenwood and Ignatova could get caught. In the same email exchange, Greenwood asked Ignatova, "how can this be investigated and found out?" and "Can any member (trying to be clever) find out that we actually are not investing in machines to mine but it is merely a piece of software doing this for us?" (*Id.*).

OneCoin also claimed to have a private "blockchain," or a digital ledger identifying OneCoins and recording historical transactions.  But, in reality, OneCoin lacked a true blockchain—that is, a public and verifiable blockchain.  (PSR ¶ 34).  Indeed, by approximately March 2015, Greenwood and Ignatova had started allocating to members OneCoins that did not even exist in OneCoin's purported private blockchain, referring to these coins as "fake coins." (*Id.*).  By at least June 2015, Greenwood and Ignatova began emailing one another models tabulating current and projected future trader package sales volumes, along with outstanding tokens and OneCoins. The spreadsheets identified separate lines for "mined coins," "mined coins (real)," and "fake coins." The references to "fake coins" in those records referred to OneCoins that had been distributed to members but did not exist on the OneCoin "blockchain."  (PSR ¶ 35).  Two months later, in August 2015, Ignatova wrote to Greenwood, in an email with subject line, "I am afraid this is an issue," "This is the implication from the big sales 4 weeks ago. 1.3 [billion] fake coins. We are fucked, this came unexpected and now needs serious, serious thinking."  (PSR ¶ 36).

Rather than walk away from the conspiracy, Greenwood and Ignatova doubled down and kept the scheme going.  By the fall of 2016, OneCoin announced that it that it was launching a new blockchain, and that it was doubling its investors' coins. In addition, at times, the OneCoin website displayed transactions on a purported blockchain, which were entirely fake.  (PSR ¶ 37).

As described in more detail below, Greenwood's scheme inflicted immeasurable harm on millions of investors all over the world.  As investors lost billions of dollars from Greenwood's scheme, Greenwood, Ignatova, and others used investor money to amass untold wealth and fund extravagant lifestyles.  As the top MLM distributor of OneCoin, Greenwood earned more than $300 million during the scheme.  By his own admission, at the time of his arrest, Greenwood had accumulated assets of between approximately $77,000,000 to $83,600,000, not to mention all the

money he had spent on his lavish lifestyle throughout the scheme.  (PSR at 28).  For example, in or around December 2015, Greenwood used approximately $10,000 of fraud proceeds to stay at an exclusive 5-star resort in Brazil.  (*See* Exhibit C, KG_USAO_00126241). Later that month, Greenwood used an additional $21,000 of fraud proceeds to stay at a luxury villa with a beach view in Koh Samui, Thailand.  (*See* Exhibit D, KG_USAO_00006560).  Later, when Greenwood traveled to Barcelona in May 2016, he used investor funds to stay at another luxury 5-star hotel and rented a Range Rover for the duration of his trip.  (*See* Exhibit E, KG_USAO_00007844, KG_USAO_00008572).

Greenwood's extravagance did not end there.  He used the fraudulently-derived funds to purchase luxury designer clothes, footwear, and watches totaling approximately $2 million.  (PSR ¶ 49).  Greenwood also paid a down payment of approximately 475,000 British Pound Sterling for a Sunseeker yacht.  (*Id.*).  Greenwood also purchased real estate properties in various countries, including in Spain, Dubai, and Thailand. (*Id.*).  Images of Greenwood's oceanfront property in Thailand are shown below:



As shown below, Greenwood also burned through investor funds by flying around the world on a private "OneCoin" airplane. Greenwood used these trips as promotional opportunities and posted videos of his travels online, as shown in the example below:[2]

 

Other top leaders at OneCoin and their affiliates also used investor funds to finance their lavish lifestyles. For example, Ignatova used fraud scheme proceeds to purchase expensive designer clothing, jewelry, luxury cars, real estate, and a yacht. (Tr. 216). One of OneCoin's principal money launderers, Mark Scott, was paid more than $50 million in OneCoin fraud proceeds and used that money to buy several multimillion-dollar homes, several luxury cars, a $1,310,000 Sunseeker yacht, over a hundred thousand dollars in luxury watches, and over $200,000 worth of jewelry and luxury bags. A second OneCoin money launderer, Gilbert Armenta, used fraud scheme proceeds to purchase his own private jet at a cost of over $3 million, bought a luxury oceanside property in Fort Lauderdale, Florida for $3.7 million, wore designer clothing and watches, and rented luxury cars.

## B. Money Laundering Operation

Due to the massive amount of illicit proceeds that Greenwood and others generated throughout the scheme, principals of OneCoin had to resort to a global network of money launderers who assisted them in laundering their OneCoin-derived proceeds. (PSR ¶ 45).

---

[2] *See* OneCoin, *Sebastian Greenwood and Kari Wahlroos: Status of the Network*, YouTube (June 11, 2016), https://www.youtube.com/watch?v=bzm3Eyv2dQA

OneCoin's money laundering operation, as facilitated by Greenwood and Ignatova, involved laundering OneCoin's fraudulently generated proceeds through various financial institutions located in at least 21 different countries, including the U.S., Hong Kong, Singapore, the Cayman Islands, the Isle of Jersey, the Republic of Ireland, and the Republic of Georgia, among others. (*Id.*).  The money laundering operation was highly sophisticated and used a plethora of money laundering techniques, including the use of: (i) shell companies that purported to be unaffiliated with OneCoin, in order to transfer fraudulently-derived funds from OneCoin investor-victims to Greenwood and others; (ii) fraudulent investment funds to conceal the source of the funds and "clean" the unlawful proceeds; (iii) fake loan agreements that papered the transfer of OneCoin-derived funds; and (iv) money changers to launder large sums of OneCoin proceeds out of certain jurisdictions. At times, OneCoin had to physically transfer tens of millions of Euros in cash from one country to another country.  (PSR ¶ 46).  The OneCoin money laundering operation often also involved the submission of false documentation to banks and financial institutions.  (*Id.*).

