| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | SOUTHERN DISTRICT OF NEW YORK |
| 2 | ------------------------------x |
| | UNITED STATES OF AMERICA |
| 3 | |
| |        v.                    17 CR 630 (ER) |
| 4 |                                     Sentencing |

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA
 3
                  v.                    17 CR 630 (ER)
 4                                        Sentencing

 5   KARL SEBASTIAN GREENWOOD

 6                  Defendant
     ------------------------------x
 7
                                      New York, N.Y.
 8                                    September 12, 2023
                                      11:00 a.m.
 9

10   Before:

11                   HON. EDGARDO RAMOS

                                        District Judge
12

13                        APPEARANCES

14   DAMIAN WILLIAMS
          United States Attorney for the
15        Southern District of New York
     NICHOLAS FOLLY
16   JULIANA NEWCOMB MURRAY
     KEVIN MEAD
17        Assistant United States Attorney

18   PATTERSON BELKNAP WEBB & TYLER LLP
          Attorneys for Defendant
19   MUHAMMAD U. FARIDI
     LAUREN SCHORR POTTER
20   HANNAH M. BRUDNEY

21   WEDDLE LAW PLLC
          Attorney for Defendant
22   JUSTIN S. WEDDLE

23   HOWARD R. LEADER
          Attorney for Defendant
24

25
```

1          (In open court; case called)

2          DEPUTY CLERK:  Counsel, please state your name for the

3     record.

4          MR. FOLLY:  Good morning, your Honor.

5          Nicholas Folly, Juliana Murray and Kevin Mead for the

6     government.

7          THE COURT:  Good morning.

8          MR. FARIDI:  Good morning, Judge.

9          Muhammad Faridi, from Patterson Belknap on behalf of

10    Mr. Greenwood joined here by my colleagues Lauren Schorr

11    Potter, Mr. Justin Weddle, Hannah Brudney.  And Howard Leader

12    is also a member of the legal team here.

13          Judge, if I can also introduce to you Mr. Greenwood's

14    parents, Terry and Lisa Greenwood, who have flown in from

15    Sweden for the sentencing today.  He is also joined by other

16    family and some friends.

17          THE COURT:  Good morning to you all.

18          This matter is on for sentencing.  In preparation for

19    today's proceeding, I have reviewed the following:

20          I have reviewed the presentence report last revised on

21    August 29, 2023 prepared by U.S. Probation Officer Alyssa

22    Lopez, which includes a recommendation.  I have also reviewed

23    the sentencing memorandum submitted by Mr. Faridi and his

24    colleagues dated August 29, 2023 on behalf of Mr. Greenwood,

25    which includes a video recording of Mr. Greenwood's parents and

1  uncle, as well as a number of letters submitted by

2  Mr. Greenwood's family, friends, business colleagues, a

3  psychological evaluation prepared by Dr. Jennifer Pearson and

4  numerous certificates of completion for classes Mr. Greenwood

5  completed during his incarceration here in the United States.

6  I have reviewed the government's submission dated February 10,

7  2023.  I also received a letter dated September 11, 2023 from

8  Ms. Potter, another of Mr. Greenwood's attorneys, and I have

9  reviewed the government's submission dated September 5, 2023,

10  and this morning the government's proposed preliminary order of

11  forfeiture.

12        Is there anything else that I should have received or

13  reviewed in connection with the sentencing, Mr. Folly?

14        MR. FOLLY:  No, your Honor.

15        THE COURT:  Mr. Faridi?

16        MR. FARIDI:  No, your Honor.

17        THE COURT:  Folks, you don't have to keep standing.

18  You can remain seated for the balance of this proceeding.

19        Mr. Faridi, have you received a presentence report and

20  discussed it with your client?

21        MR. FARIDI:  Yes, we have, Judge.  If it's okay with

22  your Honor, Mr. Weddle and Ms. Potter will do most of the

23  speaking on behalf of Mr. Greenwood today.

24        THE COURT:  Whom should I address therefor?

25        MR. WEDDLE:  On the PSR, that would be me.

1          THE COURT:  Very well.

2          MR. WEDDLE:  We've received the PSR and reviewed it

3     with Mr. Greenwood.  At this point there are no matters that

4     need to be resolved with respect to the PSR.  We've managed to

5     resolve them all essentially through discussions with

6     government counsel and all of those revisions are reflected in

7     the final draft of the PSR.

8          THE COURT:  Very well.

9          MR. WEDDLE:  I should note, your Honor, just to make

10    everything crystal clear, that we are, of course, preserving

11    for appeal our *Azeem* arguments.  That's reflected in the PSR,

12    and our submission, but also in saying there are no contested

13    issues, I want to have that footnote on it that we are

14    preserving for appeal the *Azeem* argument and any ramifications

15    that could flow from that argument if it were adopted by a

16    Court.

17         THE COURT:  Right.  Absolutely.

18         Mr. Greenwood, have you received the presentence

19    report and discussed it with your attorney?

20         THE DEFENDANT:  Yes, I have, your Honor.

21         THE COURT:  Very well.  Although I am not required to

22    impose a sentence within the sentencing range, I am required to

23    consider the guidelines, and in order to do so, I need to do

24    the calculation.

25         Mr. Greenwood entered a plea of guilty to three

1  counts:  One count of conspiracy to commit wire fraud, one

2  count of wire fraud, and one count of conspiracy to commit

3  money laundering.

4      I have reviewed the presentence report and the

5  calculations set forth therein at paragraphs 75 to 90, and I

6  agree that the total offense level is 43 based on the following

7  calculation:  The base offense level is 7 to which 30 levels

8  are added because the offense involved the loss of more than

9  $550 million.  Six levels are added because the scheme resulted

10 in financial hardship to 25 or more victims.  Two levels are

11 added because a substantial part of the offense took place

12 outside of the United States.  Two levels are added because

13 Mr. Greenwood was convicted under, among other statutes,

14 18 U.S.C., Section 1956.  Two levels are added because the

15 offense involved sophisticated means.  Four levels are added

16 because of Mr. Greenwood's leadership role in the offense and

17 that totals 53.  However, the total offense level is deemed to

18 be 43 because there is no higher level under the guidelines.

19     In addition, because Mr. Greenwood has zero criminal

20 history points, he is in Criminal History Category I.

21     And so, in summary, with a total offense level of 43

22 and a Criminal History Category of I, the applicable guidelines

23 range is life.  However, due to the statutory maximum,

24 sentences under three counts of conviction, the effective

25 guidelines range is 720 months, or 60 years.

1          And with that, Mr. Folly, does the government wish to

2     be heard?

3          MR. FOLLY:  Yes, your Honor.

4          THE COURT:  You could stand or not, whatever makes you

5     comfortable.