## II.     The Charges, Guilty Plea, and the Guidelines Calculation

On July 28, 2018, Greenwood was arrested at his residence in Koh Samui, Thailand. On October 19, 2018, Greenwood was extradited to the United States.  On December 16, 2022, Greenwood pleaded guilty without the benefit of a plea agreement to three charges that were contained in superseding information S16 17 Cr. 630 (ER): (1) conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349; (2) wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2; and (3) conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

On or about August 29, 2023, Probation issued a final presentence investigation report ("PSR") which calculated an advisory guidelines range, pursuant to the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), of life imprisonment.   Specifically, Probation

calculated the Guidelines as follows: a base offense level of 7; a 30-level enhancement based on an estimated loss of more than $550,000,000,[3] pursuant to U.S.S.G. § 2B1.1(b)(1)(P); a six-level enhancement because the offense resulted in substantial financial hardship to 25 or more victims, pursuant to §2B1.1(b)(2)(C); a two-level enhancement because a substantial part of the fraudulent scheme was committed from outside the United States, pursuant to U.S.S.G. §2B1.1(b)(10)(B); a two-level enhancement because the defendant was convicted under 18 U.S.C. § 1956, pursuant to U.S.S.G. §2S1.1(b)(2)(B); a two-level enhancement because the offense involve sophisticated laundering, pursuant to U.S.S.G. §2S1.1(b)(3); and a four-level enhancement because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, pursuant to U.S.S.G. §3B1.1(a).  This calculation resulted in a total offense level of 53.  With a criminal history Category of I and the three-point reduction for acceptance of responsibility and the defendant's timely notice of his intention to plead, yielding an adjusted offense level of 50 (*seven* points above the maximum applicable Guideline of 43), the Guidelines range would have been life imprisonment.  However, because the statutorily authorized maximum sentence for Counts One through Three is 60 years' imprisonment, pursuant to U.S.S.G. §§ 5G1.1(a), the Guideline sentence is 60 years' imprisonment.   In the PSR, Probation recommended a Guidelines sentence of 60 years.

## III.    Greenwood's Legal Arguments Related to His Plea and Sentencing

In his sentencing memorandum, the defendant raises three legal arguments that are entirely meritless and have no bearing on the appropriate sentence.

---

[3] This is the top of the loss table set forth in U.S.S.G. § 2B1.1(b)(1)(P).  As discussed below, the financial harm inflicted by Greenwood was *eight times* this amount.

First, Greenwood argues that the Government violated the Speedy Trial Act, an argument that he waived when he entered a guilty plea in this case.  *See* 18 U.S.C. § 3162(a)(2) ("Failure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section.")  More importantly, the defendant makes no argument as to why a Speedy Trial Act issue that he waived, should lead the Court to impose a lesser sentence.

Second, the defendant renews his argument that the Guidelines calculation should not include losses that were suffered by international victims of his fraud scheme.  That issue was briefed and argued extensively before the Court, *see* Dkts. 516, 519, 522, 523, 530, and the Court correctly ruled that the full international loss amount was applicable for Guidelines purposes, *see* Dkt. 539.  The argument has no relevance at sentencing.

Third, the defendant submits that it "recently came to defense counsels' attention that Count Three of the operable information," to which Greenwood entered a knowing and voluntary plea (after waiving indictment), listed both the defendant's wire fraud and his wire fraud conspiracy as predicate specified unlawful activities.  This is a red herring.  As the defendant concedes, while wire fraud conspiracy is not a specified unlawful activity, substantive wire fraud is.  *See* 18 U.S.C. §§ 1956(c)(7)(A) (defining "specified unlawful activity" to include "any act or activity constituting an offense listed in section 1961(1) of this title") and 1961(1) (including violations of "section 1343 (relating to wire fraud)").  Any error in the Information was undoubtedly harmless because the defendant pled guilty to the substantive wire fraud count, which was one of the predicates for the money laundering conspiracy charge.  In sum, none of the legal arguments raised by Greenwood bears on the merits of what an appropriate sentence should be in this case.

**Discussion**

## I.  Applicable Law

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Thus, the applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005). In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered.  Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted

above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

## II.  A Sentence of at Least 30 Years Is Warranted In This Case

A sentence of at least 30 years would be fair and appropriate in this case, given the nature and circumstances of Greenwood's unprecedented offense, the need to impose just punishment and promote respect for the law, the need for adequate deterrence, and the mitigating factors cited in the defendant's sentencing submission.