6          MR. FOLLY:  Thank you, your Honor.  I'll stand.

7          This sentencing today is the culmination of an

8     investigation that started in 2016 into what may be the single

9     largest global fraud scheme ever perpetrated.  The effort that

10    went into this investigation and prosecution was extraordinary.

11    It required the assistance of the FBI, the IRS criminal

12    investigation, a SAUSA from the Manhattan District Attorney's

13    Office, as well as AUSAs and an investigator from the U.S.

14    Attorney's Office for the Southern District.  The investigation

15    spanned the globe and truly relied not just on the assistance

16    of those I mentioned, but also on tremendous effort and

17    assistance from the international law enforcement community.

18         At the heart of that investigation was a

19    cryptocurrency scheme that this man Karl Sebastian Greenwood,

20    along with Ruja Ignatova conceived of and orchestrated.  They

21    conceived of it from day one as a fraud scheme.  This scheme

22    inflicted serious economic harm on millions of victims around

23    the world.  Most of those victims will recover next to nothing,

24    next to nothing of the more than $4 billion that they invested

25    into this scheme.  That money went to line the pockets of

1   Greenwood, of other similar co-conspirators, and they used that

2   money to fund what cannot be described as anything other than

3   an over-the-top extravagant lifestyle.  Today it's time for

4   Greenwood to be held fully responsible for his extraordinary

5   crimes and for the Court to impose just punishment for what he

6   did.  As set forth in our sentencing memorandum, nothing short

7   of 30 years' imprisonment is appropriate in this case.

8            Your Honor, I'd like to start by addressing the nature

9   and seriousness of the offense, as well as the need for just

10  punishment before turning to some of the other 3553(a) factors.

11  At the outset, it cannot be overstated just how serious the

12  defendant's crimes were.  This scheme that he conceived of and

13  orchestrated was truly a scheme without any precedent.  To the

14  government's knowledge, this was the largest international

15  fraud scheme that has ever been investigated and prosecuted;

16  over three and a half million victims, over $4 billion in loss

17  straight from the pockets of each of those victims.  And what

18  they were left with was a completely worthless cryptocurrency

19  that Greenwood and others had somehow managed to convince them

20  was going to be the next Bitcoin.  Unlike the victims of some

21  of the other largest schemes that have been prosecuted, such as

22  Madoff, here there is no realistic hope that these victims are

23  going to get that money back.  In Madoff, they received nearly

24  90 percent of the money that they invested, and here they are

25  likely to receive next to nothing which I will address in a few

1   moments.

2          Not only did Greenwood come up with this scheme along

3   with Ignatova, but he was also the company's global master

4   distributor.  He was the public face of the company.  He was on

5   top of the MLM pyramid.  He was the lead recruiter.  His

6   primary job was to tour the globe to stare into the eyes of

7   thousands and thousands of his victims and to convince them

8   that this was real.  He gave them hope.  He gave them

9   excitement, and he convinced them that this was going to be the

10  next Bitcoin.  He was masterful at that job.  This scheme was

11  remarkably successful.  It caught on like wildfire.  And as

12  your Honor saw in some of the letters from the victims, it was

13  Greenwood at the head of that MLM marketing network that made

14  it tick, that made it be so successful.

15         There are many features of this scheme, your Honor,

16  that go to the severity of the offense conduct.  The first is

17  how highly calculated and sophisticated the scheme was.  It

18  required extensive preparation.  The defendant worked alongside

19  Ruja tirelessly to come up with the features of this scheme, to

20  come up with a cryptocurrency that resembled sufficiently a

21  real cryptocurrency such as Bitcoin so that investors would

22  actually believe it's real and invest.  They had to be fluent

23  with the key concepts of legitimate cryptocurrencies such as

24  blockchain, such as mining pools, all so that they could

25  convince those investors that this was a real coin.

1          Greenwood's soul motivation to participate in this

2     scheme was to fund his opulent lifestyle that he could never

3     otherwise afford.  He flew around in a private OneCoin private

4     jet.  He stayed at luxury 5-star resorts.  He rented luxury

5     cars.  He bought properties all over the world, including an

6     oceanfront property in Thailand.  He purchased designer

7     clothes, footwear, watches, a Sunseeker yacht, every penny of

8     which was derived straight from the pockets of those investors

9     more than --

10          THE COURT:  Mr. Folly, do you know when it was exactly

11     or approximately that he and Ms. Ignatova began this, and what

12     was he doing at the time, if you know?

13          MR. FOLLY:  Yes, your Honor.  It's an important

14     question.  And it was in 2014, and as set forth in the PSR,

15     that same year Greenwood and Ignatova, before they started

16     working on the concept of OneCoin, were already involved in

17     another fraudulent scheme involving BigCoin, which was another

18     cryptocurrency they were both working on.  Greenwood described

19     it as a so-called coin -- he described BigCoin as a currency

20     based in Hong Kong that was extremely popular and successful

21     reaching a market capitalization of over USD one hundred

22     million.

23          THE COURT:  To be clear, Mr. Folly, you're saying

24     BigCoin, B-I-G, not bitcoin, B-I-T.

25          MR. FOLLY:  BigCoin, B-I-G Coin.  Your Honor, both the

1   defendant and Ignatova were working on that project together,

2   and that inspired them to pivot, launch their own, more refined

3   and far more dangerous cryptocurrency, ultimately OneCoin.  And

4   one of the key features in that pivot that they implemented was

5   this MLM structure which really enabled this coin to take off

6   and supercharge the global sales of that coin.

7           Your Honor, another feature that demonstrates just how

8   serious this conduct was, Greenwood deliberately targeted

9   members of the global community, those that they identified as

10  being the "unbanked," those that did not have traditional

11  access to banking in the traditional financial sector.  They

12  targeted that global community and sold them on the concept

13  that they were going to connect them to the banking system;

14  that they had something that was actually even better than

15  traditional banking.  He gave them hope.  He inspired them to

16  purchase.  He leveraged the fact that they were not

17  sophisticated investors so that he could get them and bring

18  them into this scheme.  And he deliberately exploited that lack

19  of financial sophistication.  He targeted that group so that he

20  could convince them that this was a legitimate cryptocurrency

21  just like Bitcoin.  And making it worse, in private he actually

22  made fun of those investors.  He called them idiots.  He said

23  that this project wouldn't work if these individuals were

24  intelligent.

25          Your Honor, he displayed a remarkable callous

1  disregard for the very victims that he got on stage and

2  recruited to join this cryptocurrency.  To make matters worse,

3  your Honor, those victims, unlike certain schemes, those

4  victims could least afford to lose that money they invested in

5  this scheme.  You saw that in the victim impact statements.