### A.  The Need For The Sentence To Reflect The Nature and Seriousness Of the Offense

The impact of Greenwood's enormous fraud is made apparent in the victim impact statements submitted to the Court in this case. For example, ████████████ ("Victim-1") described the devastating financial and emotional impact of the fraud:

> I became a OneCoin affiliate in 2015 because OneCoin was presented as a trustworthy company by Greenwood and his partner Ruja Ignatova as a world changer. It was presented as a balm to help everyone who was underbanked and financially empower everyone. It offered me, and the whole world, I believed, hope and encouragement.
>
> I firmly believed in the legitimacy of OneCoin. The apparent credibility of the Defendant was a major factor in my joining OneCoin and my active promotion. I actively followed the Defendant on social media and attended marketing events where he spoke to OneCoin enthusiasts and prospects.
> …
>
> I invested significantly in OneCoin. I put in an initial amount of EUR 15,000 - or about USD 16,270. A significant amount of the funds I earned promoting the organization were also reinvested. This amount totals EUR 90,000.
>
> …
>
> In early 2019… I tried to resign but whatever funds the organization held of mine were immediately taken. **The immediate financial hardship was very difficult.**

…

**As the true nature of the organization became apparent and I realised that I had been manipulated I became depressed and withdrawn. I actually became physically sick. I felt incredibly embarrassed, humiliated and disheartened. The shock of discovery adversely impacted my mental health. Four years were suddenly lost.**

…

No sentence is ever going to undo the devastation that the actions of the Defendant brought about to myself and multiple others. While he is incarcerated, he at least will not be able to repeat what he has pleaded guilty to and I ask that this be taken into account. The Defendant is ironically in a position, unlike so many of his victims, where his immediate subsistence is ensured.

(*See* Exhibit F) (emphasis added).

Another investor, ████████ ("Victim-2"), explained the severe impact that Greenwood's fraud had on him and his family:

In the years of 2016 to 2019 I wanted to invest money to make my retirement year more better for me and my wife…. With the hope of a high return investment and hope of reaching our dreams of financial freedom we took the plunge. We sent one 1000 USD to a number block change. Then it was showing we were making hundreds to thousand per day on [their] platform. Then we wanted to withdraw some of our money and that is when the experience took a bad turn. They asked for money for all different excuses the need to set up a program to deposit money back into my blockchain. Tell me that I have to pay all the fees upfront then saying it does not work and they have to try something else. **This went off and on for over three years until all of our savings were gone. It caused a lot of sleepless night and marriage conflicts with me and my wife. This whole issues has cause so much stress that I do not ever how if we will get our finances back too [sic] where they were.**

Exhibit G (emphasis added).

Another investor, ████████ ("Victim-3"), explained the devastation brought upon him by the OneCoin scam because of an unrelated traumatic brain injury. Victim-3 invested approximately $135,000, money that he will never get back. Victim-3 explained that his "mental suffering as a result of the OneCoin Fraud is pretty bad compared to most due to the Frontal

Cerebral Brain Injury." (Exhibit H). And although Victim-3 has tried to support himself and his family, "over the last 6 months" his income has been "zero."

The victims who testified at the November 2019 trial of co-conspirator Mark Scott (the "Scott Trial") also explained the devasting impact of Greenwood's scheme. For example, Linda Cohen, a victim who testified at the Scott Trial, stated that because of the $28,000 investment she lost on OneCoin, she was still working at the age of 76, despite wanting to retire. (*See* Scott Trial Tr. at 809-10). William Horn, another OneCoin victim who took the stand at the Scott Trial, testified that he took $20,000 from his daughter's educational fund, and sold a necklace, an old pickup truck, and a generator to finance nearly $30,000 in OneCoin investments, only to lose it all; even more, he unwittingly induced close family members to invest in OneCoin as well—"the ones that could ill afford to lose the money"–and they never again saw a dime of those funds. (*See* Scott Trial Tr. at 79, 89-91, 94, 97). A BBC podcast that explored the global reach of the scheme, "The Missing Cryptoqueen," included an interview of a victim in Uganda who sold off his most valuable possessions, three goats, in order in invest in worthless OneCoin.[4] In short, the financial damage inflicted by Greenwood devastated the lives of millions of investors all over the world.

Some of the most egregious aspects of Greenwood's offense are manifest in these letters and trial testimony. First, Greenwood defrauded *millions of investors out of billions of dollars*. The breadth and depth of the financial harm inflicted by the defendant cannot be overstated and has limited, if any, precedent. This was not a narrow fraud that impacted the lives of an unlucky few, this was a global fraud that damaged millions of lives. This was not a fraud that was discovered and shut down quickly, but rather a scheme that unfolded for several years, from 2014

---

[4] *See* The Missing Cryptoqueen Podcast, Episode 8: The Technology and the Dream, available at https://www.bbc.co.uk/programmes/p07sz990, at timestamp 1:40-3:20.

through 2018, before Greenwood was arrested.  And unlike many fraud schemes, Greenwood's victims were truly left with nothing.  They did not earn money along the way, and they will not be repaid at the conclusion of this case.  By way of illustration, although Greenwood admits that he alone had amassed $77,008,976.10 to $83,575,676.10 in fraud scheme derived assets at the time of his arrest, Greenwood has asserted he does not have access to or control over those assets at this time.  (PSR ¶ 138).  At bottom, Greenwood, Ignatova, and others managed to completely erase billions of dollars of their investors' hard-earned money without providing them with a penny in return.  And no one, save Ignatova, earned more from this scheme than Greenwood.  Notably, other than *United States v. Bernard L. Madoff*, 09 Cr. 213 (DC), the Government is not aware of *any* prosecution within this district that involved the staggering scale of financial harm as that wrought by Greenwood's scheme.  Further, as noted below, unlike in *Madoff*, where victims have recovered nearly 90% of their losses, the victims of Greenwood's scheme will recover *next to nothing*.  Indeed, Greenwood has not repaid any victims to date and has indicated that he will not be able to do so.