6  Money was drawn from college funds.  There was an individual

7  who had to continue working into their mid-seventies.  They

8  couldn't afford to retire.  There are those to this day that

9  are unable to recover because of the harm that was inflicted by

10  Greenwood through this scheme.  These were not wealthy

11  investors.  These were everyday people who did not have

12  significant financial sophistication who often even weren't

13  connected to the banking system.

14        And, your Honor, what makes it that much worse is that

15  this money has been spent.  It was laundered through a global

16  sophisticated network of money launderers, billions and

17  billions of dollars.  And unlike Madoff, these investors are

18  not going to get the money back.  The government is not able to

19  recover that money.  It has been dissipated, and they are going

20  to get, at best, pennies on the dollar for what they invested,

21  more than $4 billion completely erased from those investors'

22  pockets.

23        Your Honor, general deterrence is also very important

24  here.  The press has been following this case closely.  There

25  are several books.  There's a podcast.  There are several TV

1    productions.  Some of that is cited in our submission.  And the

2    sentence that is imposed here today by the Court will resonate

3    significantly.

4        Furthermore, this is the exact type of scheme, a

5    highly calculated scheme that requires extensive planning and

6    in which general deterrence is most likely to have a strong

7    effect.  It's also a scheme that's extremely difficult to

8    detect.  Your Honor, I addressed at the outset the extensive

9    coordination that was required with the global law enforcement

10   community.  Your Honor saw throughout the trial against Mark

11   Scott just how elaborate this maze of international money

12   laundering was.  To trace where that money went through this

13   maze of accounts all over the world took years.  Your Honor, to

14   bring these cases requires enormous, enormous efforts, and for

15   that reason it is that much more important when they are

16   successfully detected and prosecuted to impose a significant

17   sentence.

18       The last point is that schemes like this also inflict

19   exceptional harm on everyday victims.  These are not investors

20   that can afford to lose this money, and it inflicts harm that

21   is irreversible and will impact their lives permanently.

22       Your Honor, in the defendant's sentencing submission,

23   there is a great focus on his personal history and

24   characteristics.  Those factors cut both ways in this case.

25   The defendant here did not commit this crime out of necessity.

He was afforded every possible privilege.  He had a stable

home.  He had good parents.  He had a good education.  He had

an excellent job at KPMG.  He had it made.  He had

opportunities that many people only can dream of.  And yet,

that was simply not enough for him.  He was greedy.  He turned

to this abhorrent scheme out of what can only be described as

greed.  He wanted a lavish lifestyle that he could not get

through legitimate means.  All of that personal history here

counsels in favor of a sentence of at least 30 years.

What's more, he also cites in his sentencing

submissions reputation for generosity and kindness, claiming

that his impulse to help others runs deep.  But his actions

over a period of years in this case tell a very different

story.  He displayed callous disregard for the millions of

lives that he wrecked.  He ripped investors off of billions of

dollars and mocked those same people in private after claiming

publicly that he was giving them hope; that he was giving them

a path to financial independence; that he was starting a

financial revolution.  All of that must be fully accounted for

in fashioning an appropriate sentence here.

Your Honor, we do recognize that the mitigation cited

in the defendant's sentencing submission should be taken fully

into consideration by your Honor at this sentencing, but it

only goes so far, and absent that mitigation, a guideline

sentence, such as the sentence recommended by probation, is

1    what would be appropriate here.

2          Your Honor, briefly just to address the argument

3    concerning unwarranted sentencing disparities.  The first point

4    here, your Honor, is that there is few, if any, precedents for

5    this case.  We explained in detail the staggering proportions

6    of what the defendant did through this fraud scheme, but some

7    of the sentences do provide instruction here.  One was the

8    sentence of Bernard Ebbers.  We cited that in our submission.

9    There are several facets of that scheme and of the factors that

10   were considered at sentencing that are instructive here.

11         The first is, unlike this scheme, that scheme involved

12   the operation of a legitimate company that was concealing its

13   true operating performance as opposed to what Greenwood did

14   here, which was create from day one and mass distribute a

15   cryptocurrency that was through and through fraudulent, had

16   zero value whatsoever at any point in time.  There was also

17   substantial mitigation cited in that case; in particular,

18   defendant's poor health to the point where the court actually

19   concluded the sentence that the court imposed of 25 years was

20   effectively a life sentence.  Notably, in addition to that,

21   here the defendants are not going to be paid anything in

22   restitution.

23         Madoff, your Honor, is also instructive here.  It is

24   the rare case, maybe no other case where you can actually

25   compare the conduct to that of what was at issue in Madoff.

1    There are aspects of Greenwood's scheme, your Honor, that were

2    worse.  Madoff's scheme involved thousands, thousands -- not

3    millions -- of victims.  The scope and breadth of the harm of

4    Greenwood's scheme actually surpassed that of Madoff.  In terms

5    of dollars, as we set forth in our submission, there is no

6    question Madoff involved more loss to each investor, but at the

7    same time those investors have nearly been made whole.  They've

8    recovered nearly 90 percent of the money that they lost, and

9    the investors here are not going to recover anything.

10          Your Honor, at bottom, this case involved a harm of

11   unprecedented dimensions.  The defendant was the leader of this

12   scheme right alongside Ruja Ignatova.  As you saw in our

13   submission, she herself said without this defendant's help and

14   assistance and the pivotal role that he played in marketing

15   this cryptocurrency, this scheme would not have worked.  If

16   Ruja was one A, this defendant is one B.  He was right there

17   next to her from the start all the way through the finish, even

18   after she disappeared.  Your Honor, for all of those reasons, a

19   sentence of at least 30 years is necessary and warranted in

20   this case.

21          THE COURT:  Thank you, Mr. Folly.

22          Ms. Potter.

23          MS. POTTER:  Yes, your Honor.  Thank you.

24          THE COURT:  You can use the podium if you wish.

25          MS. POTTER:  You know what, I may, your Honor.  It's a

1     bit crowded.

2           Your Honor, we recognize that this is an extremely

3     serious crime. Mr. Greenwood has pled guilty. He has taken

4     responsibility for his actions. He is deeply remorseful for

5     the harm that he has caused, and I expect you will be hearing

6     directly from Mr. Greenwood today.

7           On top of that, your Honor, Mr. Greenwood waived a

8     valid speedy trial violation in this case, which was more than

9     eight months long by our calculation and would have resulted in

10     a dismissal, all while he was serving time at the MCC and MDC

11     and in Thailand before that. And Mr. Greenwood has suffered

12     for his actions. He has paid for his crimes. The punishment

13     he has already served is extremely serious. It's in fact

14     extraordinary when you think about it. Mr. Greenwood for the

15     last five years has been incarcerated in truly horrendous

16     conditions, and his experiences detained have been traumatic.