Second, Greenwood was at the top of the pyramid in this fraud scheme.  Greenwood was the global spokesperson for OneCoin and responsible, along with Ignatova, for founding the company and coming up with the elaborate and sophisticated scheme that they used to manipulate and deceive investors.  Ignatova is now a fugitive, but her placement on the FBI's Ten Most Wanted Fugitive list in 2022 is a clear indication of how serious Greenwood's and Ignatova's criminal conduct was.

Greenwood was also a prolific salesperson for the company.  As Victim-1 explained, Greenwood was a "major factor" in why Victim-1 decided to invest:

> I firmly believed in the legitimacy of OneCoin. The apparent credibility of the Defendant was a major factor in my joining OneCoin and my active promotion. I

actively followed the Defendant on social media and attended marketing events where he spoke to OneCoin enthusiasts and prospects. Ignatova's input was just as impressive in creating trust as a lawyer and former consultant with the most impressive firm.

(Exhibit F).   And while Ignatova played a slightly larger leadership role at the company, Greenwood was nearly an equal, and was the individual responsible for OneCoin's rapid growth and success.   Ignatova herself recognized Greenwood's irreplaceable role in the scheme, commenting in an email to Greenwood that, "you have done miracles in the network.  And no.  I could and would never [have] done this without you.  Never."  She signed the email "Ruja, who you made the Cryptoqueen."  (*See* Exhibit I, KG_USAO_00060041).

Third, Greenwood and the other accomplices in the OneCoin scheme used the proceeds of their crimes—money straight from their victims' wallets—to enjoy extravagant lifestyles.  As detailed above, Greenwood used investor money to stay at luxury 5-star resorts, fly around the world on a private plane, adorn himself in luxury clothing, jewelry, and travel luggage, purchase properties around the world, and accumulate a staggering amount of wealth that eclipsed $300 million.  Greenwood was not alone, and other co-conspirators like Ignatova, Scott, and Armenta spent the spoils from their scheme in similar ways.

Fourth, at the same time that Greenwood promised investors that OneCoin was going to bring financial empowerment to the "world's unbanked," Greenwood callously exploited the financial ignorance of his victims.  (*See* Exhibit J, KG_USAO_00021542, at 28). For example, OneCoin's marketing materials explained that 40% of the world's adult population, or two billion people, did not have bank accounts, and that they had no financial empowerment, no loans, no development, no security, and no hope.  (*Id.*).  OneCoin purportedly offered a solution to those people because, as a cryptocurrency, it allowed "for ultra-low cost banking."  (*Id.* at 29).  In essence, Greenwood targeted the most vulnerable segment of the global population with false

17

promises that OneCoin would connect them to a legitimate banking system.  Instead, Greenwood exploited the lack of sophistication of these investors to perpetrate his scheme and dupe them out of billions of dollars.  In private, Greenwood openly mocked these same investors he had promised to help.  For example, in a September 11, 2016, email exchange with Konstantin Ignatov, Ignatova's brother, Greenwood referred to OneCoin investors as "idiots," to which Ignatov responded, "as you told me, the network would not work with intelligent people ;).  (PSR ¶ 28).

Fifth, as the Court can see, the victims of Greenwood's scheme were not wealthy, and, based on the victim statements, the harm that resulted from Greenwood's fraud was severe: families were left unable to support themselves; marriages were strained; educational funds diminished; life savings were wiped out.  These investors worked hard for the money they invested with Greenwood.  And Greenwood worked hard to convince his victims to turn over this money, falsely portraying OneCoin as a legitimate cryptocurrency that would soon surpass Bitcoin.

The seriousness of this conduct demands a Guidelines sentence of at least 30 years' imprisonment.

**B.  <u>Just Punishment</u>**

As noted above, Greenwood's fraud was nearly unprecedented, and was accompanied by a litany of aggravating factors: (1) Greenwood's role in the scheme was second to no one except for Ignatova—he conceived of and co-founded OneCoin, which he deliberately designed as a fraud; (2) Greenwood deceived millions of investors all over the world and defrauded them of billions of dollars; (3) Greenwood's investors were not able to make withdrawals during the scheme, and his victims will likely get pennies on the dollar returned to them; (4) Greenwood was motivated by greed through and through and used his investors' hard earned money to fund his over-the-top lavish lifestyle; (5) Greenwood targeted the most vulnerable members of the global

community, recruiting everyday people and promising them a "financial revolution;" (6) Greenwood deliberatively and callously exploited his investors lack of financial sophistication, drawing countless parallels between OneCoin and Bitcoin and creating what he described as "a sense of urgency, fear of loss, I don't board the train today, I will miss it;" and (7) in addition to orchestrating the OneCoin scheme, Greenwood participated in a sophisticated money laundering scheme that exploited financial institutions around the globe.

Just punishment for Greenwood's abhorrent conduct, the need to account for the serious financial and emotional harm to his victims, and a sense of fairness of behalf of the millions of victims are additional reasons that justify a sentence of at least 30 years' imprisonment.