17     They have had lasting impacts on his health, and there are

18     effects that are going to be exacerbated with each additional

19     day he is in prison. He has done this outside of his home

20     country, outside of the presence of family.

21           Your Honor, for those collective reasons, given these

22     unique circumstances here, when you consider the 3553(a)

23     factors and Mr. Greenwood's humanity and what is just in this

24     case, we do believe that a sentence of time served is

25     sufficient to meet the goals of sentencing.

1          Now, on that point, your Honor, on the time served to

2    date, I want to just highlight what we said in our submission.

3    Consistent with how the courts have treated time recently

4    served at the MCC and MDC, particularly during Covid,

5    Mr. Greenwood's time of five years should be considered more

6    like the equivalent of double that time, of actually ten years.

7    Courts have been viewing this time in the MCC and MDC as

8    significantly more punitive than it should be and being the

9    equivalent of far more than the actual days that have been

10   spent there.

11         And that, your Honor, is even before you are to take

12   into consideration the time that he served in Thailand, which

13   is difficult to even ascribe a number of years to.

14         Before I spend much time on the 3553(a) factors, let

15   me just pause for a moment here on the guidelines range.  As

16   your Honor has noted before, the tables concerning financial

17   frauds are inflated, and they are levels wholly out of step

18   with what is rational in cases like this.  We provide for the

19   Court several examples of courts in this district that are

20   acknowledging just that.  It's all the more absurd when you

21   think about how to compare that to cases involving terrorism or

22   acts of violence that don't come close to where the numbers

23   come in a case like this.  And, your Honor, the government's

24   requested sentence ultimately does seem to really be turning on

25   the guidelines calculation here.  Of course we have to start

1   with the guidelines, as your Honor has already acknowledged,

2   but the government seems to be using that really as their sole

3   argument.  We believe, however, that the focus should be on the

4   3553(a) factors and the truly unique circumstances of the last

5   five years of Mr. Greenwood's life.

6          As I said, your Honor, the conditions under which Karl

7   has been incarcerated in three different facilities over the

8   last five years have been nothing short of traumatic.  These

9   years have stripped Karl of his humanity.  They have deeply

10  affected his health.  They have stripped him of connections to

11  his family.  And they have caused lasting effects on him that

12  will forever remain.  Karl's years detained thus far are not

13  what this court or, frankly, this country envisions when we

14  consider whether a term of imprisonment is appropriate as a

15  form of punishment.  Of course prison is punishment, but it has

16  taken far more from Karl than it is intended to do.

17         Let me just talk for a moment about some of those

18  conditions.  Of course your Honor has seen the detail in our

19  submissions.  Karl was first detained in Thailand in one of the

20  most notorious prisons in the world recognized by organizations

21  like the UN as engaging in rampant human rights violations and

22  fostering particularly cruel conditions.  His conditions were

23  what no human should experience:  Stripped naked.  Shaved down.

24  Chained to other inmates for 24 hours.  Forced to sleep on the

25  floor full of cock roaches and rodents.  Food filled with

1    maggots.  Forced to sit outside in the heat for hours on end,

2    housed with nearly 100 inmates living in constant fear.  And on

3    top of that, your Honor, I want to emphasize the particular

4    circumstances that are discussed in our brief on pages 11, 12

5    and 37 that have resulted in lasting health effects and health

6    consequences that Mr. Greenwood is forced to confront daily,

7    particularly when he is detained.

8            Now to be clear, your Honor, this isn't a situation

9    like, for example, in the Ebbers case where there were

10   mitigating circumstances before, health circumstances, I should

11   say, before the defendant's incarceration.  Rather, here they

12   have been caused by his time over the last five years.  And I

13   will note, Judge, that courts wholly look at defendant's time

14   in foreign facilities such as this when thinking about and

15   actually reducing sentences with factors very similar to those

16   that Mr. Greenwood experienced in Thailand.

17           When he comes to the United States to face his

18   charges, he is then detained at the MCC.  I don't need to get

19   into all of the horrors of the MCC in the years just prior to

20   closing.  I know that that has been discussed in many cases

21   including with your Honor, but this court has consistently

22   reduced defendants' sentences solely because of those

23   conditions.  And we cite to a litany of cases where that

24   happened of recent.

25           Mr. Greenwood was in MCC for the duration of all of

1  these incidents that occurred over the last several years.  He

2  was there in 2019 for the death of Epstein, which resulted in a

3  significant period of lockdown.  He was there in February 2020

4  when an officer smuggled a loaded firearm into the facility,

5  resulting again in lockdown and disarray.  And then immediately

6  thereafter Covid struck.  And as this Court and other judges in

7  this district have discussed the conditions in the MCC during

8  Covid were just deplorable.  And we share specific details on

9  that on page 15 of our submission.

10       Your Honor, Mr. Greenwood spent three years at the

11  MCC, including 18 consecutive months on lockdown when the

12  pandemic began.  That is 18 consecutive months being in his

13  cell for 23 hours a day.  And, your Honor, unlike many

14  defendants in this district charged with offenses similar to

15  Karl's, including his co-defendants, he was not released on

16  bail when the pandemic struck.  Instead, he was left to suffer

17  inside of the facility for the next 18 months.

18       When MCC closed, Karl was sent to the MDC which faced

19  many of the same problems.  Struggling to accommodate the

20  increase in inmates with a reduction in staffing, he spent a

21  tremendous amount of time on lockdown.  In total, Karl

22  estimates that he has been on lockdown for at least two and a

23  half years of the last five years of his detention.  And,

24  again, like MCC, with MDC, courts have reduced sentences solely

25  because of those conditions alone.  But here, your Honor, there

1    is a pile-on exacerbating effect of one institution after

2    another after another that cannot be overstated, particularly

3    given Karl's circumstances.  I cite to Exhibit 1 in that

4    regard.  And any continued incarceration will only worsen those

5    effects.  Courts, as I said at the outset, have considered time

6    spent in these conditions as days, if not years, far beyond

7    those that are actually spent and have substantially reduced

8    sentences as a result.  And here you have the compounded effect

9    of all three institutions.  And courts have been doing this, it

10   seems, because while prison is supposed to be punishment, it is

11   not supposed to be trauma of that nature or close.  And I quote

12   a Judge Engelmayer case with that point.  And as Judge Oetken

13   has said, it is not supposed to be twice as punitive as it

14   should be.