### C. General Deterrence

The enormity and audacity of Greenwood's crimes have understandably captured the attention of the public, both within and outside the United States.[5] Thus, the deterrent message and effect of the sentence imposed by the Court in this case will resonate significantly with any

---

[5] *See, e.g.*, Bogus 'Bitcoin killer' cryptocurrency founder pleads guilty, Associated Press News, December 16, 2022, https://apnews.com/article/business-manhattan-fraud-429904f53ead84144532eb3a282a7845; Luc Cohen, Reuters, 'Cryptoqueen' associate pleads guilty in U.S. over OneCoin fraud, December 16, 2022, https://www.reuters.com/legal/cryptoqueen-associate-pleads-guilty-us-over-onecoin-fraud-2022-12-16/, Jasmine Anand, India Today, OneCoin's co-founder pleads guilty, likely to face 60 years in prison: Report, https://www.indiatoday.in/cryptocurrency/story/onecoins-co-founder-pleads-guilty-likely-to-face-60-years-in-prison-report-2311398-2022-12-20, David Z. Morris, Fortune, Is OneCoin the Biggest Financial Fraud in History?, https://fortune.com/crypto/2019/11/06/is-onecoin-the-biggest-financial-fraud-in-history/, BBC's the Missing Cryptoqueen podcast, https://www.bbc.co.uk/sounds/brand/p07nkd84; Jamie Bartlett, The Missing Cryptoqueen: The Billion Dollar Cryptocurrency Con and the Woman Who Got Away with It (2022); Brad Hamilton, New York Post, Inside the life and crimes of the new addition to the FBI's 10 Most Wanted Ruja Ignatova, August 10, 2022, https://nypost.com/2022/08/10/the-life-and-crimes-of-ruja-ignatova-new-to-fbis-10-most-wanted-ruja-ignatova/; Hannah J. Davies, The Guardian, The Missing Cryptoqueen: the hunt for a multi-billion-dollar scam artist, Nov. 4, 2019, https://www.theguardian.com/tv-and-radio/2019/nov/04/the-missing-cryptoqueen-the-hunt-for-a-multi-billion-dollar-scam-artist

individual (or institution) tempted to engage in conduct like Greenwood's.  The need for deterrence is especially important here, where Greenwood and Ignatova operated a global fraud scheme that was highly sophisticated and difficult to detect.  The successful investigation and prosecution of Greenwood required substantial coordination and assistance from the international law enforcement community; considerable time and resources to trace billions of dollars through a maze of bank accounts around the world; countless interviews in the United States and overseas; and search and seizure warrants for dozens of email accounts.  Making the scheme even more difficult to investigate and prosecute, Greenwood and Ignatova also went to great lengths to avoid law enforcement detection, for example, using special encrypted phones to avoid the possibility that law enforcement would tap their phones.  Finally, Greenwood's scheme was *highly* lucrative, earning him and his accomplices billions of dollars.  Once uncovered, a lucrative fraud scheme like this one should be sternly punished. *See United States v. Eddy Alexandre*, 22 Cr. 326 (JPC), Dkt. 107 at 102 ("People in society must realize that the commission of such massive investment schemes have real victims, and when that happens there will be real consequences. There is a value for would-be fraudsters to [know] that if they choose to engage in fraud, they may be caught and face serious consequences. And economic-based fraud that requires sophistication, planning and deliberation, such as the crime here, is the sort of more rational and calculated crime for which general deterrence is likely to have a stronger impact); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). Conduct like Greenwood's also erodes the investing public's trust in investments in general.  It is meaningful to the investing public at large—and to those who seek to exploit that

20

public—that Greenwood's fraud is appropriately punished.   A a sentence of at least 30 years' imprisonment is necessary here to achieve general deterrence.

**D.  <u>Specific Deterrence</u>**

With respect to specific deterrence, Greenwood's conduct cannot be explained away as an aberration.   Greenwood's conduct was not a one-time transgression occurring on a single day. Rather, his fraud grew out of another similar scheme, unfolded over a period of four years, required extensive planning, and was highly calculated.   Indeed, before Greenwood and Ignatova founded OneCoin, they worked together on another fraudulent scheme involving a purported cryptocurrency named BigCoin, based in Hong Kong, China.   (PSR ¶ 17).   BigCoin marketed an investment opportunity that was tied to a purported digital asset (or a so-called "coin") that BigCoin claimed would be available in the future.   (*Id*.).   At the time, Greenwood described BigCoin as "a currency based in Hong Kong [that was] extremely popular and successful, reaching a market capitalization of over USD 100 M." Greenwood claimed that BigCoin had "created value for its investors."   (*Id.*).   BigCoin was clearly a fraud—any suggestion that it was a legitimate cryptocurrency is belied by what took place next.

That same year, Greenwood and Ignatova began to hatch their own version of a similar fake cryptocurrency, one that was conceived of as a fraud scheme from day one.   (PSR ¶ 27). Before the coin had even launched, Greenwood and Ignatova referred to the cryptocurrency in email correspondence as "trashy coin."   Moreover, at the outset, Greenwood and Ignatova were already discussing an exit plan that would leave their investors in financial ruin: Ignatova sent Greenwood an email on August 9, 2014 that listed the first exit option as "Take the money and run and blame someone else for this (standard approach, see Wenyard)."   (PSR ¶ 28).