15          And your Honor recognized as much in your sentence of

16   Mr. Armenta in this case, noting that it was the worst point in

17   that sad institution's history when Mr. Armenta was there.  And

18   let me just make an important comparison there, your Honor.

19   Mr. Armenta spent eight months in the MCC and only 12 days

20   during the pandemic before he was released on bail.

21   Mr. Greenwood spent three years at the MCC and 18 months during

22   the pandemic then to be followed by the MDC.

23          Your Honor, we believe the purposes of sentencing have

24   been accomplished by this extraordinarily difficult and harsh

25   five years of imprisonment that Mr. Greenwood has endured.

1    These were not ordinary five years of detention.  They will

2    have lasting effects.

3            Let me spend a moment now also to just speak about the

4    man who is before you.  Mr. Greenwood is part of a stable,

5    loving, devoted community of family and friends that have

6    remained supportive of him throughout these last five years.

7    He is a devoted son and a loving father of four.  We have

8    submitted, as your Honor noted, 33 letters of support on his

9    behalf, as well as a video, and I believe they do provide a

10   clear picture of who he is to his loved ones.  Mr. Greenwood is

11   a hard-working, kind and he is a generous man to family and

12   strangers alike, including before and after his involvement

13   with OneCoin.  Karl's children have continued to grow up

14   without a father, without a means to even see him or speak to

15   him as he's been incarcerated here in the United States, and

16   particularly during the pandemic.  They have been deeply

17   affected by Karl's conduct and his crime, as we've explained in

18   our brief.  Karl's parents are constants in his life.  As my

19   colleague noted, they are here in the courtroom here today.

20   They traveled from Sweden to be here today.  They've described

21   in detail their experience of seeing Karl at the MCC, now four

22   years ago, and the suffering they have endured over these

23   years.  Their devotion to their son has not faltered, and

24   together with Karl's uncle, who is in the video as your Honor

25   notes.  Karl will have the support he needs to restart his life

1    in Sweden.

2         Now, Karl is responsible for what he has put his

3    family through these last five years, not being present in

4    their lives when he needs them.  He lives with that.  But, your

5    Honor, while prison isolates a person from his family, it is

6    uniquely different when you are thousands of miles away with

7    limited communication, particularly during a global pandemic.

8         I would also note, your Honor, that Karl has found

9    time while incarcerated at the MDC to improve himself and to

10   help other inmates.  He's taken courses.  He's provided

11   assistance and teaching to them.  Not many people would be able

12   to sort of find that way or find that opportunity, but he did.

13        Your Honor, let me also note, you asked the -- just

14   give me one moment, your Honor.  I'm going to strike that, your

15   Honor.

16        I would like to now turn to the other 3553(a) factors

17   and the unique circumstances of this case.  We do not believe

18   that additional time here would further the goals of

19   sentencing.  Your Honor, the government is asking for 25

20   additional years for Karl.  That is five times what he has done

21   so far.  And I would note as we describe in our brief, given

22   his status as a non-U.S. citizen, he is not even eligible for

23   good time credit, so they are really asking for five times more

24   than what he has served already.  That seems unjust under the

25   circumstances of this case and Mr. Greenwood's acceptance of

1    responsibility.

2            On deterrence, your Honor, Karl's incarceration to

3    date and the circumstances he has faced provide all of the

4    general and specific deterrence needed for this crime.  No one

5    wants to experience what he has experienced in these five

6    years.  Your Honor, the government noted today and in its brief

7    about the intent resources that were required to investigate

8    this crime.  It was a global operation.  Karl has accepted

9    responsibility for it.  But, your Honor, the resources and the

10   extensive investigation that a case undertakes is not a 3553(a)

11   factor or one that Karl should be punished for.  On the

12   comparable cases the government has chosen, we would submit

13   that each is distinguishable on the facts, on the mitigating

14   circumstances, and on acceptance of responsibility.

15           First on Ebbers, just to make a few points, your

16   Honor, we do not dispute the very serious nature of the crime

17   here, and Karl has taken full responsibility.  But I would

18   submit, Judge, that that was a very different set of facts, a

19   very different type of case, involving implications for U.S.

20   and global markets alike.  Mr. Ebbers did not plead guilty,

21   which I think is a critical point for the Court to consider.

22   He went to trial.  Karl pled guilty and has accepted

23   responsibility.  And, your Honor, Mr. Ebbers was released after

24   13 years in prison on compassionate release.  In releasing

25   Mr. Ebbers early, Judge Caproni's principal consideration was

1   his declining health and his age.  While we're not in the same

2   procedural posture here, of course, I don't think it can be

3   overstated that Karl's health has materially declined because

4   of his time in prison, and it will continue to decline as we

5   describe in our submission and in Exhibit 1 if he remains

6   incarcerated.  I would also note that when Judge Caproni

7   released Mr. Ebbers at 13 years, she made very clear that that

8   was not a slap on the wrist, and it seems like no one who would

9   be considering committing a crime like that would view this as

10  a lenient sentence.

11         It seems here, your Honor, that in this case and in

12  others the primary distinction the government tries to make in

13  arguing that Karl should get more time is loss amount, but that

14  ignores the many other factors that distinguish this case and

15  cuts against all of the various cases that --

16         THE COURT:  The government also emphasizes the number

17  of victims and the relative wherewithal of those victims

18  vis-a-vis, for example, Madoff's victims.

19         MS. POTTER:  Your Honor, we recognize the number of

20  victims here, of course.  As your Honor understands, it was a

21  scheme in which there was sort of participants upon

22  participants, and we are not disputing the victims here or the

23  hardship that they faced.  That said, I do think that there are

24  many differences between these cases, their impact, and the

25  mitigating factors that are still highly relevant to

1    distinguishing these cases, particularly on sentencing grounds.

2              On the Mazer case, which is another case that the

3    government relies on in its brief, similarly it was a different

4    type of scheme.  There the defendants were agents of the City

5    of New York and committed a fraud against an institution,

6    against the city economy.  And, notably, as the government says

7    in its brief, and again, like Ebbers, the defendants in that

8    case did not plead.  Here Karl has pled and accepted full

9    responsibility.  And on top of that, we are not aware of any

10   mitigating factors of the scale that exist here.