Greenwood and Ignatova also spent countless hours planning this fraud and formulating the intricate strategy that they would use to deceive investors.   They settled on several core

concepts: (1) they marketed the coin as a legitimate cryptocurrency, deliberately duping investors into believing that the price of the coin was based on supply and demand; that OneCoin had a legitimate blockchain; and that OneCoin would soon be available to exchange for fiat currency on an exchange; (2) they drew frequent comparisons to Bitcoin and tried to instill a sense of urgency in their investors; (3) they promised a financial revolution, and targeted segments of the global community that did not have access to the traditional banking system or the financial know-how to detect that OneCoin was a fraudulent scheme; and (4) they utilized an MLM structure, which supercharged sales and resulted in the company's rapid growth.

During the four years that Greenwood executed this strategy, he committed countless individual acts of fraud and deceit: each time he stood on stage as OneCoin's lead recruiter or filmed a new promotional video, he recited a litany of lies to investors.  Moreover, his conduct was not driven by financial need or desperation, and he does not claim otherwise.  Greenwood was handed every possible opportunity.  He was "raised in a stable home environment" and his parents "instilled in him the importance of education, hard work, and independence."  (Def. Memo at 3). Greenwood went on to attend university at the European Business School in London and graduated with a degree in International Business and Management Studies in 2011.  (*Id.* at 5).  He then worked for the global auditing and consulting firm KPMG in Germany.  In short, Greenwood had it made.  But it just wasn't enough.

Moreover, it could not be clearer what motivated Greenwood to perpetrate this egregious scheme: greed.  As described above, Greenwood reveled in the opulent lifestyle that being the leader of OneCoin afforded him.  Greenwood does not address any of this in his sentencing submission, instead citing to his "reputation for generosity and kindness" and claiming that "his impulse to help others runs deep and pre-dates his crime."  (*Id.* at 6).  Although it may be true that

Greenwood was generous with members of his family, or his personal driver in Thailand, those acts of generosity pale in comparison to the callous indifference and blatant mockery he displayed towards the financial suffering he caused millions of investors in OneCoin.



For all these reasons, a sentence of at least 30 years is necessary to deter Greenwood and to protect the public from further crimes of the defendant.

### E.  The Guidelines Provide a Useful Framework in this Case

Contrary to the defendant's argument that the Guidelines calculation "produces an absurd result and should be heavily discounted in the Court's sentencing considerations," the Guidelines here provide a useful framework for fashioning an appropriate sentence, especially given the defendant's role as a leader in the scheme and the extraordinary financial harm that Greenwood caused.  Here, economic loss serves as a suitable starting place for assessing culpability because it serves as a useful—though certainly not dispositive—proxy for viewing the magnitude of Greenwood's crime. This is especially so in this case, where it was Greenwood who conceived of the scheme (along with Ignatova), and defrauded investors of more than $4 billion—money that will never be recouped by more than 3 million investors (in other words, the loss at issue is actual loss, not hypothetical loss).  Given this, there can be no question about the scope of the harm that the defendant intended to, *and did*, inflict on his victims.  Moreover, the Government considered

the Guidelines when it decided to file an information against Greenwood that only charged him with three of the five original charges against him in the indictment, thereby giving Greenwood the benefit of capping the applicable Guidelines range at 720 months' imprisonment. If the Government had proceeded on all five counts, Greenwood would have faced an additional 300 months' imprisonment.  As a result, the criticism sometimes leveled at the loss Guidelines in other types of fraud cases—namely, that they purportedly overstate the loss relative to the defendant's true culpability—ring hollow in this case.[6]  Here, the defendant orchestrated a fraud scheme that actually caused *multiples* of the damage than is captured by the highest range of the loss table.

**F.  Greenwood's Personal Background and Character Do Not Justify A Sentence of Time Served**

The Court should of course consider Greenwood's personal history and characteristics, but the defendant's contention that a sentence of time served is appropriate goes too far.  Greenwood was the co-founder of one of the largest fraud schemes that has ever been prosecuted.  As discussed herein, the scale of Greenwood's scheme was nearly without precedent.  To be clear, absent the mitigating factors cited in the defendant's sentencing submission, including his age, █████████ ██████████████████████████████, and the nature and circumstances of his incarceration in the United States, a Guidelines sentence would be fully warranted here.  The notion that the five years he has served in prison is sufficient to meet the needs of sentencing should be firmly rejected.

---

[6] Indeed, the defendant cites to such a case in his brief, relying on *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006), aff'd, 301 F. App'x 93 (2d Cir. 2008) to support his argument that the Guidelines calculation in this case is "absurd."  However, in *Adelson*, the loss calculation was based on the revelation of accounting irregularities and an ensuing drop in the stock price, unlike here, where the defendant defrauded millions of investors of billions of dollars by selling them an entirely worthless cryptocurrency.  Indeed, the Court in *Adelson* distinguished the facts presented there from other cases that are far more similar to this case, such as the 25 years given to Bernard Ebbers, which is discussed in more detail below.

Furthermore, much of the defendant's history and characteristics before the offense conduct in this case cut both ways.  In his submission, Greenwood argues that he is a generous, kind, and empathetic person and details all his success and achievements before OneCoin.  But any kindness that Greenwood has displayed in other aspects of his life pales in comparison to the selfishness and callous disregard he showed to the millions of victims of his scheme.  Further, despite all the success he had achieved before OneCoin, Greenwood still was motivated to commit the instant offense. Unlike a defendant who may feel he has no way out from poverty other than by committing crimes, Greenwood lived a successful life. He was simply greedy for more.  And he was willing to do anything it took to have such a life; in an illustrative email Greenwood sent to Ignatova at the start of their scheme, Greenwood wrote, "I will not stop and nobody can try and stop me." (*See* Exhibit I).  For a defendant who was given so many opportunities and achieved so much success—unlike many disadvantaged defendants that come before the Court—to nevertheless choose to commit such an egregious scheme reflects an uncommon level of greed. In that way, Greenwood's successful background makes his crimes more deserving of punishment, not less.