11             Let me just also make a brief note as to other

12   defendants in this case, your Honor.  With regard to

13   Mr. Armenta, as I already mentioned, I would really highlight

14   again the difference in the terms of presentence detention that

15   him and Karl have served.  Again, as I said, he spent 12 days

16   in the MCC before being released on bail.  Karl spent 18

17   months.  I would also note that Mr. Armenta's conduct, while

18   different than Karl's, was extensive.  He was held responsible,

19   as I understand, for $300 million in loss.  On the loss table,

20   that is just one level below, two points below where

21   Mr. Greenwood is.  He also was involved -- and I believe the

22   government described this at his sentencing -- that his

23   involvement in extortion, threats of violence and actual

24   violence changed the dynamics of that case from just a

25   white-collar fraud case to one that does involve at least some

1    level of violence. Nothing of the sort exists here. Let me

2    just also note Mr. Scott, who of course went to trial before

3    your Honor I believe in 2019, has served, I believe, seven days

4    in jail so far. Again, Karl has spent five years.

5         Your Honor, specific deterrence we submit is fully

6    taken care of for all of the reasons that I have already

7    discussed. Karl has suffered and lost everything for the time

8    that he has served for these last five years. He has spent

9    well over 50 percent of his detention, so two and a half years,

10   in lockdown. He has done this thousands of miles away from

11   parents, family, loved ones, all of whom continue to speak

12   support him but cannot visit him and have limited ability to

13   connect with him. On top of that, your Honor, Karl and his

14   family have suffered extreme public shame and turmoil as a

15   result of this conduct. More years in jail at this point, your

16   Honor, is only punitive given all of these circumstances,

17   nothing more.

18        Lastly, but significantly, I do want to remind the

19   Court of what Karl faces as a non-citizen if he stays

20   imprisoned. As a non-citizen, he is not eligible to receive

21   good time credit towards early release. He gets no or limited

22   access to programs that he would be eligible for if he were a

23   U.S. citizen, and, as we put in our brief, that he would take

24   advantage of. He will likely end up in a for-profit prison

25   which is known for poor healthcare, overcrowding, higher rates

1   of solitary confinement and the like.

2           And, lastly, your Honor, if Karl remains detained,

3   whenever he is released, he will return to detention in the

4   form of immigration custody.  There is no question that

5   immigration custody will be unnecessarily prolonged in

6   continuing poor conditions for an unknown period of time.

7   Judge McMahon addressed this directly in the Connelly case

8   which we cite and flatly says that it is simply just not right.

9           Your Honor, for these reasons and accounting for the

10  fact that Mr. Greenwood's five years in prison to date should

11  be treated as at least double that, the defense submits that a

12  sentence of time served or a sentence of home incarceration in

13  Sweden is sufficient to meet the needs of sentencing here.

14          THE COURT:  Thank you, Ms. Potter.

15          MR. FOLLY:  Your Honor, we would ask for the

16  opportunity to respond either before or after the defendant's--

17          THE COURT:  Why don't you do that now.

18          MR. FOLLY:  Thank you, your Honor.

19          With respect to the argument that was raised by

20  defense counsel about the guidelines, it was suggested that the

21  government's sole argument is based on the guidelines.  Just to

22  be clear, the government's argument is based on all of the

23  3553(a) factors.  The guideline sentence here is 60 years.  The

24  government is submitting to the Court that a sentence of

25  approximately half of that, 30 years is what is sufficient in

1   this case.  So the suggestion that the government is relying

2   solely on the guidelines is completely inconsistent with all of

3   the arguments we have made today and in our sentencing

4   submission.

5           But, moreover, the guidelines calculation here

6   actually completely underestimates the full scope of the

7   defendant's conduct.  The loss inflicted by the defendant

8   exceeds eight times what is captured in the highest range of

9   the loss table of the guidelines.  And not only that, but there

10  are few cases where the guidelines are more helpful in

11  understanding the full magnitude of the defendant's conduct and

12  role in a scheme.  He was a leader here.  He was a co-founder.

13  He came up with this scheme.  The more than $4 billion in loss

14  was actual loss.  This is not hypothetical.  This is not

15  intended.  This is real money that came out of the pockets of

16  those investors.  And even if the Court were just to look at

17  the $300 million that went into this defendant's pockets, it

18  wouldn't change the guidelines analysis at all, just the money

19  he earned himself off of the scheme.  So these guidelines, your

20  Honor, do not meet the narrow parameters that the defense was

21  arguing in certain cases where there might be an overstatement

22  of the offense conduct.  Here they actually understate it.  And

23  moreover, we are not even seeking the guideline sentence of 60

24  years in this case.

25          Your Honor, with respect to the other defendants in

1   this case, Gilbert Armenta, as characterized in the

2   government's sentencing submission, provided cooperation

3   efforts that were extraordinary.  Gilbert Armenta was hired by

4   this defendant and Ruja to do their bidding, to do their

5   international money laundering.  So any comparison of the

6   sentence that was imposed on Armenta versus the sentence that

7   should be and fairly imposed on this defendant, it's apples and

8   oranges.  Their conduct in this case was completely different.

9   The defendant's was far more egregious, and of course there are

10  no comparable extraordinary cooperation efforts, which were a

11  significant factor at the sentencing of Armenta.

12          Your Honor, there was also a discussion about

13  comparable cases in the citation to the Mazer case.  Just a

14  note on that.  The three defendants there were sentenced to 20

15  years each.  Those defendants perpetrated a scheme that

16  inflicted $100 million in loss on the City of New York.  These

17  were not individual victims where the money was coming out of

18  the pockets of everyday people who could not afford to lose

19  that money, and even there a sentence of 20 years for each of

20  those participants pass imposed.  And the point about a plea

21  versus going to trial, your Honor, the plea is captured in the

22  guidelines, and there is no further consideration that should

23  be given to that at this stage of sentencing.

24          Your Honor, the only other issue I would just like to

25  raise, at some point we would just ask if the Court inquires if

1    there are any victims present who would like to speak.  The

2    government has not been informed that there are, but we would

3    like to make sure that there are not.

4                THE COURT:  Let me do that now.

5                Is there anyone here who considers themself a victim

6    of the scheme charged in this indictment?  I see no hands.

7                Ms. Potter, I will give you an opportunity to respond

8    briefly if you wish.

9                MR. WEDDLE:  Your Honor, could I just say one --

10               THE COURT:  Sure.

11               MR. WEDDLE:  Just very briefly to respond the

12   prosecutor's comment about Mr. Armenta's efforts at

13   cooperation, which were extensive as reported in the public

14   record, I do think that there is something -- there are facts

15   in the PSR that speak to that issue, and I think the

16   circumstances are largely under the control of the prosecution;

17   that is, the prosecution offered to Mr. Armenta the opportunity

18   to do a great number of things.  And as a result of that, he

19   got the opportunity to make the sentencing arguments that he

20   made.  And so I think that by accepting responsibility for the

21   crime and by the other conduct that Mr. Greenwood has engaged

22   in as described in the sentencing memo and the PSR,

23   particularly portions that are under seal, he should get credit

24   for that sincere and extraordinary acceptance of

25   responsibility, your Honor.