### G. The Time-Served Sentence Greenwood Requests Would Result in an Unwarranted Disparity with Similarly Situated Defendants

A sentence of time served, which would amount to approximately five years, would create unwarranted disparities with similarly situated defendants.  As noted above, Greenwood's crime was far from average. It also was not an insider trading or accounting fraud case—serious crimes in their own right, but which often lack the personal impact on investors in a Ponzi-scheme case like Greenwood's.  Greenwood perpetrated an egregious fraud that caused personal harm to more than 3.5 million victims. To be clear, the Government is seeking a sentence of at least 30 years' imprisonment not because of the Guidelines loss table, but because such a sentence appropriately

balances Greenwood's personal characteristics, the seriousness of his crimes, the impact of his crimes on his victims, and the need for specific and general deterrence to prevent similar Ponzi-like frauds in the future.

As noted above, there have been few similarly situated defendants that have been prosecuted in this district (or anywhere).  Nonetheless, a sentence of at least 30 years would be sufficiently in line with other massive fraud schemes that have been prosecuted so as not to result in an unwarranted sentencing disparity.  For example, in *United States v. Bernard Ebbers*, 02 Cr. 1144 (VEC), Ebbers, who was the former President and CEO of WorldCom, Inc., received a sentence of 25-years' imprisonment based on his scheme to deceive the investing public and the SEC concerning WorldCom's true operating performance and financial results, which eventually caused a loss of more than $2 billion after the fraud was disclosed.  There, the Court was faced with significant mitigating factors, including the defendant's age of 63 years old, and the defendant's poor health, including cardiac-related conditions.  The Court concluded "that this sentence is likely to be a life sentence for Mr. Ebbers, [but found] that a sentence of anything less would not sufficiently reflect the seriousness of this crime." (*See United States v. Ebbers*, 02 Cr. 1144 (BSJ), sentencing transcript at 60:3-6).  Judge Jones sentenced Ebbers to a below-guidelines term of imprisonment of 25 years.  (*See id.* at 61:1-6.3).  Notably, the financial harm inflicted by Greenwood in this case *surpassed* the harm inflicted by Ebbers.  Unlike Ebbers's scheme, which involved the operation of a legitimate company that was concealing its true operating performance, Greenwood's scheme involved the operation of a cryptocurrency that was *entirely* fraudulent, and left its investors with essentially *nothing*.  Greenwood also caused significantly more financial damage than Ebbers, over $4 billion, as opposed to over $2 billion.  Given that Greenwood's

conduct was more severe than Ebbers, a sentence of at least 30 years is necessary to avoid unwarranted sentencing disparities.

The life sentence (150 years) imposed in *Madoff* is also instructive.  There, the defendant was sentenced to life imprisonment for perpetrating a multibillion-dollar Ponzi scheme over a period of several decades.  Madoff's scheme, which involved a loss amount of $13 billion, was undoubtedly the largest fraud scheme ever prosecuted in this district, and Greenwood's does not surpass him.  And yet, like Madoff, Greenwood "conceived and orchestrated a multi-billion dollar Ponzi scheme . . . solicited billion of dollars from investors under false pretenses . . . and misappropriated and converted investors' funds for his own benefit and the benefit of others." (*See Madoff* Dkt. 92 at 4).  Moreover, in some ways, Greenwood's scheme surpassed Madoff's.  For example, unlike Madoff, Greenwood defrauded *millions* of investors, not thousands.  And unlike Madoff, investors in OneCoin were never able to withdraw any money.  Most importantly, unlike in Madoff, where Madoff's victims have been able to successfully recover nearly 90% of their losses to date, victims here will likely recover close to nothing.[7]  Accordingly, any sentence less than 30 years' imprisonment will lead to unwarranted sentencing disparities, even when compared to the sentence imposed in Madoff, the largest fraud in history.

Other cases in this district involving notably smaller fraud schemes have warranted far greater sentences than the sentence of time served requested by Greenwood.  For example, in *United States v. Mark Mazer et al.*, the so-called "CityTime" fraud, the defendants defrauded the City of New York City of well over $100 million.  Notably, in that case, the financial harm caused by the defendants was a fraction of what it was here.  Further, while the most culpable defendant

---

[7]  *See*   https://www.justice.gov/usao-sdny/pr/us-attorney-announces-total-distributions-over-4-billion-victims-madoff-ponzi-scheme

in that case lined "his own pockets to a breathtaking degree rarely seen in any fraud or kickback case," his personal profit of approximately $30 million is again substantially dwarfed by Greenwood's, which was ten times that amount.  The three leading defendants in that case, who, unlike Greenwood, did not accept responsibility for their crimes, each received sentences of 20 years' imprisonment.  Given the chasm between their conduct and Greenwood's, a sentence of at least 30 years imprisonment, not time served, would avoid unwarranted sentencing disparities.