1          THE COURT:  Thank you, Mr. Weddle.

2          Mr. Greenwood, you have an absolute right to address

3     the Court before I impose sentence.  Is there anything that you

4     wanted me to know?

5          THE DEFENDANT:  Yes, your Honor.

6          Judge Ramos, thank you for the opportunity to speak.

7     And thank you to everyone here to support me today.  Your

8     Honor, there is no elegant way to say this:  What I did was

9     wrong.  The deep regret I feel from the choices that I made I

10    can't take back.  Lie side by side with the terror I

11    experienced in Thailand.  The day I blacked out, I didn't

12    believe I was going to come out alive.  In short, my body

13    simply shut down.  Confused and afraid, I suddenly reverted to

14    my childhood when I was a young boy who cherished the local

15    church.  I began to pray.  I was desperate.  I was scared.  The

16    prison felt insane, and I felt insane too.  That first day in

17    that Thai prison I begged for repentance and deliverance.

18    Though as the day went on, my prayer changed.  Please God, let

19    me die.  But I didn't die.  What came next was worse.

20         After that experience, being extradited to the United

21    States felt like the right choice.  Yet, after traveling over

22    5,700 miles across the world to a place I thought I would feel

23    safe, I entered MCC.  I quickly realized I was also very far

24    away from anything familiar or anyone that I loved, including

25    my four children who are today ages 15, 14, 7 and 6.

1    Incarceration is hard on every family and is like an unruly

2    beast that tears everyone apart.  Still, being incarcerated in

3    a foreign country with no support and no way to support those

4    you love feels damaging beyond repair.  When I stand here and

5    say this out loud in your courtroom today, your Honor, I feel

6    shattered.

7         Yet, beyond my own pain lies something more painful,

8    the pain that I have caused others, especially the victims of

9    my actions.  I cannot take it back.  All I can do is ask for

10   forgiveness.  I am deeply sorry for the harm that I have caused

11   anyone based on my actions.  I am sorry that I led them to

12   believe that OneCoin would become the next Bitcoin.  It shames

13   me when I think about all those people whose dreams of

14   cryptocurrency riches I exploited.  I am embarrassed to think

15   of how I spent their hard-earned money on extravagant purchases

16   for myself and to fund an overly lavish lifestyle.  I will

17   forever carry my past choices with me.  And as I lay in my

18   prison bed locked in the cell for most of the time, I can't

19   escape how I've destroyed my life and caused irreparable harm

20   to many others.

21        I recognize that this did not have to be my life.  My

22   parents raised me in a loving household and taught me right

23   from wrong.  I have no excuses for my actions, your Honor.  I

24   am deeply ashamed of the pain that I have caused my family.

25   For the past five years, I have been able to support my parents

1    and my uncle through health challenges when they needed me the

2    most.

3            (Counsel consults)

4            Oh.  I have been unable.  Sorry, your Honor.  I have

5    been unable to support my parents and my uncle through the

6    health challenges when they needed me the most.

7            And I have missed out on countless milestones as my

8    children have grown older and have needed more of my support.

9    My time in prison has allowed me to see clearly the simple

10   things that matter the most and I have lost and I will never

11   regain again.  Now all I yearn for today is a world where I can

12   touch the grass again, feel the sunshine on my face, celebrate

13   my children's birthdays, support them with their education, and

14   be able to touch my young boy's hair and tuck him in bed at

15   night.  And a chance to see my parents every day and give them

16   a hug.

17           That is what I wanted to share with you today, your

18   Honor.  Thank you.

19           THE COURT:  Thank you, Mr. Greenwood.

20           In deciding what sentence to impose, in addition to

21   the Sentencing Guidelines, I have considered all the factors

22   set forth at Section 3553(a) of Title 18 United States Code,

23   including as most relevant to Mr. Greenwood, the nature and

24   circumstances of the offense and his history and

25   characteristics.  I have considered the need for the sentence

1   imposed to reflect the seriousness of the offense, to promote

2   respect for the law, to provide just punishment, to afford

3   adequate deterrence to criminal conduct, to protect the public

4   from further crimes, and to provide Mr. Greenwood with needed

5   medical care in the most effective manner.

6          I have considered the need to avoid unwarranted

7   sentence disparities among similarly situated defendants and

8   the need to provide restitution to any victims of the offense.

9   I having considered all of these factors.

10         It is my intention to impose a sentence of 240 months

11  on each count of conviction to be served concurrently.  That

12  will not be followed by a period of supervised release due to

13  the certainty of Mr. Greenwood's deportation at the conclusion

14  of his prison term.

15         I will not impose a fine as I find that Mr. Greenwood

16  will not be able to pay a fine due to the other financial

17  aspects of the sentence.

18         I will impose the mandatory special assessment of $100

19  on each count of conviction for a total of $300.

20         And I order forfeiture in the amount of $300 million.

21         I believe that this sentence is sufficient but not

22  greater than necessary to comply with the purposes of

23  sentencing for the following reasons:

24         It's actually quite difficult for one to wrap his arms

25  around this crime.  It has been described nefariously as the

1    largest international fraud known at least to this district.

2    It is massive in many respects.  It is international in scope.

3    It involved more than 3 million victims worldwide who were

4    defrauded out of more than $4 billion.  And yet, at base, it

5    involved nothing more than old-school snake oil.  The entire

6    OneCoin enterprise was a fraud from the beginning, as

7    Mr. Greenwood has acknowledged.  It was never a coin.  There

8    was never a blockchain.  There was never a market.  There was

9    never a chance that it could be traded for fiat currency.

10   There was never a chance that any victim would make any money

11   except through the mechanism of a garden-variety pyramid scheme

12   whereby the early participants are able to get some money, but

13   none for the victims that follow.  And, importantly, from my

14   perspective, there was never a chance that the victims would

15   even get their investments out because the entire thing was a

16   fraud.

17          There has been talk of the guidelines in this case,

18   and obviously the amounts of money exceed the ability of the

19   guidelines to capture the seriousness of the offense.  And I

20   have in the past, as Ms. Potter indicated, suggested my view

21   that the fraud guidelines to fraud tables perhaps in many cases

22   overstated the seriousness of the offense.  But I don't look at

23   this case and look at the fraud tables alone.  A more important

24   perspective in my view is the sad list of investors, none of

25   whom will get their money back.  And even if this case involved

many millions or hundreds of millions of dollars less, the

offense would not be less egregious. Over three million people

were victimized. And what this case involved was Mr. Greenwood

and his co-conspirator simply putting their hands in the

individuals' pockets, the victims' pockets, and taking it out,

taking out the money that they found in there. And these were

people, many of whom could scarcely afford to lose that money.