Finally, Greenwood's comparison of his conduct with other members of the OneCoin conspiracy is preposterous.  Greenwood's conduct was more egregious than any member of the OneCoin scheme other than Ignatova.  As to Armenta, Greenwood's conduct far eclipsed Armenta's role in the scheme. Armenta was a money launderer, *employed by* Greenwood and Ignatova to launder their money.  Armenta did not conceive of the scheme and played little to no role in the scheme's marketing or day to day operations.  Armenta also earned a fraction of the money that Greenwood did. ███████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████ There is no comparison between their conduct, and yet Greenwood seeks the same sentence as Armenta received.  Greenwood also mentions Scott, but Scott has not been sentenced, and more importantly, was a less culpable participant in this operation than Greenwood.

## III. Restitution and Forfeiture

### A.  **The Court Should Not Order Restitution, Pursuant to Section 3663A(c)(3)**

Due to the difficulties that would be associated with fashioning a restitution order in this case, the Government agrees with defense counsel that the Court should not enter a restitution order against the defendant.

Title 18, United States Code, Section 3663A(c)(3) provides that restitution shall not be applied in certain types of cases such as the instant case (i.e., a fraud case), if the Court determines that:

> (A) the number of identifiable victims is so large as to make restitution impracticable; or
> (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

The Government submits that both factors are met here.  As noted above, between the fourth quarter of 2014 and the fourth quarter of 2016 alone, the scheme took in more than $4 billion from at least 3.5 million victims.  (PSR ¶¶ 19-20). Further, the defendant and his co-conspirators targeted OneCoin investors throughout the world.  Calculating investor losses would require identifying each of these millions of investors and determining how much they each invested. Although a small subset of investors have come forward and identified themselves to the Government, the vast majority have not.  Moreover, obtaining this information would be even more difficult in this case given the passage of time and the absence of accurate contact information for most of the victims.

Notably, the Government remains committed to recovering and returning as much money to victims as it can.  Specifically, the Government intends to recommend that monies forfeited from the defendant be distributed to victims, consistent with the applicable Department of Justice

regulations, through the ongoing remission process. *See* 18 U.S.C. § 981(e)(6) and 28 C.F.R. Part 9. Notwithstanding those efforts, the Government expects that Greenwood's victims will face a significant shortfall. To date, the Government has forfeited less than $50 million in assets. Although the Government expects that it will forfeit a similar amount from co-conspirator Mark Scott, that will still leave investors about 98% short.

For these reasons, the Government respectfully submits that it would be, as a practical matter, impossible to fashion a restitution order in this case and, in any event, the need to do so does not outweigh the complication and prolongation of the sentencing process. Therefore, the Government respectfully requests that the Court decline to enter a restitution order.

### B. The Court Should Enter a Forfeiture Order Against the Defendant

Criminal forfeiture is "an aspect of sentencing." *Libretti v. United States*, 516 U.S. 29, 49 (1995). Under Rule 32.2 of the Federal Rules of Criminal Procedure, once a criminal defendant is convicted of the offenses giving rising to the forfeiture allegations in an indictment or information, the district court must determine what property is subject to forfeiture and, if appropriate, enter a preliminary order of forfeiture. Fed. R. Crim. P. 32.2(b). Although the court may enter a preliminary order of forfeiture prior to sentencing, the order becomes final at sentencing, when the court must also orally order the forfeiture. *See* Fed. R. Crim. P. 32.2(b)(4)(A) ("At sentencing—or at any time before sentencing if the defendant consents—the preliminary forfeiture order becomes final as to the defendant."); Fed. R. Crim. P. 32.2(b)(4)(B) ("The court must include the forfeiture when orally announcing the sentence or must otherwise ensure the defendant knows of the forfeiture at sentencing."). Because fact finding at sentencing is established by a preponderance of the evidence, the preponderance of the evidence standard applies to criminal forfeiture. *United States v. Bellomo*, 176 F.3d 580, 595 (2d Cir. 1999).

Accordingly, the Government must prove by a preponderance of the evidence the amount of proceeds underlying a proposed forfeiture amount.

The applicable forfeiture statutes broadly provide for the forfeiture of "[a]ny property constituting, or derived from, proceeds the person obtained directly or indirectly, as a result of such violation."  18 U.S.C. § 982(a)(2)(A); *see also* 18 U.S.C. § 982(a)(1) (the court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.").  In addition to seeking forfeiture of specific property that was derived from or used to facilitate a crime, the Government may also obtain a money judgment against the defendant to recover the amount of the defendant's criminal proceeds.  *See* Fed. R. Crim. P. 32.2; *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010).  The amount of the money judgment should be equal to the gross proceeds of the defendant's crime, without deducting expenses.  *See Bonventre*, 646 F. App'x at 90 (affirming imposition of forfeiture based on gross proceeds, rather than net proceeds, generated by defendants' fraudulent scheme); *United States v. Khan*, 761 F. App'x 43, 47 (2d Cir. 2019).

As set forth above, the record shows that Greenwood earned at least $300 million in illegal proceeds from the OneCoin from scheme.  The Government therefore requests that the Court enter an order of forfeiture imposing a personal money judgment in the amount of $300 million.  The Government will submit a proposed forfeiture order in advance of sentencing.

**<u>Conclusion</u>**

For the reasons set forth above, the Government respectfully submits that a sentence of at least 30 years' imprisonment is necessary and appropriate in this case.

Respectfully submitted,

.          DAMIAN WILLIAMS
United States Attorney

By: <u>s/ Nicholas Folly</u>
Nicholas Folly
Juliana Murray
Kevin Mead
Assistant United States Attorneys
(212) 637-1060

Cc:    Defendant (by ECF)