Some mention has been made of the Madoff case, and

from my perspective, the way that I differentiate this case

from the Madoff case is that in the Madoff case -- and, by the

way, I never heard the name Bernie Madoff before he was

arrested, and that was because Bernie Madoff only dealt with

individuals who had tens of millions, if not billions, of

dollars who could invest, individuals who could afford to

invest money. The victims involved in this case would never

have been targeted by Mr. Madoff. They were too small. In

contrast, they were not too small for Mr. Greenwood and his

co-conspirators. They were precisely the people that they

targeted.

As Mr. Folly indicated, there is indeed evidence in

the record of this case, an email on September 11, 2016 between

Mr. Greenwood and Konstantin Ignatov, who is Ruja's brother, in

which Mr. Greenwood referred to the OneCoin investors as

idiots. And Mr. Ignatov responded, "Well as you told me, the

network would not work with intelligent people." So there is

in that email not only an evident disdain on the part of

Mr. Greenwood and his co-conspirators towards their victims but

a frank acknowledgment that they were aware that the victims

were unsophisticated and therefore easy marks.

Mr. Greenwood, and at least certain of his

co-conspirators, profited immensely and used their ill-gotten

funds to live lavishly.  It is no wonder therefore that in

another email from January 2015 with Ms. Ruja Ignatova,

Mr. Greenwood wrote, "I will not stop and nobody can try to

stop me.  I will fight day and night to generate a worldwide

audience who loves the Cryptoqueen and OneCoin."

Now, Mr. Greenwood, of course, is a person who knew

better.  He didn't need to live a life of crime, and nothing

that is before me suggests that there was any need for him to

engage in this conduct.  I have read carefully the letters

submitted on his behalf.  He was actually granted a charmed

life by his parents.  He grew up in a happy home.  He was well

taken care of.  He was educated.  He had mentors and older

adults who took care of him.  In fact, his parents were able to

send him to school abroad from his native Sweden.  After

graduation, he held important jobs with established financial

institutions.  As he indicated himself, he was a member of his

church and active in his church and drew great solace from his

religion.  He was married with two healthy children.  He

appears by all sources to be a very good father.  And I do not

1    doubt the sincerity of the many letters that were submitted on

2    his behalf, nor do I doubt Mr. Greenwood's capacity to inspire

3    the love and admiration of those who support him.  But he

4    didn't have to do any of this, and it is still a mystery as I

5    sit here today at this moment why he turned from someone who

6    had so much and who needed nothing to turn to a scheme that

7    took everything from people who could not afford to give it.

8            Now, while a substantial sentence of incarceration is

9    compelled in this case, there are at least two substantial

10   reasons to grant Mr. Greenwood some measure of lenity.  First,

11   of course, he was arrested in Thailand and spent some time in a

12   prison there under what could only charitably be referred to as

13   horrific conditions.  And once he was transferred to the United

14   States, he has been held at the MCC and then the MDC here in

15   New York.  As the parties are aware, he was held there during

16   the COVID-19 pandemic, and the conditions in those prisons

17   during that time were incredibly difficult.  While some of my

18   colleagues have suggested that it is appropriate to ascribe

19   some numerical value to the relative harshness of being

20   confined to those institutions during that period, I do not

21   think I need to do that, but I appreciate that the Court should

22   absolutely take into consideration the conditions of

23   confinement because no matter how guilty a person may be, no

24   one deserves to live in subhuman conditions.

25            With respect to deterrence, although I acknowledge

1   that perhaps with respect to Mr. Greenwood, personal deterrence

2   is not a particularly strong factor in this case, general

3   deterrence is, and this is a case where, you know, sometimes

4   when we impose sentence and talk about general deterrence, it's

5   an amorphous term or an amorphous concept, but people have been

6   following this case.  It has been the subject of a great deal

7   of interest.  There are, I'm sure as there always are, any

8   number of individuals or organizations or entities that are

9   looking to replicate the success that Mr. Greenwood and

10  Ms. Ignatova enjoyed over a number of years, and it is

11  important, therefore, I believe for that reason as well, to

12  impose with respect to general deterrence a substantial period

13  of incarceration.

14          And in this case, punishment is one of the factors

15  that I can and need to take into consideration, and this is

16  conduct that cries out for a level of punishment.  And I also

17  acknowledge that incarceration will be different for Mr.

18  Greenwood than it is perhaps for other non-foreign inmates.

19  However, on balance, there needs to be a substantial period of

20  incarceration.  And in imposing this sentence, I do not suppose

21  that Mr. Greenwood is as evil as the conduct he admitted to

22  suggests, nor as saintly as his loved ones imagine.  I look at

23  the conduct, the entirety of the conduct and the entirety of

24  his life, and come to a conclusion that I believe to be fair

25  and just.  I would note as well Mr. Greenwood's acknowledgment

1    that he had no excuse.

2           And with that, does counsel know of any legal reason

3    other than what has already been stated why the sentence should

4    not be imposed as I've indicated?

5           Mr. Folly?

6           MR. FOLLY:  No, your Honor.

7           THE COURT:  Ms. Potter?

8           MS. POTTER:  Your Honor, we believe the sentence

9    imposed is excessive, but we also -- and we preserve, I should

10   say, our prior legal arguments.

11          THE COURT:  Very well.

12          In that event, it is the judgment of the Court that

13   Mr. Greenwood be sentenced to 240 months on each count of

14   conviction all to be served concurrently.  That will not be

15   followed by a term of supervised release due to the certainty

16   of his deportation on each count.

17          He is, however, ordered to pay the mandatory special

18   assessment of $300, which shall be due immediately.  And I will

19   enter the forfeiture order that has been submitted by the

20   government in the amount of $300 million.

21          Are there any open counts, Mr. Folly?

22          MR. FOLLY:  Yes, your Honor.  The government moves to

23   dismiss all underlying indictments.

24          THE COURT:  That application is granted.

25          That constitutes the sentence of the Court.

1          Mr. Greenwood, you have an absolute right to appeal

2     this sentence.  However, the time within which you have to

3     perfect that appeal is fairly limited.  So, Mr. Weddle,

4     Ms. Potter, Mr. Faridi, will you assure me that you will

5     promptly and thoroughly discuss with Mr. Greenwood his rights

6     to appeal?

7               MS. POTTER:  Yes, your Honor.

8               THE COURT:  Any other applications, Ms. Potter?

9               MS. POTTER:  No, your Honor.

10              THE COURT:  In that event, we are adjourned.

11              Mr. Greenwood, good luck to you, sir.

12              (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25